FILED

JAN 14 2025

U.S. BANKRUPTCY COURT
BY _EL_ DEPUTY

UNITED STATES BANKRUPTCY COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

In re                                    )
                                         )
FRANCIS MCQUEEN ROZELLE, JR.             )      LEAD CASE NO. 14-51480-K
                                         )
CLARITA SOMMERS JOHNSON                  )      SECOND CASE NO. 14-51484-K
                                         )
                                         )      JOINTLY ADMINSTERED
                                         )      AT CASE NO. 14-51480

JOHN PATRICK LOWE                        )
PLAINTIFF                                )
           V                             )      ADV. PROC. 24-05022
   F M PETE ROZELLE JR                   )
CLARITA SOMMERS JOHNSON                  )

**THIRD AMENDED / SUPPLEMENTAL RESPONSE OF CLARITA JOHNSON AND PETE ROZELLE JR.  TO THE TRUSTEE'S ADVERSARY COMPLAINT SEEKING DECLARATORY JUDGMENT, CHANNELING INJUNCTION, AND RELATED RELIEF**
**And**
**MOTION TO REFER THE CASE TO THE US ATTORNEY'S OFFICE FOR FULL INVESTIGATION**
**And**
**MOTION TO STAY THE PROCEEDINGS UNTIL THAT INVESTIGATION IS COMPLETE**
**And**
**MOTION TO RECUSE JUDGE RONALD B KING FROM THE CASE**
**And**
**MOTION TO WITHDRAW THE REFERENCE ASSIGNING THE CASE TO CHIEF JUSTICE ALIA MOSES OF THE WESTERN DISTRICT OF TEXAS**
**And**
**MOTION FOR JUSTICE ALIA MOSES TO REFER THE ACTIONS OF THE ATTORNEYS INVOLVED IN THE PRICE FIXING AND BID RIGGING SCHEME TO THE TEXAS STATE BAR AND FIFTH CIRCUIT JUDICIAL COUNCIL**

The court(s) are requested to take judicial notice of the following exhibits on file and attached to the debtors' **FIRST AMENDED / SUPPLEMENTAL RESPONSE OF CLARITA JOHNSON AND PETE ROZELLE JR.  TO THE TRUSTEE'S ADVERSARY COMPLAINT SEEKING DECLARATORY JUDGMENT, CHANNELING INJUNCTION, AND RELATED RELIEF (ecf 24-05022 Document 14):**

24-05022 Doc. 14 Exhibit A – 12/18/23 Graves Dougherty letter
24-05022 Doc. 14 Exhibit B – Appellate brief v trustee's accountant (140 pages)
24-05022 Doc. 14 Exhibit C – Reply brief v trustee's accountant (94 pages)

Aside from the above, all "ecf" references (CM/ECF – Case Management/Electronic Case Files) unless otherwise identified, relate to the jointly administered Johnson Rozelle bankruptcy case 14-51480rbk and 11-53132rbk.  The debtors are thereby requesting that judicial notice be taken of the entire record and debtors' appeals of King's orders on which the trustee and Graves Dougherty base their frivolous and blatantly bad faith complaint.  For judge King to now give any credit to the trustees frivolous complaint, in which the trustee and Graves Dougherty are attempting to 'spin' the trustee's fraud into a finding by judge king that the debtors have acted in bad faith for exposing the corruption in judge Kings Court, will require Judge King to yet again turn a blind eye to all the facts and evidence in the case.

In fact, debtors prior lawyer Ron Smeberg, who filed pleadings, motions and appeals alerting Judge King and the district court to the fraud and corruption in the sale of the $50,000,000 Johnson Rozelle bankruptcy estate property for $20.3 million in the trustee's price-fixing and bid-rigging scheme, testified before judge King in 2016 that there was obviously a good faith basis for alleging fraud in the sale process **(ecf 782@18-19)**

At a sanctions hearing of June 27, 2016 Rozelle brought Smeberg to the stand and had him sworn in, and requested the court take judicial notice of the testimony regarding the good faith nature of alleging fraud in pleadings and Appellate briefs.  Asked if he believed there was a good faith basis for claiming fraud in the sale process,  Smeberg's testimony was as follows:

**Rozelle:  Mr. Smeberg, do you find that there is any bad faith in any filing on the Debtors' behalf that -- that the sale was not conducted in good faith?**

**Smeberg: Okay. To answer that question -- I -- I haven't read the pleadings that are currently on file for sanctions, so... But if -- if Mr. Rozelle is asking about our original appeal filings, I believe all the original appeal filings were done in good faith. I believe there was a basis for them to be made, and -- which are outlined in the appeals that we filed. Does that answer your question?**

**Rozelle: This is a little bit different than we just discussed, and I'm not sure exactly how it goes into attorney/client privilege. But I guess, basically, do you feel it's acting in bad faith for the Debtors in this case to allege that there were improprieties and fraud in the process of the sale?**

**Smeberg:  Based on the information we placed into the appeal regarding the hiring of Mr. Busby, I do not believe that making those allegations would be made in bad faith. (ecf 782@18-19)**

King nonetheless granted motions for sanctions against the debtors for filing pleadings exposing the price-fixing and bid-rigging scheme, as he will continually do despite any and all evidence, apparently to protect the trustee, himself, the other co-conspirators and close colleagues for decades, and of course, the $30,000,000 skim from the sale, and future development income from the development of the property.

§

Just for starters, the trustee's complaint against the debtors is frivolous and filed in bad faith.  It's based on the faulty premise that neither trustee john Patrick Lowe nor any of his professionals have committed any misconduct or breaches of fiduciary duty, and that the debtors have acted in bad faith for exposing the corruption on the record and to Federal authorities.  It's all about retaliation.  Any reasonable due diligence on the part of the trustee or the trustee's new lawyers as required by Rule 11 – such as reading the debtors' pleadings and the transcripts on the record, and the Appellate briefs of the debtors they were sent (see Document 14 attachments B and C).  The evidence on the record clearly

indicates that the complaint is filed with full knowledge that trustee john Patrick Lowe, in conspiracy with his professionals and others involved in the price-fixing and bid-rigging scheme, has lost any bankruptcy quasi-immunity for taking actions outside their scope of official duties and outside their authority. The trustee has clearly committed bankruptcy crimes and willfully, knowingly and intentionally defrauded the Johnson Rozelle bankruptcy estates with the price-fixing and bid-rigging scheme. It constitutes a gross negligence, willful misconduct and deliberate violations of his fiduciary duties, and therefore voids any immunity from civil and criminal liability.

The complaint is nothing more than the latest clear indication that they fully expect judge King to make a finding that there was "not any hint of impropriety" on the part of the trustee, and his professionals, which will be a yet another void order made in reckless disregard for the truth, facts and evidence by a judge continuing to act in clear violation of 28 USC § 455.

§

In summary, the trustee specifically hired perhaps the only broker willing to perpetrate fraud on the court in furtherance of the scheme, Walt Busby, the longtime partner and broker of the noteholder and predetermined purchaser in the scheme. Furthermore, the trustee admittedly hired Busby at the request of the noteholder Stratford Land fund and the predetermined purchaser in the scheme, Steve Sanders of Stratford land fund. Busby was specifically imbedded in the sale process to steer the property to Sanders and front man purchaser Robert Schumacher – Busby's later discovered partners in the scheme - while keeping Sanders hidden in the shadows to hide the conspiracy- going so far in fact as to have Busby claim he had cut ties with Sanders and Stratford in furtherance of concealing the conspiracy. It would later be discovered by the UST that Sanders was financially supporting the trustee's broker Busby, and that Sanders was even secretly acting as a co-broker with Busby for the trustee john Patrick Lowe in the corrupted sale of the Johnson Rozelle bankruptcy estate property to Sanders, and therefore Sanders split the $820,000 sales commission with Busby. Who could've seen this coming? Try not just the debtors and a creditor who filed objections to Busby's retention, but EVERYONE in the real estate market who watched the scheme unravel in newspaper articles following the high profile case.

Judge King approved Busby on the trustee's ridiculous assertion that Busby's longtime association with Steve Sanders and noteholder Stratford, who

obviously held an adverse interest for their attempts to engineer a foreclosure on the property, another disqualifying conflicts of interest "were an advantage". At the same time the trustee had Busby testify he had no more conflicts because he had 'just so happened to have' cut all ties with his longtime partners noteholder Stratford and Sanders *at the same time* that the trustee and the Sanders secretly met in Austin Texas immediately upon the trustee being appointed, and decided Busby would be the trustee's broker- and even though Busby's brokerage signs remained on Stratford Properties throughout the bankruptcy, signaling that he was still representing interests adverse to the bankruptcy estate[1] and Busby refused to remove them.  Busby's apparent job was not to actually market the property, as he brought no offers, but to lie on behalf of trustee john Patrick Lowe and Sanders regarding his conflicts of interest with Sanders and Stratford.

Then, through the trustee's counsel Pat Autry of Branscomb PC, Busby would give clearly coached and coordinated false testimony under direct questioning by Autry regarding entitlements on the property in an effort to artificially downplay the value of the $50,000,000 property to falsely justify the fixed $20,000,000 sales price.  This was aided and abetted by judge Kings falsified findings of fact at the beginning of the case, including a finding that an appraisal done for Steve Sanders of $15,000,000 - $17,000,000 for the entire property – the predetermined purchaser specifically kept in the shadows  - was more realistic than the testimony and appraisals of as high as $52,000,000 that king had just heard before making such a finding.  In fact, king had just heard testimony from MAI appraiser Chris Griesbach that just the front 25 acres alone of the 114 acre tract was valued at $18,000,000 as is.

On top of that, Sanders himself had just given false testimony regarding his efforts on the part of Stratford interfering with the debtors' brokers and sales to throw them into bankruptcy or foreclosure.  Sanders then disrupted the courtroom proceedings by yelling at Rozelle from the bleachers as Rozelle was testifying to emails from brokers regarding Sanders and Stratford's interference with their brokers.  It clearly appeared to be an attempt to either intimidate the witness or perhaps try to impress the witness (or perhaps Sanders was attempting to impress himself) as if he were in a special position to influence the judge.  King was first perturbed by the outburst and requested Sanders leave the courtroom – until he realized it was Steve Sanders of the almighty billion dollar Stratford and

---

[1] Stratford, the loan-to-own noteholder purchased the non performing note specifically to foreclose, and had Sanders interfere with the debtors sales to throw them into foreclosure/bankruptcy, then filed a motion to lift the stay – obviously an adverse interest.

predetermined purchaser in what was clearly a price-fixing and bid-rigging scheme already in place.  Upon Stratford lawyer Jim Hoffman relaying that it was Steve Sanders of Stratford, judge King immediately turned 180° (a common theme) and apologized to Mr. Sanders for requesting he leave the courtroom, and suspiciously becoming over accommodating and even submissive to Mr. Sanders **(ecf 111@132-133)**.  In fact, judge King's response clearly appears to be against the judicial Canons of Ethics:

> **Canon 2(B): Outside Influence. The judge should not allow family, social, political, financial, or other relationships to influence judicial conduct or judgment. A judge should neither lend the prestige of the judicial office to advance the private interests of the judge or others nor convey or permit others to convey the impression that they are in a special position to influence the judge.**

   This was the first real red flag of the case, as the only apparent reason Sanders of the $Billion noteholder Stratford could have possibly felt so confident disrupting court room proceedings in such a manner had to be the fact that he was backed by $Billion noteholder Stratford.  It clearly appeared that the $Billion part of the equation is what influenced the judge into turning 180° , almost groveling in apologies to an embarrassing extent, which clearly appeared to permit Sanders to convey the impression that he was in a special position to influence the judge.  It is believed that Sanders was already known to be the 'winner' in the bid rigging scheme that influenced Judge King to begin making a series of falsified findings of fact the following day including that Sanders' valuation of the property was more realistic than the numerous credible appraisals that rendered the Sanders appraisal but another red flag of price fixing and bid rigging schemes.
   Under later cross examination, Busby would admit that the coached and rehearsed testimony on behalf of the trustee was false, and get caught red handed in numerous other instances of perjured testimony regarding his 'cutting ties' with Sanders and Stratford, even lying repeatedly in the same hearing  that he was so disconnected with Stratford and Sanders that the telephone number on his brokerage sign on Stratford Properties had been long disconnected – only to then change his testimony when confronted with the fact that Rozelle had called the number on the sign just during the lunch break and spoke to someone on the other end who spoke on behalf of Mr. Busby.  Obviously Judge King and

bankruptcy trustee john Patrick Lowe were made unavoidably aware of Busby's repeated fraud on the court, but knowingly turned a blind eye and still promoted Busby as a disinterested party, even approving his $820,000 commission even though he brought no offers, admitted he took a targeted approach to 'marketing' for only two weeks, and his target was his partners Steve Sanders and Robert Schumacher.

Judge King and the trustee would learn from other attorney's sworn affidavit immediately following the sale and before the close of the property that Busby had lied in his testimony about cutting ties with Stratford and Sanders– the predetermined purchaser and noteholder in the scheme.  Again, the bankruptcy judge and bankruptcy trustee knowingly and willfully ignored the evidence.  Busby had lied about his disclosures and now the trustee and judge King knew it but remained silent about it in the same manner that Judge David Jones remained silent about the non-disclosures that led to his Fifth Circuit complaint, resignation from the bench and being sued for racketeering.

It is absolutely frivolous and in fact preposterous that the trustee and his law firm Graves Dougherty blame the debtors for putting facts and evidence of the trustees price-fixing and bid-rigging scheme on the record, and then blame the debtors for filing objections appeals to judge king's continually granting fee applications for the lawyers involved in the scheme.  In similar fashion, the Jackson Walker law firm has labeled as frivolous the efforts of the United States Trustee clawing back some $23,000,000 in fees based on the now disgraced former bankruptcy Judge David Jones of the southern district of Texas giving favorable rulings without making the disclosure of his connections to the Jackson Walker law firm.  The case involving judge king and trustee john Patrick Lowe goes way beyond the nondisclosure that judge King was giving favorable rulings to his former law firm Langley and Banack without disclosing the connection to the law firm, while the law firm committed egregious fraud on the court regarding their clients conspiracy and collusion in the sale, and as well, their clients being represented by another former Langley and Banack lawyer that acted as King's protégé while both were at the firm.  Obviously King making clearly falsified findings of fact and conclusions, ignoring all of his colleagues fraud on the court, and willfully ignoring other non-disclosures such as the fact that the purchaser in the scheme was discovered to have been secretly acting as a broker for the trustee and splitting the commission with Busby , clearly makes the Judge David Jones case look mild in comparison.

The facts and evidence contained within this report/response to complaint - and littered throughout the docket  - would clearly lead a reasonable and objective observer apprised of the facts and evidence to conclude at the very least that judge King's impartiality – and complicity in the scheme – as well as the trustees clear willful, intentional and knowing breaches of fiduciary duties -could reasonably be questioned and in fact, find that there's no reasonable doubt that the trustee and bankruptcy judge aided, abetted and facilitated the scheme by using the bankruptcy court as a backdrop and thin veneer of legitimacy while at the same time continually defaming the debtors for blowing the whistle.

As the UST is attempting to clawback some $23,000,000 in fees procured by a nondisclosure, the UST should be attempting to clawback all of the fees incurred in the corrupted sale of the Johnson Rozelle bankruptcy estate property and claw back the sale itself.  At the very least, it's definitely not frivolous for the debtors to object and appeal the 'fees for fraud' that were incurred perpetrating the fraud scheme, and even more absurd that now the trustee and Graves Dougherty are requesting a minimum of $200,000 more from the bankruptcy estates the trustee victimized as a defense fund against any future litigation.

The fact that the trustee and his new counsel Graves Dougherty is requesting and obviously expecting Judge King to make another falsified finding that the trustee is not liable parallels Judge King prior findings that that there was "not a hint of impropriety"  on April 21, 2015 in an attempt to cover up for the fact that judge King's closest and oldest colleagues at his former law firm, Langley and Banack, including a former bankruptcy judge and at least one former judicial clerks of King's. Along with their client Robert Schumacher, the lawyers were caught red handed committing egregious fraud on the court by falsely testifying at the sale hearing of March 26, 2015.  It was for the sole purpose of attempting to cover up a $30,000,000 fraud scheme with a blatantly falsified findings of fact in willful, knowing, intentional and reckless disregard of the truth, facts and evidence put before the court.  It was, in fact, a reckless disregard for not just the appearance of impropriety, but the impropriety itself.  If they thought it would cover up the fraud scheme, they would have King make a finding that 2 + 2 = 7, and then follow up with a finding that any objection to the ruling would be frivolous and worthy of sanctions.  It's effectively what is happening here with the trustee's complaint, and what has happened throughout the entire case. Whether or not the debtors filed the truth on the record or explain the truth and evidence in hearings – or even attended hearings and all  - was and is of no consequence .

At this March 26, 2015 sale hearing, the debtors had asked for a ruling on their motion to postpone or continue the hearing since their prior attorney had suspiciously abandoned them just prior to the sale and after suggesting they contact the FBI to report what was clearly evidence prior to the sale of a price-fixing and bid-rigging scheme to a Stratford insider.  King refused, and informed the debtors that having an attorney at the hearing would make no difference. King then heard lawyers from Langley and Banack, King's former firm, and their client Robert Schumacher give intentionally fraudulent testimony designed to hide the conspiracy between the trustee, the purchasers and the noteholder through the trustee's broker Walt Busby – who was hired as a conduit and 'cover' for the conspiracy between buyers, and conspiracy between the buyers and the trustee as seller.  At the sale hearing, the lawyers from Langley and Banack[2] and their client, front man purchaser Robert Schumacher all testified that Robert Schumacher had not had any contact whatsoever with anyone at noteholder Stratford.  Again, this was designed to hide the conspiracy between the trustee, Busby, Sanders and front man purchaser Robert Schumacher.  Only when the title company discovered that Steve Sanders of Stratford was involved in the purchase and the general partner with Robert Schumacher, did the house of cards begin to fall.  The title company refused to give a clean title policy to the clearly tainted and corrupted collusive sale.

As the trustee admitted under cross examination at a later 2016 hearing, with judge King's *ex parte* participation, they concocted a cover-up story following the sale hearing that Sanders only became involved with Schumacher *after* the March 26, 2015 sale hearing.  It was also false and clearly an attempt to cover up the conspiracy and collusion in the sale, and thereby compounded their problems

---

[2] Including former bankruptcy judge Glen Ayres, who reportedly encouraged judge king to replace him on the bench after Ayres resigned after only three years.  It is believed Ayres' as well as other Langley and Banack lawyers acted as mentors to judge King, with whom he still maintains close personal relationships.  At least one of the Langley and Banack lawyers, Alan DeBard, is a former judicial clerk of judge Kings also billed Schumacher on behalf of the firm regarding the trustee's price fixing and bid rigging case.  King's former law firm is full of mentors and mentees of judge King's, which of course was never disclosed in the same manner that the now disgraced former bankruptcy Judge David Jones never disclosed his relationship with his former clerk at Jackson Walker, which led to favorable rulings, the UST clawing back some $23,000,000 in fees, a racketeering case against Jones and an FBI investigation.  Also undisclosed in the Johnson Rozelle case was the fact that along with Walt Busby, Steve Sanders was secretly acting as the trustee's broker in the sale to himself, his partner Robert Schumacher and Walt Busby.  However, everyone's remaining silent including the UST even though the debtors have placed the evidence on the record and explained it in court proceedings.

with the blatant cover-up, which was clear evidence of intent.  Nonetheless, they decided to have a re-hearing in order to get a finding from judge King that there was "not any can't of impropriety in the sale" to give the false impression that Sanders and Schumacher were good faith purchasers for value in an arms length transaction.  This falsified finding, they believed, would fool or 'provide cover' for the title company to give a clean title policy to the trustees 'dirty hands' sale.  It was a stupid plan, but apparently the best stupid plan they could think of.

At their re- hearing of April 21, 2015, debtors Johnson and Rozelle again requested a continuance until they could find an attorney, especially since even the newspaper had reported to the public at large and that the debtors allegations and warnings to the court of an insider trading scheme between the purchaser a Stratford insider had been validated.  Consequently, the stigma on the bankruptcy court and its orders approving the sale were also known to the public at large.  King again denied the motion for a continuance, as apparently the last thing wanted was anyone cross examining the witnesses, and no one did.  Rozelle also requested of that the court have a second sale but with a legitimate trustee, legitimate brokers rather than a Stratford insider like the trustee's broker and Sanders' longtime partner Walt Busby.  Rozelle requested a sale of the property to legitimate good faith purchasers for a competitive price.  Judge King refused.

Judge king heard testimony from both Sanders and Schumacher that Schumacher had in fact had contact with not only Steve Sanders of Stratford via phone, e-mail and at least one in-person meeting prior to the March 26, 2015 sale hearing, even as far back as 2014, but also that Schumacher had even contacted at least one Stratford lawyer as well.  They were clearly admitting in the April 21, 2015 hearing that the testimony of Robert Schumacher and his Langley and Banack attorneys David Gragg and former bankruptcy judge Glen Ayres was 100% false and egregious fraud on the court.  Interestingly, they had previously testified that Schumacher had not been previously represented by counsel prior to Langley and Banack, but evidence surfaced that king's former partner at Langley and Banack and still close personal friend, bankruptcy lawyer Bill Kingman, with his own nefarious past with the case, represented Robert Schumacher.  It clearly appeared that the fraud on the court was to hide the conspiracy tying Judge King to the fraud.

 Apparently the thought process of this ridiculous cover-up scheme was to portray this testimony has voluntary and upfront 'full disclosure'.  But the problem, of course, is the fact that they were only admitting to this contact *after*

getting caught in their lies to the court, and after the title company refused to give a clean title policy for the fraud on the court.  The motive was clearly not to come clean, but to complete their scheme with a clean title policy and the perpetrators closing on the property.  It's not clear who they thought they were fooling, or if in fact they really thought they were fooling anyone, or even needed to.  Apparently a main point was to make judge King aware of the fraudulent testimony and get his approval of it so that it could not be challenged later as new undisclosed evidence.  What it did, in effect, was simply make judge king complicit in the scheme and its cover-up by simply ignoring the fraud on the court and painting it as appropriate behavior in his court.

This contradicting testimony clearly proved up *by the co-conspirators own testimony* that the sale hearing was fraught with egregious and blatant fraud on the court by the officers of the court and the purchasers – a blatant fraud scheme and attempted cover-up that in any reputable court of law would render the purchasers bad faith status and the sale to the bad faith purchasers a fraudulent conveyance procured by fraud on the court.  It also announced a judicial misconduct, bias and prejudice on the part of the judge, especially when King made a finding that the clear, convincing and indisputable evidence of fraud, collusion and fraud on the court was evidence of good faith "without any hint of impropriety".

This in itself was a clear appearance of impropriety on the part of the judge, and appears to have been an effort to not just clear the name of all of those involved in the trustee's corrupted sale, but the clear appearances of impropriety on the part of judge King himself throughout the proceedings, as the trustee and his broker Walt Busby had clearly committed fraud on the court throughout the proceedings under the watchful but intentionally blind and complicit eye of Judge King.

It didn't fool the title company at all, and now virtually no title company anywhere would issue a clean title policy for the blatant conspiracy between the trustee, his professionals and the purchasers and their lawyers full of dirty hands.  The debtors filed an appeal to the corrupted sale, and without a clean title policy, Sanders and Schumacher refused to close.  Furthermore, the straw bidder that attended the sale hearing refused to step up and take the property as the backup bidder when Sanders and Schumacher defaulted, clearly indicating he was never meant to.  Instead, the trustee kept extending the contract with the bad faith purchasers with king's approval.  It was a 'squeeze play' knowing that the debtors'

interest on the note was continually compounding at $4400 per day to none other than Stratford.

Rather than holding a second sale with a legitimate trustee and legitimate broker to good faith purchasers for value in an arms length transaction, the trustee with the court's approval felt they could instead use this depletion of the value of the bankruptcy estates as leverage to extort from the victims of the scheme a stipulation agreement stating that the sale was done in good faith and agreeing to dropping their appeal. According to the debtors' counsel at the time, Ron Smeberg, who had filed the appeal to the sale, and initially filing other motions outlining the deception in the sale process, the trustee and judge King were willing to pressure the debtors by depleting their bankruptcy estates rather than hold a legitimate sale, and judge King was threatening to lift the stay if the debtors didn't sign such an agreement. Clearly this extortion on top of the price-fixing and bid-rigging scheme is breach of fiduciary duty on the part of the trustee, and seriously calls into question the participation of Judge King to keep approving all this.

Prior to a ruling from the Appellate Court on the corrupted sale, Judge King did in fact lift the stay on December 14, 2015 just as Smeberg had warned he was threatening to do. However, after lifting the stay, King did give the debtors two weeks to sign the agreement, which they did under duress, as King was essentially telling them to accept the corrupted sale price of $20.3 million for the $50,000,000 property to bad faith purchasers involved in the trustee's price-fixing and bid-rigging scheme and conspiracy to defraud the bankruptcy estates – or take nothing at all.

It's the very same threat that the trustee levied against the debtors back on September 25, 2014 when the trustee and his counsel Pat Autry of Branscomb PC showed the debtors a $20,000,000 offer from the very same bankruptcy lawyer/broker team and their straw bidder. It was clearly used as a ploy and prop, as the trustee had procured the offer on September 23, 2014 and expired on September 26, 2014, and used just for this meeting which was called for by the trustee to be held specifically in the official offices of the United States trustee. Improperly using the offices of the United States trustee for the meeting, and implying that the trustee was speaking officially on behalf of the UST, the trustee assured of the debtors that it was the highest offer they could expect[3] from a sale of their $50,000,000 property[4], and also warned that judge King could lift the stay

---

[3] The broker had yet to be even hired to market the property for the trustee
[4] See appraisals and appraiser testimony herein

at any time if he didn't see any movement.  It was virtually the same threat – accept $20,000,000 or risk taking nothing at all.  According to Smeberg, it's a common tactic used amongst bankruptcy lawyers looking for a self- dealing bargain on bankruptcy estate assets.

From this point on, and as explained in more detail herein, every time the debtors brought forth more evidence of fraud in the sale process, including even newspaper articles wherein the new partners on the property Steve Sanders, Robert Schumacher and the trustee's broker Walt Busby provided public quotes that completely contradicted their sworn testimony regarding even their failed cover-up story, Judge King and the trustee completely ignore the new evidence of the price-fixing and bid-rigging scheme, while at the same time Judge King continues his disparaging and defamatory remarks about the debtors being nothing more than conspiracy theorists for bringing the evidence forward and filing it on the record.  At the same time, he has continued to sanction the debtors $239,000 for bringing forth new evidence of fraud in the price fixing and bid rigging scheme as sanctions for Sanders and Schumacher, who King portrayed as just "shrewd businessmen attempting to make a living for their families".

It can't be overlooked that judge King heard testimony from Robert Schumacher and his lawyers at Langley and Banack on March 26, 2015 that he had never had any contact with anyone at Stratford, which would include Steve Sanders.  Again, the point was to falsely portray Robert Schumacher as a complete 'outsider', that simply walked into court from the streets and was able to bid and purchase the property as though it were the free and open sales process – as in not fixed.  It was also to falsely portray Schumacher as a complete 'outsider' to Stratford, Sanders, Walt Busby and trustee john Patrick Lowe to hide the collusion and conspiracy between them, and deflect attention away from the 'insider' nature of the conspiracy between them and the insiders of the inner circle bankruptcy racketeering ring closest to judge King, like the lawyers of Langley and Banack, King's former law firm and mentors representing Schumacher.

It bears repeating that the 'outsider' charade blew up in their face on April 21, 2015 when King then heard Robert Schumacher testify in a subsequent hearing that he had in fact had numerous communications and meetings with Stratford's Steve Sanders and Stratford lawyers.  It proved conclusively that Schumacher's of March 26, 2016 was all a lie This was their worst nightmare because even the newspapers had reported rows else testimony that the trustee's scheme was to sell the property for as cheap as possible to an insider to

Stratford, and in the newspapers reminded readers again of Rozelles prior allegations and that they became proven true.

However, knowing and ignoring all the fraud on the court, in a later hearing of June 1, 2016, judge King *still* defended and protected the multimillionaire developer as if King were stitched squarely in Schumacher's pocket like Clarence Thomas would likely defend his billionaire developer Harlan Crow[5].  described Robert Schumacher as an outsider as an excuse to then sanction the debtors $239,000 for filing a Rule 60 motion and required *lis pendens* with new evidence of even Busby, Sanders and Schumacher making public statements in a headline news article that even contradicted their sworn testimony and cover-up story. King told Rozelle:

> **"We had a case many, many years ago where a ranch got sold in another county near San Antonio, and a gentleman came in that was not a creditor. He was not a debtor. He was just someone looking to buy a ranch. And so he made an offer and bought this ranch from a bankruptcy estate.**
>
> **And the bankruptcy debtor, I think he was *pro se* at that point, filed an adversary proceeding suing that individual for fraudulent transfer, bad faith, something like that. And that was not a well-taken complaint, an adversary, because the person that was making the offer was not a creditor, had nothing to do with the case. He was just somebody off the street that wanted to buy a ranch. And so I dismissed that adversary proceeding with prejudice."**
>
> **"You've got a 60(b) motion to set aside certain orders**

---

[5] As will become apparent throughout this document, the comparisons are undeniable, as the facts and evidence would clearly lead a reasonable and objective observer apprised of the facts and evidence to draw the same comparison and likely conclude that Judge King would only be willing to ignore the facts and evidence of the fraud on the court and the fraud scheme itself for the private gain of either himself,  his closest colleagues involved in the scheme, or all involved in the fraud scheme.  In white collar crimes circles, the magnitude of the theft of $30,000,000 is known as a 'whale', and as King relayed in the October 7, 2014 **(ecf 438)** trustee compensation hearing, he wasn't bound by an agreement between the UST and career bankruptcy trustee john Patrick Lowe for Lowe to take the lesser of hourly fees or statutory fees from the sale, because 'a case like this doesn't come along every day, and he didn't want to limit the upside potential for Lowe'.  Clearly king didn't want to limit the upside potential two anyone involved in the scheme.  The lower the sale price, the more profit the purchasers and officers of the court facilitating the scheme had to split amongst themselves.

**of the case. And we'll have hearings on those in due course. But, I mean, this buyer was an outside party, not a creditor, not a debtor, just someone that came in with cash to buy this property." (ecf 888@20)**

Obviously King was comparing Schumacher to just some innocent outsider who walked in off the street to buy the property without any connections whatsoever with noteholder Stratford or Steve Sanders or Walt Busby.  Again, this was June 1, 2016 - **AFTER** Schumacher and judge King's buddies at his former law firm Langley and Banack were caught red handed committing fraud on the court by lying about Schumacher's connections to Stratford and Sanders – and therefore Busby and trustee john Patrick Lowe.

This is also AFTER a March 11, 2016 frontpage headline newspaper article about the development of the bankruptcy estate property by Sanders, Busby and Schumacher, with photos of Sanders, Schumacher and Busby, and quoting them making public statements that completely contradicted their sworn testimony at the sale hearing and even the April 21, 2015 cover-up hearing and cover-up story. The debtors had specifically request of the court take judicial notice of the article and its implications and proof of new evidence of fraud on the court in the corrupted sale process.  Judge King and the trustee willfully, knowingly and intentionally ignored it as an apparent means to cover up and intentionally blind themselves from what what the public could now see as a cover-up.

This was clearly judge king knowingly, willfully and intentionally attempting to cover up for the millionaire developer and his fraud scheme, and furthermore, using this as a predicate act for then approving a $239,000 sanction against Johnson and Rozelle for filing the rule 60 Motion with new evidence of the price-fixing and bid-rigging scheme.  And what did judge king use as an excuse?  He brought in none other than the same Glen Ayres and David Gragg as witnesses who had already committed egregious fraud on the court lying about Schumacher's non-disclosed insider relationship with noteholder Stratford and his partners Steve Sanders and Walt Busby.  Their other witness was none other than Steve Sanders, who testified that the $239,000 was an appropriate sanction to pay Langley and Banack legal bills for six months.  Sanders falsely testified he and Schumacher **couldn't** close on the sale for those six months because of the appeal that bankruptcy lawyer Ron Smeberg filed on behalf of the debtors to the corrupted sale.

The hypocrisy, of course, as King well knew, was that for starters, filing appeals to a crooked and corrupt sale is not a sanction of all event.  Furthermore, if the appeals made them choose doing nothing for six months, how did they rack up $239,000 in legal fees.  It was all false testimony because Sanders and Schumacher **could** have closed at any time.  They **chose** not to because the title company refused to give a clean title policy and insure them against litigation for their committing fraud on the court.  If they couldn't get title insurance for lying to the court in furtherance of the price-fixing and bid-rigging scheme, perhaps they shouldn't have lied to the court in furtherance of the price-fixing and bid-rigging scheme, or perpetrated a price-fixing and bid-rigging scheme to begin with.

The billing records received from Langley and Banack – if they can be believed that all -indicate that on April 14, 2015 following the sale, it clearly appears that fidelity insurance decided not to insure Sanders and Schumacher based on the false testimony that Sanders and Schumacher had never had any contact – not any appeals, which the title companies knew would likely be forthcoming prior to the sale, but didn't care, as even the trustee's counsel admitted.  This had to do with the collusion with Sanders and a false testimony.

The Langley and Banack billing entry for April 14, 2015 reads:

**"4/14/15   Discussion with co-counsel on Fidelity decision not to ensure regarding bankruptcy, and on issues regarding Sanders"  (ecf 623)**

Clearly Langley and Banack knew the appeals were not holding up title insurance-it was the undisclosed conspiracy with Steve Sanders that was the "issue".  They didn't simply fail to disclose, they committed fraud on the court to conceal the collusion, and fraud on the court - in any credible bankruptcy court – equates to bad faith.  Bad faith purchasers in § 363 sales are not protected by § 363(m), which moots any appeal to a sale of assets under § 363 to good faith purchasers.

According to the debtors' counsel at the time Ron Smeberg, the trustee and his lawyers at Branscomb PC (Pat Autry and Grady Jolley) were well aware that the appeals didn't create any issue for the title company issuing a clean title policy - it was the fraud on the court that rendered the sale procured by fraud on the

court by bad faith purchasers and their lawyers to be a fraudulent conveyance. Smeberg emailed the debtors as such:

> **"I met with Pat Autry and Grady Jolley today at their office...Jolley admitted to me that the title company was told beforehand there was going to be appeals and appeals were pending and told the trustee they would still write a title policy. I think this will be good..."** (ecf 989-2, exhibit B)

The evidence indicates that a legitimate bankruptcy court would have overturned the sale, removed the trustee and his corrupt professionals, referred the case to the US attorney's office for investigation and had a legitimate sale using non conflicted brokers for fair market price. Instead, King made a finding that the same fraud on the court that caused the title companies to refuse to ensure the sale between the trustee, Sanders and Schumacher "contained no hint of impropriety" in clear and reckless disregard for the truth. When a bankruptcy judge is willing to ignore fraud on the court throughout the bankruptcy proceedings, it calls for his removal. When a bankruptcy judge attempts to paint and mischaracterize the blatant and egregious fraud on the court by officers of the court, including those of his former law firm and closest colleagues in furtherance of an obvious price-fixing and bid-rigging scheme that defrauded bankruptcy estates of some $30,000,000 as not even a hint of impropriety, it calls for an investigation by the FBI and the Fifth Circuit judicial council.

It can only be inferred that the reason the second legitimate sale didn't happen was because the officers of the court perpetrating and approving the scheme had to protect the scheme and its purchasers, as they all had too much on each other to start pointing fingers at each other or breaking up the conspiracy. A fair and legitimate sale would not produce a $30,000,000 skim for those involved in the scheme to split amongst themselves. In a legitimate sale the equity from the sale would go to the bankruptcy estates where it belonged.

Clearly king should have recused himself long ago, when he first made serious misrepresentations about the debtors at the lift stay hearing of August 28, 2014 including clearly false derogatory and defamatory statements about the debtors, their property and in particular Rozelle – apparently as a rationale and justification for the scheme. There should be no doubt in anyone's mind that Judge King has acted outside the jurisdiction by showing bias and prejudice against the debtors demonstrating a willingness to cover up for the fraud scheme

of the purchasers, the trustee, the trustee's broker and judge King's former law firm.  King has clearly been acting in violation of 28 USC § 455 and has disqualified himself from presiding over any case having to do with Johnson and Rozelle file for failing to recuse himself when any reasonable person apprised of the facts, evidence and circumstances would question his impartiality.  King has attempted to cover up for the scheme from the get go.

In 2019, the trustees broker Walt Busby filed his own chapter 7 bankruptcy. In the process, Busby was cornered into unexpected questions regarding the $820,000 sales commission he received in 2016 from trustee john Patrick Lowe on the sale of the Johnson Rozelle bankruptcy estate property.  Only after attempting to dodge the repeated questions about the commission did he admit on two separate occasions that he split the commission with his co-broker in the sale. Only when finally questioned further by the United States trustee to disclose the name of the co-broker did Busby admit in the sworn testimony that his co-broker was none other than his longtime partner and purchaser of the property Steve Sanders – the very same Sanders Busby had testified previously he had cut all ties with in order to work for the trustee.

This is the very reason disclosures for professionals are not merely reviewed for actual conflicts of interest, but also for the potential conflict of interests.  As the debtors alleged at the time King approved Busby over all appearances of impropriety, as the debtors counsel at the time informed the court – especially given that the trustee's counsel promoted Busby on behalf of Steve Sanders, and called the conflicts of interest "an advantage" – it's the reason judges should follow the rules rather than act above the law by ignoring the judicial canons of ethics regarding appearances of impropriety.

Trustee john Patrick Lowe had filed an application to hire Busby despite the fact that Busby was disqualified as a disinterested professional for his long-term partnership with noteholder Stratford and Steve Sanders.  To get around this, the trustee had Busby testify that he had just so happened to have cut all ties with Steve Sanders and Stratford Land fund in order to feign qualifications as a disinterested professional.  In fact, the trustee's lawyers branscum PC actually instructed the court that Busby's conflicts of interest and long-term relationships with Stratford and Sanders "was an advantage".  The debtors counsel at the time informed the court and Judge King the hiring and approving such a conflict and professional as Busby "reeks of impropriety".  King approving Busby was essentially a signal that it was going to be an insider/back door sale agreement – and it was.  It's no surprise to discover that not only had Sanders and Busby not

cut ties, but that Sanders was secretly working as the trustee's broker in the sale to himself, and splitting the commission.

Busby's new 2019 bankruptcy lawyer was none other than the very same Ron Smeberg that had initially filed motions and pleadings and appeals *against* Walt Busby and trustee john Patrick Lowe on behalf of his clients Johnson and Rozelle for their roles in the scheme. As the UST even questioned, there was no waiver of conflicts signed by Busby, and the debtors only found out on their own investigation that Busby had filed for bankruptcy and employed Ron Smeberg as his counsel. Given that Smeberg had initially railed against the corruption and filed documents, pleadings and appeals regarding the corrupted and collusive sale process, it was a red flag when Smeberg had for some reason suspiciously turned 180° after being informed that the UST would not investigate anything to do with trustee john Patrick Lowe.

Smeberg then made several attempts to pressure the debtors into agreements for hard money loans and joint ventures whereby the debtors would agree that the corrupted sale price of $20.3 million represented fair market value, and drafted as though they originate from the debtors themselves. According to Smeberg, the trustee was willing to cancel the sale to Sanders and Schumacher if the debtors were to get a hard money loan or enter into a joint venture agreement that would pay off all creditors, but the documents clearly appeared designed to instead absolve the trustee of his breaches of fiduciary duty in selling the $50,000,000 property for $20.3 million in the price-fixing and bid-rigging scheme.

Apparently the trustee and Smeberg felt if they could con the debtors into agreeing that $20.3 million reflected fair market value for loan or joint venture purposes, and had it documented in black and white from the debtors themselves, it would waive any complaint against that same sale price from the trustees fraudulent scheme. It clearly appeared to the debtors that their lawyer Smeberg was for some reason either threatened or incentivized into now protecting the trustee and his professionals, including Walt Busby, and therefore no surprise to learn that Smeberg had signed on afterwards to be protecting the scheme as Busby's bankruptcy lawyer of record. Smeberg in fact helped Busby conceal in his own bankruptcy Busby's $10,000 - $12,000 per month income/kickback to Sanders and Schumacher until being caught by the UST. Effectively Smeberg is benefiting from the price-fixing and bid-rigging scheme through the money paid to Busby by Sanders and Schumacher, from which Smeberg gets his attorneys fees.

With Smeberg as his bankruptcy lawyer, Busby testified before the UST on several occasions that he split the commission from the sale of the Johnson Rozelle bankruptcy estate property with his co-broker in the sale, and again with his co-broker in the project, and finally admitted under more questioning from the UST that his co-broker was Steve Sanders – his longtime partner whom he claimed he had cut ties with  - who was also the purchaser.  The

So with this 'smoking gun' testimony, the debtors immediately alerted the trustee and his counsel Pat Autry to get a reaction and see how they're going to worm their way out of this one.  The trustee, Autry, and even the UST remained silent, which effectively proves up their intent and failure to act in breach of their duties to maximize and protect the bankruptcy estates, and act as the 'watchdog' over the bankruptcy estates and integrity of the bankruptcy court.

In fact, every time the debtors brought forth new evidence of the trustee's price-fixing and bid-rigging scheme that defrauded the bankruptcy estates he was duty-bound to protect and maximize, everyone – including the district court and fifth circuit - ignored it.  It can be inferred that the only reason that the court heard new evidence following the corrupted sale hearing - evidence proving that the debtors' allegations of a Stratford insider being set up as a purchaser at a price $30,000,000 below fair market and appraised values was in fact correct, was to aid and abet those involved in the scheme with a cover-up story, and that was only to obtain a clean title policy.  It has to be remembered that it was the title company that refused to give a clean title policy for the fraud on the court, as even the trustee's counsel admitted that appeals were not a problem for the title company, because good faith purchasers are protected from appeals by § 363(m).  The reason the trustee and the purchasers could not get a clean title policy is the fact that there's nothing good faith about committing fraud on the court in furtherance of defrauding bankruptcy estates with the price-fixing and bid-rigging scheme.

On January 1, 2021 the debtors filed the transcripts of Busby's of 341 meetings of creditors, and as well, the depositions by the UST of Busby and Sanders. Within the objection of the fees of the trustee's lawyers at branscum PC, the debtors filed a motion to have the case referred to the US Attorney's office for investigation.

On January 19, 2021 the debtors filed a motion to reconsider the approval of fees for Branscomb PC with yet another request that the case be referred to the U S Attorney's office for investigation.

On January 26, 2021 the western district of Texas announced the vacancy created by judge King's sudden retirement.

On February 10th, 2021 a hearing was held on the debtors' motion for reconsideration **(ecf 1008)**. Judge King's falsified findings of fact at the very first hearing of August 28, 2014 appeared to be the pretext, predicate act and set up for what was to be the price fixing and bid rigging scheme. It clearly appeared to be a preparatory act from which intent can be inferred. Likewise, circumstantial evidence of post-offense behavior that is offered to support relevant inferences consistent with a scheme or the accused's guilt is also important. Often called after the fact conduct, it is relevant in any criminal investigation.

At the February 10, 2021 hearing, on numerous occasions, Rozelle requested Judge King refer the case to the US Attorney's office. Rozelle also requested that King take judicial notice of the transcripts the debtors filed on record with Busby's critical 'smoking gun' admissions. King took judicial notice of the transcripts, but refused to answer whether or not he was going to do that, even though Rozelle explained on the record how the transcripts provided new evidence that the trustee, through his broker Walt Busby, colluded and conspired and the corrupted sale of the bankruptcy estate property.

The responses to this new evidence on the part of trustee john Patrick Lowe, his counsel pat autry of Branscomb PC and judge King himself clearly indicate to be just the latest evidence of intent to cover up the price-fixing and bid-rigging scheme - *aside from the frivolous 2024 complaint by trustee john Patrick Lowe and his law firm Graves Dougherty.*

It's important to review Busby's exact 2019 testimony in order to fully grasp exactly what judge king, the bankruptcy trustee and his counsel were not willing to acknowledge, as it's the knowledge of the evidence of the fraud scheme that renders the cover-up on the part of the officers of the court to have been perpetrated willfully, knowingly and intentionally, and thereby losing any form of immunity afforded bankruptcy judges and bankruptcy trustees.

**Busby's 2019 testimony before the UST**

Questions of Busby by Robert Brown for creditor Turner Holdings:

Brown: Mr. Busby, did you receive a commission of approximately $850,000 in the last five years?
Busby: yes
Brown: okay and when was that paid?

*(It's important to note here how Busby attempts to avoid and dodge the question of a single commission of some $850,000 by responding to other commissions)*

Busby: I had two or three commissions in 2017. One of them was $132,000. There [sic] on the tax return
Brown: okay. And the next one?
Busby: there was one for around 42,000 that same year.
Brown: okay
Busby: and another one for 51,000 in that year of 2017

*(Brown circles back to the original question that was dodged, and at this point Busby realizes he is being asked questions pertaining to actions further back than expected)*

Brown: okay. And how about the large commission? The one that was over $800,000?
Busby: that was in 2016
Brown: okay. And what was the commission paid for?
Busby: that was paid for my work as a broker in judge King's court for bankruptcy. It was – – I worked for the trustee Pat Lowe.
Brown: okay. Where was that 804,000 deposited?
Busby: when or what?
Brown: when and where?
Busby: in Plains Capital Bank sometime in August 2016.
Brown: okay. And what were those funds used for?
Busby: they paid back debts, and then they were used forward for operating expenses and just general living expenses.
Brown: when you say "operating expenses", what – – are you talking about a business?

Busby: <u>no, not much. I'm a sole proprietor, so there's not a lot of money that we spend there. It's mostly housing. Just what we were doing</u>.
Brown: so they're used on – –
Busby: <u>and taxes. Almost half of it went to the taxes</u>. The evidence – –
Brown: <u>so it's used for consumer – type expenses housing</u>?
Busby: <u>yes. Yes</u>.
Brown: <u>it wasn't used for business purposes</u>?
Busby: <u>no</u>.
Brown: and that money was entirely used up when?
Busby: sometime in 2017. I don't know exactly. **(ecf 985-2@PP12-13)**

---

Questions by Jim Rose representing the UST at the same 341 meeting:

Jim Rose: okay. All right. So you've discussed already central Texas Realty Central Texas Realty, you where Central Texas Realty received a commission check of over $800,000 in approximately August 2016?
Walt Busby: that's correct
Rose: and you deposited that, those monies, in Central Texas Development's bank account at Plains?
Busby: I did
Rose: okay. Now, we have – –  we asked for records and we got records – I think the first month we have for Central Texas Realty's bank account is December 31 of 2016, and it shows a beginning balance of 4000, about $4200. So in August you deposited $800,000 into that account?
Busby: M-hm

*(so Busby and his new lawyer Ron Smeberg supplied records to the UST, but only as far back as December 31, of 2016. Busby and Smeberg perhaps thought this would conveniently omit and perhaps circumvent any questioning about the $820,000 commission from the trustee. Only when a creditor's lawyer asked about the commission and when it was deposited did Busby own up to it. Busby clearly tried to dodge the question about the commission, and there's no reason to believe he didn't include bank statements documenting the deposit and withdrawal for the same reason – dodging any issue regarding the corrupted sale, and the reason would soon be apparent)*

Rose: and by January 30 − − by December 31, it was down to $4200. So what a happened to all − − all the funds?

Walt Busby: I paid some to a co-broker that I had in *the − − in the project*. And then I paid the rest in taxes, and then the rest was transferred to my personal account.

Jim Rose: okay

Busby: at Plain Capital

Rose: okay. It would really help if we could get copies of the bank records from 2016 from when you got the commission to December 31, 2016, do you have access to those records?

Walt Busby: yes  **(ecf 985-2@23 - 24)**

§

Jim Rose of the UST continued…

Jim Rose: so, you've earned that commission or Central Texas earned that commission in 2016. I've got your 2016 tax return, and so it's − − an LLC, so you ran it, you ran your tax return, right, for the LLC?

Walt Busby: yes

Jim Rose: Walt Busby consulting CTRD, Central Texas Realty?

Walt Busby: yes, sir

Jim Rose: so it shows you got − − had a gross receipt from sales of $433,000, but you got a commission for 800 − − over 800,000. Can you explain why it − − it just has that quantity?

Walt Busby: I split it 50-50 with my other co-broker on *the deal*.

Jim Rose: okay. And who was that?

Walt Busby: Uhm − − uhmm − − Uhm − − Uhm − − Steve Sanders

(Long pause) (Busby obviously had stalled and a stammered for time but could not think of a way out of identifying Steve Sanders, especially since there was a paper trail of the $392,500 he had wired to Steve Sanders immediately after Busby received his $820,000 commission from the trustee.  Busby and Sanders have been close partners for years, and remained so, so Busby wasn't stammering for time to think of the name Steve Sanders, Busby was busy thinking a way out of all this mess.  He has just committed the cardinal sin of any co-

conspirator- fingering a fellow co conspirator to an agent of the department of justice.  Not only that, Busby had just admitted to the collusion and fraud on the court in the sale process of the Johnson Rozelle bankruptcy estate property that renders the sale a fraudulent conveyance which in any credible bankruptcy court would render orders approving the sale void for being procured by fraud on the court.

Busby realized he had just admitted to splitting the commission 50-50 with his "co-broker on the deal", and "the project",  and the deal and the project was the sale of the Johnson Rozelle bankruptcy estate property to the same Steve Sanders of Stratford land fund that Busby had been doing business with for years, and Robert Schumacher, Busby's new partner. Busby had previously testified before judge King that he had cut all ties with Stratford and Sanders prior to becoming the trustee's broker in order to be approved as a 'disinterested' professional for the trustee.

Likewise, Schumacher and his Langley and Banack lawyers had repeatedly lied to the court in stating that Schumacher had never had any contact with Steve Sanders in order to be considered a good faith purchaser.

They were all lying about the conspiracy with each other in any shape or form, and as with any web of lies, the liars eventually get caught up in the web themselves.  Fraud schemes eventually get tripped up over the truth.

It has to be remembered that a central component of the scheme was to hide the fact that Steve Sanders of the noteholder Stratford land fund and Robert Schumacher were the pre-determined purchasers at the predetermined price. Now Busby had a big problem, as he had just admitted that his testimony that he had cut ties with Sanders and Stratford was all a big lie and a fraud on the court, and admitted that Sanders was essentially from the get-go working from the inside for trustee john Patrick Lowe just as was Busby, and just as the debtors had alleged and the newspapers had reminded readers.  Busby and Sanders were clearly brokering the deal to themselves, as further evidence brought by the debtors before judge King in 2015 that Busby had never cut ties with Sanders and Stratford as he had testified was ignored by the bankruptcy trustee and UST, as well as judge King (see affidavit of lawyer Carol Mattick **(ecf 240-2@1-3)**

Then in 2016 following the corrupted sale, a headline newspaper article revealed Busby was part of the development team on the property was Sanders and Schumacher, and included quotes from the tree of that completely contradicted their sworn testimony in court.  This is also ignored by the UST, the bankruptcy trustee and bankruptcy Judge Ronald B King.

The problem for Busby, aside from being on the wrong side of the truth, was he was now freewheeling without a script from trustee John Patrick Lowe or Pat Autry to follow, and without the confidence of judge King's protective court — unless he consulted with them prior to this creditors meeting.  He was in a different court and without his co-conspirators, and now had to hope King's former clerk Gargotta would go light on revealing this evidence of the scheme, and pretend he did know its implications.  Lying to judge King in perjured testimony that constituted fraud on the court was one thing, as King had demonstrated a willingness to repeatedly turn a blind eye to all of Busby's blatantly perjured testimony. But lying to Jim Rose of the United States Trustee office — an arm of the Department of Justice — is in the big boy leagues, and could land him in jail for obstruction of justice.

Busby had been ambushed by questions he wasn't expecting at all, as his later testimony reveals he was only expecting questions to be limited to financial matters two years prior to his filing bankruptcy in 2019, but one of the creditors and Jim Rose of the UST were the going back three years. Now he had to now fly solo in trying to cover up for his unwitting and unexpected admission to the very collusion and kickback that just sank the whole house of cards in the price-fixing and bid-rigging scheme - the smoking gun/bombshell admission that at this point rendered the sale to Sanders and Schumacher a fraudulent conveyance, and that incriminating testimony is now on the record. Now Busby had to make up more lies to cover his for what he had just admitted to.

> Jim Rose: so  thinking back to the – – I was involved in those cases back in – – In that commission. Was the court aware that Mr. Sanders was getting half of the commission?
> Walt Busby: at the time that the commission was awarded, no. But I decided to go to work with him after the commission was awarded, and he loaned me some money to get started in another business, and so that is how that came about.
> Jim Rose: so he was involved after you signed up with the trustee to represent the trustee or before?
> Walt Busby: after. And so, we didn't get the commission paid until quite a time after it was awarded – – so – –. **(ecf 985-2@25-26)**

§

Busby would later testify in an August 15th, 2019 hearing **(ecf 985-4)** with more questions by the UST regarding his bankruptcy schedules.  Not until Busby was asked how he was still living in his house and making payments without any income disclosed in his bankruptcy filings.  Busby's response was that he never said he didn't have any income – he just did my report it in his bankruptcy filings or even amended filings.

The reason Busby didn't report it because he was working for Sanders and Schumacher on the development of the very bankruptcy estate property he steered courts Sanders and Schumacher at a $30,000,000 discount.  Now Busby testified he makes $10,000 - $12,000 per month "watching over the development of apartments and hotels on the property".  Busby's testimony was that there is no written agreement will contact -just as Busby would later testify there was nothing written in his prior agreement with Sanders to split the $820,000, and the obvious answer as to why is because in illegal price fixing, bid rigging and kickback schemes you don't want any paper trail.  But the reason Busby gave – again in sworn testimony -was that his agreement was Sanders was simply on a handshake, because Busby would rather have a handshake was someone than a written contract, which he found "for the most part unenforceable".

Now the agreement with Schumacher is, according to Busby, also not documented, and not included in his schedules or amended schedules - some five months after filing for bankruptcy.  His reason for not disclosing his income to creditors and the bankruptcy court was because his bankruptcy lawyer the (Smeberg) said he didn't have to.  His bankruptcy lawyer is the same Ron Smeberg that had represented Johnson and Rozelle *against* Busby, Sanders and Schumacher and their corrupted sale with trustee john Patrick Lowe.

Nobody knew better than bankruptcy lawyer Ron Smeberg the importance of disclosing income on bankruptcy filings, and no one knew better than Smeberg, Busby and his co-conspirators the importance of hiding this red flag of price-fixing and bid-rigging schemes – the promise of future income from the scheme.  This is also, income that Smeberg himself is benefiting from through Busby's attorneys fees paid to Smeberg, which stems from the very property from the the the bid rigging scheme – AKA ill gotten gains.

This is further evidence that the reason Smeberg turned 180° and began protecting the scheme while still representing Johnson and Rozelle was perhaps to protect his own future income from the scheme, or derive some benefit from protecting the scheme such as lucrative case referrals or other means.  Perhaps it is no accident that Smeberg later got the Chris Pettit case, the San Antonio lawyer

who defrauded his clients of over $200,000,000 believed to be stashed in foreign bank accounts.  So similar to later collecting 'consulting fees' generally awarded as payment in such schemes, Busby is essentially now the night watchman over the property – paid for simply 'watching' the development on the former Johnson Rozelle bankruptcy estate property for Sanders and Schumacher as it happens. **(ecf 985-4@21-24)**

So clearly in 2019, even the UST was made aware of the collusion by Busby's own testimony and the corroborative evidence of Busby's immediately splitting the commission from the sale of the Johnson Rozelle bankruptcy estate property with his secret co-broker – *who was also the purchaser* – Steve Sanders. This new evidence only corroborates the mountains of other clear and convincing evidence of fraud on the court that had played out directly in front of judge King and then had been squarely placed before the court with explanations.  The debtors connected the dots as to how the distinct pattern of perjury and fraud on the court leading up to and included in the sales hearings themselves were *willfully and intentionally* made in furtherance of the price-fixing, kickback, bribery and bid-rigging scheme to defraud the bankruptcy estates of some $30 million.

Also in 2019, trustee John Patrick Lowe and Pat Autry of Branscomb were made unavoidably aware of this new evidence by Johnson and Rozelle in their pleadings with the Fifth Circuit court, as the debtors have mentioned this in their request for extension of time which was also sent to the trustee and his counsel Pat Autry  – which naturally went ignored as per the traditional *modus operandi* of intentionally attempting to avoid knowledge of the facts and the evidence, and failing to make reasonable inquiry in further breach of fiduciary duty to the bankruptcy estates.

There has been a common song and dance between the debtors and the bankruptcy court: each time the debtors bring forth new evidence of the price-fixing and bid-rigging scheme, place it on the record, and request that the bankruptcy trustee and bankruptcy judge act upon the new evidence, the new evidence is ignored and in some cases, the debtors sanctioned for filing frivolous pleadings

It continued in 2021, when the debtors filed on record the transcripts of Busby's smoking gun incriminating testimony in which Busby admitted to the collusion in the sale between himself, trustee john Patrick Lowe and the purchasers that was undisclosed to the court or the debtors or the public.  It

rendered the sale orders void – and in fact all orders of all proceedings leading up to and including the corrupted sale and in the entire case void for being procured by fraud on the court, and signed by a judge who was clearly disqualified for refusing to recuse himself under 28 USC § 455.

The February 10, 2021 hearing is simply more evidence of post offense behavior that support relevant inferences consistent with other evidence that judge king, the trustee and the other officers of the court involved in the scheme not only perpetrated the fraud scheme from its inception, but took a willful and deliberate the acts to ignore and cover up for the bankruptcy court corruption.

Rozelle began by responding to judge King's question as to why he opposed the some $400,000 in fees to the trustee's counsel.  Rozelle's response was **"Because they're not earned.  It's a fraud upon the court, and for entering into a scheme to defraud the bankruptcy estates.  They shouldn't get paid for that"** if a (ecf 1008@4-5)

Rozelle added: **"And I'd like you to take judicial notice I guess of the record, including the latest transcripts that were put on with Busby's testimony before the UST that he kicked back half of his commission to Steve Sanders, the purchaser. He split that commission because Sanders was secretly, undisclosed to the Court, Busby and Trustee John 11 Patrick Lowe's co-broker brokering the deal to himself."** (ecf 1008@5)

King's response to the completely ignores yet again the bombshell evidence Rozelle just laid on the table regarding the corrupted sale.  King's response was simply: **"Okay. I'll take judicial notice of the transcripts of hearings in this case, and I'll take judicial notice of the record, the docket sheet, and the evidence that's been introduced and admitted in evidence.**

**Mr. Autry, did you –"**  (ecf 1008@5)

It's important to note here how King not only simply ignores the fact that Rozelle was explaining that the transcripts containing testimony before the UST that Busby and Sanders were in collusion with trustee john Patrick Lowe in the sale -and doesn't even bother to ask Rozelle to explain further or ask, could possibly be true.  Instead, King quickly tries to change the subject by asking the question of Pat Autry: **"Okay.  Mr. Autry, did you have any response?"**

Clearly anyone representing a bankruptcy trustee wrongly accused of participating in a price-fixing and bid-rigging scheme that defrauded bankruptcy estates of $30,000,000would want to rebut and challenge what Rozelle just

explained in court about Busby's testimony admitting to the collusion  in the trustees corrupted sale, and Autry's response clearly indicates that the trustee was not being wrongly accused, as Autry completely ignores it all together:

**"Your honor I filed a brief response. There are two things that I think I emphasized in my response, and I would emphasize here, that the sale of the 114 acres, which was the heart of this case, was conducted in open court, and a competitive bid.**

**There was a second bidder who was, I believe, $100,000 off the lead bid; that was the Oden Hughes bid. Oden Hughes being represented by Dean Greer at the hearing is my recollection.**

**I believe the record is very clear also that the purchaser was Steve Schumacher, acting through an entity which he had created. And the fact that c**

**Other than that, Your Honor, I think my time records, both for Branscomb PC which -- and Branscomb PLLC, the PLLC being my time since, I believe, July 1st of 2019. Those records are in the Court. I'm open to any questions that the Court may have, but otherwise, I will stand on my applications  and prior testimony in the first hearing."  (ecf 1008@6-7)**

Just for starters, it's important to note that the trustee's lawyer continues in a well-established pattern of behavior: willfully, knowingly *completely ignoring* any and all of the new evidence of the fraud scheme provided by Johnson and Rozelle for the sole purpose of attempting to fabricate plausible deniability for the trustee john Patrick Lowe and judge King.  Autry was specifically asked to respond to the string of facts that Rozelle had just brought to the court's attention.  Instead, the trustee's lawyer gave a premeditated statement to specifically dodge the issue of the smoking gun testimony on the part of the trustee's broker.

These lawyers are well versed in the art of deception and gaming the system by walking a fine line between fact and fiction in their sworn testimony. The trustee's lawyer pat autry of Branscomb PC clearly omits any reference to what he was asked to respond to, clearly dodging the question in the same manner that his client Walt Busby had attempted and failed, and autry fails as well.  Lying by omission, also known as a continuing misrepresentation occurs when an important fact is left out in order to create a misconception, especially in situations that require full disclosure.  The common rule in bankruptcy is 'disclose disclose disclose', not dodge questions.  Disclosure is the foundation of providing material information in bankruptcy.

Lying by omission is an overt act that can be considered, along with perjury, to be evidence in furtherance of conspiracy in criminal activity. Legally, and omission is a failure to act, which generally attracts legal consequences from positive conduct. In criminal law, and omission will constitute an *actus reus,* and give rise to liability when the law or situation imposes a duty to act and the defendant is in breach of that duty. As elsewhere in this report, both the trustee and his counsel of testified they didn't believe they had a duty to act or investigate fraud in the case, when it is exactly the bankruptcy trustees duty. Liability can also be imposed for an omission when they can be established that the defendant was under a duty to act or duty of care as is a bankruptcy trustee and his legal counsel.

A lie by omission is an intentional failure to tell the truth and the situation requiring disclosure. As in this report in more detail, and as Autry well knows, the bankruptcy court approved Busby as the trustee's broker on Busby's representations and testimony that he had cut all ties with Steve Sanders. This was an important fraud on the court in order to get the courts approval.

As late as Busby's fee application hearing of July 13, 2016, Busby again testified that he had cut all ties to Sanders and Stratford, and that's how he was able to work for the trustee. Regarding his prior testimony before judge king to be approved as the trustees broker, Busby testified in the present sense that he "works" with Steve Sanders on a number of projects, and was asked if that was correct testimony. Busby responded **"I probably misspoke. I mean, I'd say in my deal [affidavit], we had severed our ties and that was one of the reasons I could − − I could work [for the trustee] (ecf 681@64-65)**

Now Busby is testifying that not only had he committed perjury and fraud on the court about cutting ties with Steve Sanders to be approved by the court as a disinterested broker, now Busby was testifying that not only was that a lie at a fraud on the court, but in fact the two were still so close that Sanders was secretly acting his co-broker for trustee john Patrick Lowe. But more importantly than the mere fraud on the court -there was plenty of that on the part of the trustee and his professionals and those involved in the scheme – they're admitting to the very collusion through Busby and Sanders that represented collusion between Sanders partner Robert Schumacher and Busby's client trustee john Patrick Lowe.

As is often the case with deceptive testimony, an element of well established truth is usually added to mislead one into believing perhaps all of the

testimony has an element of truth.  It's usually to hide the true deception.  For example, autry does claim that the auction was held in open court, and there was another bidder other than Robert Schumacher.  What autry omits however is the evidence concludes that Oden Hughes was nothing more than a 'straw' bidder which is often a common characteristic and bid rigging schemes.

Where autry's statement claims that Robert Schumacher was a purchaser, it's true but not the whole truth.  Obviously Autry is aware – and so is the trustee and judge King who are obviously there listening to all of this – that the testimony of April 21, 2915 was that Sanders was also allowed to be a purchasing partner with Robert Schumacher as well as the general partner with Robert Schumacher in the development of the property, a critical omission the trustee's lawyer makes in claiming that only Robert Schumacher was the purchaser.  It gives the false impression that Steve Sanders as the general partner of the development with Robert Schumacher did not have a vested interest and colluding with the trustee and Walt Busby to steer the property to Sanders and Schumacher at a $30,000,000 discount.  Obviously the fact that Sanders was co-brokering the deal, which was specifically concealed from the court and the public, is obviously a critical omission for Autry to not have addressed.

Where Autry states in his response "**And the fact that Mr. Sanders was brought in by Mr. Schumacher to assist in the later development of the property was a matter which was disclosed to the Court at the time the Trustee discovered it himself." ,** what Autry clearly omits is that it was the title company that discovered Sanders involvement, and the fact that Robert Schumacher had specifically lied to the court, along with his lawyers at Langley and Banack, in claiming that he had never had any contact whatsoever with Steve Sanders.  Autry clearly omits that it was that fraud on the court that was discovered later by the title company who then refused to give a clean title policy to the trustee, Steve Sanders and Robert Schumacher for the fraud on the court.  The lie and fraudulent testimony was specifically designed to hide the conspiracy between Sanders, trustee john Patrick Lowe, the trustees broker Walt Busby and Robert Schumacher.  Autry is clearly was very well versed at telling the truth, but not the whole truth in clear violation of his duty to disclose.

After getting caught red handed by the title company, autry knows well that the concocted cover-up story was that Sanders only became involved with Schumacher "in the later development" of the property as autry states in his response.  What autry omits, however, is that the testimony of April 21, 2015 not only proves that the prior testimony was false -that Sanders and Schumacher had

never had any contact -but it was later discovered that the cover-up story of Sanders only becoming involved after Schumacher became the winning bidder was also false, as the newspapers even quoted Sanders "later" admitting that it was Sanders to convinced Schumacher to bid on the property with him in the first place.

It is true, as the trustee's lawyer states, that the court was aware of the fraud on the court and collusion in the price-fixing and bid-rigging scheme, but of course what Autry left out was that the bankruptcy court didn't care. Autry also omitted the part about the fraud on the court and collusion in the price-fixing and bid-rigging scheme. So long as you leave out all the facts and evidence of the fraud on the court in furtherance of the price-fixing and bid-rigging scheme, the fraud on the court by the officers of the court regarding the relationship between Sanders, Schumacher and Busby, Busby's latest 2019 testimony before the UST , and the fact that the property sold for an unconscionable $30,000,000 below fair market and appraised values to a partnership between Steve Sanders, Robert Schumacher in the trustees broker Walt Busby, who at the very least as living off the development proceeds of the property that he secretly co-brokered with Steve Sanders, Autry's version of events could almost sound plausible.

Again, the trustee's lawyer has no problem telling the truth but not the entire truth, as they have done this throughout the entire bankruptcy proceedings. Throughout the case, the trustee and his professionals as well as the purchaser's through their lawyers at Langley and Banack have continued to give an extremely summarized and sanitized version of events are with critical omissions. When the debtors give their version of events with the overwhelming amount of facts and evidence proving up the egregious fraud on the court in furtherance of the price-fixing and bid-rigging scheme, they are accused of 're-litigating everything but frivolous pleadings' .

Following Autry's deceptive response, judge King asks for only the trustee or his counsel to refresh his memory on the chain of events of the case. They acted as though they were confused as to whether or not the sale was in 2015 or 2016, and it was obvious king was looking for yet another watered down version from only those involved in the scheme, so Rozelle interjected: **"It's 2015. It was first approved on March 26th of 2015. Glen Ayers made statements to the Court and so did Robert Schumacher that there had never been any contact with Steve Sanders or anyone at Stratford Land Fund.**

**When the title company found out that in fact Steve Sanders and Sanders Family Trust was involved in the sale, they refused to give clean title, so there**

was another hearing on 21 April 21st, an affirmation hearing, in which Sanders and Schumacher both came in and admitted that they had been in contact contrary to Judge Ayers -- Glen Ayers' former testimony and the testimony of Rob Schumacher.

Schumacher was not a good faith purchaser for lying to the Court. You cannot lie to the Court and be qualified as a good faith purchaser, so the title company refused to give a clean title policy. That was back in 2015." (ecf 1008@7-8)

Again, nobody wanted to rebut or dispute this testimony, as they could see it would be a losing battle.  Instead, King simply asked Autry if there was some kind of settlement, to which Autry again give a sanitized version of the debtors simply dropping appeals with a stipulation agreement.  What the trustee's lawyer was not willing to say is what Rozelle did say: **"And I will add that the appeal was -- the appeals were dropped under the threats of lifting the stay, which it was lifted. And also, the stipulation agreement in no way prevented us from filing a later Rule 60 when new evidence came to light of the fraud upon the Court.**

THE COURT: Uh-huh.

MR. ROZELLE: Which was -- and I -- it was completely ignored by the Court, but it was a motion to take judicial notice --

THE COURT: Have you --

MR. ROZELLE: -- of the newspaper article, March 11, 8 2016, wherein Sanders, Schumacher, and Busby all contradicted their sworn testimony in court; Sanders even saying he was the one that got Schumacher to bid on the property.

Sanders was bidding on the property as a co-broker to Walt Busby and Trustee John Patrick Lowe, in collusion with  Schumacher.

And as far as the sale being a competitive sale, it wasn't a competitive sale. By the Durrett Rule, if the sale  price is not 70 percent of fair market value, and it's far below that, it's like 35 or 40 percent, the sale should be set aside.

But the Dean Greer, Carlos Klutts, we've already explained that in our pleadings. They are no strangers to the Court. They come in when they need to be -- or a case needs to have an investor or a purchaser or a straw bidder.

It's extremely similar to the -- what's known as the *Maholtra* case, and we've got -- we've already put that in our pleadings as well. It was a straw man bidder; it wasn't a competitive offer at all. They put in a three-day contract that the Trustee used -- the Trustee, or Pat Autry rather, got a contract on

September 23rd of 2014 that was only good for three days for $20 million from Oden Hughes.

They used that to call a meeting with the debtors on September 25th at the offices of the UST, using that as a backdrop of legitimacy, to spring that on us and tell us that  that was the fair market value of the property, and that was all we were going to be able to get.

It was not a competitive offer. The offers that were already on the table before Busby was even hired to gatekeep against legitimate offers for Sanders and Stratford and Schumacher, they were not competitive offers. At all. There was nothing competitive about this at all.

So, I do take exception to this testimony that everything was done with due process. Or any order stating  there wasn't even any hint of impropriety. There was nothing but impropriety from the very moment that Busby was hired against the rules of disinterestedness.

When Branscomb PC came in and said, "Hey, look man, just ignore all the rules". What is it, 1001-14 of 627(a) or something like that. You know, just ignore the rules. We think this is an advantage to have Busby come in here and be the broker on the sale. He's well-established the relationships and business partnerships with Sanders and Schumacher. He's getting in  trouble right now. He's had a federal complaint against him, and it's been filed here in your Court by even the UST.

Now, they've tried to paint Busby and Schumacher and Sanders as being shrewd businessmen, but it's like Leif Clark has said, the former bankruptcy judge. He had a test. You know, the take the same set of facts and circumstances, go out to Alamo Plaza, talk to the people, and say, what do you think about this. Do you think there was fraud, corruption, and collusion in the court? They're going to say "yes", because they can read the papers. This stuff has been in the papers.

THE COURT: Okay. I understand what you're saying. How does that apply to the fee application?  (ecf 1008@8-11)


So no one steps up to rebut were challenging of this.  The reason of course is clear – it's all true.  No one knows it better than Judge King, the trustee and the trustee's lawyer from Branscomb PC attending the hearing.

As stated elsewhere in this report, judge King has no other reaction that the state that he understands all of this.  King knows it's all true, but never read but said himself or asks either the bankruptcy trustee or the trustee's lawyer if they

take exception to anything that was said, nor do they are on their own jump in and make any objection.  The reason is they know that it's all on the record, and they will only be compounding the problem by challenging any of it, as it would require more falsehoods and false testimony, and they can see by busby's latest testimony that they have dug themselves in deep enough as it is.

Perhaps what is most telling is Judge King telling Rozelle he understands everything he said, but rather than taking specifics from Rozelle's testimony in challenging any part of it, our requesting either the trustee or his counsel to address anything Rozelle said specifically, king simply ignores it as he is done in the past, and instead diverts attention elsewhere by asking how it relates to the fee application of the trustee's lawyer of some $400,000.

**MR. ROZELLE: Because you cannot get paid for running  an embezzlement scheme in bankruptcy court. It's like a guy robbing a bank, getting caught, hiding the money, and then  asking the judge, "Hey, judge, I need some gas money for the  getaway car".**
**You can't do that. It defies logic. It defies sound reasoning, and it defies sound judgment. (ecf 1008@11)**

Interestingly, trustee john Patrick Lowe after hearing all of this is asked by judge king if he has anything to add, to which Lowe response: **"Patrick Lowe, trustee.  No, your honor, I don't. (ecf 1008@12)**
So at this point in the hearing, king tries to close it down with his own pre scripted watered down version of events in his findings of facts and conclusions. King falsely states that **"the trustee "beat the bushes" to try to get people to come in and bid on the property". (ecf 1008@14)**  To the contrary, the facts, evidence and testimony proved that Busby brought no offers whatsoever, and only had a marketing period of between January 23, 2015 and February 5, 2015. Furthermore, the trustee even testified through his counsel had Busby simply took a targeted approach, and obviously his target was his partners Steve Sanders and Robert Schumacher.  It calls to question if judge king really expects anyone really believe that Steve Sanders and Walt Busby as brokers for trustee john Patrick Lowe really wanted anyone but their partner Robert Schumacher to end up with the $50,000,000 property at $20.3 million?  For Lowe to have remained quiet is to be complicit in his silence when he had a duty to speak up.  Lowe has essentially ignore alleged that he knew all along that Sanders was secretly his

concealed from the court broker with Walt Busby and steering the property specifically to Busby and sanders' partner Robert Schumacher.  The trustee has effectively admitted to his role in the price-fixing and bid-rigging scheme, and king has simply remained silent as well, and therefore complicit.

It has become truly an insult the intelligence of the public for judge king to continue covering up for the scheme with delusional statements that are not only clearly false, but willfully, knowingly and intentionally false in furtherance of attempting to cover up for the scheme and his closest colleagues involved in the scheme.

King also falsely states that because of the appeals that the debtors filed, it delayed the closing on the property.  It's a way of falsely blaming the debtors for the actions of the bankruptcy judge, bankruptcy trustee, the trustees professionals, the purchasers and the lawyers representing the purchasers – judge Kings former law firm Langley and Banack.  King knows very well it wasn't the appeals, it was the fraud on the court on the part of Busby, Sanders, Schumacher, schumacher's lawyers and the trustee and his counsel for not speaking up and correcting the perjured testimony and fraud on the court when they had a duty to.  It was their fraud on the court throughout the proceedings that cause the title company to back away from ensuring the likes of bad faith purchasers Sanders and Schumacher.

King then attempts to almost trivialize the fraud on the court and price-fixing and bid-rigging scheme by finding that the debtors **"just have a view of the case that doesn't coincide with my view of the case".(ecf 1008@15).**  What it amounts to is that the debtors can see the case for what it is – bankruptcy court corruption at its most egregious, where king has continually attempted to turn a blind eye to the facts and evidence as if he can possibly avoid actual and constructive knowledge of the corruption.

King then states **"Mr. Rozelle's view of the case was the property was worth two or three times more than the ultimate sale price at the auction. And so, because of that, he feels like there's some giant conspiracy to take away his equity in the property, and  his mother's equity in the property. And nothing could be further from the truth." (ecf 1008@15).**  What king clearly omits is that the sale price of the property is clearly at odds with the appraisals of qualified appraisers, and the sale price was dictated by collusion between the trustee and the purchasers through greed is fraud on the court to hide the members of the conspiracy.  King clearly omits that it was the title company that discovered the fraud on the court at the sale hearing, and refused to give a clean title policy.

But that didn't stop King from slandering and defaming the debtors as giant conspiracy theorists for simply exposing the facts and evidence of the conspiracy to defraud the bankruptcy estates.

The other reason that neither King nor the trustee, or the trustees counsel wanted to acknowledge the busby's testimony before the UST that Sanders was secretly acting as a broker for trustee john Patrick Lowe as the cover-up story that Sanders only became involved with Schumacher after the sale – a cover-up story that has been proven false time and again with different pieces of evidence, which is why judge king also has continually ignored the facts and evidence of Sanders involvement which Schumacher prior to the sale, including Sanders own statements to the press and published for everyone to read – not to mention the motion to take judicial notice of the self authenticating evidence and article.

In fact, the article quoted Sanders telling Schumacher as follows:

**""I said hey, there's a piece of property we talked about at one point." Sanders said. "It's going to go up for bid at a trustee sale.  We should try to get that"' Several weeks later, after just minutes of bidding inside the downtown Federal courthouse, Schumacher had it for $20.3 million.**

 In fact, the article further quotes:
**"And Schumacher had something else to give him confidence [to purchase], Sanders, who offered his development background and services, as well as his history with the tumultuous property that had spent the past three years in court. 'he knew the property the best because of his involvement in it, Schumacher said''."**
**(ecf 465 – Motion To Take Judicial Notice of The Article)**


It is significant to Judge King wishes to ignore this type of evidence, when the district court itself indicts and convicts on this type of evidence.  It essentially the very same type of Rule 902 self-authenticating evidence used in another case at the same time, being the public statements made by State Sen. Carlos Uresti that contradicted his sworn testimony, and which and which led to the indictment and conviction of the state senator who was just recently released from serving a 6-12 year sentence (released early for reasons under seal).     According to the

prosecution, including assistant US Aattorney Joseph Blackwell, the contradicting statements made to the press by Uresti in 5:17-cv-00381 DAE which are inconsistent with statements he made in depositions and courtroom testimony, is extremely significant and evidence of ill intent. According to the US Attorney's office, giving conflicting answers, untruths, and vague responses – extremely similar to the testimony of the conspirators who defrauded the Johnson Rozelle bankruptcy estates – are all indicative of a consciousness of guilt, and King is old enough to know that. Clearly king's judgment has been clouded by his bias and prejudice against the debtors and in particular Rozelle, and his favoritism towards his longtime colleagues, including his former law firm, involved in the scheme. Clearly king is disqualified himself for refusing to recuse himself in a case where he is not only made blatant and flagrant falsified findings of fact in furtherance of the scheme, but clearly made willful, knowing and intentional attempts to cover up for their crimes.

Regarding the inconsistent statements made in the public that contradicted the sworn testimony in the Uresti case, the Department of Justice stated by the Fifth Circuit in the *United States v Villareal,* 324F. 3d 319, 325 (5th Cir. 2003) (internal citations omitted):

**"[b]oth inconsistent statements and implausible explanations have been recognized as evidence of guilty knowledge. Also, a defendant's exculpatory statements which are shown by other evidence to be false may give rise to an inference of consciousness of guilt"**.

As Judge Ezra was quoted in that case by the *Express News* coverage and headline story of September 11, 2018: ***Scheme mastermind Stan Bates gets 15 years in Prison***

According to judge David Ezra, ***"It was a scam from the get-go", and therefore all of the fees procured "tainted".***

The debtors have are used virtually the same argument as the US Attorney's office and the UST and the case of the United States Trustee vs. Jackson Walker, where the UST is moving to clawback some $23,000,000 in tainted fees from Jackson Walker for their collusion with the now disgraced former bankruptcy Judge David Jones of the southern district of Texas, and that

was just for non-disclosures of conflicts of interest.  The judge King case makes Judge David Jones look like a choirboy.

In essence, judge king's "it's a free country" mantra that he has also repeated as an excuse for the collusion in the sale, king believes price fixing and bid rigging schemes are perfectly appropriate behavior because, after all, it's a free country.

The fact that judge king willfully, knowingly and intentionally ignored this evidence speaks volumes -he didn't want to know it, and it is believed to be the reason why judge King holds such disdain for Rozelle in particular – he is an investigator that has blown away any plausible deniability king has pretended to feign for his role in knowingly, willfully and deliberately ignoring the facts and evidence in furtherance of the scheme and its cover-up.  As Ron Smeberg had expressed to Rozelle and even third parties **"King hates Rozelle, and will rule against him on anything"**.,Even later when Rozelle brought forth the evidence in cross examination, King simply dismissed it as hearsay and **"just something cluttering up the record" (ecf 650@16-17).** At the same hearing where King claims the article and motion to take judicial notice of it is nothing more than just something "cluttering up the record",  Lowe was cross examined by Rozelle on the statements from Sanders, and testified he didn't see where any of it correlates or contradicts their testimony before Autry immediately objects and King sustains on grounds of hearsay before Lowe can actually fully answer the question **(ecf 650@60-63).**  Clearly it was a legitimate question and the rule 902 self authenticating evidence was not hearsay.  King is not only at odds with virtually everyone except his small inner circle of those comprising what is believed to be an ongoing criminal enterprise in the form of a bankruptcy racketeering ring closest to judge king for decades.

It's apparently why King ignored the indisputable facts of the case in this particular hearing, as his pre scripted falsified findings kept up with the false mantra **"And the fact that Mr. Sanders got involved later after the auction was concluded, as I said on the record, it's a free country. People can get involved in sales and real estate and development and so forth. I don't think that there was any preplanning on anyone's part to try to depress the sale price or to try to cheat Mr. Rozelle and Ms. Johnson out of  their property.**

Again, king has repeatedly repeated this fraudulent misrepresentation the again and again in light of the fact that Sanders has admitted he was the one who convinced Schumacher to bid on the property with him.  Not only was Sanders

involved with Schumacher prior to the sale from the purchasing standpoint, even Busby has testified that Sanders was *even double dipping by* acting *as a broker* from the get go and receiving half the commission *for being involved in the sale from a seller's standpoint*. Obviously this contradicts the false narrative that King and his colleagues have continually repeated as part of the cover-up – the Sanders never had any involvement in anything related to the case until after the March 26, 2015 sale hearing.

Just looking at the timeline itself (see numerous herein), the debtors filed for bankruptcy on June 2, 2014. Just days later, on June 11, 2014, after Sanders and loan to own noteholder Stratford had successfully driven the debtors back into a second bankruptcy by interfering with their brokers and their sales – for which Sanders also gave false testimony regarding - Sanders created Sanders Family Investments, LLC **(ECF 959-4 exhibit D)** to be the general partner entity of winning bidder Robert Schumacher, who along with Sanders had been following the bankruptcy case since 2012 **(ECF 390-1@8)**, when Stratford purchased the note Sanders began contacting the debtors brokers relaying that a trustee was set up to sell the property rather than the broker **(ecf 721 Exhibit A@48-49)**.

How can King logically make a finding of fact that there's nothing record to indicate pre-planning? Let's not forget that immediately upon being appointed, trustee pat Lowe and his counsel Pat Autry immediately drove up to Austin, Texas to meet with Steve Sanders in person, rather than by phone or e-mail. And in fact, why would they require a personal meeting with Sanders, or contact with Sanders at all? As the timelines contained herein clearly indicate the chain of events immediately following this meeting clearly indicates it was a planning session, where it was decided that Busby would be the trustee's broker to steer the property back to Sanders and Schumacher.

As the Judge David Jones case reminds all in bankruptcy that non-disclosure is a common means by which to hide bankruptcy court corruption, it's worth noting that the meeting with Sanders by the trustee was never disclosed to the debtors or the court, but only found by the debtors embedded in Autry's billing records **(ECF 377@14).** It's also worth noting that the debtors had requested billing records from Autry and Lowe on several occasions during the case, but were refused. In a meeting between the debtors, their then ounsel Ron Smeberg, Lowe and Autry in Autry's office, the debtors again requested the billing records up to that date which was December 7, 2015. Instead, Autry only supplied three pages of billing representing 10 days of work **(ecf 721 Exhibit 1A@37)**, as an example of his billing, but flatly refused to give complete billing records up to

date.  Debtors believe Autry made a backdoor agreement with the debtors' counsel Smeberg to delay any fee application with billing until after Sanders and Schumacher closed on the property, apparently believing it would be much harder to undo the sale at that time, as Autry's billing reads like a roadmap of the preplanning that king claimed didn't exist.  As with what even the Fifth Circuit has termed a "conspiracy of silence" amongst bankruptcy professionals, once autry's fee application was submitted in 2016, Smeberg flatly refused to file an objection to autry's fee application or Busby's either, they had conspired in the price-fixing and bid-rigging scheme.  It bears repeating what others have discovered in bankruptcy – "a person who represents themselves has a fool for a client, but a person represented by a bankruptcy lawyer is played for a fool", as bankruptcy lawyers have to 'go along to get along', the even if it means selling out their clients were intentionally throwing their case.  That's apparently why Smeberg now formally represents Walt Busby, and until getting caught, intentionally failed to disclose on Busby's bankruptcy filings Busby's income of $10,000 - $12,000 per month from Sanders and Schumacher, instead claiming Busby had no income.  It could easily be inferred given the facts and circumstances of the case that Smeberg and Busby knew well that that the income was likely the incentive Busby had a not marketing the property to anyone but his partners Sanders and Schumacher – especially when Sanders was obviously promised a split of the commission on the sale for acting as co-broker with Busby.

Virtually everything uncovered by the debtors smacks of preplanning and premeditation in the conspiracy to defraud the bankruptcy estates with the blatant price-fixing and bid-rigging scheme.  The clear and apparent reason judge king wants to make a finding there was no preplanning, is because part of that preplanning had to do with king himself.  In fact, the success of the conspiracy to defraud the bankruptcy estates was clearly contingent on the expectation that judge King would go along with the scheme and make findings that seriously question the integrity of judge King's bankruptcy court, such as finding that the fraud on the court of the purchasers and their lawyers at judge Kings former firm Langley and Banack were not indicative of even a hint of impropriety.

Judge King as willfully, knowingly and recklessly making serious misrepresentations as though they are factual for no other purpose than to continue to cover up for the price-fixing and bid-rigging scheme that clearly defrauded the Johnson Rozelle bankruptcy estates of $30,000,000.

It bears repeating every time King's makes false statement in court in furtherance of the cover-up: it defies logic to believe a bankruptcy judge in

collusion with former bankruptcy judge Glen Ayres and the lawyers at his former firm Langley and Banack involved fraud on the court and in the cover-up would not have been involved in the crime from its inception.  It also defies logic to believe that a scheme this brazen, blatant and flagrant would have ever been attempted without the prior understanding that judge king would do just as he's done and will continue to do - ignore all the fraud on the court and other overt acts that played out in furtherance of the scheme in such reckless, sloppy and 'who gives a crap /we own the court' fashion.

King uses the 'conspiracy theory' defense again and again, as is often used to discredit whistleblowers in corruption cases – until as in the Johnson Rozelle case, the facts and evidence are proved to be true.  Then it's not simply a theory but fact, and what King is left with is the conspiracy to defraud the bankruptcy estates, and a willful, knowing and intentional attempt to discredit the whistleblowers and victims of the conspiracy.  As king himself has stated, he is well aware of the facts of the case, and the reason is because the debtors themselves are the have made King unavoidably aware of the facts and evidence. As filed elsewhere, it was the debtors Johnson and Rozelle who themselves made extensive copies of all of their hearing exhibits at self Serv copy machines without help from their counsel, and in fact, in spite of the some bankruptcy lawyers attempting to prevent the debtors from filing facts and evidence on the record.

The most recent example is the debtors last bankruptcy lawyer of record Ron Smeberg , who on December 7, 2015 threatened to immediately withdraw from the case just prior to the upcoming December 14, 2015 hearing on Stratford's motion to lift stay.  Following a meeting with the trustee and his lawyer Pat Autry, Smeberg became enraged when the debtors planned to file an exhibit and witness list including appraisers and appraisals to again demonstrate that the creditors were adequately protected by the amount of equity in the property, and also that the corrupted sale price when compared to fair market and appraised values itself constituted fraud *(see in re: Golson herein)*.  Smeberg himself had previously asked and emailed if the debtors intended on having appraisers at the hearing, and which ones.  Now, however, Smeberg was pressuring the debtors not to have any appraisals or appraisers at the hearing, apparently because King was planning on making a finding that the creditors were not adequately protected.

In an e-mail discovered in documents provided by the trustee's accountant Jennifer Rothe, the debtors discovered an e-mail from Smeberg to Autry Lowe and Jim Hoffman representing Stratford Land dated  December 11, 2015 in which

Smeberg begins by telling Hoffman **"lost control of client….  Need to make the argument there is adequate protection.  Rather than put Pat Lowe on the stand and spend a lot of time talking about raw numbers, can we agree for purposes of this hearing that the debtor's current likely take away is $3.5 million…  I think getting that out there may give the court some extra ammo to read Pete the riot act.  Please let me know, thank you, Ron." (24-05022 Doc. 14 Exhibit C @73)**

It bears repeating that the debtors prior bankruptcy counsel John Tutt and David Brown had attempted to also prevent the debtors from filing appraisals on the record or having appraiser testimony at the 2012 confirmation hearing, adamantly claiming value and adequate protection for creditors was not an issue (even banging fists and yelling at the debtors for insisting on having appraisers and appraisal testimony, along with their land planner).  In fact, the lawyers had attempted to pressure the debtors into a consensual value of $12,000,000[6] for the property "just for purposes of the confirmation hearing".  They claimed this would prevent the fight over value, which would upset judge king to the point of appointing a trustee to liquidate the property.  Obviously, with appraisals at that time of $44,000,000 as is, and an appraisal of just the front 20 acres at $14.8 million as is, it clearly appeared the debtors were being set up by their own bankruptcy lawyers to waive any argument of a trustee selling the property for $12,000,000 – especially should they have been gullible enough to fall for any agreement of any kind in any setting  but that they themselves believed the value to be $12,000,000.  It's virtually the same attempt to Smeberg would later make by drafting documents as though they originated from the debtors themselves agreeing that the $20.3 million sale price represented fair market value, which of course could and likely would have been used to waive any argument that the debtors felt the $20.3 million corrupted sale price was itself a sign of fraud.

The debtors therefore take serious exception to a bankruptcy judge willing to ignore all the facts and evidence after everything the debtors had to go through – even fighting their own bankruptcy lawyers -to put appraisals, engineering reports, feasibility studies etc. etc.  and their witnesses on the record in order that judge king's orders and falsified findings of fact are made with the full knowledge of the true facts and evidence of the case.  King can claim he

---

[6] Earlier pleadings went by memory, and stated their request for a consensual value was $14,000,000.  However, when Clarita Johnson remembered it to be $12,000,000, recently rechecking emails with the lawyers confirms this -  which only makes it worse, as this was even much less than fair market and appraised values that the debtors' own bankruptcy counsel were attempting to use

hasn't seen any evidence of a conspiracy to defraud the bankruptcy estates in a price-fixing and bid-rigging scheme, and falsely claim he doesn't know the value of the property, or that Rozelle has an exaggerated opinion of value to provide cover for an egregiously an unconscionably low sales price as part of the scheme, but such findings on the part of judge King are clearly not credible – and neither is his smear campaign to the frame and discredit the debtors as being exaggerated conspiracy nuts. It clearly appears to be all part of the smear the victims campaign and an acknowledgement on the part of judge King that 'when you cannot rationally attack the facts and evidence, attack the victim'.

Trustee john Patrick Lowe also attempted to avoid knowledge of the appraisals and extensive studies done on the property in order to also testify he had no idea what a reasonable sales price would be, and using as an excuse that he has no money for an appraisal. He was well aware of recent appraisals, as is judge king, and as relayed elsewhere this report, had a duty to discover the fair market value of bankruptcy assets. The trustee and clearly breached his duties willfully and intentionally as part of justifying a sales price at roughly 30% of – 40% of fair market and appraised values as part of the scheme.

As one reads through the remainder of this report, with details and citations to the exact testimony within the different hearings, the fact that judge king, the trustee and the trustee's lawyer willfully, knowingly and intentionally attempt to ignore and willfully blind themselves of the fraud on the court and collusion in the trustee's price fixing, bribery, kickback, bid rigging and money laundering scheme becomes even more shocking, as it is clear that they all knew what was going on but like the Judge David Jones scandal in the southern district of Texas, stayed quiet in order to profit from it.

It becomes blatantly clear that they are not simply part of the cover-up, they were part of the scheme from its inception, including the undisclosed trip to Austin by trustee john Patrick Lowe and his lawyer pat autry to meet with Steve Sanders on September 16, 2014 immediately upon the trustee being appointed by judge King. This was only discovered by the debtors following the sale, as the disclosure came in the form of a notation embedded in the billing records of Pat Autry and Branscomb PC. Sanders was involved from the time he created Sanders family investments, LLC on June 11, 2014, and apparently finalize the arrangements to have Busby embedded as the broker, Schumacher as the front man purchaser, long time bankruptcy lawyer Dean Greer to provide the straw bidder and judge King to approve everything they needed, and ignore anything

that needed to be ignored.  It's definitely the way it worked out, and these things don't happen by accident.

It has been theorized that the reckless, in your face, above the law style brazenness and blatant nature of the scheme is the result of Judge King and trustee john Patrick Lowe using their immunity as a shield and a sword to defraud bankruptcy estates.  However, the immunity does not cover acts outside of the court's jurisdiction and where the acts are willfully, knowingly, willfully and intentionally designed to commit fraud on the court, cover-up for fraud on the court can provide cover for defrauding bankruptcy estates.

Judge King has clearly acted in the absence of jurisdiction by presiding over this case when the facts, evidence and circumstances required his dismissal and recusal from the case, and dealing with the conspiracy on an *ex parte* basis outside of court in furtherance of concocting a cover-up scheme for the fraudulent testimony of those involved the in the defrauding of the bankruptcy estates.  It is also clearly the case that the bankruptcy court has lost jurisdiction for presiding over a case for which judge king's impartiality is reasonably questioned.

As did Judge David Jones (commonly referred to by the press now has the former disgraced chief bankruptcy judge of the Southern District of Texas), Judge King willfully, knowingly and intentionally ignore conflicts of interest and evidence of fraud, price fixing and bid rigging in furtherance of the scheme to defraud the Johnson Rozelle bankruptcy estates.  Furthermore, when the court's orders are procured by fraud on the court, and there is no statute of limitations for fraud on the court, all orders are void – all settlements are void and the court did not have jurisdiction.


In the same hearing of February 10, 2021, king continued on with his falsified findings of fact stating: **"And I believe it was a fair and open process. There's no impropriety by anyone in my opinion, other than Mr. Rozelle believes that he's getting cheated somehow. And as I said, nothing could be further from the truth." (ecf 1008@16).**

Again, the numerous instances fraud on the court cannot reasonably or rationally be denied.  It's all on the record and it's all in the transcripts.  King had previously attempted to get title insurance for the bad faith purchasers on April 21, 2015 by holding a hearing specifically to make a actual finding of fact that the fraud on the court on the part of his longtime colleagues at his former law firm

and purchaser Robert Schumacher didn't amount to **"even a hint of impropriety"** **(ecf 242@70, 72).**

It sure didn't work then either.  While the cover-up scheme was clearly designed to get title insurance for bad faith purchasers Sanders and Schumacher, and complete the job of the conspiracy, the only thing it ensured was that now virtually *no title company anywhere would give a clean title policy for the trustee's clearly corrupted sale*.  This is all on King for agreeing to go along with making such a finding when even the testimony of Sanders and Schumacher at the concocted April 21, 2015 'cover-up' hearing completely contradicted the prior testimony of Schumacher and his lawyers at Langley and Banack.  It almost appears as though King is compromised to the point of complicity, and willing to make orders as irrational as a finding that 2+2=7, clearly sacrificing the integrity of the bankruptcy court in a last ditch effort to save a $30,000,000 skim from the price-fixing and bid-rigging scheme.

Continuing with Kings falsified findings of February 10, 2021, king continued: **"I've had this situation for over nine years, and I'm very familiar with everything that's happened in the case. And I just think that its conspiracy theories taking little things out of context and trying to build conspiracy theory on conspiracy theory." (ecf 1008@16).**

Here King admits he Is familiar with everything that has happened in the case, demonstrating that King's falsified findings are made knowingly, willfully and intentionally.  King then approves the fees for the trustee's lawyer as expected and part of the routine, but then makes sure he puts on the record that the system as a rigged, it's just that Mr. Rozelle is unhappy.  King states the sale process was designed **"to preserve as much as we can for the debtor's" (ecf 1008@17).**  Who honestly believes that fraud on the court on the part of the purchasers, their lawyers and the trustees other professionals that, not to mention the trustees broker colluding with the purchasers in a price-fixing and bid-rigging scheme was designed to preserve as much equity for the victims?  King further states that the efforts to return as much to the debtors was **"frustrated by all the appeals and all the litigation and there could have been several million dollars more for Mr. Rozelle and his mother if things had gone the way we hoped, but they didnt because of all of the claims by Mr. Rozelle"(ecf 1008@17)**

This of course it is the victim blaming/blame shifting as cover-up for the scheme.  It has to be remembered that once judge King approved Busby at the October 28, 2014 hearing on the trustee's application to hire Busby, and on the trustee's allegation that the conflicts of interest "were an advantage", the case

was fixed. The trustee's broker specifically informed the court at the hearing for the brokers approval that the trustee may take a **'targeted approach' of "simply dealing with those the trustee believes they should be dealing with" (ecf 129@24)** to selling the property rather than marketing far and wide for a competitive price, and judge King signaled his approval by reminding the broker in the same overly cordial conversation with a broker that **"bankruptcy is a good place for people find good deals on land" (ecf 129@22).** Sure enough, now having be court's approval to essentially 'target' the broker's partners, at the sale hearing the trustee's counsel informed of judge King that the trustee had in fact taken a "targeted approach" **(ecf 220 @47).** King's overly cordial conversation with Busby was clearly meant to send a message to the debtors that King and Busby were on the same page – two like-minded individuals and birds of a feather of the same character and composition in lockstep with what was going to happen.

King had heard testimony from Rozelle previously that the debtors were smart enough to recognize a ploy and collusion between their brokers and Steve Sanders of Stratford Land fund to have the debtors hire Walt Busby as a consultant, with the broker feigning ignorance of the fact that Sanders and noteholder Stratford and Busby were 'linked-at-the-hips'. This was clearly King 'winking and nodding' at Stratford, Sanders and Busby that the debtors may have been smart enough to see through the scheme to embed Busby as a part of their sales team, but now King was gonna cram Busby down their throat with a judicial order approving him in the sales process. It's what the debtors counsel at the time **"reeked of impropriety" (ecf 129@44-45)**

In fact, had judge Kings sale gone as king had planned, the prior bankruptcy lawyers' attempts to convince their clients have to agree to a $12,000,000 value would have likely been used for King to make a finding that represented fair market value coming from the debtors themselves, and would have approved a trustee sale at that time of $12,000,000. It clearly appeared that the bankruptcy lawyers were under pressure from judge King to prevent evidence of value from being placed on the record, as the lawyers had turned 180° from their original position when they were hired. At that time, they opined that the prior bankruptcy lawyers had attempted to deceive Johnson and Rozelle into a fire sale situation against the best interest of the debtors and the bankruptcy estates. In fact, the lawyers' own opinion of value was consistent with the appraisals of roughly $45,000,000 - $50,000,000, and that it therefore created a large enough equity cushion for a three or four year plan to sell off any or all of the property to

pay off the debt. For the bankruptcy lawyers to then suspiciously turn 180° and attempt to convince the debtors to agree to a $12,000,000 valuation can be perhaps explained by the fact that King and his colleague Jim Hoffman had leverage over David Brown for failing to disclose to the debtors or the court that he had previously been sued for legal malpractice and represented by Jim Hoffman, as the debtors own legal malpractice lawyer had discovered and disclosed in an objection to Brown's fees **(BK 11-53132 Doc.230)**

It clearly appeared to be 'frustrating' Judge King that the debtors did not fall for the schemes of the bankruptcy lawyers, and clearly appears to be frustrated that the debtors could not have been controlled by their bankruptcy lawyers, and the only reason this would frustrate Judge King, who appears to take it personally, is if king himself was directing the lawyers to sabotage their clients' case. It would clearly explain King's other falsified findings of fact of August 28, 2014, wherein he described Rozelle in particular as being "extremely difficult to deal with" and claimed Rozelle "burned many bridges with professionals" (see herein).

King knows full well that the only professionals that found Rozelle difficult were bankruptcy lawyers that had suspiciously turned 180°, and attempted to coerce or pressure the debtors into actions against their best interests or the interests of their bankruptcy estates. The latest and last of these, of course, was Ron Smeberg, who was apparently also pressured or incentivized to turn 180° after filing the pleadings and motions regarding the deception in the sale process **(ecfs 239, 240, 241 and 244)** as well as appeals alleging fraud. Talk about 180°, Smeberg then completely turned to represent formally same Walt Busby he had filed motions against for fraud in the Johnson Rozelle bankruptcy sale.

King also had falsely stated that Rozelle "appeared to be the common element", when in fact it clearly appears to be an attempt on the part of King to deflect attention away from the fact that the common element that could possibly threaten bankruptcy lawyers into 'going along to get along' in his court is judge King himself.

In fact, judge Kings animosity, bias and prejudice against the debtors and Rozelle in particular appears to stem from the fact that the debtors have l been advised by a board-certified legal malpractice attorney that recognizes unethical behavior of bankruptcy lawyers with or without robes.

Two of judge Kings former clerks with Haynes and Boone filed a false claim in the prior bankruptcy case after the debtors could not be coerced into agreeing to a $12,000,000 valuation for their $50,000,000 property by Tutt and Brown the

Next step to justify having a trustee appointed was a false claim for attorneys fees that was beyond the statute of limitations and statute of frauds, as Rozelle had never signed any fee agreement with a law firm, nor had he even been asked to until some seven months into litigation. According to David Brown, the law firm was claiming to have a signed fee agreement with Rozelle signature, and even if it was forged, judge king was looking for any excuse to appoint a trustee to liquidate the property. Brown attempted to convince Rozelle to simply accept the false claim rather than fight it, as judge king would clearly sided with Haynes and Boone even if he felt the document was forged.

When Rozelle refused to be pressured into 'going along' with being victimized by fraud out of fear of judge King, Brown refused to represent Rozelle in the adversary proceeding, and suggested a legal malpractice lawyer, Don Krause. Clearly brown felt Rozelle would not know the Don Krause was the longtime litigation Atty. for Rozelle's adversary/noteholder Broadway bank.

At the last minute Rozelle brought in Robert Johnson of Corpus Christi, which caught the debtor's bankruptcy lawyers in the bankruptcy court off guard. Now recognizing Robert Johnson in court, Haynes and Boone did a 180° turn. Even though Johnson was denied admittance in court by judge King over objections by Jim Hoffman, he instructed David Brown to represent Rozelle using Johnson's own note cards and case preparation. Now Haynes and Boone and judge King's former clerk Abigail Ottmers changed their story:

> **Brown: And, again, we've asked for a copy of the fee agreement. Haynes and Boone has indicated they have a copy of the fee agreement that was signed by Mr. Rozelle. Mr. Rozelle says he never signed a fee agreement. He disagreed with it. That doesn't ...**

> **King: okay. So he doesn't remember signing a fee agreement, but they say they have one?**

> **Brown: they say they have one... And we've requested that they produce it. They've – – haven't produced it because they said there might be attorney conflict – – attorney privileged information in the agreement – – (ecf 265@16)**

**Ottmers: may I interject for a moment?**

**King: is there a written agreement?**

**Ottmers: let me just clarify. There is not a written agreement with Mr. Rozelle. He did not sign the engagement agreement. I think – –**

**King: okay. Did Ms. Schimpff?**

**Ottmers: yes. Ms. Schimpff did sign an engagement agreement.**

**King: okay. So he – – Mr. Rozelle did not sign it?**

**Ottmers: no he did not       (BankDoc.265@15-17)**

Long story short, Rozelle was pressured into selling for $43,000 on their claim of $340,000 in order to give King's two clerks, Abigail Ottmers and Eric Terry a 'bridge to back out over'.  Where there original intent was to extort $340,000 from Rozelle and defeat confirmation of the debtors plan of reorganization by judge king's granting temporary allowance to vote against the plan – even prior to facts and evidence of their bad faith claim -they now agreed to vote for the plan, which was confirmed.

In a similar case, it has been reported the Judge David Jones had unethically presided over a case involving two of his former clerks, and the debtors believe firmly that the only reason they brought the claim along with a forged fee agreement in the first place is they had a friendly court.  King was clearly upset that an 'outsider' – and a board certified legal malpractice lawyer at that – that exposed a false claim and ethics violations of two of his former clerks.  Rozelle was informed that "King would not forget it".

Another longtime fixture of the court and colleague of judge Kings, Robert barrows, who also represented Walt Busby, brought in a flagrantly false claim for a brokerage commission of $44,000 falsely claiming it was owed for the debtors' sale to Valero.  Barrows only included six pages of the 13 page listing agreement in his claim **(ecf 721 Exhibit A@35-40)**, strategically omitting the very pages that referred to in excluded list of parties for which the brokers would not be owed a

commission -and left off the excluded list as well.  On top of the excluded list was Valero.

Clearly any third grader could see the discontinuity of the paragraphs between the missing pages, so there's no reasonable expectation of that the false claim was ever intended to be scrutinized by the debtors bankruptcy counsel.  It was simply expected to be paid without any objection.  But the debtors are extremely difficult to deal with in judge king's eyes, because they file objections to fraudulent claims and fraudulent price fixing and bid rigging schemes.  Clearly judge king was expected as well to simply rubberstamp the claim with his seal of approval regardless of the fact that it was false and intentionally deceptive.

This is clearly what appears to upset judge king the most -outside of the bankruptcy court the of had competent legal counsel, and are smart enough themselves to recognize the Atty. misconduct and judicial misconduct.  Apparently that makes an extremely difficult to deal with.  Robert Johnson filed an objection to the claim politely explaining its 'shortcomings' with the complete listing agreement attached **(ecf 721 Exhibit A@41-43),,** and the claim wisely was withdrawn.  The back story to the false claim is even more nefarious, but for purposes of this report is sufficient to demonstrate how the bankruptcy court of Judge Ronald B King works -if you got a claim against the debtors for which King has an incredible bias and prejudice against, it can expect to be granted regardless of how meritless, frivolous or fraudulent it may be.  It's exactly why judge king is poised to grant any and all requested relief in the trustee's latest frivolous 'complaint' against the debtors the for the trustees 'defense fund'.


At the sale hearing of April 21, 2015, after the front man purchaser and his lawyers at Langley and Banack were caught in their fraud on the court to hide the conspiracy between Sanders and Schumacher, and therefore Busby and Lowe, Rozelle attempted to persuade the court to have reputable brokers like DH Realty Partners sell off just the front 25 acres quickly at a fire sale price to pay off all debts and exit bankruptcy.  King would have nothing to do with it, and instead continued to champion and defend bad faith purchasers and their lawyers for their fraud on the court so egregious that they couldn't get a clean title policy.

That alone speaks volumes

Had the court run a clean game, the bankruptcy case could've been ended years ago without any objections from the debtor's to a price-fixing and bid-rigging scheme.  King blaming the debtors for exposing facts and evidence of corruption in his court is nothing but further defamation to discredit and retaliate

against the whistleblowers.  The trustee clearly breached his duties by refusing his duty to protect and maximize the bankruptcy estates by willfully, intentionally and specifically pursuing a corrupted sale that would obviously minimize the sale price, value of the bankruptcy estates and return to the debtors, and therefore obviously drew objections.  Apparently the trustee felt comfortable breaching his duties for operating under the approval of the scheme by the bankruptcy judge. However, two wrongs don't make a right.  Judge King being in a position to make a finding that the trustee and his professionals committed no misconduct or have any liability for breaches of fiduciary duty was like judge Isgur presiding over a case involving his 'adopted son' Judge David Jones and the conspiracy with Jackson walker and Jones' live-in girlfriend Elizabeth Freeman, which Isgur was poised to do until the media apparently shamed him into doing the right thing and recusing himself.  King has continually refused to recuse himself in the Johnson Rozelle case, and apparently refused the debtors repeated requests to refer the case to the US Attorney's office for investigation- not that the debtors have not done that already.

King, however, is apparently not accustomed to victims speaking out about the corruption in his court.  As Pat Autry testified, the allegations of a price-fixing and bid-rigging scheme in judge Kings Court was **"shocking"(ecf 713@65-66)**.  As other lawyers have written of bankruptcy racketeering rings and bankruptcy courts' reputation for corruption, "... ***Creditors help rig bids in bankruptcy**, aid in the facilitation of debtor fraud, **and threaten certain actions against the debtor unless the debtor "plays along"*** [7].  Just one of the certain actions in the case at hand involved Judge King threatening to lift the stay unless the debtors 'play along' with dropping their appeals, which they were forced to do when king did in fact lift the stay prior to a ruling from the Appellate Court on the debtors appeal to the corrupted sale.  It's apparently the bankruptcy lawyer's job to control their clients into 'playing along' with being victimized by bankruptcy court corruption. The only choice King wanted for the debtors were to accept being defrauded of $30,000,000 and receive pennies on the dollar for what they should have received from a legitimate sale, or take nothing at all.  The debtors chose to expose the corruption and overturn the sale, and report the facts and evidence to the Federal authorities which they have.

---

[7] Shafferman, Joel **"Let Counsel Beware: Overzelous Bankruptcy Practice Can Lead To a Prison Cell"**, *The Champion / National Association Of Criminal Defense Lawyers, Sept/October issue 2012*

It has to be remembered it was the title company that discovered the fraud on the court, and refused to give a clean title policy. Debtors had nothing to do with that – they just reported it to the Federal authorities and filed on record with the court the evidence of the fraud on the court in the sale process. It's not the debtors fault that collusion in bankruptcy sales is prohibited by the bankruptcy code § 363(n), nor is it the debtors fault that the trustee, his professionals and the other offices of the court committed fraud on the court, which renders judge king's orders throughout the proceedings void. It's not the debtors fault that the purchasers were not protected by § 363(m) that only protects good faith purchasers for value from appeals, nor is it the debtors fault that Judge King pressured the debtors under duress into signing a stipulation agreement to drop their appeals. This is all on the trustee and Judge King, who obviously felt their immunity could be used as a shield and a sword. Judge David Jones felt his immunity protected him, but the arguments by the UST and other plaintiffs prove otherwise, and did not prevent him from resigning in disgrace and forever stigmatize and his legacy as yet another bankruptcy judge that used conflicts of interest to grant favorable rulings for profit.

Any reasonable and objective person aware of the facts and circumstances could easily draw the conclusion that the Judge King case is far more egregious and unconscionable than that of former bankruptcy Judge David Jones in the sister district of the western district of Texas, the southern district of Texas. And any reasonable objective person could easily conclude that judge king's clearly irrational and falsified findings of fact in reckless disregard for the truth, facts and evidence put squarely before him by the debtors are in furtherance of protecting not just the scheme and resulting profits for the purchasers, but self-dealing profit to himself as well , perhaps as a 'golden parachute' and thank-you gift from the lawyers whose legal fees he has blindly approved for decades . If it is found that King did not profit already from the scheme (if he ever files his financial reports), there's no reason to believe that like his counterparts Busby and Sanders, he and other lawyers that have shuttered their longtime offices and moved to Langley and Banack haven't been promised profits in the future. It is, after all, a common trait of price fixing and bid rigging schemes. King and the bankruptcy trustee have opened themselves up to this scrutiny by their own actions in the case - not mere *allegations* by the debtors – but just documented evidence placed on the record by the debtors.

Furthermore, with the court's knowledge, the trustee not only refused to hire reputable non-conflicted brokers to market the property, but lied about hearing from reputable brokers who could market the property for competitive price.  This is all on the trustee and the bankruptcy judge for approving all.  That the bankruptcy judge attempts to discredit, blame and defame the victims in furtherance of protecting his closest colleagues in their price-fixing and bid-rigging scheme that defrauded the bankruptcy estates of $30,000,000 is further evidence that Judge King was required to recuse himself for his clear bias and prejudice against the debtors, and his impartiality could not only be reasonably questioned, but in fact, there is no question about his partiality towards those involved in the scheme.  It also demonstrates that the judge is not morally or ethically fit to sit in judgment of the debtors or anyone else, and should be removed from the bench - at a minimum.

As to be remembered that the libel and slanderous smear campaign and defamation to discredit the debtors whistleblowers wasn't simply made in passing, but made in a public forum in a finding of fact.

Also at the same February 10, 2021 hearing – following judge king's approval of fees and pre scripted findings of fact and conclusions of law

Just as the debtors' motions for reconsideration exposed fraud on the court from prior hearings, their request to postpone the sale hearing until they could have counsel present was denied, and their request for a second but legitimate sale at the April 21, 2015 'rehearing' (when it became clear that Sanders was involved in the purchase of the property as the debtors had alleged, and resulted in a fraudulently low sales price) was denied, virtually every hearing where evidence was brought forth of fraud on the court and the price-fixing and bid-rigging scheme, the court and its inner circle of closest colleagues appears to be preprogrammed with pre scripted findings of fact, and will not let anything get in their way of protecting the scheme and its $30,000,000 in profits skimmed off the top alone – not to mention future development 'mailbox money' laundered as attorneys fees.

It's important to keep in mind as well that the scheme that defrauded the bankruptcy estates of $30,000,000 also defrauded the Federal government of the capital gains tax that would have been realized from a competitive process and a competitive price.

The final straw was the February 10, 2021 hearing.  Again, debtors had already put on the record the transcripts of Busby's admissions before the UST to the role he and Sanders played in the price-fixing and bid-rigging scheme, including the kickbacks.  All of this evidence was completely ignored, and rows else testimony completely dodged.  Along with this the debtors had filed a motion to have the case referred to the us attorney's office for investigation, which apparently prompted judge King's immediate retirement, apparently believing taking a senior status protected him from the fifth circuit complaint and investigation such as the one that prompted Judge David Jones to immediately retire.

Would it proves conclusively is the fact that regardless of how much evidence is put before the court, and how strong, clear, convincing and beyond any reasonable doubt the evidence is that is put before the court, the court has its own agenda and it doesn't involve acting upon evidence of fraud and corruption It's all about protecting the scheme and its profits.  It doesn't matter if the debtors have legal counsel or not.  It doesn't matter if the debtors appear or not.  It clearly appears that orders are already signed and hearings are simply designed to give the façade of giving the eight debtors their 'day in court' and provided 'due process'.

It's  worth noting that the complaint began with a letter from the trustee's newest bankruptcy lawyers Graves Dougherty from Austin, Texas.  The debtors have filed this letter on the record in this case as Document 14, Exhibit A.

On December 4, 2024 the prior motion of the debtors for the requested relief above was denied by an order from judge King (24-05022-rbk Doc#22) on the grounds that it was multifarious and contrary to local rules.  In fact, judge king was required to recuse himself from the case on his own initiative as per 28 USC § 455 as it is more than obvious to any reasonable observer aware of the facts and circumstances that judge King's impartiality is more than merely questionable.

As well, U.S.C. 18 § 3057(a) *requires* a judge or trustee having reasonable grounds for believing *any* laws have been violated in relation to a bankruptcy case to *report all the facts and circumstances* to the office of the United States Attorney (USA). It is the USA - not a judge or office of the United States Trustee (UST) - that determines if investigation is warranted.

A judge, trustee or UST that fails to report even possible violations of bankruptcy related crimes is in violation of their duties and the law (U.S.C.18 § 3057(a)).

On December 24, 2024, debtor Clarita Johnson received a letter from the Bankruptcy Noticing Center addressed to debtor Francis McQueen Rozelle Jr. And his address and with Johnson's address as well. It contained an order from judge King signed December 3, 2024 approving $23,866.82 in interim fees for the trustee's counsel Graves Dougherty.

The order informs that Graves Doherty had filed a fee application as ecf 1073 in bankruptcy case 14-51480rbk. Debtors never received any notice of the fee application and were therefore denied any opportunity to object. Looking at the fee application itself and downloading it from PACER, Graves Dougherty apparently filed the fee application on November 7, 2024 that included a certificate of service certifying that the debtors have been sent notice of the application by U.S. mail at their respective addresses. Debtors received no notice and therefore denied due process and the ability to object.

As stated elsewhere within this document, prior orders signed by judge king granting interim fees to the trustee were granted with judge king stating he had reviewed the record and seen no objections by the debtors when in fact, the debtors objections were clearly on the record. There is a distinct pattern of signing orders and making falsified findings of fact in reckless disregard of the truth that and denial of due process. The debtors obviously object to any fees to the trustee or any of his professionals as they have from the beginning, as fees procured for defrauding the Johnson Rozelle bankruptcy estates of some $30,000,000 with judicial orders approving fees and facilitating the scheme are obviously without merit and should be clawed back by United States trustee in the same manner they are clawing back millions of dollars in fees fraudulently granted by the now disgraced former bankruptcy judge David Jones in the sister southern district of Texas.

Billing entries in the fee application and billing summary state there had been communications with debtors and Rozelle in particular, but the debtors have only received an initial letter dated December 18, 2023 and sent initially only to Clarita Johnson **(filed by the debtors as 24-05022 Doc. 14 Exhibit A)** stating that the Graves Dougherty firm had failed to see any misconduct on the part of the trustee or his professionals and a voicemail left for Rozelle on April 8, 2024 from a telephone number from Grand Rapids, Michigan stating to be Brian Cumings of the graves Dougherty firm and requesting a callback at 616-309 6800 that lasted 11 seconds.  Outside of that, the only 'communication' has been the debtors sending pleadings as required with a certificate of service.

The 'complaint' levied against Johnson and Rozelle comes from a career chapter 7 bankruptcy trustee, John Patrick Lowe, who was removed from the Johnson Rozelle case in 2015 **(ecf 332)**, and is requesting an order from a bankruptcy judge who has been disqualified by 28 USC § 455 and other provisions of law and Judicial Canons of Ethics.

The 'complaint' is nothing more than a fee application for Trustee john Patrick Lowe under the guise of a complaint.  It's a means of identifying in labeling whistleblowers Johnson and Rozelle 'defendants' as though they had done something wrong.  What Johnson and Rozelle have done is exposed the corruption of judge King's court.  The complaint is virtually the latest step in attempting to cover up the corruption and price-fixing/bid rigging scheme, and protect the $30,000,000 in ill-gotten gains.  It fails on the face of it as have all other attempts to cover up every new piece of evidence of the fraud scheme as it came about and discovered by the debtors' own investigation.

The 'trial' is nothing more than a fee application hearing.  Debtors have objected to the fees for fraud and breaches of fiduciary duty for years, and provided evidence such as that in this document proving elements of the price-fixing and bid-rigging scheme that defrauded their bankruptcy estates, including sworn testimony before the United States trustee by the trustee's broker, in which he admitted to the concealed collusion between the trustee and purchasers including the kickbacks.  The fee application in the form of complaint is nothing but a calculated 'work-around' to allow the trustee and his professionals unlimited funds from the remaining assets and the bankruptcy estate for their work defrauding the bankruptcy estate, especially given that the order King will no doubt sign granting the requested relief and a finding that

neither the trustee nor any of his professionals have any liability for defrauding the bankruptcy estates.

The 'trigger' to activate the requested $200,000 *minimum* from the bankruptcy estates of Johnson and Rozelle is nothing more than a thinly veiled disguised sanction against the debtors should they lose any appeal to judge King's an order, knowing of course that other judges have a history of 'circling the wagons' to protect Judge King by affirming his orders.  To send it back for reexamination would be a reexamination of the facts and evidence of the corruption, which makes them all look bad.  One need only examine the facts and evidence of the facts and evidence that toppled the now disgraced former chief bankruptcy judge of the southern district of Texas David Jones, and the Federal judges that sealed the information[8] that ultimately led to a fifth circuit complaint against the judge, the judge being sued for racketeering, and a Federal investigation into the actions of David Jones and his favored law firms.  The cover-up worked in that case until another pro se litigant leaked the sealed document to the press.

 Judge David Jones and Jackson Walker attempted to sanction pro se litigant Michael Van Deelen and his counsel for bringing forth numerous valid claims, including but not limited to: racketeering, common-law fraud, breach of fiduciary duty, aiding and abetting in the breach of fiduciary duty, professional negligence, common-law conspiracy, unjust enrichment, negligent misrepresentation, and conspiracy to interfere with plaintiffs constitutional rights – as well as arguing against the attorneys fees unlawfully taken from the bankruptcy estates and a courtroom corrupted by fraud in which the ongoing criminal enterprise operating within that court allow the lawyers to enrich themselves unjustly without a level playing field for other parties.

In the Bouchard case vs. Judge David Jones, the former ceo of Bouchard transportation company, Morton Bouchard III was advised to file his bankruptcy in the Houston bankruptcy court even though his company was based in New York.  The reason given was because Judge Jones was a 'friend' of Kirkland Ellis law firm.  As in the Johnson Rozelle case, it's all about connections.  King clearly overlooked all of the evidence of the above causes of action and fraud on the court because his closest longtime colleagues were involved, including his former

---

[8] See James Nani and Ronnie Greene, **How Four Judges Kept Romance Allegations Quiet for Two Years**, *Bloomberg law*, March 1, 2024

law firm Langley and Banack and his closest colleagues, former partners  and at least one of judge Kings former law clerks at Langley and Banack.

Democracy dies in darkness, and corruption thrives in darkness.

Judge King has demonstrated a distinct and unmistakable pattern of knowingly, willfully and intentionally signing numerous orders procured by blatant and flagrant fraud on the court in a textbook example of impropriety[9].

The goal clearly appears to have been for perpetrating and perpetually covering up the egregious and unconscionable court facilitated price-fixing, bribery, kickback, bid-rigging and money laundering scheme that defrauded the Johnson Rozelle bankruptcy estates of some $30,000,000.

The trustee's complaint is nothing more than a frivolous 'best defense is a good offense' last ditch desperate effort to attain a 'pardon' for the bankruptcy crimes committed by himself and his professionals – and effectively others - with whom he conspired.  The complaint appears as well to be an effort to absolve the bankruptcy judge, as the bankruptcy trustee and his professionals operating the egregious price-fixing and bid-rigging scheme were doing so under the authority, approval and protective umbrella of bankruptcy judge Ronald B king, at the time the chief bankruptcy judge for the western district of Texas.

The complaint fails on its own, as in seeking fees – some $200,000 – for the trustee's own defense against being sued for blatant breaches of fiduciary duty and bankruptcy crimes and defrauding the Johnson Rozelle bankruptcy estates.  It clearly appears to be a manufactured means of not simply being paid as a reward for breaching his duties as a bankruptcy trustee, but now has a defendant, and

---

[9] As the debtors' counsel informed bankruptcy Judge Ronald B King, who approved the clearly disqualified and conflicted longtime broker and operative of the loan-to-own noteholder Stratford, Walt Busby, as the trustee's broker to sell the bankruptcy estate property, **"It reeks of impropriety if nothing else" (ecf 129@44-45).**  And in fact, it stunk up the whole case from that point on, as it came to no -one's surprise then that the trustee and Busby sold the property to Busby's longtime partner at Stratford Steve Sanders for a $30,000,000 discount from fair market and appraised values.  The trustee failed to disclose that he and his counsel had immediately upon being appointed secretly met with purchaser Steve Sanders and arranged to hire Sanders' longtime partner Walt Busby as the trustee's broker.  This was only discovered by the debtors after the sale.  The entire case from that point on was judge king and trustee john Patrick Lowe attempting to cover up for the numerous instances of egregious fraud on the court in furtherance of the trustee's price-fixing and bid-rigging scheme.  Busby would later admit before the UST that Sanders was secretly acting as his co-broker for trustee john Patrick Lowe in the sale of the property to Sanders, and therefore kicked-back half of the commission to Sanders, who was also financially supporting Busby during the bankruptcy.

not just any defendant, but a defendant guilty of willfully, knowingly and intentionally breaching his fiduciary duties in committing crimes *against* the bankruptcy estates from which he requests payment **on top of** the $30,000,000 damage to the bankruptcy estates he caused. It is essentially a sanction against the debtors were blowing the whistle on an ongoing criminal enterprise that has apparently been operating within judge king's bankruptcy court for decades, as there has been no one willing to stop them.

This is clearly not just self serving, but self serving at the expense of the victims of the trustee's bankruptcy fraud. Self dealing by a bankruptcy trustee occurs when trustees breached their fiduciary duty to protect and maximize the value of the bankruptcy estates, and instead, use the bankruptcy estate assets for their own benefit or the benefit of others instead of the beneficiaries of the bankruptcy estate. This is a criminal breach of fiduciary duty that another bankruptcy courts would lead to litigation, penalties, disgorgement of fees, restitution, removal from the case, disbarment and imprisonment. Obviously the trustee believes since he received approval of the corrupted sale netting $30,000,000 as the spread between the trustees sale price and fair market and appraised values, the bankruptcy court and a senior courts will clearly allow the bankruptcy estates to pay for the trustee's criminal defense.

The trustee's requested relief is an outrageously ridiculous request that if so ordered and approved, will only provide more compounding evidence of a distinct pattern of a clearly disqualified bankruptcy judge **(as per 28 USC § 455 and Canon 3(c)I )** for willfully and deliberately approving fees as a reward for the willful and deliberate defrauding of bankruptcy estates, and actually rewarding a bankruptcy trustee that had been removed from the case back in 2015 **(ecf 332)**. The order will simply be noted in furtherance of the continued attempt to cover-up the crimes and retaliation against the debtors as whistleblowers. The facts and evidence clearly demonstrate intent to defraud the bankruptcy estates with an egregious and blatant price fixing, bribery, kickback, bid rigging scheme and money laundering scheme.

An egregious, blatant and unconscionable price fixing and bid rigging scheme was perpetrated by the trustee and his professionals in conspiracy and collusion with the purchasers/'winning bidders'. This was done primarily through the trustee's undisclosed and concealed- from- the- court collusion with the predetermined purchasers prior to the sale, as the trustee agreed to hire the purchasers' longtime partner as a 'disinterested' real estate broker in the sale of the bankruptcy estate property.

The debtors themselves provided information from their own investigation that the trustee's chosen broker was clearly disqualified for his conflicts of interest with the noteholder and purchaser of the bankruptcy estate property, and as the debtors' counsel informed the court at the time, it **"reeked of impropriety" (ecf 129@44-45).** It is believed that the trustee was prepared to claim there was no prior relationship between his broker and the noteholder/purchaser who chose the broker, as it is the same lie they used later in falsely claiming to the court that the noteholder/purchaser had never met or had any contact with the 'front man' purchaser in the scheme, who was also later discovered to be the broker's partner in the purchase/development of the property. They were caught red handed in that lie and fraud on the court by the title company who therefore refused to give a clean title policy to the trustee and his predetermined purchasers in the scheme.

When the debtors objection to the trustee's choice of broker revealed the connections with the noteholder and eventual purchaser in the bid rigging scheme revealed the connections, the trustee's 'Plan B' was an absurd and even more revealing 'red flag' evidence and forewarning of the scheme: the trustee actually told the court that the clear conflicts of interest of the disqualified broker **"was actually an advantage to the bankruptcy estates"(ecf 129@15-16)**. Then, when bankruptcy Judge Ronald B King, the former chief bankruptcy judge of the western district of Texas, gave his approval, it was clear that the bankruptcy judge himself was willing to ignore all conflicts of interest and appearances of impropriety in furtherance of approving a corrupted sale process, and as the debtors warned the court, the trustee was going to conduct a sale of the debtors $50,000,000 property for a preset and fixed price of roughly $20,000,000 in a collusive sale to an insider of loan-to-own noteholder Stratford Land fund. To do this with the judge's approval, the purchasers made sure to use the judge's former law firm and closest professional and personal colleagues to ensure not just orders approving the sale and orders approving fees for those involved in the corrupted sale, but also sanctions against the debtors as whistleblowers for bringing forth other evidence of fraud and fraud on the court in furtherance of the scheme and filing the evidence on the record.

Even the newspaper following the high-profile case reported the debtors' allegations of an insider sale prior to the sale, and confirmed following the sale that the debtors' allegations were proven correct. Allegations of fraud on the court, and reporting that fraud on the court with indisputable evidence is not

frivolous.  It clearly disrupts and exposes corruption in the bankruptcy court, but telling the truth and exposing corruption is not frivolous.  It's a requirement.

§

Summary of appraisals of the debtors' bankruptcy estate property

- 2007 DB Harrell – **$38 million** 'as is'  **(ECF 240, Exhibit 2C-1)**
- 2007 Jones Lang LaSalle – **$35 million-$45 million** 'as is' **(ECF 240, exhibit 2C-2)**
- 2009 Central Texas Appraisals – $**44 million** 'as is', **$49 million** if sold in separate parcels **(ECF 85-6, 85-7)**
- 2011 TerCorp appraisal of front 20 acres – **$14,810,000** 'as is' **(ECF 959-1)**
- 2014 CJ Patton appraisal – **$38 million** 'as is', **$44 million** if sold in parcels **(ECF 85-3)**
- 2014 Lone Star appraisals - 12 acres –**$10,280,000** 'as is' **(ECF 85-5)**[10]
- 2014 Lone Star appraiser Chris Griesbach, MAI testimony and valuation of just the front 25 acres –$16.50/ft **($17,968,500)** 'as is'  **(ECF 112@53-54)**
- 2014 central Texas appraisals – **$47 million** 'as is', **$52 million** if sold in parcels **(ECF 85-8)**

Bankruptcy trustee john Patrick Lowe and his legal counsel Pat Autry took numerous willful and intentional steps to avoid proof of actual and constructive knowledge of the appraised and fair market value of the property as an attempt to self-create a failed argument of plausible deniability.  From the outset of the case they had set the price – apparently was judge King's approval – of $20,000,000 for what is and has been the common consensus amongst numerous appraisers of a roughly $50,000,000 valuation for the property since 2009.

---

[10] note comparables number 4 and 6, which confirm the neighboring 81 acres, that according to the appraisers testimony as a virtually identical "sister tract" to the bankruptcy estates' 114 acre tract, and which sold in two separate parcels in 2013 and 2014 for $44 million. **(BankDoc.85-8@37)**.  The properties are directly across UTSA Boulevard from the debtors/bankruptcy estate's 114 acres, and out of an inferior tract to the subject 114 acres with respect to access.

In fact, the bankruptcy trustee's predetermined broker/purchasing partner Busby would later admit in 2016 under cross examination by Rozelle that he was not surprised by appraisers testimony and appraisals that a neighboring 66 acre tract – "almost identical" and a  "sister tract" that sold for "north of $11.00 a foot"**(ecf 112@48-49)** According to the appraisers comparable sales, the 66 acres sold in in 2014 for $11.75/ft ($33.8 million) and the abutting 15 acre tract sold it to a student housing developer for $15.00 per foot ($9.8 million) for a combined $44,000,000.

If one were to extrapolate those comparable sale values of the 81 acres next door and apply to the bankruptcy estates 114 acres, the value of the bankruptcy estate property as of 2014 was **$61,925,925.93**.

 Busby admitted the reason he wasn't surprised at the sales prices of the neighboring tract was because he himself and another partner, Brad Galo, had purchased another neighboring 100 acre tract of raw land just across IH 10 from the debtors property for $10.42/ft ($45,389,520) in 2006 **(ECF 681@12,84)**. Busby could obviously see where the line of questioning was going, as Busby and purchasers Steve Sanders and Robert Schumacher had access to all of the debtors' appraisals that other proposed bidders – *had there been any*[11] - did not have access to, one of which was a 2008 valuation by Jones Lang Lasalle that valued the Johnson Rozelle property at that time between $35,000,000 and $45,000,000, and even used the well-known and often used Brad Galo purchase of the neighboring property as a comparable sale to arrive at amount.

It should be noted that the highest appraisal attributed to the bankruptcy estate property, being their 2014 appraisal of $47,000,000 "as is" and $52,000,000 valuation if sold in parcels **(ECF 85-8)**, was calculated without benefit of having the latest sale of the 81 acres next door.  Obviously, with the latest and newest comparable sales, but appraisal would have been higher.

§

---

[11] Busby, as the trustee's broker, brought no offers at all, which was his job as gatekeeper in the scheme.  The only 'offers' on the table were lowball or 'insult' offers from the trustee's fellow bankruptcy lawyers in what the DOJ identifies as 'straw' or 'complementary' bids in bid rigging schemes, and are used to simply make the predetermined winning bid stand out as the best.  As even the newspaper reported, these offers were already on the table prior to Busby being hired by the trustee. Busby did not even bring the straw bidder with the 'standout' offer of $20,000,000. The trustee obtained that 'offer' himself prior to Busby being hired.  And in fact, the trustee secretly met with the predetermined purchaser prior to Busby being hired -and in fact Busby was only hired at the predetermined purchaser's suggestion to ensure he would be the winning bidder at $20,000,000.

The true value of the property as determined through numerous independent appraisals from reputable appraisers since 2007 clearly appears to be why judge King slandered and defamed Rozelle and the property by making the clearly false, demeaning, derogatory and defamatory official findings of fact on August 28, 2014.  There is a history of the debtors' own bankruptcy lawyers attempting to coerce and pressure their clients from using appraisals and appraiser testimony in hearings, claiming it would upset judge King, who by no coincidence, has used falsified findings of fact to blame debtors for firing numerous bankruptcy lawyers who clearly appeared to be operating under judge King's thumb, apparently pressuring the bankruptcy lawyers into throwing their client's case in furtherance of the price-fixing and bid-rigging scheme.  As relayed throughout this report and response, preventing the debtors from filing on record the true value of the property only served one purpose: to prevent the fair market and appraised value of the $50,000,000 property from being compared with the court facilitated and corrupted sale of the property for $20.3 million, which itself is evidence of fraud -especially given the facts and circumstances.  As stated elsewhere in this report, price fixing, bribery, kickback, bid-rigging and money-laundering scheme required two key components to be successful:

1) **The participation of Judge King** to turn a blind eye to whatever fraud on the court was needed to get him plausible deniability in approving every aspect of the scheme and its cover-up
2) **The participation of the debtors' own bankruptcy lawyers** to 'go along to get along' with the scheme by tying the hands of their clients Johnson and Rozelle from filing any evidence of value, any evidence of fraud and from filing any objections or appeals to the tainted and corrupted sale

Judge King and the bankruptcy lawyers that essentially make up the inner circle of the bankruptcy racketeering ring closest to judge King were obviously banking on the fact that for several decades this modus operandi has apparently worked.  Debtors and creditors are often unfamiliar and intimidated by bankruptcy, the fact that they are in a Federal Court risking everything, and are at the mercy of the bankruptcy lawyers to dictate the case and the clients actions.  The in many cases the, ethical bankruptcy lawyers will help their clients navigate the system for the best interest of those clients.  However, there are bankruptcy lawyers that give ethical bankruptcy lawyers and judges a bad name for simply analyzing the best way to exploit and profit from their clients situation.

## CODE OF SILENCE

On August 1, 2016, judge King read off a pre-scripted findings of fact, willfully and intentionally mischaracterizing Rozelle as claiming he could not find a lawyer, and then King named each of the debtor's bankruptcy lawyers in the cases **(ecf 625@11-12)**.  The idea was apparently to deflect blame from the bankruptcy lawyers working on behalf of judge king, and make it appear that it was the *debtors* who were the problem rather than the bankruptcy lawyers breaching their fiduciary duties to their clients in furtherance of the price-fixing and bid-rigging scheme. What King  knowingly, willfully and intentionally omits, of course, is that the bankruptcy lawyers were fired for cause and breaching their fiduciary duties – apparently under pressure from judge King himself to breach their fiduciary duties to their clients.  More specifically, King was very much aware that the debtors could not find a bankruptcy lawyer to represent the debtors in judge King's court who would adequately defend and protect the debtors and their interests.  The reason was clearly because the debtor's interests conflict it with judge King's interest, and the interests of King's longtime colleagues who were profiting from the price-fixing and bid-rigging scheme.

Defending clients victimized by bankruptcy court corruption inherently requires exposing the corruption of the court by disclosing on the record the blatant and indisputable fraud on the court and undisclosed conflicts of interest by King's closest colleagues throughout the proceedings  - which in turn, clearly implicates Judge King for at the very least, turning a blind eye to it all in furtherance of protecting and covering up the scheme and corrupted sale.  The fact that judge King also specifically, repeatedly and willfully defamed and sanctioned the victims as retaliation for blowing the whistle on the corruption by putting evidence of the corruption on the record only further corroborates King's intent and demonstrates not just simply bias, prejudice and judicial misconduct, of the complicity in the scheme and its attempted cover-up.

King has routinely portrayed and defamed the debtors, and Rozelle in particular, as being exaggerated paranoid conspiracy nuts to believe that King's court – or any bankruptcy court - could possibly be corrupt, and that the number of bankruptcy lawyers involved in either committing the crimes were remaining silent was simply too large for the scheme to work.  King has attempted to mischaracterize the facts and evidence as just an implausible "giant conspiracy theory", as though it would be impossible for so many bankruptcy lawyers to be involved in a conspiracy to defraud bankruptcy estates without other bankruptcy

lawyers knowing.  It's true that the rules of professional conduct for lawyers requires that they report their fellow lawyers or judges to the state bar or fifth circuit when their honesty and integrity are in question, but very few ever due out of fear.  In simple terms, what King portrays as an implausible, delusional and unrealistic exaggerated giant conspiracy is the very real "code of silence", and it's what judge king and the other lawyers involved in the price-fixing and bid-rigging scheme have exploited in order to carry out the scheme – while at the same time defending the debtors for claiming it doesn't exist.  As reported herein, too many reputable sources disagree with King on too many facts of the case for anything coming from judge King to be believable.

King knows very well that the "giant conspiracy theory of paranoid exaggerated debtors Johnson and Rozelle" mantra he keeps repeating is in actuality the very same "code of silence" that has enabled judges like King, the disgraced and removed US District Judge Samuel Kent of Houston, the disgraced and removed US District court judge Thomas Porteous of Louisiana, the disgraced and removed U.S. District court judge Walter Smith of Waco, Texas, the most recent disgraced and removed former U.S.  District court Judge David Jones of Houston, Texas and many many others.  King wishes to imply the giant conspiracy theories are implausible because it would take too much coordination.  However, the code of silence is the same but the Fifth Circuit refers to as a "conspiracy of silence", and it is very large and it is very real, and it takes no coordinated effort whatsoever – it is simply there: bankruptcy lawyers know to remain silent is to 'go along to get along', especially when it comes to professional fees.  There are hardly ever any objections from other lawyers out of fear of retribution and retaliation against their own professional fees.  In other organized crime circles than the judicial court systems of these judges, such as the mafia, it is known as the law of omerta.  It is very real and a disgrace for judge king to smear and defame the debtors for being the victims of the very code of silence and the fear that it instills in lawyers from speaking up about the price fixing or bid rigging scheme, or daring to bring legitimate offers for the property.

The debtors have spoken to numerous ethical bankruptcy lawyers who do good honest work for their clients, and who have put their own clients' interests above their own – some going above and beyond their duty and reasonable expectations.  They and other attorneys familiar with bankruptcy court corruption in San Antonio had relayed that almost any lawyer would be committing career suicide to adequately defend the interests of the debtors in judge King's court

given the facts and circumstances of the price-fixing and bid-rigging scheme that judge King as facilitated.

As stated elsewhere, Rozelle was held in contempt of court by judge king for refusing to name names on the witness stand of every lawyer that even suggested contacting the FBI regarding the bankruptcy case corruption **(ecf 843 @135-end)**   As Rozelle testified then, lawyers are reluctant to represent the debtors because of the fraud in the case – not on the part of the debtors, but because judge King has willfully, knowingly and intentionally ignored the fraud on the court by his closest colleagues in furtherance of the price-fixing and bid-rigging scheme that defrauded the bankruptcy estates of some $30,000,000.  Any lawyer representing the debtors in judge king's bankruptcy court is essentially signing on to expose Judge King for his facilitating the fraud, or at least expose his corruption.  While several have tried, they eventually turn 180° because someone 'got to them'.  Rozelle testified in court on other occasions that their lawyers have been bought off or scared off of the case by judge King's inner circle of lawyers demanding to know the identity of those lawyers helping the debtors draft pleadings:

> **Rozelle: "And, true to form, these lawyers here demanded to know who they were so that they could twist them, coerce them, get to them, threaten them, like they've done with other attorneys. Our attorneys have been bought off or paid off. They've seen fraud, and then told us, "we can't pursue this because it would not be good for our career"". (ecf 692@54)**

It's all about retaliation.

And besides, judge king and his accomplices have $30,000,000 of house money profited from the skim to spread out for protection, or even perhaps buy the loyalty of any lawyer representing the debtors.

Following their firing of the debtors last bankruptcy lawyer of record, Ron Smeberg, for failing to expose the corruption for which he was hired, and failing to object to the fees of the trustee's broker Walt Busby and the trustee's counsel pat autry/Branscomb PC, the debtors realized no bankruptcy lawyer was better than a compromised or fearful bankruptcy lawyer, or a bankruptcy lawyer willing to cover up for the price-fixing and bid-rigging scheme of his colleagues out of fear of retaliation.

The debtors began filing their own pleadings with the help of other attorneys outlining the facts and evidence of the blatant price fixing and bid rigging scheme.  The lawyers would only help on condition of anonymity for fear of their own careers, as even an Article I federal bankruptcy judge not only has the ability to disbar a bankruptcy lawyer from his court, but with their connections can have other judges retaliate on their behalf in other courts, virtually stifling a lawyers career.

One Texas lawyer crusading against judicial corruption, Ty Clevenger, has been quoted throughout the debtors pleadings and elsewhere within this report. In his blog Lawfog .com, the archives show in just his issue of July, 2018 prime examples from his following experiences with the following stories:

FIFTH CIRCUIT INVESTIGATES ALLEGATION THAT THREE BANKRUPTCY JUDGES COVERED UP CLERKS SEXUAL MISCONDUCT

IT IS JUDGE KYLE HAWTHORN TRYING TO COVER UP REAL ESTATE FRAUD BY HIS FORMER LAW FIRM

A CASE STUDY IN GOOD OLD BOY JUDICIAL CORRUPTION

The first story has to do with a formal complaint filed against judge King, complete with his photo, accusing him of covering up for sexual harassment in the bankruptcy clerk's office.  The complaint was filed by a former clerk.

The second story has to do with a judge covering up for real estate fraud by his former law firm, which is eerily similar to Judge King covering up for the fraud on the court on the part of his former law firm Langley and Banack, which was fraud on the court made specifically in furtherance of covering up the conspiracy to defraud the Johnson Rozelle bankruptcy estates with the price-fixing and bid-rigging scheme.

The third story has to do with a judge retaliating against Ty Clevenger on behalf of another judge.  Clevenger has been widely heralded for single-handedly having two other corrupt U.S. District court judges removed from the bench: one for sexually assaulting court clerks and the other for attempting to cover it up on behalf of the first judge.  Regarding another case, Clevenger wrote **"I learned long ago (and the hard way) the judges are often quick to retaliate.  When I speak up, there it is a strong chance that one of my client's will suffer for it.  I once criticized U.S. District judge Vanessa Gilmore in Houston for some grossly**

**inappropriate comments that she made in the courtroom, and 361st district Judge Steve Smith decided to a venture by retaliating against one of my clients in a totally unrelated case and Bryan (Texas). The judiciary as a fraternity after all, and they protect their own."** When lawyers are willing to relay that the 'good old boy' judicial corruption system is still alive and well on their web sites, the debtors can hardly be singled out as being exaggerated for seeing the same type of retaliation from other judges protecting Judge King.

U.S. District judge Samuel 'King' Kent of Galveston and Houston TX. felt he was so above the law and 'King of his own little kingdom' he could sexually assault his female clerks even with deputy marshals right outside the door listening to her cries for help. It was all due to the fear he instilled in lawyers and other courtroom personnel that were afraid to speak up about it. Lawyers have relayed their frustration with the fact that Kent regularly gave favorable rulings to those lawyers from whom he was receiving kickbacks, but knew that confronting the corruption could be career suicide. It's what corrupt judges bank on – fear of retaliation amongst the local bar. Stories written in Texas Monthly and other publications quoted from lawyers who knew that any other clerks and lawyers aware of the assaults would be blackballed from not just judicial circles if they squealed, but would find it next to impossible to be employed by any law firm for fear of retaliation from the judge and the judges friends if they reported the corruption and misconduct.

Investigative reporter Lise Olsen wrote numerous articles and finely and award -winning book regarding the tumultuous efforts to have Kent held accountable. The book, **Code of Silence: Sexual Misconduct By Federal Judges, The Secret System That Protects Them, And The Women Who Blew The Whistle** not only delves into the fact that the lawyers remain silent to corruption out of fear, but also other Federal judges 'circle the wagons' to protect their fellow Federal judges in the 'fraternity'. It's the same system believed to be the reason US district judges Xavier Rodriguez of San Antonio and visiting judge Royce Lamberth attempted to protect Judge King by stating the debtors' allegations, facts and evidence of price fixing and bid rigging were frivolous. The facts and evidence clearly do not support such a finding. Lamberth even threatened the debtors with sanctions should they base arguments against the trustee's counsel's professional fees on the fact that the fees were procured for work done defrauding the Johnson Rozelle bankruptcy estates of some $30,000,000. Debtors saw this as a clear tactic of intimidation and an attempt to obstruct

justice to protect the scheme, judge King and the other lawyers involved. The debtors refused to be intimidated or back down from the truth, and included the logical and applicable arguments against the 'fees for fraud' which apparently infuriated the judges.

Dr. Richard Cordero, Esq., Ph.D., University of Cambridge, England, M.B.A., University of Michigan Business School, and D.E.A., La Sorbonne, Paris, has studied and written extensively on the corruption of the judiciary, and his writings, like that of US Atty. Gen. John Ashcroft and many others, parallel what Johnson and Rozelle – and many victims – have experienced. Cordero explains in HOW A BANKRUPTCY FRAUD SCHEME WORKS, bankruptcy judges and their fraud schemes are protected by the district and circuit court judges in appeals:

**"Eighty percent of all federal cases enter the Federal judiciary through its bankruptcy courts. Of the 1,571,183 bankruptcy cases filed in the year to March 31, 2011, 1,516,1971 were filed by consumers. The overwhelming majority of them are individuals appearing in court pro se, for they lacked the money to hire lawyers. They also lack the knowledge of the law to detect bankruptcy judges' wrong and wrongful decisions, let alone to appeal. As a result, only 23% the bankruptcy court decisions are reviewed by district courts and fewer than 8% by circuit courts."**

**"Even when a bankruptcy decision reaches the circuit court of their respective circuit, it is reviewed by the circuit judges that appointed the bankruptcy judge. They are biased towards affirmance, lest a reversal impugn their judgment for having appointed an incompetent or dishonest bankruptcy judge. Thereby they assure the immunity of their appointees. Consequently, bankruptcy decisions are de facto un-reviewable. Even a small benefit ill-gotten from each case multiplied by so many cases adds up quickly to a very large benefit, such as a massive amount of ill-gotten money. In turn, circuit courts get rid of about 75% of all appeals by rubber-stamping summary orders that carry no explanation and are non-precedential; and a 15% by opinions so perfunctory and arbitrary that they mark them "not for publication" and "non-precedential". To ensure that those decisions stand, they systematically deny review *en banc* of each other's decisions. Finally, fewer than 1 out of 100 petitions for *certiori* to the Supreme Court is taken up for review. Un-reviewability breeds arrogance. It turns Federal judges into Judges Above the Law".**

**"Obviously, the judge and the trustee can conspire with one or more creditors to violate bankruptcy law and share unlawful profits among them, e.g., By inflating debt, disapproving exemptions so as to increase the estate; not confirming the plan and granting a motion to liquidate the debtor's estate; _liquidating estate properties at depressed prices to their own., etc._"**

Cordero has also explained how the judges corruption like the Judge King case equates to racketeering and violations of the RICO statute:

**"The everything goes mentality gives a boost to a degenerative trend that leads from judicial wrongdoing to organized corruption.  In such organization, even third parties outside the court, whether it be court staff, lawyers, others frequently before the court, such as bankruptcy trustees, or litigants, are allowed in the corruption in exchange for a material or moral benefit payable or receivable in the case to the at hand or in IOUs for future cases.  By then, the force dominating the court and its judges' business is not the law of Congress under the Constitution, but rather their interest in surviving and thriving.  The court becomes a Racketeer Influenced and Corrupt Organization.**

Cordero has also used a chart to demonstrate that the price-fixing and bid-rigging scheme in the Johnson Rozelle case is far from uncommon:



The flow-chart above represents the conspiracies in bankruptcy court corruption typically work, and provides yet another example of why King's delusional denial defense that bankruptcy court corruption is simply a giant conspiracy theory on the part of the debtor's is not grounded in anything but an attempt to smear and defame the debtors as whistleblowers.

Cordero has also written:

*"'Circling the wagons' is often seen as a necessary evil for the judiciary's self-preservation, as "it is not wise for any judges' career to turn a peer into an enemy. That peer may become an enemy for life given that federal district and*

*circuit judges and the justices can stay put forever, their 'bad behavior' notwithstanding. Quibbling about legal points and policy matters is perfectly acceptable. But disturbing the collegiality among professionally conjoined brethren and sisters by exposing the wrongdoing of any of them is an attack against the very survival of the whole judicial class and its privilege: Their unaccountability and in effect unimpeachability have rendered them Judges Above the Law."*

*"An investigation by outsiders of any one judge may take a life of its own that can soon get out of control, causing a judge to give up many more or one higher up 'honcho' in plea bargaining in exchange for leniency, who could in turn do the same. Soon everybody is tarnished or even incriminated for their own wrongdoing or their condonation of that of others. That the judges are determined to prevent or stop at all costs, whether with a stick or a carrot."*

At a book signing in San Antonio, one of 'King' Kent's victims, Kathy McBroom, relayed as she had in the book that she was advised by some of her lawyer friends to simply stay quiet out of fear for her welfare and safety. As well, McBroom relayed to the audience that she feared for her life from some of judge Kent's lowlife lawyer buddies for holding the corrupt judge accountable.

Also at the symposium with the author Olsen and victim McBroom was longtime local investigative reporter and newspaper columnist for the San Antonio Express News Rick Casey. Casey relayed in person what he had written online:

*"Powerful outsiders would lie about her [one of Kent's victims] as well. Olsen's news stories prompted a number of columns from me. As a result, I received a phone call from a prominent attorney active in democratic politics who assured me that Kent, appointed by Pres. George H.W. Bush, was innocent. The "girl", he said, was a well-known flirt who came on to Kent. It was a theme that would be taken up by Kent's famous criminal defense lawyer, Dick DeGuerin, who described the sex as "enthusiastically consensual." The lawyer who called me was chummy with the [Houston] Chronicle's editor. Later, after another column or two, he called the editor and confided, "Casey didn't buy my bullshit".*

Debtors believe the same type of b####### has been circulated amongst the bankruptcy bar and district court judges in San Antonio by King's little circle of

lawyers in an attempt to discredit the debtors allegations of corruption in judge King's court.  One need only review the false narrative spread to the district court by the trustee's lawyers Pat Autry of Branscomb PC and Ronald Hornberger that the debtors simply refused to sell their property and refused to pay for missing transcripts (see herein) as a cover-up for the bid rigging purchasers interference in the debtors' attempts to sell property and pay off the note.  If they're ethics are that of spreading such false narratives in pleadings, one can only imagine the level of falsehoods being told by high in the scenes in the so-called 'whisper network' amongst lawyers and judges.

 A reasonable person not apprised of the facts and evidence could be misled by the fact that three Federal judges have falsely claimed allegations of the price-fixing and bid-rigging scheme are frivolous.

A reasonable person not apprised of the facts and evidence – or not aware of the judicial landscape and culture – might be misled into believing that three federal judges might have a point.

However, a reasonable person that *is* aware of the facts and evidence could easily conclude that the three judges making such false accusations after they themselves were made *unavoidably aware* of the facts and evidence by the debtors are making their false accusations to protect a fellow judge and perhaps more importantly, protect the price-fixing and bid-rigging scheme that netted $30,000,000 – some of which could be spread out for private gain of those who 'circle the wagons' to protect the scheme.

With respect to Kathy McBroom fearing for her life, others have also written of bankruptcy lawyers and even bankruptcy trustees being murdered for attempting to report to federal authorities bankruptcy court corruption. Bankruptcy lawyers including those acting as trustees[12] have been murdered for cooperating with and providing information to federal authorities regarding the bankruptcy racketeering criminal enterprise within the Western District of Texas bankruptcy courts. Included in those murdered have been bankruptcy trustee Jane Ford. Ford had reportedly played a key role in the bankruptcy corruption and

---

[12] In San Antonio/Austin bankruptcy courts, it's virtually a game of musical chairs among a relatively small number of bankruptcy lawyers routinely interchanging roles of representing debtors, creditors and representing each other when one is playing the role of trustee. It's an extremely tightknit association and network of the same lawyers – the usual suspects - even by bankruptcy standards, yet debtors have been portrayed as "paranoid" and "conspiracy theorists" for even suggesting the lawyers have the means and opportunity to conspire with each other, and of course, for providing clear and convincing evidence of the conspiracy to defraud the Johnson Rozelle bankruptcy estates and it's continued cover-up.

massive systemic theft from bankruptcy estates with court approval, but eventually decided to become a cooperating witness when indictments were handed down against her. Upon announcing her intention to expose the larger criminal racketeering enterprise within the Texas bankruptcy courts, she was murdered.

So too was lawyer John Scott who was murdered near Austin as his charges of bankruptcy corruption started to expose the looting of assets involving federal judges, trustees and law firms. Just as with the Mafia, once you become a liability and threaten the bankruptcy ring's larger racketeering enterprise, you have to be silenced.

Even closer to home was the murder of a corruption fighting lawyer named Gary Ray Pinnell of San Antonio, who was also found dead as he was preparing to turn evidence over to the FBI. It's been an an unwritten rule for decades – the Mafia law of 'omeirta' - that bankruptcy lawyers know better than to cooperate with federal investigations into the bankruptcy racketeering and corruption ring. This is specifically why Rozelle refused to give the names of attorneys despite repeated badgering and threats by the trustee's lawyers, Langley and Banack and judge King to reveal the names of lawyers even suggesting that the courtroom corruption he reported to the FBI(see herein). Such attempts to obstruct justice with the threats of sanctions, incarceration and contempt charges to pressure Rozelle to reveal the names  - and which miserably failed – exposed the true character and insecurity of the court and bankruptcy ring even more so than had the scheme itself. It totally validated and confirmed the finding of US Atty. Gen. John Ashcroft: "***Parties in cases are sanctioned to discourage from pursuing justice. Contempt of court powers are misused to coerce litigants into agreeing with extortion demands.***"


AGAIN, IT BEARS REPEATING THAT THE TRUSTEE'S BROKER HAS EVEN ADMITTED IN SWORN TESTIMONY BEFORE THE UNITED STATES TRUSTEE TO THE COLLUSION BETWEEN HIMSELF, THE TRUSTEE AND THE PURCHASERS IN THE BLATANT PRICE-FIXING AND BID-RIGGING SCHEME.  JUDGE KING EVEN TOOK JUDICIAL NOTICE OF THE TRANSCRIPTS THAT THE DEBTORS FILED ON RECORD.  IT HAS BECOME TRULY BIZARRE THAT JUDGE KING AND 2 OTHER JUDGES (RODRIGUEZ AND LAMBERTH) HAVE CONTINUED TO MAKE DELUSIONAL DENIALS AND FALSE ACCUSATIONS AGAINST THE DEBTORS/WHISTLEBLOWERS BY CHARACTERIZING THEM AS CONSPIRACY NUTS FILING FRIVOLOUS PLEADINGS – EVEN THOUGH THE DEBTORS PLEADINGS CONTAIN THE TRANSCRIBED

INCRIMINATING TESTIMONY IN ORDER THAT THE JUDGES COULD NOT POSSIBLY AVOID ACTUAL AND CONSTRUCTIVE KNOWLEDGE OF THE TRUTH.

It is in fact perhaps the most blatant and flagrant the case of judicial corruption ever. It dwarfs the Judge David Jones scandal unfolding in Houston and the southern district of Texas at the very time of this writing/filing. If the United States trustee is moving to clawback some $23,000,000[13] in lawyer's fees for the corruption in that case, and after 4 federal judges in the southern district of Texas attempted to seal evidence of the corruption (until the national press got wind of the story and evidence), it begs the question of why has the UST has not moved to object and claw-back the professional fees of the lawyers involved in the scheme that defrauded $30,000,000 from the Johnson Rozelle bankruptcy estates – especially when it was questioning of trustee john Patrick Lowe's broker by the UST that resulted in the broker unwittingly being cornered into admitting to the scheme and its kickbacks!

In simplest terms, the scandal involving the now disgraced former chief bankruptcy judge of the southern district of Texas involved the nondisclosure of that judge and lawyers involved that the judge's presiding in cases without revealing a romantic relationship with one of the lawyers – his live-in girlfriend. As such, he approved millions of dollars in a lawyer fees to his girlfriend and her law firm.

In the Johnson Rozelle case, the trustee and his lawyers failed to disclose the collusion between the trustee and the purchasers in a price-fixing and bid-rigging scheme, and on numerous occasions, did and simply fail to disclose the collusion and conspiracy, but took knowingly willful and intentional steps to conceal the conspiracy and collusion including fraud on the court on the part of the lawyers involved. On top of that, every time the debtors brought new evidence of the price-fixing and bid-rigging scheme to the court's attention, it was completely ignored, including the debtors' discovery of the brokers own bankruptcy and being represented by the debtors' prior bankruptcy counsel that had filed pleadings and appeals outlining the brokers fraud in the price-fixing and bid-rigging scheme. Add to that the admissions in sworn testimony before the UST of the trustee's broker to the collusion between himself, the bankruptcy trustee and the purchasers, including kickbacks to one of the purchasers for acting secretly as the trustee's co-broker in the scheme and thereby splitting the sales commission from the sale of the bankruptcy estate property with the 'front

---

[13] An approximation, as numerous media reports different dollar figures, but generally in the same neighborhood

man' broker and the investigation into the price-fixing and bid-rigging scheme is now complete with not simply circumstantial evidence corroborated by direct evidence, but even the 'smoking gun' direct evidence.

When one considers judge King's attempts to mischaracterize the insurmountable and indisputable evidence of the fraud on the court in furtherance of the price-fixing and bid-rigging scheme including an admission from one of its participants as simply a conspiracy theory on the part of the debtors, one gets a complete picture of bankruptcy court corruption and a judge that was at the very least disqualified by numerous judicial canons of ethics and by 28 USC § 455 that required Judge King to recuse himself from a case in which his impartiality could reasonably be questioned.

In this case, lawyers and other judges that have had been made unavoidably aware by the debtors of the facts and evidence of the case yet have remained quiet about the facts and evidence of the case are in violation of their ethical duty **(Rule 8.03)** to maintain the integrity of the profession by reporting misconduct by their fellow lawyers and judges. On top of that, the lawyers and judges that have been made unavoidably aware of the facts and evidence of the case yet the not only continue to remain silent, but in fact may willful attempts to give the false appearance that they have avoided knowledge of the facts and evidence before them are as guilty as the perpetrators of the scheme under the doctrine of willful blindness.

Even more so, lawyers and judges that have attempted to this same the whistleblowers as paranoid, exaggerated conspiracy theorists can clearly be seen to be attempting to cover up the crimes of the bankruptcy court and the officers of the court. As became apparent in the Watergate scandal, the cover-up is sometimes worse than the crime itself.

Again, Judge King, like Judge David Jones banked on the fact that it's the 'code of silence' – the unwritten and unspoken rules of the bankruptcy court – and the threat of retaliation that prevents lawyers from speaking out about bankruptcy court scandals. It is believed that lawyers will only speak on the condition of anonymity once the press gets ahold of a corruption scandal, and even then, many will continue to require anonymity. The local San Antonio Express news, for example, often cites quotes from bankruptcy lawyers to request their names be kept from the article, including the Johnson Rozelle case. In fact, even the San Antonio Express News who followed and reported on the high profile case closely refused to do a follow-up report on Busby's 2019 sworn admission before the UST to his collusion with Sanders in the sale of the

bankruptcy estate property, as bankruptcy judges can bar anyone from the courtroom.

Four different Federal judges in the southern district of Texas sealed incriminating evidence against the bankruptcy court corruption of the now disgraced former bankruptcy Judge David Jones.  This was obstruction of justice no matter how you look at it, as the judges know that democracy dies in darkness and corruption thrives in darkness.  Once the national press began reporting on the story, Judge Jones' fortress was exposed as nothing but a house of cards in a prevailing wind.  The National Media has been widely reporting, and now quoting ethics professors and experts.  One of the most notable and brightest of them is distinguished law professor at the University of Nevada at Las Vegas Nancy Rapoport, whom different media outlets have come to respect and call on for her expertise and her opinions of the Jones scandal.

One of Ms.Rapoport's articles, **Failing To See What's In Front Of Our Eyes: The Effect Of Cognitive Errors On Corporate Scandals**, begins "why do we believe flimflam artists so readily, especially in the business and commercial reality?  This article explores for real life versions of "The Emperor's New Clothes" fable."  Apparently judge King and his inner circle believe that so long as the public is kept in the dark, or told to simply disregard the facts and evidence of the case in true to form "it's not what it looks like" fashion, the bankruptcy racketeering ring will freely operate under the code of silence – but totally unaware that simply acting out as if the court has maintained its integrity in the face of the facts and evidence is like the emperor proudly prancing around with his new invisible clothes.  The scheme is completely transparent, and attempts to deny it only digs a deeper credibility and integrity hole from which there is virtually no way to climb back out without showing dirt.

As Ms. Rapoport describes the code of silence and unwritten/unspoken rules in the Judge David Jones case in her article:

> "The mega-case procedures were designed to draw, and did draw, significant cases to Houston. But with that power dynamic came fear. When I wrote my first article about the Jones scandal, I posted a draft version of the article on SSRN[14]. That posting got folks talking. I heard from several attorneys who were too afraid for their own careers to go public with what they knew and when they knew it. They were comfortable talking to me only if I

---

[14] Social Science Research Network

promised them anonymity. The lawyers who reached out to me were bystanders without hard evidence. They weren't the lawyers who were supposed to be disclosing Freeman's relationship with Jones in cases in which Jones was either presiding or acting as a mediator. But they routinely walked into Jones's courtroom believing that, if they were opposing Jackson Walker or Liz Freeman, their odds of prevailing dropped dramatically."

Ms Rapoport adds footnotes to several sentences, but only one of which is relevant to the point being made here, and which is as follows:

"In case you think that the timidity of those lawyers was overblown, consider this: I've also felt the blowback from speaking up about the scandal.
When I was first invited to speak at the bench-bar conference of the United States Bankruptcy Court for the Southern District of Texas (yes, the very same court that I've been talking about this whole time), I had proposed topics ranging from (no surprise) the issues regarding disclosures in bankruptcy cases to other, less controversial topics, such as the ethics of artificial intelligence or ethics in the movies. I was actually in the process of exchanging e-mails with the planning committee about the logistics of being a luncheon speaker when I received a call telling me that I had been disinvited from the conference—not just from speaking on disclosure in particular, but disinvited in toto. See E-mail from Benjamin Wallen to Nancy B. Rapoport (Feb. 5, 2024)(on file with author). I
n case you're wondering, I first posted my draft article on January 19, 2024 (with permission from the Emory Bankruptcy Developments Journal editors), long before the disinvitation arrived. See generally *Colleague's Keeper*, supra note 18. Timing is everything. I have no problem writing about this scandal. After all, I'm a law professor—though I do appear in court from time to time as a fee examiner or as an expert witness. I have very little to fear from having published Colleague's Keeper, because I have a wonderful "day job" as a tenured full professor. Yet I still faced some backlash.
Imagine the type of backlash that a spunky lawyer, or a good lawyer appearing on behalf of a spunky litigant, would fear."

As Ms. Rapoport explains, especially the last sentence, the debtors had discovered themselves long ago that even the very best lawyer would fear backlash for adequately protecting and defending the interests of Johnson and Rozelle in a bankruptcy case, as to defend victims of bankruptcy court corruption requires exposing that bankruptcy court corruption.  It's why lawyers in the Judge David Jones case – that weren't even part of the case but knew of the corruption – remained silent, and only willing to discuss with legal experts on the condition of anonymity to this day.  It's why the lawyers representing the debtors in the Johnson Rozelle case eventually turn 180°and began protecting the scheme against their own clients.

Later in the same article, Rapoport put it another way:

**"Transforming the Southern District of Texas into as attractive a place to file the biggest bankruptcies as the Southern District of New York and the District of Delaware was a power play, and Jones was the most powerful player of all on the bankruptcy Bench. What attorney or firm was going to poke that bear by raising the issue of his undisclosed and consensual romantic and economic relationship?"**

Several footnotes were included, but the last one referring to "**What attorney or firm was going to poke that bear by raising the issue of his undisclosed and consensual romantic and economic relationship?**  Reads:

**"Well, besides Michael Van Deelen and the United States Trustee".**  Van Deelen could blow the whistle because he was a pro se whistleblower like the debtors Johnson and Rozelle have been for years.  The same UST for the southern district of Texas that is moving to claw-back some $23,000,000 in illicit fees paid to lawyers involved in that scandal have remained silent in the Johnson Rozelle bankruptcy case and Judge King scandal.  The reason appears to be lack of press coverage of the Judge King scandal.  Based on information and belief, it appears the record is clear that the UST only began taking actions in the Judge David Jones case once van Deelen shared sealed information with the press, and essentially shamed the UST into taking action.

Clearly when lawyers are afraid to 'poke the bear' or bankruptcy judge that failed to disclose relationships, it stands to reason that lawyers are not going to poke Judge King for actively participating in a price-fixing and bid-rigging scheme that defrauded the bankruptcy estate a 90 year-old widow at a $30,000,000 by conspiring with his former law partners and millionaire and billionaire developers like Clarence Thomas of the supreme court.  That kind of lewd as a lot of protection and can finance a lot of vengeance and retaliation.

Van Deelen is the *pro se* litigant who obtained information about the corruption and was not afraid to blow the whistle.  Lawyers would not do it for years out of fear in the same manner that the code of silence has prevailed in the Johnson Rozelle case despite the fact that the debtors since 2015 have repeatedly sent the facts and evidence to the United States trustee and other Federal authorities.

On information and belief, the United States trustee was also aware of their relationship and corruption in the Judge David Jones scandal but remained silent as they have in the Johnson Rozelle case.  After the judges sealed the incriminating evidence sent to Van Deelen, Van Deelen exposed it to the national press.  Only then did the United States trustee feel the apparent obligation to act.

Unfortunately, the failure to act on the part of the United States trustee in the Johnson Rozelle case goes beyond turning a blind eye.  The so-called "clubby nature" and relationships between judges, lawyers and court personnel in the Jones scandal is no different than the clubby code of silence nature of the relationships between lawyers and judges in San Antonio bankruptcy court.

In the Jones case, Jackson Walker has now turned the tables on the United States trustee, and have now received approval to depose members of the UST on what they knew and when they knew it – or decided not to know it.  Furthermore, Judge Jones has been accused by the lawyers at Jackson Walker of requesting that they cover up the corruption with false disclosures.  As well, the UST discovered that David Jones and Jackson Walker met secretly prior to Jones deposition, apparently to hammer out a 'back door" deal, as they all have millions of dollars to lose, and all have a vested interest – including the UST – and working out some kind of compromise that they believe will placate the public outrage at the corruption.  Debtors firmly believe, as Jackson Walker has asserted, that the UST had to be aware of not just the Judge David Jones/Elizabeth Freeman/Jackson Walker connection, just as the UST has been made *unavoidably* aware of the corruption in judge King's court regarding the undisclosed King/Langley and Banack connections and code of silence in the Johnson Rozelle case and judge

King's favoritism towards his former firm and his closest colleagues and mentors. It clearly appears to be the reason (and perhaps good old fashioned greed[15]) King was willing to turn a blind eye to their fraud on the court in furtherance of defrauding the bankruptcy estates of $30,000,000.

It is believed that the very code of silence that case bankruptcy lawyers in line also keeps the UST in line, and the corruption in both the southern district of Texas and western district of Texas bankruptcy courts that the UST has been willing to overlook is massive. It's become really nasty in the case of now disgraced former bankruptcy Judge David Jones, and on information and belief, they all knew what was going on the profited from it and remained silent. Debtors believe it's impossible for the UST not to have known of the corruption in the Jones scandal, as they have been made unavoidably aware by the pro se debtors Johnson and Rozelle in the Judge King scandal of the facts and evidence. However, rather than simply remaining silent, the UST had actually allowed their offices to be used as a staging ground – by accident or design -for the fraud scheme by trustee john Patrick Lowe and his counsel pat autry of Branscomb PC law firm.  The trustee specifically requested the debtors and their counsel meet in the official offices of the UST, whereby they instructed the debtors that a $20,000,000 offer from a longtime fellow bankruptcy judge procured just for this meeting represented the highest sale price possible.  As added incentive to accept such a low price for a $50,000,000 property, the trustee threatened that judge king could lift the stay at any time if they don't see any movement in the case – effectively threatening the debtors to quickly accept a $20,000,000 price or risk losing everything.  As further incentive, the clear implication was that the United

---

[15] It's almost as if King and his inner circle of compadres were influenced in their formative years of lawyering in the 1980s being influenced by the Gordon Gecko character of the movie Wall Street, wherein the slicked back character famously uses insider trading to 'game' the Financial System. According to the character, "greed is good" as a rationale for cheating the system. Every thief has an excuse.Gecko also defends insider trading by teaching his young protégé "wake up pal. If you not on the inside, you're on the outside", meaning outsiders to insider trading schemes are just everyday 'schmucks.' In bankruptcy, there's nothing like a good old fashion insider trading/ price-fixing and bid-rigging scheme.  Apparently it's uncool just to be an everyday bankruptcy lawyer on the outside, and it's apparently an ego play to be on the inside and privileged and entitled 'inner circle' with those who make 'above the law' decisions behind closed doors, and ignoring all evidence of fraud by the insiders that reap millions of dollars from elderly widows in bankruptcy cases, while the everyday bankruptcy lawyers, including the debtors own bankruptcy lawyers, are too afraid to speak up, and feel pressure to 'go along to get along', and thereby become part of the fraud and corruption.

States trustee was on board with all actions of career bankruptcy trustee john Patrick Lowe, including selling the property for $20,000,000 (see herein).

The close-knit relationship between the UST and the San Antonio bankruptcy lawyers and judges is believed to be of the same relationship as the UST with the Houston bankruptcy lawyers and judges. Jim Rose, for example, is known as "Cousin Jim" by judge King **(ecf 111@7-8).** The clear impression received by the debtors was the Judge King wanted the debtors to know at the very first hearing of the 2014 bankruptcy that the UST was 'like family' to the judge. As US Atty. General John Ashcroft had stated back in 2007, "***"Bankruptcy court corruption is not just a matter of bankruptcy trustees in collusion with corrupt bankruptcy judges. The corruption is supported, and justice hindered, by high-ranking officials in the United States Trustee Program...The American public, victimized and held hostage by bankruptcy court corruption, have nowhere to turn.".***

On information and belief, Mr. Rose simply does what the bankruptcy lawyers closest to judge King tells him what to do and what not to do – like ignore all the fraud on the court and the clearing convincing evidence of the price fixing and bid rigging scheme. Jim Rose is the one who elicited the admission from trustee john Patrick Lowe's broker Walt Busby in 2019 that purchaser Steve Sanders was secretly acting as the trustee's other broker in the sale to Sanders. Obviously this collusion in the high profile case renders the corrupted sale a fraudulent conveyance that should have been overturned back then. However, even with full knowledge of the collusion and corruption in the sale of the Johnson Rozelle bankruptcy estate property, Rose was apparently told to simply file an objection to Busby's discharge. It was smart for Rose and the UST, as bringing this new evidence to light would have obviously raised questions as to how they missed all of the red flags and warning signs that the debtors Johnson and Rozelle had warned him if in the courts of since 2015. Of course it's that code of silence the Judge King claims is nothing more than an giant conspiracy theory on the part of the debtors.

This is the distinct impression the debtors received from trustee john Patrick Lowe, and why he attempted to scare the debtors into accepting $20,000,000 as a sale price for their property or threaten them with losing everything – and implying that the UST was on board with the scheme and extortion. It's no surprise that the eventual sale price was $20.3 million in the scheme, as the trustee specifically chose those professionals who would go along with the scheme and provide false testimony in support and furtherance of the scheme.

In fact, the debtors memorialized some of their discussion with trial Atty. Jim Rose of the UST in San Antonio in an e-mail to Mr. Rose requesting that the trustee and his counsel be removed for their price-fixing and bid-rigging scheme and the case referred to the US attorney's office and FBI for investigation **(ecf 721 Exhibit A@11-12)** . The debtors made no bones about expressing in no uncertain terms the fact that the UST and judge king appeared to be turning a blind eye to the fraudulently false testimony involved throughout the proceedings and as overt acts in the price-fixing and bid-rigging scheme. Debtors relayed that they had also spoken to others in the UST as well about the price-fixing and bid-rigging scheme.

As is believed to be the case in the Judge David Jones bankruptcy court, the UST has close personal and professional ties with lawyers who specifically and intentionally make members of the UST feel like 'family' or part of the fraternity. In San Antonio, for example, members of the UST invited to the monthly social gatherings at this exclusive San Antonio country club, sponsored by the San Antonio Bankruptcy Bar, where for several hours a month officers of the UST can share cocktails and swap stories feel like privileged members.

In fact, the United States trustee for region 7, Kevin Epstein, has proudly served as not simply an officer of the San Antonio Bankruptcy Bar with lawyers involved in the scheme, including Langley and Banack as fellow officers, but also as its vice president in 2017 and its president in 2018. It appears to be part of the problem, as it's much harder to investigate and prosecute those with whom you socialize and fraternize with not just in the once a month social gatherings, but on a daily basis. The UST is often called upon to give speeches regarding cases, and the Johnson Rozelle bankruptcy case has been one of the topics.

Upon Kevin Epstein's appointment as the Region 7 United States trustee in 2020, Langley and Banack lawyer Natalie Wilson announced the appointment on the San Antonio bankruptcy bar newsletter, stating **"The San Antonio Bankruptcy Bar Association wishes to congratulate Kevin Epstein on his appointment as the U.S. Trustee for Region 7. He has been a valued member of our bar association for many years, including his tenure as president in 2018 and his numerous contributions to our CLE programs. We wish Mr. Epstein the best in this exciting new chapter of his career. Thank you!!!"**

In fact, in a truly ironic but not surprising twist and spin on things, Judge King spoke at the November 2024 San Antonio bankruptcy bar association meeting on his **"Top 10 List of Judges Behaving Badly"**.

It should be noted that the UST was formally and a motion by the debtors requested to investigate the fraudulent billing of the trustee's accountant, who billed $200 per hour for reading documents and newspaper articles unrelated to her duties as accountant simply because the trustee sent them to her with the understanding that she would charge the bankruptcy estates $200 per hour regardless **(see Appellate briefs as attachments B and C to the original filing to document 14 in the adversary case and information herein)** . The debtors requested that the emails, pleadings, motions, orders and newspaper articles be produced in the offices of the UST in order that the UST also could see the padded billing. The UST clearly wanted to avoid constructive and actual knowledge of the fraudulent billing. They responded with an objection falsely implying that the debtors were requesting to improperly use copy and scanning equipment of the UST, and therefore it was an improper use of the official offices of the United States trustee. In fact, the debtors only intended to bring their own scanner or perhaps simply take photographs of the discovery documents – not use the UST's official equipment.

One of the duties of the UST as the official 'watchdog' over bankruptcy cases and bankruptcy trustees is to investigate fraud in bankruptcy cases and object to unreasonable fee applications - the same style fee applications they ignored in the Houston bankruptcy court of Judge David Jones, which the UST is now attempting to claw-back once the media got ahold of the scandal. Bill padding is illegal, especially in bankruptcy cases - and especially when done as overt acts in bankruptcy fraud and corruption cases. In effect, this is how the trustees accountant was paid for her silence. And by the way, price-fixing and bid-rigging is also against the law, which the UST should know well. It's more than simply ironic that the UST would allow its offices to be used as a springboard, staging ground and 'front' of legitimacy by the trustee john Patrick Lowe for his price-fixing and bid-rigging scheme, but it is somehow improper for the UST offices to used for the official duties of the UST to investigate fee applications and overbilling – especially when they were part of the larger scheme to defraud the Johnson Rozelle bankruptcy estates of $30,000,000.

It's also ironic that judge King found that it was perfectly appropriate for the trustee's accountant to charge $200 per hour for reading newspaper articles and pleadings for which she could not defend herself or such actions under cross examination by Rozelle. The irony is that the same newspaper articles, for example, validated the debtors claims that of a price-fixing and bid-rigging scheme, as they had been quoted in articles prior to the sale that it was all a set

up by the trustee to sell the property to an insider to Stratford -and that's exactly what happened, which the paper also reported. Other newspaper articles from the San Antonio Business Journal, as relayed herein, exposed the fact that the purchasers in the scheme, including the trustees broker, made a big splash with a headline news article wherein they all were quoted making public statements that directly contradicted their sworn testimony regarding the alleged good faith nature of the sale. As documented herein, King simply dismissed this Rule 902 self- authenticating evidence to be nothing more than "something cluttering up the record" and "hearsay" – but approved the accountant charging $200 per hour to read the article is perfectly appropriate and a legitimate expense against the bankruptcy estates.

In its objection, the UST also used as a shield from investigating the fact that visiting U.S. District Judge Royce Lamberth (who spends roughly half his time in San Antonio and the other half of the DC Circuit) made a finding in the appeal of the trustee's counsels fee application that the indisputable facts and the evidence of the price-fixing and bid-rigging scheme were nothing more than frivolous allegations on the part of the debtors. As such, the UST warned the debtors that they too might file a motion for sanctions against the debtors *for requesting the UST investigate or refer the case to the US attorney's office as they are required to do.*

Debtors are not saying that the offices of the UST are as corrupt as U.S. Atty. general john Ashcroft had stated, as well as many others, that any reasonable person apprised of the facts and evidence could easily draw the conclusion that people are turning a blind eye for private gain or fear of retaliation.

Investigative journalist Matt Taibbi analyzed and summarized the HSBC bank's 'too big to fail', 'too big to jail' and 'too big to prosecute' status when caught laundering over $800 million for the drug cartels (Netflix/Jigsaw Productions' **Dirty Money**, "Cartel Bank", produced by Kristi Jacobson 2018). When the part-time DOJ lawyers refused to prosecute anyone within the bank even though they had admitted guilt, and career DOJ lawyers wanted to prosecute, Taibbi's take on it is a widely accepted and unfortunate truth about what's known as the 'revolving door'.

Taibbi echoed what other journalists have found regarding the 'political' prosecutors that refused to prosecute - they "came from the same big law firm Covington and Burling in Washington which represented almost all of the 'too big

to fail' banks that caused the great recession. They know that the instant they leave the 'swamp' and go back to the private sector, they are going to get offered a partnership that is going to be worth 3, 4, or $5 million a year, **"But if you're too rough on the clientele, then that partnership might not be there. There is a powerful incentive for you to behave a certain way towards the people you are regulating."**

As well, career lawyers with the DOJ climbing the corporate ladder to becoming a federal district court or magistrate judge will possibly lose that opportunity for advancement should they prosecute cases involving federal judges complicit in fraud schemes. Just like the lawyers and the UST in the Johnson Rozelle bankruptcy corruption case, assessing their role in the case is the same as how the banks consider in laundering dirty money for drug dealers: what's the reward, what's the risk. The risk is minimal at best, as the US Trustee's office is not willing to investigate their colleagues for fraud, and as in the Johnson Rozelle case, can be used as tools of intimidation against victims of the bankruptcy ring just as they allowed their offices to be used as a staging ground for the scheme, and their official seal to be used as a 'seal of approval' for the scheme – not to mention the UST's own threats of sanctions made against Johnson and Rozelle for requesting the UST simply investigate the professional fees and the case.  As in the Judge David Jones case, it's all about the fees.

All of this is relevant.  Debtors are not accusing the UST or the US DOJ under which the UST operates as being as corrupt as others knowledgeable about the system have alleged, but as a relates to the code of silence, it's a pretty big spread.  As a relates to lawyers fearful of representing the debtors for fear of retribution and retaliation for exposing the corruption they were victimized by as the logical arguments would be, it explains a lot.

It's worth noting that the debtors bankruptcy counsel Lorenzo Tijerina suggested the debtors file a complaint against judge king and report the facts and evidence of the case to the chief justice of the western district of Texas and to the FBI as their only hope for justice in judge king's bankruptcy court – *and this was even before the corrupted sale*.  As Tijerina inform the court and the debtors, once judge king approved the clearly conflicted and disqualified Walt Busby as the trustee's broker to sell the property, everyone knew it was a fixed game .  It's why Busby was going to steer the property to one of his partners at noteholder Stratford – and of course is exactly what happened.  Tijerina even addressed the court telling judge King approving Busby "reeked of impropriety".  Tijerina would then impeached the false testimony of trustee john Patrick Lowe with witness

testimony and admitted evidence that the trustee had lied in meetings held in the offices of the UST regarding brokers who had approached the trustee to sell just the front 25 acres of the 114 acre property at a fire sale price and allow the debtors to exit bankruptcy by paying off all their debts with the sale **(ecf 117-3).** The brokers had emailed this proposal to Jim Rose of the UST at Rose's suggestion (see below).

```
From: Bill Holder [mailto:bholder@dhrealtypartners.com]
Sent: Wednesday, September 03, 2014 4:43 PM
To: James.Rose@usdoj.com
Cc: Bill@AlynRealty.com; 'Charles L. Jeffers'
Subject: Proposal regarding Case # 14 - 51480


Mr. Rose,

We met the other day in the courtroom and wanted to follow up with a
proposal letter to market the property located off IH 10 and UTSA/Hausman
Road. We have attached a proposal for your review. We very much appreciate
the opportunity to be considered for the assignment. Please feel free to
contact us should you have any questions or need additional information.
Thank you.

Sincerely,



Bill Holder

President
```

> 📎 2 attachments   at least 1.0 MB

Then the proposal simply disappeared with the trustee claiming in sworn testimony he never received the proposal from Jim Rose or DH Realty until after choosing Busby as the broker, and Rose himself remaining quiet about the situation – again, the code of silence large and in charge.  As with any legitimate offers, the scheme could only work if they lied and committed fraud on the court regarding legitimate brokers to market the property and ignored any and all reputable offers.  Any reasonable person could conclude that a trustee willing to lie about brokers wishing to legitimately market the property would also lie about legitimate offers for the property, and the purchasers and broker would later provide newspaper quotes indicating there were more offers on the property

than the trustee disclosed in sworn testimony. Again, the same failure to disclose style of fraud and corruption as in the Judge David Jones scandal, as the trustee also failed to disclose his meeting with the predetermined purchasers almost immediately upon being appointed, and also failed to disclose that one of the purchasers was secretly acting as a broker for the trustee, which was not known until 2019 when the trustee's broker Walt Busby was surprised by unexpected questions he could no longer avoid and dodge, and admitted this was worn testimony before the UST.

Then a funny thing happened – after Tijerina informed the debtors he would supply the names of FBI agents that would not simply 'sit on it', he suspiciously disappeared and abandoned his clients. By all appearances, someone had threatened Tijerina into abandoning the case prior to the sale- a setup for the debtors to attend the sale hearing without legal counsel. Tijerina had already demonstrated he could cause problems for the unfolding scheme and apparently had to be 'dealt with'. Tijerina would only surface for a fee application hearing wherein he would be confronted in cross examination by Rozelle with questions of why he abandoned his clients and questioned about reporting the case to the FBI.

Now all of a sudden, Tijerina suspiciously began spouting the falsified talking points of Judge King, testifying that Mr. Rozelle was "extremely difficult to deal with", which was part of King's rationalization for the fraud scheme. Clearly Tijerina was given the choice of either turning on his clients by validating judge Kings falsified findings of fact with his own falsified testimony or suffer possible disbarment.

At Tijerina's fee application hearing of August 22, 2016, Rozelle as a *pro se* litigant testified that "Tijerina had advised us [Johnson and Rozelle] to contact the Federal Bureau of Investigation over the bias of the court and the corruption and collusion in this case, and then he didn't do anything further- - he said he was going to give us some names of some FBI agents, because it's very political, and then he never did. And then we finally send him an e-mail saying, well, were going to go to the FBI ourselves, and we have those documents" **(ecf 692@14)**

Tijerina then under cross examination by Rozelle testified never advise the debtors to contact either the chief justice of the western district of Texas or the FBI, stating it was only the debtors idea to do so, *as best he could recall* **(ecf 692@19-20)**. Tijerina then testified that the debtors only asked if he knew any FBI agents to contact, and testified **"I did not agree to give you those names**

unless you ask for them.  You never asked me for them… As the best I can recall, that you'd never asked "(ecf 692@20).

To the contrary, the debtors and filed on the record the numerous emails questioning Tijerina as to why he had stopped responding to phone calls and emails.  Amongst those emails were the numerous emails requesting the names of the FBI agents Tijerina had promised to provide.

For example, the debtors had emailed Tijerina with the subject line: **"unanswered calls and emails"**, stating **"we have called and left messages with Adriana to call, and has since you several emails, as we're concerned about a motion to reconsider and appeals."** The e-mail also asked the question of why Tijerina had asked Clarita Johnson outside the courthouse if she would take $37 million for the property, and were that idea came from.  The last sentence of the e-mail states **"As well, you suggested we call the FBI to investigate the case, and give us some contacts but as we have been asking, we have yet to receive them from you or received any response from our prior emails-please call or respond." (ecf 721-3, exhibit 1A@28)**

Another e-mail to Tijerina has the subject line: **"lost contact with you"**, where Rozelle rights **"Lorenzo and Adriana – tried calling you again and left a message on your voice mail yesterday.  Would you please contact us?" (ecf 721-3 Exhibit 1A@29)**

 Yet another e-mail from Rozelle to Tijerina: **"Lorenzo – we have sent numerous emails and left messages with Adriana for you to call us when you can but have received no response.  Can you call us or respond to our emails regarding the MTR, appeals and deadlines?....  Can you respond" (ecf 721-3, exhibit 1A@29)**

Another e-mail with the subject: **"KING AND TRUSTEE REMOVED – FBI CONTACT - CASE EXAMINER"** states **"Lorenzo – we have not received your FBI contact list on having the case examined – can you send that?  Why should we not be moving to have the trustee removed for lying to the debtors and working against the best interests of the estate?  We want him gone.  We have now proven with Bill Alyn's testimony that the trustee lied to us all and breached his duty to disclose, and my testimony that we cannot trust the trustee, so we sure wouldn't trust him to disclose all offers if he is not even willing to disclose all brokers that approached him -we have all that out there now don't we?  And for that matter, why are we moving to have king recused for arguing the trustees points that our appraisals and other due diligence items were not appropriate**

to bring up on emotion regarding due diligence? It is obvious that king and lied about me in his MLS ruling and has an obvious bias against the debtors in this case. Please let us know what you are going to do to have a case examiner appointed and an FBI investigation done on this entire case. Thanks, Pete" (ecf 721-3, exhibit 1A@30)

Finally, Clarita Johnson emailed Lorenzo Tijerina on February 9, 2015 that includes the following: **"Pete and I just left you another voicemail and sent you a draft of our affidavit that we're finishing up. It includes our claim that we have been denied our due process as we have discussed with you before, and you were to include in your 1/7 objection... Also based on the evidence we provided to the court including Bill Alyn's testimony and as we have discussed before, the trustee has been totally dishonest with us which shows a severe favoritism towards Stratford Land fund and he should therefore be removed. As for the judge, we are also questioning in our affidavit is reasonableness in turning a blind eye to the evidence as we have discussed, as well as the judges obvious bias against the debtors. Also, as we have discussed, your suggestion of contacting higher authorities such as the FBI, we have waited long enough for you to supply the names which you had yet to send us, and we're therefore moving forward on our own. Since we have pled fraud on the part of Stratford Land fund in this case, we're calling for an investigation in our affidavit".** (ecf 721-3, exhibit 1A@34)

Clearly Tijerina's testimony that the debtors never asked for the names of the FBI agents he said he would supply was false, as was his testimony that it was only the debtors that felt an investigation was necessary and having the judge and trustee removed from the case. It has to be remembered that at the beginning of his representation, it was Tijerina who advised filing a motion to reconsider to correct judge king's misrepresentations about the debtors and their property, including the defamatory, derogatory, demeaning and disparaging comments aimed at discrediting Rozelle when the debtors' prior bankruptcy counsel Steve Cennamo had refused to. It was Tijerina who initially emailed to the debtors:

*"The abuse of discretion is an appellate standard and used to attack a judge's decision on appeal. So no need to overly concern yourself at this stage of the case. It will be raised on appeal. You can and should cite the derogatory remarks made by judge King to shore up your argument of prejudice against the debtors. Put in all you want concerning Kings prejudice; but, use words to the*

*effect that the court "appears"," seems", "such action could be interpreted as being prejudice" etc. against the debtors. Sorry I did not return your calls today"* **(ecf 721 Exhibit 1-A,@25)**

For the record, the debtors have tried to be polite in their pleadings, and follow the examples of using *"appears"," seems", "such action could be interpreted by a a reasonable and objective person as being bias and prejudice"* to describe fraud on the court in furtherance of the blatant fraud scheme, but there comes a point when it seriously calls to question if any victim of crime or reasonable and objective person reviewing the facts and evidence of the indisputable fraud and corruption would or even should be polite about being defrauded out of $30,000,000 from their bankruptcy estates while at the same time having their reputations smeared by lies from a bankruptcy judge and his little inner circle of bankruptcy lawyers who perpetrated and facilitated the fraud scheme.

For Tijerina to perjure himself and commit fraud on the court by falsely testifying that he never suggested contacting the FBI or suggested reporting the facts and evidence of the case to the chief justice of the district – and falsely testify that the debtors never even asked for the names of the FBI agents Tijerina had offered to provide while at the same time simply abandoning his clients, speaks volumes. Tijerina was clearly between a rock and a hard place as were other bankruptcy lawyers the debtors had hired. On the one hand he could perhaps save his legal career by protecting Judge King by committing perjury, or on the other hand he could've told the truth about advising the debtors to contact the FBI which would make King look bad. Obviously Tijerina chose to risk being reported to the state bar by protecting king, who could then use his influence to influence the state bar into going easy on Tijerina. Even bankruptcy judges have that type of influence.

The debtors next Atty. of record Ron Smeberg would also initially suggest a parallel track of prosecuting the case from civil standpoint and report the price-fixing and bid-rigging scheme to the FBI in order that they conduct their own concurrent investigation. As such, Smeberg suggested his new client's contact the FBI after immediately upon being hired filing motions to reconsider and stay proceedings based on fraudulent misrepresentations of the purchasers at the sale hearings **(ecf 239, 240, 241 and 244)**.However, Smeberg would then suspiciously to a 180 degree turn after informing the debtors on May 12, 2015 that Jim Rose of the UST was not going to investigate anything having to do with trustee john

Patrick Lowe.  It was clear that Lowe was working directly under Rose, and both rose and Lowe clearly appeared to be operating under the willfully and intentional blind eye of Judge King.  Smeberg would then advise not contacting the FBI, as it could inhibit making some kind of deal with the trustee to negate the sale to his purchasers.  The debtors, however, did not trust making any deal whatsoever with john Patrick Lowe, and obviously distrusted hard money loans and other partnership agreements drafted by Smeberg for the debtors to sign as their own, and which had the debtors agreeing that the fair market value of the $50,000,000 property was dictated by the corrupted sale price of $20.3 million.  It clearly appeared to be a setup to waive any claims against the corrupted sale and sale price, and thereby waive any claims against the trustee and his professionals.

§

When an attorney is telling their client that the judge has already made up his mind and there is nothing that can be done about it - other than contact the FBI -  then the attorney is really defenseless to defend their client and should not even be charging any money for it. It puts the attorney in a precarious position because they are precluded from advocating for their client, and therefore the only choices are to take money from their clients trying to prosecute a case that the lawyer knows has already been decided against them, and cave in and do what the court tells them to do no matter what, which implicates the attorney in the fraud. The only other alternative is to simply walk away.  When indications are that 2 other Federal judges and the UST are willing to turn a blind eye and even threatened sanctions against the debtors claiming the debtors have made frivolous allegations of a price-fixing and bid-rigging scheme, at face value it makes the debtors look bad which deters lawyers from representing them. However, when looking deeper into the facts and evidence, it becomes clear that there is nothing frivolous regarding the allegations of the debtors, as they are backed up by indisputable facts and evidence.  At this point it becomes apparent that the UST and 2 other Federal judges are likely 'circling the wagons' as part of a corruption cover-up.  This deters lawyers even more so from representing the debtors, because as stated elsewhere, no one wants to 'poke that bear' out of fear of retaliation.

It's important to remember it was the UST and other creditors questioning the trustee's broker Walt Busby in 2019 after Busby had filed for his own chapter 7 bankruptcy in San Antonio's other bankruptcy court at the time.  To be approved by the bankruptcy court as the trustee's broker in the Johnson Rozelle

bankruptcy, the trustee had a huge obstacle to overcome: the fact that Busby was the noteholders broker, employee and longtime operative. The conflicts of interest were essentially insurmountable. So the trustee decided to 'double down' and claimed through his counsel that the extreme conflicts of interest that they could not overcome "are actually an advantage" to the bankruptcy estates. Imagine Jackson Walker in the Judge David Jones scandal making representations to the court that they saw it as an advantage to the integrity of the bankruptcy system that the judge was sleeping and cohabiting with one of their partners and signing off on millions of dollars worth of unscrutinized billing to his lover and the firm. Imagine also how ridiculous it would be for them not to expect any objections. As the fictional character J.R. Ewing was famously quoted "once you lose your integrity, the rest is a piece of cake".

To get Busby approved as the trustees broker in the Johnson Rozelle case they also had Busby falsely testify he had cut all ties with his longtime partners loan to own noteholder Stratford and Steve Sanders just at the time that the trustee had secretly met with Steve Sanders in September of 2014. It was the trustee that met with his predetermined purchaser in the scheme Sanders, and they simply agreed to embed Sanders longtime partner Busby as a 'disinterested' buffer between the trustee and purchaser. The UST was informed of numerous evidence that Busby had never cut ties with Sanders and Stratford which were all ignored by the UST and judge King.

In 2019 the UST was involved in Busby's bankruptcy and made aware by Busby's testimony at the *numerous* meetings of creditors that not only had Busby lied to the Judge King court about cutting ties with Sanders and Stratford, but the smoking gun nondisclosure kept secret from the debtors and the court[16] was the fact that not only had Busby not cut ties with Sanders, but Sanders was acting as a co-broker with Busby for trustee john Patrick Lowe all along in the sale of the Johnson Rozelle bankruptcy estate property to Sanders. This actual transcript testimony is within this report.

This didn't pose a real problem for the price-fixing and bid-rigging scheme, as no one involved in the scheme or its cover-up was willing to spill the beans. Apparently the plan was to simply ignore the domino effect to the Johnson Rozelle case and protect the $30,000,000 scheme. However, they couldn't simply ignore the gravity of this incriminating testimony for one simple reason – Rozelle had become aware of the bankruptcy and ordered the recordings from the 341

---

[16] Well maybe not judge King, as it is believed he was aware of the scheme from the get go – but definitely kept from the public and the debtors.

hearings.  Now they had a problem, and they solved the problem in the very same manner they solve every problem in the Johnson Rozelle case: every time the schemers screw up, they concoct a cover-up.

When Busby and Sanders' partner, front man purchaser Robert Schumacher, and his lawyers were caught by the title company lying about Schumacher never having any contact with Sanders or Stratford, they refuse to give a clean title policy for the fraud on the court.  Therefore King, Lowe and the others (king's former law firm Langley and Banack included ) concocted a cover-up story that perhaps they lied to the court about the relationship between Sanders and Schumacher, Sanders only became involved with Schumacher after the sale to the front man purchaser.  This was also proven false as this report proves conclusively, but the point is they used the same failed tactic in explaining Busby's new cover-up story (concocted also with Busby's new lawyer Ron Smeberg -the same Ron Smeberg that had filed documents exposing the fraud and collusion between Busby, the trustee and purchasers and who had turned 180° and tried to trick his clients Johnson and Rozelle into signing documents accepting the corrupted sale price as valid, and thereby absolving the trustee of fraud.

The new story they concocted -and apparently the UST -— was that Busby and Sanders only got back together as partners **after** the sale of the Johnson Rozelle bankruptcy estate property, and the money was given to Sanders for a 50-50 partnership moving **forward**.  The flagrant and blatant cover-up story failed for numerous reasons -mostly because it was coming from Sanders and Busby.

For starters, it completely contradicted Busby's initial testimony that the $820,000 commission received from trustee john Patrick Lowe for the sale of the Johnson Rozelle bankruptcy estate property was "split with his co-broker in the deal".  When asked again Busby had testified he "split the commission with his co-broker in the project", both referring to the sale of the Johnson Rozelle bankruptcy estate property.  Only when Jim Rose of the UST followed up in a subsequent line of questioning of who the co-broker was, Busby was backed into admitting it was Steve Sanders.  The testimony was corroborated by banking statements obtained by the UST proving that immediately upon receiving the commission from trustee john Patrick Lowe, Busby wired half of it to his co-broker Sanders. Busby and Smeberg would also hide from creditors Busby's income from the development of the property he steered to his partners Sanders and Schumacher at $30,000,000 below fair market value -an obvious red flag that DOJ and FBI agents look for in price-fixing and bid-rigging schemes, as those involved

are usually promised future income for their role in the scheme.  It also became clear from further testimony that Sanders was financially supporting Busby throughout, so busby's loyalty was never to the Johnson Rozelle bankruptcy estates, but to his benefactor Steve Sanders and new partner/ front man purchaser Robert Schumacher.  Busby and others were also likely promised a split from the $30,000,000 skimmed off the top.

Another huge hole in the cover-up story was just the stupidity of it.  Busby's cover-up story was that he I wanted to go in 50-50 with Sanders and split all costs in pursuing *future* deals.  Busby testified he therefore just immediately split the commission from the Johnson Rozelle bankruptcy estate sale with Sanders to show his good faith.  Any partnership splitting expenses would pay them as they incurred.  Another blatant hole in the story came when Busby and Sanders testified they spent the commission money pursuing deals that never panned out because of Busby's reputation and dishonesty, which Sanders claimed hurt his reputation as well.  Busby testified he sat Sanders down and explained exactly why he was giving him the half commission.  Sanders testified he had no idea why Busby gave him half the commission.  Then they could never come up with any receipts for the alleged "pursuit costs" or evidence that they were ever pursuing any deals, claiming they didn't keep receipts because "that's not how you keep score in their world of big time development deals".

Yet another huge hole which they fail to overcome in the third grade cover-up attempt is that the cover-up story that the commission money was used in *future* business purposes of moving forward also directly contradicts Busby's prior testimony in meetings of creditors that approximately half of the commission went to Sanders as his co-broker, the other half to taxes, and what was left was specifically *not* spent on business pursuit purposes of any kind, but just living expenses **(ecf 985-2@PP12-13)**.  The word for word transcription of this testimony is also included herein.

One might wonder why anyone would attempt to compound and aggravate the obvious, blatant and flagrant fraud scheme with an equally flagrant false cover-up story.  After all, everyone knows by now it's always be ill fated cover-up that proves intent and catch as many white collar criminals (especially when they arrogantly pose for photos and give quotes in headline news articles that directly contradict their sworn testimony).  The overwhelming circumstantial evidence is matched with overwhelming direct evidence throughout the case, and there is no doubt whatsoever in any reasonable mind that the price-fixing and bid-rigging scheme is undeniable, so what's the harm in attempting to cover the tracks.

The real question becomes why would the UST file their complaint against Busby for dishonesty, misrepresentations and omissions to defraud creditors in his own bankruptcy  - and two other documents as well  - falsely stating in clear contradiction to the truth and testimony that Busby's **first** explanation as to why he wired Sanders roughly half the commission was for "***future endeavors*** that was not disclosed until later in the bankruptcy.  That was the cover-up story.  The UST knew well that Busby had already testified previously that he split the commission with Sanders because Sanders was acting as his secret co-broker for trustee john Patrick Lowe in the sale of the Johnson Rozelle bankruptcy estate property.

In fact, upon Busby initially testifying to questions from Jim Rose of the UST that his co-broker was Steve Sanders, it was clear that Busby was stalling on answering the question and attempting to think his way out of it in the same way he had attempted to evade and dodge the prior questions about the trustee's commission by a bankruptcy lawyer for one of the creditors.

Again it's important to note Busby's attempt to stall and think his way out of identifying Sanders as his co-broker upon the UST question to identify the Busby's co-broker in the sale of the Johnson Rozelle bankruptcy estate property: **"Uhm - - Uhhh - -Uhm - - - Uhhh - - Steve Sanders"**.  Consider that Busby and Sanders had been partners for years, and it's hard to believe he had to think this hard to remember his name.  Busby was already thinking of a cover-up in a way out, and probably the first cover-up to come to his mind was what his partners Sanders and Schumacher, and apparently trustee john Patrick Lowe and his counsel pat autry of Branscomb PC and use previously when caught in a lie -the good old "**after the sale**" alibi**.**

Jim Rose of the UST, upon learning purchaser Steve Sanders was Busby's co-broker in the sale to Sanders himself, had to be well aware of the gravity of this smoking gun testimony.  This was testimony that overturns the sale for fraud in any credible bankruptcy court.  Rose's follow-up question was **"So  thinking back to the – – I was involved in those cases back in – – In that commission. Was the court aware that Mr. Sanders was getting half of the commission?**

Walt Busby: At the time that the commission was awarded, no. But I decided to go to work with him after the commission was awarded, and he loaned me some money to get started in another business, and so that is how that came about.

At first glance that may appear to be quick thinking on the part of someone practiced in the art of deception, at least until one considers it totally contradicts his prior testimony that the commission money was spent on living expenses and specifically not business expenses.  It surely didn't fool anyone including the UST, as just from a commonsense standpoint, logic dictates that two instances of directly contradicting testimony cannot both be true, and again, there was nothing to corroborate that they spent the money on future endeavors as they admitted in sworn testimony.

On top of that, the fact that Busby testified to splitting the commission with Sanders as his co-broker for the trustee fits perfectly with the facts and evidence and other overt acts of the trustee in the Johnson Rozelle bankruptcy case.  For example the nondisclosure of the September 16, 2014 meeting between the trustee and Sanders immediately upon the trustee being appointed.  This meeting was never disclosed to the court or the debtors.  The trustee only disclosed to the debtors and their counsel Lorenzo Tijerina in a meeting of September 25, 2014 that they were hiring Walt Busby as the trustees broker at the recommendation of Steve Sanders.  The debtors only discovered the meeting when branscum PC submitted their fee application with itemized billing in 2016, and apparently only after the debtors then the Atty. of record Ron Smeberg had made a gentlemen's agreement not to object on behalf of his clients Johnson and Rozelle.  Where Smeberg had initially vowed to overturn the sale by exposing the fraud on the court in the sale procedures, which would automatically disgorge or forfeit fees for the trustee and his professionals, Smeberg would later flatly refuse the debtors request that he file an objection to the fee applications of Branscomb PC and Walt Busby for their roles in the defrauding of the bankruptcy estates.

The trustee apparently wanted it to be known by the debtors but they were hiring Walt Busby at Sanders recommendation or referral (conspiracy) in order that they waiving any arguments for nondisclosure.  The fact that this meeting between the trustee and the debtors was held in the offices of the UST was clearly designed to intimidate the debtors from making any objections and accept a $20,000,000 sale price for the property or risk taking nothing at all.  Knowing that Sanders had recommended his longtime partner Busby as the broker and then failing to make an objection out of fear of retribution from the UST and/or DOJ would waive any claims by the debtors against the price-fixing and bid-rigging scheme.  The trustees argument was obviously designed to be that the debtors knew what was going on but didn't file any objection – as if they were OK with it all.  The trustee's tactic didn't work, of course, and in fact backfired, as the

debtors that raised objections to Busby being appointed as the broker, and began memorializing the meetings with the trustee and collecting evidence from their own investigation that neither the UST nor DOJ could possibly do – or were willing to do.

However, the fact remains that the trustee refused to disclose this to the court, and even had Langley and Banack lawyer Jim Hoffman made false representations to the court - fraud on the court - that neither of Busby's partners Stratford nor Sanders had anything to do what the trustee choosing Busby. The trustee and his counsel Branscomb knew this was false but remained silent.

In price-fixing and bid-rigging schemes, there is often a pay-to-play component. In the trustee's scheme, it clearly appears a deal was struck between the trustee, Sanders as the purchaser and Busby as the broker whereby Sanders would extort a 'referral fee' from Busby of half the commission for the agreement with the trustee to embed Busby in the sale. Once the sale is completed at a $30,000,000 discount from fair market and appraised values, Busby and Sanders could then use their respective parts of the commission for their 'buy in' with their front man purchaser/partner Robert Schumacher just as Sanders and Schumacher had testified in the hearing of April 21, 2015. Undoubtedly they would also share in the $30,000,000 take/skim that also defrauded the government from the capital gains taxes that would have been realized from a competitive price for the property in a competitive sale, and as Busby attempted to conceal from the court in his own bankruptcy and in the Johnson Rozelle bankruptcy court as well, Busby was obviously promised his admitted $10,000 - $12,000 per month income from the development on the property for being a 'glorified night watchman' as he finally was cornered into admitting as well – after concealing this and his bankruptcy filings.

The circumstantial and direct evidence clearly points to the Sanders being part of the purchase through Busby from the get go, which they all kept secret - at least until Busby couldn't think his way out of the corner under questioning from the UST in his own later bankruptcy - because collusion in § 363 sales - as well as fraud on the court - is prohibited by the bankruptcy code and invalidates the sale.

Section 1 of the Sherman Act prohibits conspiracies "in restraint of trade or commerce among the several States . . . ."( 15 U.S.C. § 1) "[C]onspiracies under the Sherman Act are not dependent on any overt act other than the act of conspiring."( *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940). Moreover, conspiracies to "submit collusive, noncompetitive, rigged bids,"( *United States v. Young Bros., Inc.*, 728 F.2d 682, 687 (5th Cir. 1984)

(internal quotations and citations omitted).allocate customers,( *United States v. Cadillac Overall Supply Co.*, 568 F.2d 1078, 1090 (5th Cir. 1978). and fix prices are *per se* violations of the Sherman Act.( *See, e.g.*, *Socony-Vacuum Oil Co.*, 310 U.S. at 218 ("[P]rice-fixing agreements are unlawful per se under the Sherman Act.").

As the debtors outlined in their objection to Branscomb fees (ecf 985-1), the and deliberate effort to misrepresent exactly when Busby admitted in his bankruptcy testimony to the collusion in the sale. In fact, the word collusion isn't even mentioned the inner formal complaint against Busby. The UST in fact filed three different documents falsely claiming that Busby's testimony of Sanders being his secret and concealed-from-the-court co-broker was not until August 15, 2019, when Busby claimed he paid Sanders $393,500 to be a partner in future real estate deals. The UST falsely alleged in its filings that the August 15, 2019 'cover-up' represented the very first time Busby offered any explanation as to why he wired that money to Sanders.

However, truth is in the transcripts themselves. The UST knows full well that Busby first revealed his explanation of why he paid Sanders the $393,500 was in his testimony of May 9, 2019 -some three and ½ months prior. It was at that 341 meeting of creditors that Busby explained *exactly* why he wired the money to Sanders upon receiving it from trustee john Patrick Lowe: on two separate occasions he testified he split the money with "a co-broker in the deal", and again testified in the same line of questioning he split the money with "a co-broker in the project" – both times referring to the sale of the Johnson Rozelle bankruptcy estate property as broker for john Patrick Lowe. Then, when finally asked by Jim Rose of the UST himself who the broker was, Busby clearly revealed it was Steve Sanders. There's no mistake about it - that was the very first time Busby disclosed the nature of the $393,500 payment to Sanders. The August 15, 2019 cover-up story was definitely not the first disclosure or explanation of the payment as the UST attempted to portray in pleadings.

Again, Jim Rose was not only aware of the price-fixing and bid-rigging scheme back in 2015, he was made *unavoidably aware* of the price-fixing and bid-rigging scheme back in 2015 by the debtors, initially believing the UST would perform its duties and refer the case to the US attorney's office for investigation. Debtors now believe apprising the UST of the facts and evidence only serves to Nancy Rapoport my brother's keeper bankruptcy disclosure propensity for conflicts prevent any claim of plausible deniability. The UST had to know the impact of Busby's incriminating testimony on the validity of that sale, and therefore calls to question why the UST would make such a critical omission – *in*

*three separate pleadings*, clearly indicative of intent.  The debtors, as creditors in Busby's case, filed the transcripts of Busby and Sanders' testimony in Busby's bankruptcy, which were stricken from public view by bankruptcy judge Gargotta (King's former clerk).

In fact, the UST had an obligation to object to trustee john Patrick Lowe's application to employ Busby as his broker.  It's hard to imagine that the UST was willing to also ignore Busby's clear conflicts of interest as a longtime partner of noteholder Stratford Land fund and its agent Steve Sanders.  It's hard to imagine that the UST was willing to further ignore the trustees argument that "the conflicts of interest were an advantage".  Of course it was an advantage to a price-fixing and bid-rigging scheme wherein Steve Sanders and set up the purchaser of the $50,000,000 property for $20.3 million along with Busby's other partner Robert Schumacher.  Even the debtors Counsel Lorenzo Tijerina told the court on the record that it "reeks of impropriety".  So how is it the official 'watchdog' of the bankruptcy system missed all this?  Did Jim Rose feel conflicts of interest of professionals are an advantage to bankruptcy estates and the proper administration of justice?  Obviously Busby as longtime partner and real estate broker of the noteholder attempting to foreclose on the debtors property was representing an interest adverse to the bankruptcy estates - his brokerage signs still sat on Stratford Properties while Busby himself testified he had cut all ties with Stratford and Sanders, yet refused to remove his signs.  So was it really a shock to the conscience of the UST that Busby and Sanders were co-brokering the Johnson Rozelle bankruptcy estate property for Sanders to purchase in a price-fixing and bid-rigging scheme??  Or perhaps was it a shock to now have to deal with concocting a lane and transparent cover story to prevent overturning the sale.  Obviously, a reasonable person examining the facts and circumstances could conclude that the failure to disclose that Busby had lied about cutting ties with Stratford and Sanders calls not just for disqualification and disgorgement of fees, but also calls for overturning the sale.

But there's a Catch 22 there: how can the UST now do the right thing when that requires an admission that they failed to do the right thing before, and overlooked all of the evidence of fraud on the court and other red flags that caused even the title company to refuse giving a clean title to the trustee and his purchasers in the sale?  A reasonable person apprised of the facts and evidence would likely be asking the following questions:

How could the UST – the watchdog over the bankruptcy system's integrity – find conflicts of interest to be appropriate in applications to hire professionals?

How could the UST – the watchdog over the bankruptcy system's integrity – find that the lies told to the court at the sale hearing of March 26, 2015 by Robert Schumacher and his lawyers were appropriate behavior when testifying that Schumacher had never had any contact whatsoever with anyone at Stratford?

How could the UST – the watchdog over the bankruptcy systems integrity – possibly believe those lies didn't constitute fraud on the court when the title company discovered they were false testimony to the court?

How could the UST miss even the Express-News newspaper articles following the high profile headline case that spelled out the fact the debtors had even prior to the sale alleged that the courtroom proceedings were a set up/frame up for an insider a sale to a Stratford related entity to purchase the property at an unconscionably low price prior to the sale?  And how could the UST and then have missed the later newspaper articles that validated the debtors allegations when it was discovered after the sale that Steve Sanders  - an insider of noteholder Stratford  - was in fact involved in the purchase of the property just as the debtors had alleged?  How could the UST overlook what everyone else in the Central Texas area could read for themselves and the newspaper?

How could the UST – the watchdog over the bankruptcy system's integrity – possibly believe the trustee's of April 14, 2015 motion for rehearing held any validity by falsely claiming that Sanders only became involved with Schumacher after the March 26, 2015 sale?

How could the UST – the watchdog over the bankruptcy system's integrity – possibly believe that the lies told at the March 26, 2015 hearing weren't designed to intentionally deceive the court and conceal the conspiracy between the trustee, his broker Busby and Busby's partner Sanders and Schumacher  - especially upon hearing Schumacher and Sanders admitting later in the hearing of April 21, 2015 that they had had extensive contact prior to the sale.

How could the UST – the watchdog over the bankruptcy system's integrity – possibly believe that completely contradicting testimony of two the court regarding the collusion and conspiracy between the partner of the trustee's broker and front man purchasers didn't constitute fraud on the court in furtherance of the now obvious price fixing and bid rigging scheme?

How could the UST – the watchdog over the bankruptcy system's integrity – then miss the significance and take no action regarding the affidavit of attorney Carol Mattick of May 4, 2015 with new evidence swearing that Busby had never

cut ties with Stratford as he had testified, and was still acting as an active broker for Sanders and Stratford Properties?

How could the UST – the watchdog over the bankruptcy system's integrity – find it reasonable and prudent to inform the debtors' bankruptcy lawyer at the time, Ron Smeberg, that despite the affidavit and other filings of Smeberg demonstrating fraud on the court in the process of the sale, that the UST would not take any action against its longtime career chapter 7 panel trustee john Patrick Lowe for his role in the scheme despite the facts and evidence of fraud?

How could the UST – the watchdog over the bankruptcy system's integrity – be willing to simply overlook the fact that disclosures are an important and ongoing obligation of bankruptcy professionals, and that busby's failure to disclose he was still working for Stratford contrary to his testimony was yet another significant red flag and overt act in the price-fixing and bid-rigging scheme?

How could the UST – the watchdog over the bankruptcy system's integrity – then overlook the March 11, 2016 headline news article in the San Antonio Business Journal profiling Busby, Sanders and Schumacher – complete with their photos -wherein they gave quotes that completely contradicted their sworn testimony, clearly proving their bad faith actions in the sale, but providing more overt acts in furtherance of the price-fixing and bid-rigging scheme?

How could the UST – the watchdog over the bankruptcy system's integrity – overlook the debtors' *pro se* motion to take judicial notice of the newspaper article proving that Busby, Sanders and Schumacher had not simply lied throughout the entire bankruptcy proceedings, but proving that even their cover-up story was a lie and a fraud on the court - a virtual Ponzi scheme of lie after lie after lie to cover up for prior string of lies[17].

How could the UST – the watchdog over the bankruptcy system's integrity – possibly fail to see the significance of Busby's May 9, 2019 testimony that he wired roughly half the commission from the sale of the Johnson Rozelle

---

[17] It goes without saying that fraud cases riddled with a Ponzi scheme of lies requires often repeated facts and evidence, and often repeated 'connection of the dots', as many lies are often used to cover up a single specific act, and a single lie is often used to cover up numerous specific acts taken in furtherance of the scheme to defraud.  Then you have the Judge King case, where self- contradicting lies and fraud on the court are flailing all over the place, and connecting the dots not only requires repetition, but demonstrates fact patterns that create not simply an enormous web of lies, but paints a picture of indisputable, willful, knowing and intentional corruption.

bankruptcy estate property to purchaser Steve Sanders immediately upon receiving it from trustee john Patrick Lowe, which corroborates his testimony that Sanders was acting as his co-broker in the sale of the Johnson Rozelle bankruptcy property to Sanders himself.

How could the UST – the watchdog over the bankruptcy system's integrity – possibly dismiss Busby's May 9, 2019 testimony that Sanders was his secretly concealed from the court co-broker in the sale of the Johnson Rozelle bankruptcy estate property to Busby's partners Sanders and Schumacher

How could the UST – the watchdog over the bankruptcy system's integrity – possibly dismiss the May 9, 2019, the Sanders was secretly a co-broker for trustee john Patrick Lowe and which is corroborated by the wire transfer sent to Sanders immediately upon receiving the commission from trustee john Patrick Lowe, in favor of a flagrantly transparent cover-up story for which neither Sanders nor Busby could corroborate with any evidence at all ?

How could the UST – the watchdog over the bankruptcy system's integrity – overlook the fact that Busby and his new lawyer Ron Smeberg concealed from Busby's creditors, bankruptcy trustee and the UST Busby's income from Sanders and Schumacher of $10,000 - $12,000 per month, and only revealed when questioned as to how Busby could possibly arrange to be making house payments when his bankruptcy schedules claimed he had no income?

How could the UST – the watchdog over the bankruptcy system's integrity – possibly overlook the fact that the income from Busby's partners Sanders and Schumacher in the development of the bankruptcy estate property constitutes yet another red flag and overt act common amongst price fixing and bid rigging schemes -as it clearly shows Busby had a vested interest in ensuring his partners received the property – and at a $30,000,000 discount from fair market and appraised values.

How could the UST – the watchdog over the bankruptcy system's integrity – possibly overlook the direct parallels between what can now logically be termed the Judge King corruption scandal and the scandal involving the now disgraced former bankruptcy Judge David Jones in the sister southern district of Texas, where in the same UST is clawing back millions in fees based on non-disclosures, yet remaining silent in a much larger corruption case involving judge king and his closest colleagues?

§

§

§

Apparently, the May 9, 2019 'smoking gun' transcripts pose a real problem for the credibility of the San Antonio bankruptcy courts:

ecf.txwb.uscourts.gov/cgi-bin/HistDocQry.pl?1319...

**Full docket text for document 41:**
Request the Court Take Judicial Notice of Official Certified Transcripts of Walter Busby's Testimony of May 9, 2019, filed by Interested Party Francis McQueen Rozelle Jr (Attachments: # 1 Exhibit A) (Luna, Emilio)

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 01/08/2025 07:23:54 | | | |
| PACER Login: | ▬▬▬▬ | Client Code: | |
| Description: | History/Documents | Search Criteria: | 19-05051-cag Type: History |
| Billable Pages: | 1 | Cost: | 0.10 |

← → C  ecf.txwb.uscourts.gov/doc1/180026029339

CM▦ECF  Query  Reports ▾  Utilities ▾  Help  Log Out

**ACCESS TO THIS DOCUMENT HAS BEEN RESTRICTED BY THE COURT.**

Corruption thrives in darkness, and democracy dies in darkness

As of January 8, 2025, the May 9, 2019 'smoking gun' transcripts, and in fact all of the transcripts from Busby's bankruptcy, including the deposition transcripts of Steve Sanders by the UST, still remain stricken from public view by the bankruptcy court as above.

As well, on September 19, 2019, the debtors filed 54 page Amicus brief in the UST case against Busby **(19-05051 Hobbs v Busby Doc 5).** This document also remains stricken from the record.

ecf.txwb.uscourts.gov/cgi-bin/HistDocQry.pl?1319...

Full docket text for document 5:
Restricted from public view per the Court's direction. Amicus Curiae of
Francis Rozelle McQueen Jr filed by Interested Party Francis Rozelle McQueen
Jr (Kanyumbu, Terrance). Text modified on 9/25/2019 (Luna, Emilio).

| PACER Service Center | | | |
| --- | --- | --- | --- |
| Transaction Receipt | | | |
| 01/08/2025 10:52:39 | | | |
| PACER Login: | | Client Code: | |
| Description: | History/Documents | Search Criteria: | 19-05051-cag Type: History |
| Billable Pages: | 1 | Cost: | 0.10 |

The restricted document clearly explains the obvious limitations of the UST claims against Busby and how the May 9, 2019 testimony proves up the collusion between the bankruptcy trustee john Patrick Lowe and the purchasers Sanders and Schumacher through using Busby as a tool and conduit for profit, in effectively the same manner that Elizabeth Freeman of Jackson Walker was used as a conduit for favorable rulings and millions of dollars in fees from Judge David Jones, from which he profited as well. Freeman, of course, is Judge Jones girlfriend and former clerk. More importantly, they restricted document also questions why the UST would 'sweep under the rug' the May 9, 2019 admission to the collusion in the corrupted sale, and instead claim falsely that Busby "for the first time" explained why he split the commission with Sanders in August of 2019, and that it was for a *future* partnership.

It bears repeating, judge King repeatedly slandering and defaming the debtors/ whistleblowers Johnson and Rozelle by referring to them as exaggerated and paranoid conspiracy nuts, knows full well the so-called 'giant conspiracy' theory he continually attempts to put in their mouths, and which he claims doesn't exist, actually does exist in the form of the ever present 'code of silence'. Any reasonable objective observer apprised of the facts and circumstances would likely conclude that Judge King is the only one in denial of this code of silence, and stands alone against reputable sources (newspapers, investigative reporters, other lawyers, other bankruptcy judges, esteemed law professors, U.S. Atty.

General, legal ethics experts and scholars etc. etc. and the debtors as well). King knows well that the debtors have never claimed a giant conspiracy was involved in his court's price fixing, bribery, kickback, bid rigging and money laundering scheme that defrauded the debtors' bankruptcy estates of some $30,000,000, but just the opposite. King apparently wants to deflect attention away from the fact that the debtors have from the beginning claimed a small tight knit clubby incestuous conspiracy of what appears to be a bankruptcy racketeering ring made up of the inner circle of those closest to judge King. The 'giant conspiracy' mantra is all judge King's doing as a way of providing cover of the scheme he facilitated while at the same time defaming the victims of the scheme.

It could appear to a reasonable objective observer aware of the culture of the court as well as the facts and circumstances of the case that King apparently wants his profitable and protected little kingdom to stay intact, and wants anyone willing to listen to believe that everyone in the larger outside world with an objective if you are all working in a giant conspiracy against him, and that they are all wrong, and only the small little inner circle of bankruptcy ring lawyers profiting from the scheme are right. As has been said many times, when certain lawyers can't dispute the overwhelming facts and evidence, they simply attack the victims.

As well, the debtors have never had their 'day in court' as King would have believe, as they have never been judged by a jury of their peers. The debtors have only been judged by judge king and judges that clearly appear to be protecting Judge King by 'circling the wagons'. It's the reason the trustee's complaint requests that Judge King maintain any and all jurisdiction over the debtors forever.

Rozelle was quoted by the newspaper upon King reaffirming the sale after making a finding that the egregious fraud on the court didn't amount to even a hint of impropriety. According to Rozelle "A jury never would have said this passes the smell test. It stigmatizes the court". And it did - to the point where virtually no title company anywhere would give any respect to judge Kings finding of fact, which was clearly concocted for the sole purpose of giving a clean title policy. It failed miserably. It seriously stigmatized the court in the public's eye.

The restricted document also expresses that the UST has failed in its duty to act by protecting the cover-up story, which can only be accomplished when intentionally and knowingly sweeping facts and evidence under the rug. It too was restricted by the court of judge Gargotta (who is again, the former clerk of

judge king and former bankruptcy judge glen Ayres of Langley and Banack, who committed some of the most egregious fraud on the court as an officer of the court in furtherance of concealing the conspiracy's between those involved in the scheme.

As exhibited in the scandal of bankruptcy Judge David Jones, former clerks are often rewarded for what has been described in numerous articles as 'idol worship' and a system of "worshipful silence"[18] – essentially keeping their mouths shut of what they've seen transpire as a judicial clerk, and thereby making them equally complicit, as 'to remain silent is to be complicit'.  Gargotta has written a glowing 'idol worship' style publications regarding Judge King and Judge Ayres.


It bears an eerie resemblance to the Judge David Jones scandal, in which newspaper headlines and articles read How Four Judges Kept Romance Allegations Quiet for Two Years[19] parallels what soon could be **HOW FOUR JUDGES KEPT PROOF OF CORRUPTION QUIET FOR 10 YEARS.**  As with all else, the corruption in judge King's bankruptcy court totally dwarfs the corruption in the court of now disgraced former bankruptcy Judge David Jones.

A reasonable person would also be asking why the UST only prosecuted an objection to discharge against Busby, but failed to act upon the domino/spillover effect of Busby's testimony that clearly invalidates the clearly corrupted sale of the Johnson Rozelle bankruptcy estate property to Busby's partners.  After all, it's not like the Chris Pettit case -the estate planning lawyer that stole some $200,000,000 plus from clients to stash in foreign bank accounts that may never be seen again.  The property is still there and apparently only half developed.  Clearly the debtors to be made whole, IC specially when punitive damages are available for victims of price fixing and bid rigging schemes.  The assets of the perpetrators of the fraud are not hidden at all – the apartments are there, the pad site developments are there, the land is there and the money is easily attainable.

---

[18] See Dahlia Lithwick, **He Made Us All Victims and Accomplices,** *Slate*, December 13, 2017.  Speaking out about the disgraced former U.S. District judge Alex Kozinski, "The relationships between law clerks and their judges are mostly built on worshipful silence.  There is no other work relationship left in America that is as comparable. Which is, as it happens, part of the problem."

[19] See James Nani and Ronnie Greene, **How Four Judges Kept Romance Allegations Quiet for Two Years**, *Bloomberg law*, March 1, 2024

The UST knows that bankruptcy sales have been overturned after even 21 years when evidence of fraud on the court and corruption is apparent (*in Re:Roussos*), as the debtors have made them unavoidably aware with their pleadings and filings sent to the UST.

Apparently the intent is to protect the $30,000,000 skim and development proceeds in the future for those who aided and abetted - or simply willing to overlook their oversight responsibilities.  Again, these are logical questions that would be asked by any credible investigation into the corruption of judge Kings Court, and would be asked by the public .

As stated elsewhere, and it bears repeating, a reasonable person apprised of the facts and circumstances could easily draw the conclusion that the UST and bankruptcy court attempted to intentionally sweep under the rug the smoking gun evidence – and in fact all of the evidence  - of fraud and collusion in the sale of the Johnson Rozelle bankruptcy estate property.

Keeping the public in the dark obviously prevents a reasonable person from knowing the facts and circumstances, and can mislead the public into believing that the debtors' allegations of fraud and corruption are frivolous as a means of protecting what clearly appears to be gave highly lucrative ongoing criminal enterprise within the San Antonio bankruptcy courts.

It clearly appears to be the point.

It clearly appears to be a tactical and intentional cover-up that could clearly appear to be an attempt to protect the UST and the bankruptcy trustee from claims of willful and intentional failure to act and breaches of duty, and protect Judge King for turning a blind eye willfully, knowingly and intentionally in order to defraud the bankruptcy estates.  Hiding the May 9, 2019 transcripts from the public might solve this problem, as corruption thrives in darkness.

The UST was also aware that Smeberg's representation of Busby constituted an ethical violation sanctionable by the Texas State bar.  It is specifically why the UST asked Busby if he had signed any waiver of conflicts before hiring Smeberg, to which Busby responded "no"

As stated elsewhere with the citations to the transcript testimony, it could clearly appear that Smeberg turn on the debtors Johnson and Rozelle as soon as he realized the UST would breach its duties to act.  That was a clear signal to Smeberg that he needed to 'stand down'.  And he did.  Debtors believe Smeberg was offered either lucrative case referrals, cash stuffed in envelopes, or a split from the proceeds of the price-fixing and bid-rigging scheme that could be laundered in any number of ways.  Smeberg really didn't have anything to fear

that for his failure to adequately prosecute the case, are breach his duties by secretly representing his former clients adversaries Walt Busby. As Atty. Ty Clevenger and others have stated, the state bar won't touch a connected lawyer regardless of the crime or misconduct. The fact is, Smeberg is financially benefiting from the development of the bankruptcy estate property through Busby's fees that originate through Busby's partners Sanders and Schumacher, which is derived from the corrupted sale Smeberg vowed to overturn for the fraudulent acts of Busby, trustee john Patrick Lowe and the other co-conspirators.

As stated elsewhere, two other attorneys shuddered their longtime firms to join judge Kings former firm Langley and Banack, who represent Sanders and Schumacher and who committed some of the most egregious fraud on the court in furtherance of the bid rigging scheme as noted herein. By joining Langley and Banack after the sale, it could appear that James Hoffman and Robert Barrows – who represented Stratford Land fund and Walt Busby respectively – are like Smeberg set up to receive kickbacks laundered in the form of attorney's fees. As stated herein, overt acts taken by themselves can appear to be unrelated to any illegal scheme. However when combined with numerous other acts that establish a distinct pattern of fraud on the court that indicate a coordinated effort to profit from those acts, they become red flags and corroborated patterns of fraud that establish intent.

It clearly appears to be the reason the Judge King in particular has attempted to defame the debtors, and Rozelle in particular, by labeling him as an exaggerated, paranoid and extremely difficult to deal with conspiracy nuts for firing numerous bankruptcy lawyers. What king willfully and knowingly omits in his smear campaign is that the bankruptcy lawyers were fired for cause, including incompetence and intentionally trying to throw their clients case. King has to protect the bankruptcy lawyers to protect himself, knowing they were operating under him for the common goal of seeing that the price-fixing and bid-rigging scheme moved through the court without objection or disruption by the pesky and unreasonable debtors wanting a fair and non corrupted sale process.

Judge King also knew the sale was tainted and corrupted by fraud on the court, conspiracy and collusion between the trustee, his broker, his lawyer pat autry of Branscomb PC and the purchasers and their lawyers at King's former firm of Langley and Banack even prior to Busby's 2019 testimony, and as explained in this document, King also made willful and intentional steps to avoid knowledge and dodge questions regarding busby's incriminating testimony in a hearing of February 10th, 2021. As stated elsewhere in this report, King's actions in that

particular hearing above all others **(ecf 1008)** – days after he announced a sudden retirement following the debtors motion to have the case referred to the US attorney's office for investigation - is a textbook case of a bankruptcy judge attempting to deliberately blind himself of evidence of the very corruption that King approved of.

It clearly appears to any reasonable person apprised of the facts, evidence and circumstances – especially given the reputation of the UST by even the Atty. general john Ashcroft and others as being corrupt – could conclude, and likely would conclude that the defrauding of the Johnson Rozelle bankruptcy estates of $30,000,000 was fully protected all the way 'from top to bottom'. Again, the offices of the court clearly appeared to hold disdain for Rozelle for exposing the corruption and breaking the code of silence they have profited from for decades. Debtors believe the only difference between the UST actions in the Judge David Jones scandal in attempting to claw back millions of dollars in illegitimate fees paid to lawyers who failed to disclose conflicts of interest, and profited from those conflicts of interest, and the Judge King case is the fact that the press has yet to fully digest and report on the Judge King scandal. But they have, and they will.

§

It has to be remembered that the cover up stories that don't have to make sense in the bankruptcy courts of San Antonio. They just have to provide an implausible amount of plausible deniability for those wishing to cover up for a $30,000,000 take to turn a blind eye – regardless of the damage to the integrity of the bankruptcy courts. It's simply a case of a $30,000,000 'take' vs losing one's integrity, and the J.R. Ewing's of the world will take that choice every day.

The transcripts of the 341 meetings of creditors and depositions of Sanders and Busby are a 'must read' for anyone wanting to know how not to cover up a price-fixing and bid-rigging scheme, and the debtors had the recordings transcribed and filed on the record. Rozelle even had Judge King take judicial notice of them and listened to Rozelle explain in court the new evidence, to which Judge King responded by continually attempting to change the subject and then claiming it was all just a conspiracy theory in the exaggerated minds of Johnson and Rozelle.

Clearly the debtors throughout the bankruptcy case have been represented by ineffective and compromised legal counsel and denied the opportunity to have the case adjudicated by a fair and impartial judge. The debtors fully believe that bankruptcy Judge Ronald B King has lost all subject matter jurisdiction in the bankruptcy case(s) (including the adversary proceeding) of the debtors for failing in his requirement to recuse himself in a case(s) where his impartiality is reasonably questioned, as well as for his complicity in the scheme to defraud the Johnson Rozelle bankruptcy estates. Furthermore, the debtors fully believe as the evidence points out, the Judge King is a morally and ethically unfit to sit in judgment of the debtors, or for that matter, anyone else.

The fact that judge King specifically, willfully and intentionally read off the list of names of bankruptcy lawyers that had attempted to throw their clients' case in favor of protecting their own bankruptcy careers speaks volumes. King made specific and intentional falsified findings of fact that "Rozelle burned many bridges because he was extremely difficult to deal with" falsely implying that Rozelle had problems with his other professionals, such as engineers, land planners, appraisers and lawyers. This is clearly not the case, but it made Rozelle look bad and was used to falsely imply Rozelle was the reason the debtors couldn't sell the property to pay off the note. It was clearly in coordination with Broadway bank and Stratford Land fund to cover up for the tortuous interference of city councilman Reed Williams had prevented the debtors purchasers from rezoning any property for multi family, and collusion between Steve Sanders and the debtors brokers.

King knew very well that Rozelle could not be manipulated by bankruptcy lawyers operating under judge king's thumb to throw the case in favor of a price-fixing bid rigging scheme that netted $30,000,000 from the corrupted sale – the spread between the fixed sale price fair of $20.3 million and the $50,000,000 of the property as per appraiser testimony and appraisals since 2007. (even Valero offered $25,000,000 in 2008 **(ecf 989-3)**, at a time when the property was appraised at between $35,000,000 and $45,000,000 - see appraisals herein)

Rozelle testified to this when he was brought to the witness stand *pro se* at the fee application hearing of trustee's counsel Ron Hornberger and grilled by judge King and the trustees counsel Ron Hornbarger, who demanded to know the names of any and all attorneys who helped draft pleadings outlining the fraud scheme and a professional manner. Rozelle was held in contempt of court by judge king for refusing to allow the judge to threaten honest lawyers lives or

livelihoods.  According to Langley and Banack lawyer and former bankruptcy judge Glen Ayres, the pro se pleadings of the debtors following the corrupted sale were "sophisticated", and in a somewhat panicked plea to the court, demanded that Rozelle disclose the name of attorneys – or anyone – helping draft the pleadings that clearly demonstrated the debtors had legal advice from those who recognize attorney and judicial misconduct.  Rozelle refused then as well, and add a subsequent hearing, Ayers again demanded to know the names of anyone helping the debtors draft pleadings and what is known as unbundled legal services.  When Rozelle refused again, King ordered him deposed within the next two weeks, which was eventually quashed.

King, the trustee and the other lawyers involved in the scheme are well aware of how the corrupt system works through a 'conspiracy of silence' as even the fifth circuit has noted (see herein).  King is clearly at odds with even the fifth circuit who is willing to acknowledge that bankruptcy lawyers have a 'gentlemen's agreement' not to object to each other's inflated fee applications.[20]  In fact, they exploit, capitalize on and profit from the code of silence and fear instilled upon bankruptcy lawyers from speaking up about the corruption in order to smear and defame any victims or lawyers that dare speak out against the corruption.  King, the trustee and the other bankruptcy lawyers involved in the scheme want the public to believe this is all fallacy and exaggerated paranoia - they have to because they profit from the code of silence.

As others have written and even published websites and books regarding the corrupt nature of bankruptcy courts, including publisher Sol Stein's **Bankruptcy: A Feast for Lawyers,** and even the highest ranking law enforcement officer of the country, the United States Atty. General, it may often be true that anyone representing themselves in court has a fool for a client.  The exception to the rule is bankruptcy court, where being represented by bankruptcy counsel is considered being played for a fool.  As San Antonio bankruptcy lawyer Lawrence Beck testified before the house subcommittee on economic and commercial law:

---

[20] What the fifth circuit has termed 'a conspiracy of silence' regarding fee applications of bankruptcy lawyers.  Some might call it honor among thieves.  Again, debtors don't believe all bankruptcy lawyers engage in the practice of submitting illegal and inflated fee applications simply because they are routinely approved without any objection by their fellow lawyers or scrutiny by the judge or the UST.  It's part of the business model that King's everyone happy and quiet – and fearful of retaliation for speaking against the corruption

*"Most individual debtors who enter bankruptcy with significant assets, eventually conclude that they have become trapped in a crooked, dishonest system which is run for the benefit of the panel trustees and his handpicked attorney, and which is supervised by incompetent bureaucrats"*

Beck also offered the following criticism of the United States Trustee program and in particular, chapter 7 panel trustees and their handpicked lawyers like trustee John Patrick Lowe and his handpicked lawyers Branscomb PC, Ron Hornberger and that now Graves Dougherty, who are known to defend unethical lawyers and legal malpractice cases.:

*"Notwithstanding the valiant and praiseworthy efforts of the first several United States Trustees in Chicago and New York under the pilot program, the UST is not doing its job.  Although there are some bright spots, my opinion is that the UST conceives his role to be the protector of the lonely, underpaid panel trustee.  And, panel trustee's and their attorneys eventually become some of the wealthiest members of the bankruptcy bar." [21]*

The 'poor little underpaid career panel trustee' false narrative was used by judge King at the 2014 hearing on compensation for trustee john Patrick Lowe whom King had just appointed.  The debtors Johnson and Rozelle, along with their bankruptcy lawyer Lorenzo Tijerina, listened as King made a finding that he was not bound by the agreement between the UST and Lowe that the trustee would take the lesser of hourly fees or statutory fees. Stating that trustees often have 'no asset' cases in which they get the minimum payment as an excuse/rationale, King stated he didn't feel it was fair for career bankruptcy chapter 7 panel trustee to administer a big case with a valuable property like that of the Johnson Rozelle bankruptcy estate property to be bound to the lesser of hourly fees or statutory fees.  As a result, King stated he **"did not want to limit the upside fee potential of trustee john Patrick Lowe in the case" (ecf 438@5-6)** Given what is now known as numerous apparent attempts to cover up the bankruptcy crimes of trustee john Patrick Lowe and his professionals in the price-fixing and bid-rigging scheme and its kickbacks that defrauded the Johnson Rozelle bankruptcy estates of some $30,000,000 in one case alone, a reasonable person apprised of the facts and

---

[21] See Peter E Alexander, **A Proposal to Abolish the Office of The United States Trustee,** University of Michigan Journal Of Law Reform At University Of Michigan Law School Scholarship Repository

circumstances – and the way other bankruptcy judges like Judge David Jones profit from his own orders approving fees - could easily conclude that judge King was not simply attempting to protect the upside potential in fees for career panel trustee john Patrick Lowe, but for the judge himself.

It's worth noting that bankruptcy judges have long had a reputation of receiving kickbacks from bankruptcy trustees and other bankruptcy lawyers for approving illegal and padded fees that defraud bankruptcy estates. One need look no further than the case of the now disgraced former chief bankruptcy judge of the southern district of Texas David Jones, who resigned in disgrace and is currently under investigation by the FBI. Jones would appoint his former clerk (for six years) and girlfriend Elizabeth Freeman as a liquidating trustee, and approved millions of dollars in fees to freeman and her firm Jackson walker, which no doubt helped pay for their joint living expenses and homes they jointly owned. Headlines read **"Bankruptcy Judge Accused of Helping Attorney Girlfriend Land Cases"** and **"Judge Turns Huston Bankruptcy Court into Profitable Venture for Girlfriend"** and many more in the still unfolding judge Jones bankruptcy scandal. Other headlines include **"New Study Accuses Bankruptcy Judges Of "Routine Illegality""** from the Wall Street Journal regarding research by UCLA law professors Lynn LoPucki and Joseph Doherty, who exposed the fact that many high dollar bankruptcy cases are funneled specifically to bankruptcy judges known for giving favorable rulings and approving illegal fee applications for bankruptcy trustees and other bankruptcy lawyers. Known as 'judge shopping', it's a practice that would not thrive if bankruptcy judges and their orders were not for sale.

§

An understanding of the bankruptcy court's self contained and well protected 'ecosystem' is required if a reasonable person is to be apprised of all the facts and circumstances, which is required in order to make informed decisions regarding judicial appearances of impropriety, and judicial misconduct in the defrauding of the Johnson Rozelle bankruptcy estates, and many other bankruptcy cases involving the same cast of characters for decades.

For newby lawyers fresh out of a law school, obtaining a judicial clerkship is a highly prized commodity, as it not only looks impressive on the resume, but law firms seek to hire former clerks as a perceived 'inside track' to a particular judge and the 'wink and nod' perception that it needs to favorable rulings in the future. Again, the one need look no further than the relationship between Judge David Jones and his girlfriend Elizabeth Freeman. Most judicial clerks do a one year stint, but Freeman was a clerk to Jones for *six years.* This became important

when Freeman joined the Jackson Walker law firm, who became the 'go to' law firm for large bankruptcy cases and millions of dollars in fees to bankruptcy lawyers and trustees. As chief justice of the western district of Texas Alia Moses opined, it's the reason Kirkland Ellis used Jackson Walker as local counsel in Houston bankruptcy cases. Kirkland Ellis is not only the largest law firm in the nation, but even has a Houston office of their own. They were not out of towners meeting local counsel but for one reason and one reason alone -the connection that Jackson Walker had with Judge David Jones. The clear corruption is one of the reasons that the United States Trustee began moving to claw back some $23,000,000 in legal fees. The other reason – and the most obvious reason - is that the national press got a hold of the scandal that the local press kept quiet. Everyone knew how the bankruptcy court corruption worked, including the UST, but kept silent. Now Jackson Walker has been given the green light to depose bankruptcy lawyers working for the UST regarding their prior knowledge of the corruption, and why they failed to act sooner. It's what the Fifth circuit terms **"a conspiracy of silence"** regarding professional fees in bankruptcy, as everyone is profiting from those thrown into bankruptcy, the there's not only the financial incentive to remain quiet and continue to profit, but there's also the fear of retaliation for speaking out and exposing the corruption[22]. According to one legal ethics expert, the Jones scandal has now become a question of who knew what, and when did they all decide not to know it.

In a recent bankruptcy case San Antonio lawyer Chris Pettit stole over $200,000,000 from his own clients, many of them elderly, in the often- used tactic of lawyers gaining a client's trust in order to specifically betray that trust for the lawyers own private gain. When Pettit was sued for fraud, he filed for bankruptcy on behalf of himself and his firm. The bankruptcy judge in the ongoing case is Judge Craig Gargotta. Gargotta began his career as a clerk for bankruptcy judge Glen Ayres, who served only three years as a bankruptcy judge before resigning and later becoming a bankruptcy lawyer for the firm Langley and Banack, which in turn was apparently used in conspiracy with career chapter 7 panel trustee john

---

[22] See Clifford White III and Walter W Theus Jr, Executive Office of the United States Trustee, **Professional Fees under the Bankruptcy Code: Where Have We Been and Where Are We Going?** "Creditors' committees frequently fail to review and object to the fees of other estate professionals. As the *Busy Beaver* court noted, committee professionals do not object to fee applications that of either *professional courtesy or fear of retaliation*.... More than two decades ago, the Fifth Circuit stated its belief that bankruptcy professionals engage in a "conspiracy of silence" on fees."

Patrick Lowe as the 'inside track' to judge King in the defrauding of the Johnson Rozelle bankruptcy estates of some $30,000,000 in the same manner that Jackson Walker was used as an inside track to former and now disgraced bankruptcy Judge David Jones for favorable rulings and illegal fee applications.

Langley and Banack is judge king's former law firm with whom he still maintains close personal and professional ties, and is believed to have looked upon several members of the firm as his mentors including Judge Ayres.  It is Judge Ayres who is credited with convincing Judge King to take his place on the bench.  This was relayed in a 2011 profile of judge King by one of King's former clerks Abigail Ottmers of Haynes and Boone, who wrote in a glowing profile of her mentor that King only decided to apply for the vacancy created by Ayres resignation "after speaking with Ayres" **(ecf  867 Exhibit 19)**.

The newsletter published by the San Antonio Bankruptcy Bar also describes King as 'stumbling into the role of bankruptcy lawyer' for being the only lawyer at Langley and Banack (then known as Foster, Lewis, Gardner, Langley and Banack) who knew where the courthouse was, and after specifically avoiding  bankruptcy classes in law school.  A later profile following judge King's sudden 'retirement' ***(immediately following debtors Johnson and Rozelle filing their motion to have the case referred to the U S Attorney's office for investigation ecf 985 and 989)*** by the same Abigail Ottmers and another former clerk of judge King's Eric Terry, changed their story to state that King decided to replace Judge Ayres "after speaking with his family".  The same Ottmers and Terry had attempted in 2012 to circumvent the statutes of fraud defense against attorney fees by bringing in a false claim against Rozelle in judge King's bankruptcy court with the use of a forged document.  The scheme, which was setup with the help of Rozelle's own bankruptcy lawyers, was only foiled when Rozelle brought in a board certified legal malpractice attorney  that surprised not only the lawyers but the court as well (see herein)

It was Judge Ayres who also talked King into keeping on Ayres' clerk Craig Gargotta, who saw Ayers as a mentor,  as King's clerk[23].  Another of king's former clerks, along with Gargotta, also serves as a bankruptcy judge in San Antonio. Gargotta serves as the bankruptcy judge in the Pettit case, where Eric Terry serves as the bankruptcy trustee.  Pettit was locked up in jail for contempt of court by judge Gargotta for failing to turn over a computer believed to contain information

---

[23] See bankruptcy Judge Craig Gargotta and lawyer Dick Davis of Langley and Banack, **"In Memory of Roderick Glen Ayres Jr (1947-2017) Professor Of Law, Saint Mary's University School Of Law"**, *Saint Mary's Law Journal*, Volume 49, 2018

regarding offshore bank accounts used to stash the $200,000,000 stolen from his clients.

Pettit's first lawyer, who routinely acts as bankruptcy trustee in numerous San Antonio bankruptcy cases, was forced to disgorge tens of thousands of dollars he received in legal fees for knowingly accepting money that was stolen from Pettit's victims.  He was replaced by bankruptcy lawyer Ron Smeberg who had previously represented Johnson and Rozelle before being dismissed for breaches of fiduciary duty. Pettit was also represented by criminal Atty.  Matthew Allen. To avoid the same disgorgement the prior lawyer and his firm suffered, Smeberg now claimed his fees were being paid "by friends of Chris Pettit". The Pettit case had become a high profile case covered by every local media outlet, and it was a 'no brainer' that Pettit was a flight risk should he be released from jail, where he could flee the country and live lavishly in hiding off the millions stolen from his clients and likely stashed in offshore bank accounts.

However, in a really suspicious twist, judge Gargotta, at the suggestion of bankruptcy trustee Eric Terry and bankruptcy lawyer Ron Smeberg, ordered Pettit released from jail.  The reason? "To help his victims find where all the money went".  Seriously.  That was the reason[24].  Judge Gargotta based his decision on the fact that he asked Pettit if he intended to flee to Mexico if released, prompting Pettit's response of "I would stay here in San Antonio", which apparently was good enough for Gargotta to release the lawyer who defrauded his victims of over $200,000,000.  Bankruptcy judge Gargotta explained that he believed Pettit could **"best cooperate with the bankruptcy trustee if he was no longer incarcerated.  Pettit is the source holder of the information".** [25] It could clearly appear to the reasonable person apprised of the facts and evidence – and the way the bankruptcy court works - that Pettit was ordered released on a secret backdoor arrangement to kick back large sums of his ill-gotten gains to those who orchestrated and approved his release and escape as a fugitive from justice.  That was $200,000,000, which is a lot of incentive for corruption, and lawyers know better than anyone how to launder money.

Luckily, as the only apparent 'adults in the room', the DOJ and FBI had become suspect and attended the hearing.  They quickly acted upon Gargotta's release order by immediately dragging trustee Eric Terry with them before U.S.

---

[24] See Patrick Danner, **Judge Orders Chris Pettit Released From Jail After Ex-Lawyer Clears Himself Of Contempt Charge**, San Antonio Express news, December 8, 2022

[25] See Patrick Danner, **Chris Pettit Indicted Over Alleged Thefts From Law Firm Clients, Remains Locked Up**, San Antonio Express news, December 8, 2022

magistrate Judge Elizabeth 'Betsy' Chestney.  The DOJ had apparently convinced bankruptcy Trustee Eric Terry to turn 180° and now cooperate with testimony that in fact Pettitt should not be released as the trustee had just previously agreed to.  Fortunately judge Chestney granted the prosecutors' request to keep Pettit detained without bond.[26] According to the newspaper, **"Though a bankruptcy judge had ordered Pettit's release from jail Wednesday after finding that he had cleared himself of a contempt of court charge, he was never set free.  An arrest warrant and indictment were probably delivered to the U.S. Marshals Service while Pettit, 55, was still in custody.  He has been jailed in the Karnes County Detention Facility for three months.  Justice Department representatives, including assistant US Attorney Robert Almonte, attended Wednesday's bankruptcy court hearing.  They were likely there to see if the judge would release Pettit, and if so, move to keep him in custody"**.[27]

The fact that the bankruptcy judge had suspiciously ordered Pettit's release as an obvious flight risk had to raise many eyebrows not only amongst the creditor victims of Pettitt, but also amongst the public following the story as to the rationale behind such an order, thereby raising questions about the bankruptcy court's credibility and integrity – even though the public has in large part been kept in the dark about bankruptcy court corruption.  If the public knew what the debtors knew and have experienced in their own bankruptcy case, there would be more of a public outcry.  Debtors have no reason to doubt, nor does the public, that an arrangement was made to kick back a small fortune to the bankruptcy lawyers and bankruptcy judge for the release.  Debtors believe the DOJ saw this as well.

Again, in order to make informed decisions regarding the plausibility of allegations the court has deemed frivolous, the public needs to be made aware of not simply the facts and evidence of the Johnson Rozelle case, but made aware of the environment that allows defrauding the bankruptcy estates for the benefit of those looking to best capitalized on the misfortunes of debtors and creditors in bankruptcy cases.  Just as in any investigation by law enforcement, a key consideration in analyzing fraud cases is the question of whether a certain environment was conducive to fraud.  As well, any investigation by law

---

[26] See Patrick Danner, **"Judge Denies Pettits Release On Bond, Will Remain Jailed Until His of the Criminal Trial"**, San Antonio Express news,

[27] See Patrick Danner, **Pettit Remains Jailed After Indictment**, San Antonio Express News

enforcement has to take into consideration the credibility of those defendants defending themselves by making false allegations against whistleblowers.

In large bankruptcy cases, the bankruptcy case itself is often immaterial with respect to debtors or creditors.  They are simply a fly caught in the web, whereby creditors and debtors are simply a means to an end, and that end game is bankruptcy trustees, judges and bankruptcy lawyers exploiting the bankruptcy case by defrauding and bleeding large bankruptcy estates dry with unscrutinized 'professional fees' for their own private gain while leaving behind ruined lives in a scorched earth scenario.  The judges, trustees and bankruptcy lawyers of this caliber[28] often see themselves as being the big fish in their small protected pond when, in reality, they are truly the bottom-feeders of the swamp or cesspool of the legal system.  Lawyers outside the bankruptcy bar are reluctant to enter into the bankruptcy swamp of protected corruption in the same manner Jake was advised to "forget it Jake - it's ChinaTown".

It has to be remembered that in alleging fraud and racketeering, prosecutors are required to the not simply supply the ever-compiling facts and evidence as the debtors have done for years now, but also demonstrate by 'connecting the dots' exactly how the price fixing and bid rigging schemes plausibly work, and as well, the conducive environment that allows for ongoing criminal operations and racketeering activity to go undetected and undeterred by ineffective, nonexistent or even complicit oversight.

Evidence surfacing of the "insider/clubby and incestuous nature of the Houston, Texas bankruptcy court (which is believed to pale in comparison to that of the San Antonio bankruptcy courts) is what blew the bankruptcy Judge David Jones scandal wide open and led to the Fifth Circuit investigation and complaint against bankruptcy Judge David Jones, the racketeering case against Judge David Jones, the United States trustee of moving to claw back millions of ill gotten gains by bankruptcy lawyers, what has been reported to be an FBI investigation of the disgraced former judge and his conspiring law firms.  The parallels between the Judge David Jones bankruptcy court culture and environment and that of the San Antonio bankruptcy courts is only now believed to be investigated.  It is believed to be the reason that trustee john Patrick Lowe and his new law firm Graves

---

[28] There are many honest bankruptcy lawyers, and in fact a majority of the bankruptcy lawyers truly attempts to help their clients be a creditors or debtors.  However, debtors have discovered, they are powerless and intimidated from exposing the corruption in bankruptcy courts, as several bankruptcy lawyers and even bankruptcy trustees have been murdered for cooperating with investigations into bankruptcy court corruption.

Dougherty appear to be in a panic to close the case with a finding by judge King that there has been no misconduct or liability on the part of those involved in the price-fixing and bid-rigging scheme – which would be as valid as a diploma from a mail order college.  Apparently the fear is that once it hits the press, the United States trustee, DOJ and FBI will also feel public pressure to investigate on claw-back millions of dollars through the many cases- both still open and closed – involving judge King, trustee john Patrick Lowe, the Branscomb law firm, Jim Hoffman and King's former firm and lawyers at Langley and Banack.

It should be noted that following press coverage indicating that the Federal judges in the southern district of Texas were covering up for Judge David Jones and keeping the evidence sealed from the public to protect the profitable corruption and ongoing racketeering enterprise, even judge Isgur the apparently felt pressured to refer the entire Jackson Walker law firm – not just those involved directly in the scandal, but any and all who benefited for being a partner and sharing in the spoils – to the Texas state bar for what he wrote **"defiling the temple of justice"** [29].  It has been reported in the press that even the UST was aware of the corruption that did nothing, which is an argument that Jackson Walker has made against the UST attempting to clawback millions of dollars in fees paid to Jackson Walker.

More recently in the Pettit case, for example, a December 12, 2024 express news article **"Victims of Disgraced Ex San Antonio Attorney Chris Pettit Awarded More Than 100M In Restitution: They Have An Ice Cubes Chance In Hell of Receiving The Money, A Lawyer Says"** [30]

Pettitt had already been sentenced to 50 years in prison by Federal judge Orlando Garcia, who also ordered restitution to victims.  However, according to the article, "Garcia's decision to award restitution is largely symbolic.  His victims don't expect Pettitt will ever pay any of what he stole".  The article also quotes Atty. David Mcquaid Leibowitz, who represented about 130 victims suing banks that did business with Pettitt, such as Frost Bank, call the situation "truly tragic". According to Leibowitz,"my clients have an ice cubes chance of hell of ever receiving any restitution money", a sentiment echoed by assistant U S Atty.  Kelly Stephenson.

---

[29] See Katherine Rubino, **Judge Slams Law Firm, Says It 'Defiled the Very Temple Of Justice'**, *abovethelaw.com,* September 25, 2024

[30] Patrick Danner, **"Victims of Disgraced Ex San Antonio Attorney Chris Pettit Awarded More Than 100M In Restitution: They Have An Ice Cubes Chance In Hell of Receiving The Money, A Lawyer Says",** San Antonio Express News, December 12, 2024

It was the FBI and US Attorney's office that apparently investigated a 'follow the money' trail that ended nowhere.  This prompted Judge Garcia to ask if the money was all spent, "Where does one go out and spend $106,000,000?".  It should be noted here that the victims of Pettitt had collectively lost over $200,000,000, and the real question is how can anyone spend $200,000,000?  While it's true Pettit the head several multimillion dollar homes that were identified and sold, the excuse given was that he spent lavishly on furnishings, such as "a life-size storm trooper figure from the Star Wars films".  A quick search on Ebay shows they can be purchased for $1500.  While that appears to be a lot for the life-size toy, it's a far cry from $200,000,000.

In another recent San Antonio express news article, **"Chris Pettit And His Defunct Law Firms Bankruptcies Wind Down As Assets Are Sold, Litigation Unfolds",** the public is made aware that Pettitt "spent an enormous amount of money and apparently didn't leave behind much of a paper trail to help find out where it all went". [31] Of course a well seasoned estate planning lawyer stealing hundreds of millions of dollars from his clients, most of them elderly, knows how to cover his tracks.  Apparently the only trial was in the computer Pettitt refused to hand over, and for which he was held in jail – until the bankruptcy judge the decided he could best help look for the money *if he was free.*

The article goes on to inform the public that according to a lawyer for the bankruptcy trustee Eric Terry, **"There's more than $1.3 million in his [Pettit] estate and about $1.3 million in his law firms estate available for distribution to his unsecured creditors.  Those are relatively small amounts considering that unsecured creditors submitted $238,000,000 in claims against his personal estate and $273,000,000 against the law firms estate.  They include duplicate claims, but the actual total is likely about $300,000,000.  The amounts available for distribution are a far cry from the more than five million dollars in fees that professionals in the cases have already been paid or are owed.  That includes more than $1.3 million to trustee Eric Terry, $1.4 million to the primary law firm representing him, and nearly $1.9 million to the forensic accounting firm Forvis Mozars LLP hired to track were all the money went ".**

Just for starters, as in the Johnson Rozelle case and the now disgraced former Judge David Jones case, those fees should be clawed back for at a minimum, *quantum merit.*  They didn't find the money – only the homes in Pettit's name or other names easily tried to Pettitt.  But again, it's not about

---

[31] Patrick Danner, **"Chris Pettit And His Defunct Law Firms Bankruptcies Wind Down As Assets Are Sold, Litigation Unfolds",** San Antonio Express news

restitution for the victims, is this is bankruptcy court.  This is for the professional fees.

Longtime San Antonio bankruptcy lawyer Martin Seidler was asked by the paper if the results were commensurate with the fees taken by the professionals off the top.  According to Seidler, "I don't know the answer to that.  It didn't appear that way, but I don't know all the facts.  It's hard to say." It is obviously hard for a bankruptcy lawyer practicing before bankruptcy judges Ronald B king and Craig Gargotta to say what the public sees as an obvious response of "hell no it's not right", as bankruptcy lawyers are beholden to these judges for approval of their own 'rubber-stamped' and unscrutinized professional fees in their own cases, and no one wants to shoot themselves in the foot.  Former San Antonio bankruptcy Judge Leif Clark, who was and remains a colleague of King and Gargotta, and who also represented some of Pettit's victims, was also hesitant to give an opinion, simply responding **"By our calculation, the current number is $4,359,976.21 [to the lawyers], which is a fair amount of money"**.  It's a fair amount of money alright, but is not fair. It's simply unfair to have the victims further victimized by even more lawyers simply riding on the gravy train of inflated professional fees to add insult and even more injury to the already injured.  One need only consider this: the DOJ and FBI were already looking for the money.  Does anyone really think the trustee's hiring a trainload of other bankruptcy lawyers immediately upon being appointed to find the money Pettit stashed away was going to do a better job than the FBI?  They were simply on the gravy train of rubber-stamped fees taken from what little recovery – if any – the victims would receive.  It's worse than the sum $30,000,000 in illicit fees the UST is currently attempting to claw-back in the Judge David Jones case.  Again, they admitted they didn't find the money, and are only being rewarded with overpriced fees for failure.  It's a great gig if you can get it, and to get it, you have to be connected.

Even the trustee's accountant was guilty of padding her fees for charging $200 per hour reading newspaper articles, personal emails between the trustee and other lawyers involved in the price-fixing and bid-rigging scheme, and pleadings and orders having nothing to do with her job assessing tax liabilities for the bankruptcy estates.  According to the accountant, she simply had an understanding with trustee Lowe that she would charge her early fee for reading anything and everything he sent to her, regardless of the fact that it was insignificant and immaterial to her duties, and the fact that the accountant herself

couldn't answer how it had anything to do with her duties other than defrauding the bankruptcy estates for her own unjust enrichment (see herein). It can be assumed

After naming off each lawyer, King blamed the debtors had hired and dismissed, King blamed Rozelle, stating **"Mr. Rozelle just as an inflated view of what this property is worth. He thinks it is worth $50,000,000, and he is said that on numerous occasions " (ecf 625 @ 12).** Here King is telling the truth, *but not the whole truth,* by intentionally and strategically omitting the fact **that the property is worth $50,000,000 based on numerous appraisals since 2007 and appraiser testimony before judge King.** Throughout the case, judge King as attempted to falsely relay that Rozelle – *and only Rozelle* – believe the property was worth $50,000,000. There has been an attempt to portray Rozelle – and only Rozelle -as the only one who believes in the property's fair market and appraised value as a means not just smearing the reputation of Rozelle, but in furtherance of falsely painting the $20.3 million corrupted, fixed and tainted sale price as fair market value.

According to King, the trustee and the lawyers involved in the scheme, nothing defines fair market value like a good old fashioned price-fixing and bid-rigging scheme. Judge King's finding that the 'appraisal' of loan-to-own noteholders Stratford and Steve Sanders- *later discovered to be the 'behind the scenes' purchaser in collusion with the trustee, the trustee's broker and front man purchaser* - of $15,000,000 - $20,000,000 at the beginning of the case was essentially the predicate act and foundation of the price-fixing part of the racketeering scheme.

King made the statement even after the trustee's broker had just testified on July 13, 2016 – *just two weeks prior* – that he wasn't surprised that the neighboring and almost identical 81 acre property had sold for $44,000,000. What clearly upset King was from the get go, a major part of the scheme was pressuring the debtors' own bankruptcy lawyers into controlling and tying the hands of the debtors into 'going along' with the sale of the property for $20,000,000 or take nothing in a total liquidation of the property at the loan amount. As other lawyers have written and published regarding the corrupt reputation of bankruptcy courts and quoted elsewhere herein, "*Creditors help rig bids in bankruptcy, and threaten certain actions against the debtor unless the debtor*

*'plays along.'"* [32]  Bankruptcy lawyers themselves have published articles wherein they admit that even up to the 2007 bankruptcy code revisions (Bankruptcy Abuse Prevention and Consumer Protection Act of 2005)," not many lawyers were all that excited about calling themselves bankruptcy lawyers.  To do so was kind of like carving of the scarlet letter '**B**' in your forehead.  You were seen as the **B**ottom-feeders of the lawyering business." [33] Other articles have described how bankruptcy lawyers with robes have likewise historically been shunned by even their own bosses, Article III District court judges[34].

According to the *Stern vs. Marshall* article in American Bankruptcy Law Journal article, Behrens writes that Article III U.S. District Court judges felt that bestowing Article III status to bankruptcy judges would almost certainly diminish the prestige and influence of District Courts, citing the dismissive attitude of district court judges towards bankruptcy judges and the low esteem in which bankruptcy judges are generally held, and the inability to attract qualified candidates as bankruptcy judges.  The same apparently holds true for bankruptcy lawyers as a general category, as others have written that they too have been looked upon with disdain and distrust by other lawyers because of their reputations as being corrupt and corruptible.[35]  It's important to any reasonable observer to be aware of not just the facts, evidence and circumstances of the price-fixing and bid-rigging scheme that defrauded the Johnson Rozelle bankruptcy estates, but also for any reasonable observer and/or investigator to understand the culture of corruption that permeates the bankruptcy system when analyzing the allegations of judge King and his colleagues who pretend to be "shocked" by allegations of corruption and Judge King describing himself as "living in an ivory tower" and therefore unaware of bankruptcy lawyer

---

[32] Shafferman, Joel **"Let Counsel Beware: Overzelous Bankruptcy Practice Can Lead to A Prison Cell",** *The Champion / National Association Of Criminal Defense Lawyers, Sept/October issue 2012*
[33] Julianne Frank, Esq.  **Tales From The Bankruptcy World**, December 27, 2017 Juliannefranklaw.com
[34] See Behrens, Eric G, **Stern v Marshall: The Supreme Court's Continuing Erosion of Bankruptcy Court Jurisdiction and Article 1 Courts**, *American Bankruptcy Law Journal,* 2011.
[35] Debtors are very much aware of good, honest bankruptcy lawyers who are nonetheless powerless to fully represent and protect the interests of parties in bankruptcy cases when corruption is involved, and who hold disdain towards those corrupt bankruptcy lawyers and judges who give their bankruptcy profession a bad name.

misconduct. The main defense of those bankruptcy officers of the court is that the bankruptcy system is of such high integrity and beyond question that price fixing and bid rigging schemes are virtually impossible, and the former chief bankruptcy judge King of the western district of Texas and the now disgraced former chief bankruptcy Judge of the sister southern district of Texas David Jones are above reproach and above question.

Their supplementary defense has been a longstanding attempt to smear and defame Johnson and Rozelle as "exaggerated and paranoid conspiracy nuts" whistleblowers - which they apparently believe the public would believe, *but only so long as the public is kept in the dark as to how the bankruptcy courts and their machinery actually operates*. Until only recently since the Judge David Jones scandal involving Jackson Walker and Kirkland Ellis law firms was broken wide open by another pro se litigant have the bankruptcy courts in Texas been able to thrive in darkness. Where the local press has ignored the scandals of the King and Jones bankruptcy courts, the national press has not. No doubt judge King, trustee john Patrick Lowe and his professionals and the other law firms involved in the price-fixing and bid-rigging scheme that defrauded the Johnson Rozelle bankruptcy estates consider the following to be part of the Johnson Rozelle conspiracy:

Bloomberg Law, the Wall Street Journal, Reuters, Business Insider, AboveTheLaw.com, Law.com, Business Standard, American Bar Association Journal, American Bankruptcy Institute, Financial Times, The Texas Lawbook, Emory Law Scholarly Commons, Law 360, New Media Legal Publishing, Substack, Restructuring Newsletter.com, Daily Mail (UK), Forbes, Ethicsunwrapped.utexas.edu, Fifth Circuit Court of Appeals (who insisted on publishing their formal complaint against Judge David Jones), Abuseivediscretion.com, New York Times, New York Post, and other publications are exaggerated, paranoid conspiracy nuts along with Johnson and Rozelle.

Regarding the numerous historic appraisals of the Johnson Rozelle bankruptcy estate property, the debtors' prior bankruptcy lawyers in the 2011-2012 case had actually attempted to coerce the debtors from using their appraisals of actual fair market value in pleadings or proceedings. The first

attorneys of record tried to prevent the debtors from even speaking with any of their team of professionals, including appraisers, land planners and engineers, claiming once in bankruptcy all lines of communication had to go through the bankruptcy lawyers.

They then concocted a plan to bring in their own broker and appraiser, and claimed to have even hired them without knowledge or consent of the debtors. Part of the 'confirmation plan' of the lawyers' new team was to virtually give away a large section of the westward portion of the property to Valero, claiming because it contained floodplain, it was actually a liability.  The lawyers knew this was incorrect, as they had already had been sent the debtors own floodplain reclamation study from qualified engineers specializing in floodplain reclamation.

This 'plan' of the lawyers appeared to tie in with their initial idea of obtaining a 'stalking horse' bidder- that they themselves would provide -  to bid against Valero for the entire property, and the bidding would take place in the privacy of the lawyer's office.  This, they assured the debtors, would ensure a highest competitive price would be paid for the property immediately and end the bankruptcy quickly.  The floodplain idea clearly appears to stem from extensive surveys Valero had done on the property for a joint development deal with UTSA **(ecf 789@11)**.  They had accomplished this by trespassing on the property without the family's knowledge or consent, and only discovered later. The map Valero showed the debtors Johnson and Rozelle was one created by Valero's engineers Pape Dawson, and incorrectly identified 32 acres of the westward portion of the property as "unusable".

Apparently Frost, Valero and UTSA believed that the debtors were unaware of the development potential of their prime development property, and the fact that the majority of the floodplain could not only be reclaimed, but also very valuable as an offset for tree mitigation and green space requirements for large developments.  The debtors' bankruptcy lawyers were well aware of this and had been provided extensive engineering, feasibility and environmental studies demonstrating that the property also did not have any problem with trees, endangered species or karst features that have been known to hinder other developments.

As well, the debtors had their own floodplain reclamation study showing that with very little cost the seasonal tributary passing through a part of the property could be channelized to result in 8 to 10 acres of floodplain – hardly 32 acres unusable land as Valero had attempted to portray for land in which Sanders and Schumacher have now built apartments and planned other developments.



Unnamed Tributary to Leon Creek
Approximate Revised Floodplain
Based on 2010 LiDAR &
Concept Channel Design

On top of that, development upstream from the tributary was required to mitigate the amount of any seasonal flow coming through the tributary, which they did.  Furthermore, the lawyers' plan of giving some 35 to 40 acres of land to Valero because it had perhaps eight acres of floodplain appeared to be a scheme to allow Valero to be a linchpin for any future development on the debtors remaining property, as the natural drainage would then have to go through Valero property to get to the seasonal creek bed.

Along with other serious breaches of fiduciary duty, the debtors first bankruptcy counsel clearly appeared to have been bought out from under them. It could also appear that perhaps the bankruptcy Judge Ronald B King had been 'influenced' by Valero interfering with the bankruptcy estates in the same manner Valero and UTSA interfered with the Clara Sommers estate to obtain the property at a foreclosure price.  Debtors began to wonder if judge King was putting

pressure on their bankruptcy lawyers to induce or coerce their clients to sell out cheap where the increased profits could be split amongst those making it happen.

According to the Association of Certified Fraud Examiners (ACFE):

*"Judges and other court personnel face significant pressure to rule in favor of powerful political or business entities rather than in accordance with the law. A malleable judiciary can be used by those in power to provide protection for and lend legitimacy to fraudulent acts."* [36]

Prior to and since the first bankruptcy case, scandals involving Federal judges including those of the supreme court receiving kickbacks in various forms from wealthy real estate developers have become a scandal damaging the integrity of the judicial system. According to former U.S. Atty. General john Ashcroft:

*"Bankruptcy court corruption is not just a matter of bankruptcy trustees in collusion with corrupt bankruptcy judges. The corruption is supported, and justice hindered, by high-ranking officials in the United States Trustee Program.*
*The corruption has advanced to punishing any and all who mention the criminal acts of trustees and organized crime operating through the United States bankruptcy courts.*
*As though greed is not enough, the trustees, in collusion with others, intentionally go forth to destroy lives. Exemptions provided by law are denied creditors. Cases are intentionally and unreasonably held open for years. Parties in cases are sanctioned to discourage from pursuing justice. Contempt of court powers are misused to coerce litigants into agreeing with extortion demands. This does not ensure integrity and restore public confidence.*
*The American public, victimized and held hostage by bankruptcy court corruption, have nowhere to turn."*

Former US Atty. Gen. John Ashcroft, 2007
**(source: www.uscourts.gov**

Debtors are not 'exaggerated' for accepting the valuations from numerous qualified appraisers that are on the record as to the value of the property as King

---

[36] see BRIBERY ON THE BENCH: A LOOK AT JUDICIAL CORRUPTION, Jordan Underhill, J.D., Research Specialist, ACFE (Association of Certified Fraud Examiners)

has *repeatedly* alleged in his falsified findings of fact – ***even after the trustee's broker admitted in sworn testimony that he did not dispute the appraisals and even admitted to collusion with the purchasers in the corrupted sale in sworn testimony before the United States Trustee***. Since the first bankruptcy, different investigations into corruption at the Federal judicial level have led to headlines such as that from Forbes magazine **Over 100 Federal Judges Heard Cases Despite Conflicts of Interest, Report Says** (Graison Dangor, *Forbes* magazine, September 28, 2021) and based on the study by the Wall Street Journal **131 Federal Judges Broke The Law By Hearing Cases Were They Had a Financial Interest,** James Grimaldi, Coulter Jones and Joe Palazzolo, *Wall Street Journal*, September 28, 2021.  And then of course, that is the scandal involving former bankruptcy Judge David Jones playing out in the southern district of Texas where he and his favored law firms hid conflicts of interest for the judge's favorable rulings and profit.

The debtors last attorney of record, Ron Smeberg began his representation by filing documents **(ecf 239, 240, 241 and 244)** requesting that the court take judicial notice of the fraud on the court involved in the sale of the debtors $50,000,000 property to the partners of the trustees broker for $20.3 million. However, Smeberg – like other bankruptcy lawyers before him – had either been threatened or purchased into 'going along with the scheme of his colleagues to get along with his colleagues, and eventually threatened to immediately withdraw if the debtors insisted on having an appraiser testimony at the December 14, 2015 hearing on noteholder Stratford's motion to lift stay.  An attorney who observed the bizarre behavior offered to submit testimony to the fact showed the debtors report Smeberg to the Texas State bar.  Smeberg had previously documented in e-mail suggesting the debtors have appraiser testimony, but as with other lawyers, it was clearly a CYA document inconsistent with what the lawyers say and threaten in person.

For example, the debtors very first bankruptcy attorneys of record specifically attempted to speak only with Rozelle over the phone in a 'two on one' situation and without their other client Clarita Johnson being made a party to the conversations.  When Johnson and Rozelle insisted on Johnson being part of the the lawyers claimed she didn't need to be in on conversations about her own case, and claimed that the debtors insistence on simply conferencing her in on calls equated to being extremely difficult to deal with an uncooperative.  They even left a message on Rozelle's voicemail angrily chastising Rozelle for insisting that his mother as their client be part of the conversations, which was transcribed and given to the court and the UST as part of an objection to the lawyer's fee

application and hearing. However, in typical CYA mode, they then sent an e-mail stating **"Where is Clarita? She needs to be in on these conversations".** It was evident that the lawyers wanted a 2-on-one so they could corroborate each others lies with no one to corroborate the truth with Rozelle.

In fact, in a phone call on December 8, 2011, the two lawyers spoke only with Rozelle in a 15 minute conversation. In a subsequent a phone call of December 16, 2011, now with Clarita Johnson on the line, the lawyers began literally yelling and screaming over the phone denying the prior December 8, 2011 conversation had happened at all. For some reason, both lawyers claimed it was in fact a physical impossibility for one of the lawyers to have been on any phone call at all "for reasons they would not discuss". The lawyers then in the same conversation claimed they were recording the phone conversation and threatened to play it to others, and followed up with emails claiming Rozelle was delusional to believe in the conversation between himself and the lawyers on December 8, 2011 happened at all.

Only when Rozelle took a screen shot of his December 8, 2011 telephone call record with the lawyers did the lawyers then apologize – one of them claiming mental fatigue at the time and a total loss of memory. The debtors' broker at the time had also informed that the lawyers had called him yelling and screaming over the phone over the brokers attempt to sell a portion of the property for student housing. In fact, the broker eventually obtained a contract which was fully executed by the debtors with a student housing developer Tonti development – which judge King even admitted as evidence in a 2012 confirmation hearing **(ecf 989-6 exhibit F @194-195)**- yet then later on August 28, 2014, made a falsified finding of fact that the debtors simply refused to sell their property by "refusing every offer other than the two acre sale to Valero " **(ecf 112@126)**, and further falsely claimed negotiations always broke down because "Mr. Rozelle is extremely difficult to deal with" **(ecf 112@126)**. This was the false narrative of Broadway bank, who was well aware of valero's influence in preventing the debtors from selling their property through their control over the city councilman voting against any rezoning of the property by prospective purchasers.

Broadway bank and Stratford Land fund were at the time negotiating for the note with bankruptcy lawyer Jim Hoffman, who has worked closely with judge King for decades, continuing on as Stratford's lawyer upon their purchase of the note. At this point it was becoming clear that the actions of the bankruptcy lawyers was a coordinated effort with the bankruptcy judge also attempting to

prevent the debtors from selling off any of the property to pay off the note.  As another of the debtors brokers relayed, Stratford was only interested in purchasing the note so long as the entire property stayed intact.  In fact, the very first development on the debtors property once Steve Sanders of Stratford obtained the property in the price-fixing and bid-rigging scheme was student housing apartments in the very same location that the debtors had under contract with Tonti development for student housing.  It was a fraudulent misrepresentations about Tonti development by Hoffman, as well as their belief that King, on behalf of Stratford, would not approve the sale that eventually killed the deal.  Hoffman had even claimed falsely that Tonti development was nothing more than a different name for prior student housing developer Campus Crest, which the debtors proved false by providing an e-mail from Tonti that it was a lie, and which the debtors had testified to and had the e-mail from Tonti admitted as evidence at the hearing of August 27, 2014 **(ecf 111@114-129)**

It clearly appears to be a coordinated effort between the debtor's own bankruptcy lawyers, Broadway bank and Stratford lawyer Jim Hoffman and Judge King, as they all made fraudulent misrepresentations regarding the contract with Tonti development and appeared to coincide with noteholder Broadway Bank's desire to prevent parcels of the property sold to pay off the note, which also coincided with subsequent note holder Stratford's desires – and apparently judge King's.  It would later be discovered that Broadway and Stratford were in negotiations for the note at the time, and Stratford would then attempt to prevent any sale of the property by the debtors. As a pattern would soon develop, the price-fixing and bid-rigging scheme and those involved clearly have a disdain for Rozelle in particular for documenting breaches of fiduciary duty of unethical bankruptcy lawyers and those involved in the scheme.

That was the end for these first bankruptcy lawyers.  King, however, granted almost $100,000 in fees to the lawyers for their 'work' done between September 6, 2011 and December 16, 2011 – just over four months. The 'work' was attempting to prevent the debtors from filing a plan of reorganization and apparently selling any property to pay off the note. King attempted to trivialize the attorney misconduct and breaches of fiduciary duty by mischaracterizing it as a simple he said / she said dispute over a meaningless phone call the lawyers claimed never happened. King pretended not to know of the unethical reputation of bankruptcy lawyers in general, and ignoring the over 1000 pages of evidence of breaches of fiduciary duty on the part of the lawyers by stating perhaps he'd been up in his "ivory tower" too long to remember disputes between the attorneys and

clients - but admitted he had never heard such yelling from lawyers at clients as the bankruptcy lawyers had yelled at Johnson and Rozelle **(11-53132 RBK ecf 133@6)** (apparently under pressure from King himself or the bankruptcy racketeering ring for the lawyers to control and prevent the debtors and their brokers from selling property). There was obviously way more going on, but from the get go, it clearly appeared that the debtor's bankruptcy lawyers were under some type of pressure to sell out their clients and discredit them and their evidence of value of the property in favor of the price-fixing and bid-rigging scheme that clearly appears to have been set up from the get go. It clearly appears that the lawyers involved and judge King as well were attempting to fabricate a rationalization or justification for the price-fixing and bid-rigging scheme.

There is a distinct pattern of coercion amongst the debtors' bankruptcy lawyers who apparently operated under pressure from the bankruptcy racketeering ring to sell out Johnson and Rozelle 'from the inside'. As relayed and provided elsewhere in this report, the debtors' last bankruptcy lawyer of record, Ron Smeberg, emailed Jim Hoffman apologizing for "losing control of his clients" who were demanding appraisals and appraiser testimony at the December 14, 2015 hearing on Stratford's motion to lift stay that apparently neither Stratford nor King wanted, as the fair market and appraised values of the property in comparison to the corrupted sale price that King approved despite massive fraud on the court is itself evidence of fraud.

See ***Golson v. Capehart*, 473 S.W.2d 627, 628 (Tex. Civ. App., Eastland 1971)**, " Where an inadequacy of price is extreme in view of the circumstances surrounding the transaction and is so gross as to constitute, in itself, decisive evidence of fraud, the sale and deed may be set aside."

§

Clearly judge King's favored law firm is his former law firm Langley and Banack, including former bankruptcy judge Glen Ayres whom King agreed to replace on the bankruptcy bench and who served as a mentor for King. It's similar to the relationship between bankruptcy judge Marvin Isgur of Houston, who served as a mentor and 'father figure' to the now disgraced former bankruptcy Judge David Jones of Houston. Judge Jones had refused a motion by a *pro se* litigant to recuse himself as he was obligated to do under 28 USC § 455. And other incredible conflict, Judge Marvin Isgur decided he was the one to decide whether or not his protégé should recuse. It's how things work in corrupted bankruptcy courts. Isgur claimed the new information regarding secret

relationships for profit were just an unfounded allegation and based on an anonymous letter that had no merit. As it turns out, Isgur's 'blind eye' approach to the ethics violations of his 'adopted son' Judge Jones raised a lot of eyebrows in the Houston bankruptcy legal community because due to the close relationship between the two judges, Isgur either knew or had to know well of the secret relationship between Judge Jones and Elizabeth freeman of Jackson Walker, but kept quiet to protect his fellow judge, Jackson Walker and the millions of dollars they were making for being known as a 'friendly' court to large cases where the lawyers could profit. In fact, now litigants have sought to recuse judge Isgur have been best friends for years and therefore, judge Isgur's impartiality might reasonably be questioned due to that deep relationship.[37]

Like Judge Ayres and judge King, judge Marvin Isgur and Judge David Jones had been partners at the same firm, and in another similar twist, it was Marvin Isgur that convinced and encouraged David Jones to apply to the fifth circuit for appointment as a bankruptcy judge. Just like judge Isgur kept quiet to protect Judge David Jones, Judge King has repeatedly turned a blind eye to egregious and unconscionable fraud on the court on the part of his former firm Langley and Banack, and the egregious and blatant price-fixing and bid-rigging scheme they employed to defraud the Johnson Rozelle bankruptcy estates of some $30,000,000 in one corrupted sale alone.

In another similar twist, just like judge Isgur kept secret the relationship between his former law partner and protégé Judge David Jones, the trustee in the Johnson Rozelle case kept secret that judge King's the former protégé and sidekick/junior partner at Langley and Banack, bankruptcy lawyer Bill Kingman, was involved in the corrupted sale of the Johnson Rozelle bankruptcy estate property by secretly representing the 'front man' purchaser.

In fact, the trustee and purchaser not only remained silent about Kingman's is involvement, they went the extra mile of committing fraud on the court to conceal Kingman's involvement and role in the scheme – apparently because it clearly appeared the old Langley and Banack crew were conspiring together for yet another score.

---

[37] See, e.g., Reorganized Debtors' Motion for Orders (I) Reopening the Lead Chapter 11 Case; (II) Vacating Certain Orders Approving Jackson Walker Applications for Compensation and Reimbursement of Expenses Pursuant to Federal Rule 60(b); (III) Disgorging Compensation and Expenses Awarded to Jackson Walker Relating Back to July 18, 2018; and (IV) Granting Other Appropriate Relief at 2, In re Exco Resources,Inc., No. 18-30155 (Bankr. S.D. Tex. Jan. 12, 2024), ECF No. 2334;

At the sale hearing of March 26, 2015, former bankruptcy judge and mentor to judge King Glen Ayres of Langley and Banack, along with his partner David Gragg, gave testimony that amongst other serious misrepresentations, falsely claimed that prior to Langley and Banack's recent employment by the purchaser, the purchaser had not been represented by counsel at all.  The lawyers and purchaser also testified that the purchaser had never had any contact with noteholder Stratford Land fund, when in fact, Schumacher was discovered to be secretly partnering with Steve Sanders of Stratford Land fund in the purchase of the property.

However, as the debtors have copied and pasted in their pleadings, purchaser Robert Schumacher had some six months prior to this March 26, 2015 testimony approached the trustee to purchase the property in an e-mail carbon copied to Schumacher's lawyer Bill Kingman **(24-05022 Document 14@358).**  In fact, the e-mail specifically requests that future communications between the trustee (as seller) and Schumacher (as the future 'winning bidder' of the trustee's bankruptcy auction) be channeled through Bill Kingman.

What is particularly telling is that such a statement to the court -that a purchaser in a bankruptcy sale had been unrepresented by counsel-would under normal circumstances be irrelevant and immaterial.  However, in a conspiracy to defraud bankruptcy estates with a price-fixing and bid-rigging scheme, the false statements to the court were clearly to mislead the court by:

1) Giving the false impression that the sale was fair and open to any anyone who could simply walk in off the street and make a bid, and;
2) Giving the false impression that the bankruptcy court controlled 'auction' was not controlled by those bankruptcy lawyers that make up the bankruptcy racketeering ring operating in San Antonio courts, and;
3) Giving the false impression that bankruptcy lawyers closest to judge king were not involved in the sale to;
4) Give the false impression that judge King does not have a financial stake as to his closest colleagues in the purchase of the property or in any way profiting from the sale at $30,000,000 below fair market and appraised values

Like the Judge David Jones case, it's really just the bankruptcy bar that knows the secret relationships between the bankruptcy lawyers and the lawyers and the judges.  The public, or pro se litigants like Michael van Deelen, Johnson and Rozelle, are generally not privy to the inner workings of the bankruptcy court

machinery.  Van Deelen, for example, only became aware of the relationship between Judge David Jones, Elizabeth freeman and Jackson Walker through an anonymous letter, present to be from one in the Houston bankruptcy bar tired of the corruption in the Houston bankruptcy courts.  Johnson and Rozelle have discovered the relationships between King, Kingman and Langley and Banack through their own investigation, as nothing was revealed in court over the relationships for which judge king should have recused himself from the case - especially in ignoring the egregious fraud on the court by his former partners in furtherance of defrauding bankruptcy estates of $30,000,000.

Just as the now disgraced former bankruptcy Judge David Jones was profiting from non-disclosed conflicts of interest, debtors believe king is profiting from a case in which he too was obligated to recuse himself from being back to 2014 – not just from the undisclosed relationships, and fraud on the court to hide those relationships, but because of judge King's clear bias and prejudice against the debtors and Rozelle in particular.  Judge David Jones clearly disliked, ridiculed and ruled against pro se litigant Michael van Deelen for apparently the very same reason judge King-according to a bankruptcy lawyer Ron Smeberg – "hates Rozelle and will rule against him on anything".  The reason is that there are very few pro se litigants who fight back with the truth, facts and evidence of corruption that bankruptcy lawyers can't politically or financially afford to do out of fear for their future bankruptcy careers.  Smeberg informed his clients Johnson and Rozelle that exposing the depth of the fraud scheme by King's closest inner circle of lawyers would implicate King himself are turning a blind eye to it all out of favoritism.  According to Smeberg, it would be career suicide for him because he has to live in this town and didn't want to crap in his own backyard.  Such *pro se* litigants pose the biggest –and perhaps only - threat to corruption, and there have been clear attempts to smear, discredit, threaten and sanction them into silence.

Perhaps the best of numerous examples of judge King's partiality was in allowing the former bankruptcy judge Glen Ayres to himself essentially preside over the April 21, 2015 'cover-up' hearing.  Ayers and his fellow Langley and Banack lawyer David gragg had previously on March 26, 2015 made repeated false representations to the court regarding the good faith nature of the sale of the bankruptcy estate property to Langley and Banack client Robert Schumacher, who had secretly conspired with purchaser Steve Sanders of noteholder Stratford Land fund to purchase the property through the trustee's broker Walt Busby, who was Steve Sanders longtime partner.  They therefore lied to the court claiming

there was no connection or collusion between Sanders and Schumacher, and for that matter with the trustee and the trustee's broker. As explained in further detail herein, the title company discovered Langley and Banack's fraud on the court and refused to give a clean title policy for purchasers with unclean hands.

To get a clean title policy, the trustee discussed *ex parte* the matter with judge King (ecf and likely Langley and Banack to come up with a plan covering up the fraud on the court. The concocted cover-up story needed to be the subject of a new hearing for the sole purpose of judge King making a finding that there was "not even a hint of impropriety in the sale" to of course whitewash the fraud on the court in the sale, which was in furtherance of the price-fixing and bid-rigging. They apparently had reason to believe the title company would fall for it. Either that, or the ridiculously concocted plan was simply the best stupid plan they could come up with.

Since it was Ayres himself that committed the most egregious and repeated fraud on the court at the prior hearing, it should have been Ayres and David gragg, along with their client/purchaser who agreed with all the false statements being grilled by the trustee, who filed the motion for rehearing and 'get to the bottom of things'. Instead, the trustee through his counsel advised King that they were going to just "sit back and listen [to Ayers just as the court will". **(ecf 242@16).** Ayres then stepped up to the plate and announced "I think the ball is in my court" **(ecf 242@16)** before proceeding to have his two witnesses sworn in and provide testimony that completely contradicted their sworn testimony of Schumacher and the Langley and Banack lawyers at the prior hearing in a virtual Ponzi scheme of lies and fraud on the court. Apparently believing two wrongs make a right, or that *essentially* admitting to their fraud on the court by proving up their fraud on the court - but without actually *admitting* to their fraud on the court somehow made things right.

It didn't work on the title company, and in fact, ensured that virtually now no title company anywhere would now even consider giving a clean title policy or ensuring the fraud on the court of the purchasers and their lawyers to. To the point here is that king, Langley and Banack apparently felt the the that the influence the law firm held over judge King in the insular and tight knit/inbred little world of the bankruptcy court was so immense that it could somehow influence the title company as well.

The only thing it *did* do was influence judge King into making a clearly improper findings out of favoritism to his closest colleagues, being that the Ponzi scheme of lies and fraud on the court by his former law firm and mentors was

acceptable behavior by King and his bankruptcy court's standards – so it should be acceptable to everyone else. Clearly the outside world has higher standards regarding appearances of impropriety and defrauding bankruptcy estates of $30,000,000. Just because a Federal judge says fraud on the court and defrauding bankruptcy estates in price-fixing and bid-rigging schemes is appropriate behavior doesn't make things right - it exposes systemic wrongs and corruption.

King's finding strategically omitted the fact that the sworn testimony he had heard earlier in the same proceeding by the purchaser's completely contradicted the sworn testimony of the purchaser and Langley and Banack at the prior § 363 sale hearing.

As an added bonus, King made the following findings:

King: "So I don't see any impropriety or hint of impropriety or appearance of impropriety in this transaction.

Certainly Mr. Rozelle and Ms. Johnson are entitled to inquire into all of the circumstances and they are entitled to no what the background is of these dealings. And I know that they're very suspicious of everyone's motives and everyone's actions, and that's fine. But I don't find any hint of impropriety." **(ecf 242@72)**

Clearly Langley and Banack's clients who purchased the $50,000,000 bankruptcy estate property for $20.3 million were benefiting financially through their lawyers relationship with the bankruptcy judge, who was willing to sacrifice the integrity of his court and the bankruptcy system itself by covering up bankruptcy crimes and the entire price-fixing and bid-rigging scheme due to the relationship. The major undisclosed relationship that they in fact lied about was that one of their purchasers was tied to the trustee through the trustee's broker, actually testifying that the broker had cut all ties with of his partner. It was irresponsible to accept this as being true, and later proven to be untrue.

Another major undisclosed relationship with the fact that one of the purchasers was secretly acting as co-broker for the bankruptcy trustee in the sale to himself and his partners, which also happens to include the trustee's broker of record.

In the Judge David Jones case, the press made hay of the fact that the Jones made no real effort to hide his public romantic relationship with his former clerk/Jackson Walker lawyer Elizabeth Freeman and the lawyers that routinely practiced before Judge Jones.



Source: @cookingwithtreb on Instagram

**Bloomberg Law**

Likewise, before the Judge David Jones scandal broke, King flaunted his relationship with his former firm and still close confidants Langley and Banack, which is fine, but it was never disclosed how close the relationship was between king and his former firm representing the purchasers and offers an explanation as to why king would turn a blind eye to the fraud on the court on the part of former bankruptcy judge glen Ayres and David gragg of the firm, and the fraud on the court/perjury on the part of their client Robert Schumacher.



**Judge King with former law partners Buddy Banack, Ken Malone, Mike Garatoni and Richard Kerr, June 2019**

In the Judge David Jones case that it was determined that there was an extreme public interest

It's the reason the for the trustee's complaint against the debtors, with false claims that the debtors' facts and evidence put on the record are nothing more than frivolous allegations.

Here are a few of the "allegations" from the debtors the trustee claims are false and frivolous:

- Debtors alleged the trustee's choice of Stratford insider Walt Busby would lead to an intentional and willful insider sale of the debtors' bankruptcy estate property to an insider of noteholder Stratford in a backdoor deal. **Debtors' allegations were proven true**
- Debtors and their lawyer alleged that the hiring and approval by judge king and Walt Busby was a clear appearance of impropriety on the part of judge King. **Debtors' allegations were proven true**
- Debtors alleged that the testimony of the trustee's professionals Branscomb PC and Walt Busby that Busby had just so happened to

have cut all ties with his employers Sanders and Stratford was false. **Debtors' allegations were proven true**

- Debtors alleged prior to the sale that the egregious fraud on the court by the trustee and the trustee's broker Walt Busby was an indication that Walt Busby had secretly been promised future income from the development of the property for his role in the price-fixing and bid-rigging scheme. **Debtors' allegations were proven true**

- Debtors alleged prior to the sale that the fraud on the court on the part of the bankruptcy trustee and his professionals Branscomb PC and Stratford employee/Walt Busby regarding the entitlements on the property were knowingly, willfully and intentionally made to artificially downplay the value of the property to increase their profits from the sale. **Debtors' allegations were proven true**

- Debtors alleged that from the very first September 25, 2014 meeting with trustee john Patrick Lowe and his lawyer Pat Autry of Branscomb PC that the trustee claiming he had not heard from DH Realty Partners and their interest in marketing the property was false. **Debtors' allegations were proven true**

- Debtors alleged the other the lies they told by the trustee and Pat Autry at the same meeting were false, and the three day offer the trustee solicited of $20,000,000 was nothing more than a 'straw' offer used in furtherance of falsely justifying the future sale of the bankruptcy estate property for $20,000,000. **Debtors' allegations were proven true (actual sale price $20.3 million for the $50,000,000 property – the same 'straw' back-up bidder failed to step up and close when Sanders and Schumacher defaulted)**

- Debtors alleged that the sale hearing testimony given by Langley and Banack lawyers Glen Ayres, David Gragg and their client /purchaser Robert Schumacher regarding Schumacher never having had any contact with anyone at Stratford was false. **Debtors' allegations were proven true**

- When the title company refused to give a clean title policy for discovering that the sale hearing testimony of Glen Ayres and David Gragg regarding their client Robert Schumacher was false, as the debtors alleged, the debtors then alleged that the statements made in the trustee's April 14, 2015 motion for rehearing was false. **Debtors' allegations were proven true**

- Debtors alleged that judge King conspired with the trustee *ex parte* to concoct a cover up the scheme to get a clean title policy. **Debtors' allegations were proven true**
- Debtors alleged that the cover-up story concocted by judge King, the trustee and the purchasers and their lawyers -that Steve Sanders of noteholder Stratford only became involved in the purchase after Schumacher became the 'winning bidder' was false. **Debtors' allegations were proven true**
- Debtors have alleged that their bankruptcy lawyers have attempted to throw their case of fear for their bankruptcy careers and protecting judge King's involvement in the scheme. **Debtors' allegations were proven true**

As far as Judge King and the lawyers involved in the price-fixing and bid-rigging scheme benefiting themselves from the scheme, King's former law firm and buddies at Langley and Banack are known to partner with their clients in real estate deals and being sued for fraud.

Langley and Banack were more recently sued in March 2021, when the conservator for Lawrence 'Larry' Hancock, an heir to the founder of a fabric store chain and suffering from dementia, sued Langley and Banack for $27 Million for malpractice, self dealing and fraud for their 'partnering' with their client Hancock in which they are accused of forging their elderly client's signatures on documents relating to ranch transactions designed to allow the Langley and Banack lawyers- or 'partners' – to foreclose on their partner/client Hancock and flip the properties and or valuable water rights for their own profit while leaving the elderly dementia client/partner in debt. Quoting plaintiff's attorney Shane Langston, it represents "the most egregious" legal malpractice he has ever seen. Some of the Langley and Banack lawyers in the Hancock case were involved in setting up corporate entities for Sanders and Schumacher.

See San Antonio Express-News, **San Antonio Law Firm Sued After Southwestern Ranch Deal Goes Awry**, Patrick Danner, April 9, 2021.

See also **5:21-cv-00219 OLG document 22**, which names as defendants Robert B Werner and Stephen Brooks of Langley and Banack, who are the very same lawyers that reserved and formed Sanders and Schumacher's purchasing entity UTSA BLVD IH 10 LP, who's address is Sanders' home address of 4512 Elohi Dr., Austin Tx. 78746,and the address of Sanders Family Investments LLC which was created just days after Johnson and Rozelle filed for bankruptcy.

UTSA BLVD IH 10 LP was reserved with the state of Texas on April 8, 2015 by Robert Brooks of Langley and Banack **(ecf 421@14-16)**, and formed as an entity the following day by Robert Werner of Langley and Banack **(ecf 421@11-12)** - both just days after the March 26, 2015 sale hearing in which Langley and Banack lawyers David Gragg and Glen Ayers - *himself a former bankruptcy judge* - made repeated false statements to the court - fraud upon the court - and sserted as being true in sworn testimony by their client Robert Schumacher. There exists a distinct pattern of this very same inner circle of lawyer close to judge king working together on cases involving allegations of fraud against Langley and Banack.

For example, Broadway bank/Stratford lawyer Jim Hoffman is believed to be one of the closest colleagues and friends of judge King's along with the other lawyers at Langley and Banack and Pat Autry of Branscomb as well as the career chapter seven panel trustee John Patrick Lowe.  As it has been written about the now disgraced former bankruptcy Judge David Jones,**"Jones routinely lured the boundaries between his professional and personal lives, becoming friends with a group of attorneys who often appeared before him." [38]** And of course it is now known that judge Jones was profiting from those relationships in exchange for favorable rulings and a "gravy train" of unscrutinized fees Jones routinely approved for the lawyers practicing before him.  It's believed to be essentially the same corrupt system in the Judge King cases, which is why Judge Jones has been sued for racketeering violations of the RICO statute, millions of dollars in lawyer's fees are being clawing-back by the United States Trustee, and why former bankruptcy Judge David Jones is under investigation by the FBI.  It's why Johnson and Rozelle have referred to judge King and his closest colleagues that defrauded their bankruptcy estates of $30,000,000 as the inner circle of the bankruptcy racketeering ring even before the Judge Jones case made headlines.  With the parallels between the cases, a reasonable person apprised of the facts and evidence could easily conclude that King would not be sacrificing the integrity of his court, and his own integrity as well, simply for the benefit of his friends without taking a cut for himself. See **NEW STUDY ACCUSES BANKRUPTCY JUDGES OF "ROUTINE ILLEGALITY" (** Wall Street Journal, May 6, 2009)

As for Hoffman, who made numerous false statements to the court - fraud on the court - that clearly appeared to be in furtherance of sabotaging the debtors' confirmation plan in 2012, and in an October 28, 2014 hearing, telling

---

[38] Daikin Campbell, **The Incredible Oblivion of Judge Marvin Isgur,** Business Insider**,** June 3, 2024 "lawyers in the insular Texas bankruptcy industry had deliberately turned a blind eye to the judge is a romantic relationship with his former clerk" – and so did everyone else.

the court his client Stratford Land fund had nothing to do with the bankruptcy trustee choosing Stratford's longtime employee/operative Walt Busby as a broker (see herein). In fact, the trustee had already disclosed to the debtors and their counsel on September 25, 2014 that they were hiring Walt Busby as a broker specifically at the recommendation of Steve Sanders of Stratford Land fund. The trustee would later admit this under cross examination. The trustee heard Hoffman's false testimony, knew it was false, and made the willful and intentional decision to remain silent and not correct the record when he or his counsel had a duty to set the record straight when hearing fraud on the court. The trustee and Autry would remain silent repeatedly when hearing false testimony by officers of the court that they knew was false. It was all part of cover-up.

Another key non-disclosure at the time was that immediately upon being appointed, the trustee through his counsel pat autry reached out to Hoffman, who directed them to Steve Sanders of Stratford Land fund in Austin, Tx. The trustee and his counsel then immediately drove up to Austin and met with Steve Sanders and perhaps others on September 16, 2014. It is believed that time they finalized the price-fixing and bid-rigging scheme including broker, sales price and 'front man' purchaser Robert Schumacher. There clearly appears to have been an agreement to keep Sanders and Stratford hidden in the background or they wouldn't have been lying about Sanders role as purchaser. In fact, in sworn testimony before the United States trustee, Walt Busby would later admit that Steve Sanders was actually acting as his co-broker for trustee john Patrick Lowe in the sale to Sanders and Schumacher for $30,000,000 below fair market and appraised values.

These non-disclosures in furtherance of the $30,000,000 defrauding of the Johnson Rozelle bankruptcy estates make the nondisclosures of Judge David Jones, Elizabeth Freeman and Jackson Walker look like third grade stuff, and yet the UST is clawing back some $23,000,000 in the Judge Jones case and taking a blind eye approach to the Judge King case. Based on information and belief, the UST would not be moving for disgorgement and forfeiture of fees and the Judge Jones case had pro se litigant Michael van Deelen exposed to the press what 4 different Federal judges in the Judge David Jones case had attempted to seal from the public. Corruption thrives in darkness, and democracy dies in darkness. It's not surprising that Hoffman would be part of the scheme and making false statements to the court in furtherance of the scheme involving judge king's closest colleagues at Langley and Banack. So close is Hoffman to affirm that he

requested pleadings be drafted for him by the firm so he could "plagiarize" as his own in conspiracy with the firm **(24-05022 Document 14@325)**

Hoffman's former law firm Clemens and Spencer was well known to defending lawyers accused of fraud and malpractice for decades, and have been representing Langley and Banack at least since 1987 when a San Antonio jury found Foster Lewis Gardner Langley and Banack (as the firm was then known) guilty in yet another case involving a widowed victim of the firm (*in re: estate of B. R.Willeford/Emma Elizabeth Willeford*) regarding the law firm's mishandling and negligence of her developer husband's $34 million estate. The jury found damages against Langley and Banack to be in the range of $14 million – $20 million.

It should be noted that Hoffman shuttered his firm and moved to Langley and Banack following the corrupted sale to Langley and Banack clients Sanders and Schumacher, where conceivably, he can now receive a cut from the scheme laundered in the form of legal fees.  In fact, another lawyer who represented Walt Busby in his fee application hearing, Robert Barrows, shuttered his long time firm to join Langley and Banack following the corrupted sale.  And of course as discovered later, Busby is receiving $10,000 - $12,000 per month from Sanders and Schumacher following the corrupted sale as a glorified night watchman over the development of the Johnson Rozelle bankruptcy estate property.  As price-fixing and bid-rigging are largely inferred by the circumstances, this one is a no brainer, especially considering the ***direct evidence*** of Busby's admission that Sanders was the trustee's secret co-broker all along, and therefore was wired half the $820,000 commission from Busby as soon as he received it from trustee john Patrick Lowe.

As the former bankruptcy judge Ayres  himself proudly stated regarding Rozelle bringing forth more new evidence of fraud in a Rule 60 motion that was denied with prejudice by King, **"past conduct predicts future conduct"(ecf 692@39)**, and therefore, by the same token, it could be said with respect to Langley and Banack that between the Willeford case, the Hancock case and the Johnson Rozelle case, their past conduct parallels their present and future conduct, and there's no reason to doubt that Langley and Banack – and perhaps judge king himself – have a partnership stake in the future development proceeds from the development on the bankruptcy estate property they sold and approved to Langley and Banack clients Sanders and Schumacher.

Ayres himself had given blatantly falsified testimony in furtherance of the scheme, there was no reason to believe anything more from Ayers or his co-conspirators that it also committed fraud on the court in furtherance of the scheme, as if they committed fraud on the court previously, they committed fraud on the court recently, they could be counted on to do it again and again and again.

§

It's important to remember in reading through this report that the facts and evidence are anything but frivolous allegations, and backed by extensive case law regarding fraud on the court, intent to defraud and corruption and collusion in 363 sales.

### § Fraud On The Court §

In all adversarial proceedings, litigants have a duty of full disclosure and honesty with the court **(ABA Model Rules of Professional Conduct Rule 3.3 (AM. BAR ASS'N 1983)**. Typically, where a party obtains a judgment through fraudulent conduct, the only way to overturn that judgment is through a motion to vacate pursuant to Federal Rule of Civil Procedure **60(b)(3)** *Metlyn Realty Corp. v. Esmark, Inc.***, 763 F.2d 826, 832 (7th Cir. 1985).**

A final judgment can also be overturned by a motion, pursuant to Federal Rule of Civil Procedure **60(d)(3)**, as incorporated into the Bankruptcy Rules by **Rule 9024**, to vacate a judgment based upon fraud on the court. Fraud on the court was once generally limited to instances where "the integrity of the judicial process ha[s] been fraudulently subverted" and does not include fraudulent conduct that only affects a party to the action.**(*Hazel-Atlas Glass Co. v. Hartford-Empire Co.***, 322 U.S. 238, 245-246 (1944))** (creating the standard for fraud on the court). Fraud on the court is typically limited to the most egregious conduct that implicates an officer of the court **(*Rozier v. Ford Motor Co.***, 573 F.2d 1332, 1338 (5th Cir. 1978)** (holding that fraud on the court only includes actions "such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an

attorney is implicated"). Several courts have applied a lower standard for determining whether specific fraudulent conduct rises to the level of fraud on the court **(See, e.g.** *Levander v. Prober (In re Levander),* **180 F.3d 1114, 1120 (9th Cir. 1999)** (perjury committed by a single non-party witness was so detrimental to the entire bankruptcy proceeding that it was held to be fraud on the court); *In re*

*Cardwell,* **No. 09-43121, 2017 WL 2304220, at \*5-\*6 (Bankr. E.D. Tex. May 25, 2017)** (holding that filing false bankruptcy schedules, misrepresenting liabilities on real property, including a co-conspirator, and preparing fraudulent loan documents established fraud on the court). *See also, In re Clinton Street Foods Corp.***, 254 B.R. 523 Bankr. S.D.N.Y. 2000)**.

Courts have not explicitly defined the concept of "fraud on the court." (*United States v. Estate of Stonehill***, 660 F.3d 415, 444 (9th Cir. 2011)**. *In re Roussos***, 541 B.R. 721, 728-29 (Bankr. C.D. Cal. 2015).** Rule 60(d)(3) is the codification of a court's inherent power to investigate whether a judgment was obtained by fraudulent conduct (*Universal Oil Products Co. v. Root Ref. Co.,* **328 U.S. 575, 580 (1946))**. There is no statute of limitations for a fraud on the court claim and a court may consider such a claim even if no adversarial parties are before the court (*In re Roussos***, 541 B.R. at 729)**[39].

Courts must reverse the policy of upholding final judgments when the judgment was obtained by perpetrating a fraud on the court (*In re Met-L-Wood Corp.***, 861 F.2d at 1016** (balancing a possible fraud on the court claim with the policy of protecting a 21-year-old final sale order). Taking that policy into account, a fraud on the court claim can be successfully brought to overturn a final judgment in a bankruptcy proceeding, *even 21 years after the judgment* has been entered (*in re Roussos* **541 B.R. at 729-30**).

The Supreme Court, in *Hazel-Atlas Glass Co. v. Hartford-Empire Co.,* created the standard necessary to establish a fraud on the court claim **(322 U.S. at 245-246.).** The Court held that, "only the most egregious misconduct, such as bribery of a judge or members of a jury, or the fabrication of evidence by a party in which an attorney is implicated, will constitute a fraud on the court." In order to adequately plead a fraud on the court claim, a plaintiff must allege "a scheme by which the integrity of the judicial process had been fraudulently subverted" and must involve far more than an injury to a single litigant (*Addington,* **650 F.2d at 668).**

Fraud on the court will, most often, be found where the fraudulent scheme defrauds the "judicial machinery" or is perpetrated by an officer of the court such that the court cannot perform its function as a neutral arbiter of justice (*Martina Theatre Corp. v. Schine Chain Theatres, Inc.,* **278 F.2d 798, 801 (2d Cir. 1960)**.

---

[39] see also LEXOLOGY, *"Court Sets Aside 21 Year Old Bankruptcy Sale for Fraud on the Court Despite Absence of Specific Allegations That Fraud Reduced the Sale Price!"*, Weil Gotshal and Manges LLP

Fraud directed at the "judicial machinery" can mean conduct that fraudulently coerces or influences the court itself or a member of the court, such that the impartial nature of the court has been compromised (***Bulloch v. United States***, **721 F.2d 713, 718 (10th Cir.1983))**.

An attorney and all officers of the court, has a duty of honesty towards the court (***in re Tri-Cran, Inc.***, **98 B.R. 609, 616 (Bankr. D. Mass. 1989))**. Where an attorney neglects that duty and obtains a judgment based on conduct that actively defrauds the court, such judgment may be attacked, and subsequently overturned, as fraud on the court (***H.K. Porter Co. v. Goodyear Tire & Rubber Co.***, **536 F.2d 1115, 1119 (6th Cir. 1976**)).

Fraud on the court can be found where a party's attorney proffers a material misrepresentation in order to obtain a judgment (***In re Tri-Cran***, **98 B.R. at 624**).

Specifically, in a situation where a debtor's attorney, upon direct inquiry by the court, fails to disclose the close personal relationship between the debtor and purchaser, can rise to the level of fraud on the court (***in re Tri-Cran***, **98 B.R. at 617).** By the same rule, an attorney for any purchaser failing to disclose the close personal relationship between the noteholder and purchaser can rise to the level of fraud on the court.

The debtor is an "officer of the court" because the debtor possesses "a responsibility to act in the best interests of the estate as a whole" and "bears a special responsibility for the proper functioning of the machinery of justice." **(*In re Tri-Cran*, 98 B.R. at 624.)**

Officers of the court possess "a responsibility to act in the best interests of the estate as a whole" and "bears a special responsibility for the proper functioning of the machinery of justice." ((***in re Tri-Cran***, **98 B.R. at 617).** Officers of the court who misrepresent bankruptcy sales as arms-length transactions when they are instead specifically funneling the sale to pre-directed purchasers and /or are self dealing, those actions deny the bankruptcy court the ability to impartially adjudge the proposed sale, and are thereby guilty of fraud on the court. **(*in re Roussos*, 541 B.R. at 729-730).**

In ***in re:Cardwell,*** the court looked at all of the debtor's misrepresentations, together, and determined that the use of the bankruptcy court to further a fraudulent scheme is fraud on the court.**(2017 WL 2304220, at \*5-\*6.)**

Courts have adopted different standards that encompass a wider range of conduct that can constitute fraud on the court. The bankruptcy court in ***In re Clinton Street Foods***, allowed the trustee's "fraud on the court" claim finding that

the four-prong analysis previously set forth by the Second Circuit Court of Appeals was instructive and the facts at hand satisfied such requirements, including that the claim was based on "(1) the defendant's misrepresentation to the court; (2) the denial or grant of the motion based on the misrepresentation; (3) the lack of an opportunity to discover the misrepresentation and either bring it to the court's attention or bring a timely turnover proceeding; and (4) the benefit the defendant derived by inducing the erroneous decision."**(See *In re Clinton Street Foods Corp*., 254 B.R. at 533 (citing *Leber-Krebs, Inc. v. Capitol Records*, 779 F.2d 895, 899-900 (2nd Cir. 1985)).** In applying this analysis, the bankruptcy court found that the actions of a litigant alone can invoke the doctrine of fraud on the court and that an officer of the court need not be involved *In re Clinton Street Foods Corp*., 254 B.R. at 533.

Specifically, the defendants lied to the bankruptcy court regarding whether any bidding agreements existed which led to the approval of the sale by the Chapter 7 trustee, subsequently allowing the defendants to buy two million dollars worth of property for $320,000 *In re Clinton Street Foods Corp*., 254 B.R. at 533. The above mirrors the fraud on the court by Schumacher, Sanders and their lawyers who lied not only throughout the sales hearings of March 26, 2015 and April 21, 2015, but the fraud on the court by Stratford lawyer Jim Hoffman as well as trustee John Patrick Lowe, Branscomb and Busby in the hearings leading up to the clearly corrupted sale allowing the fraudsters to buy $50 million worth of property for $20.3 million.

In *In re Cardwell*, the court held that a Chapter 7 debtor's actions (without referring to the debtor as an "officer of the court") standing alone can constitute fraud on the court, and the court also looked at all of the debtor's misrepresentations, together with the totality of the circumstances, and determined that the debtor simply used the court to further his fraudulent scheme **(2017 WL 2304220, at 5-6)**.In the same manner, trustee John Patrick Lowe and his professionals Busby and Branscomb simply used judge King and his bankruptcy court is a thin veneer of legitimacy to facilitate, whitewash and cover up in the furtherance of the price-fixing, kickback, bribery and rigged bidding scheme that netted the perpetrators and their lawyers $30 million off the top alone.

Furthermore, the court in *In re Levander* held that perjury, by a single non-party witness, can rise to the level of fraud on the court (*In re Levander* **180 F.3d 1114, 1120)**. Specifically, a single non-party witness in the case, during a deposition, testified that the corporation had not sold any of its assets when in

realito the contrary, the corporation had previously transferred most of its assets to a related partnership **(180 F.3d at 1116-17)**. The bankruptcy court relied upon that testimony and entered a judgment against the corporation only, and therefore found the conduct was so detrimental to the underlying proceedings that even without any action by an officer of the court, the court still found that the impartial nature of the court had been subverted **(180 F.3d at 1116-20)**.

Fraud on the court was usually found in only the most egregious of circumstance, bribery of a judge or jury, fabricating evidence that implicates an attorney, or any action directly attacking the judicial machinery **(*Hazel-Atlas Glass Co. v. Hartford-Empire Co.*, 322 U.S. at 245-246)**. However, where a litigant can prove that an officer of the court fraudulently coerced or improperly influenced the impartial nature of the court, fraud on the court can be established **(*Bulloch*, 721 F.2d at 718..)**

***Cardwell*** and ***Clinton Street Foods*** both involved the concealment of assets and co-conspirators that resulted in large economic gains for the defendants **((Bankr. E.D. Tex. May 25, 2017,.2017 WL 2304220 at \*5-\*6; 254 B.R. at 532)**. In *re Levander* involved perjury by a single non-party witness that resulted in an active defiling of the bankruptcy court and resulted in large economic gains for the defendants **(180 F.3d at 1121)**.

The term "fraud on the court" is only mentioned in **Rule 60(d)(3)** of the Federal Rules of Civil Procedure, yet courts have also used this doctrine to order dismissal or default under other rules where a litigant has stooped to the level of fraud on the court.

***C.B.H. Resources, Inc. v. Mars Forging Co.*, 98 F.R.D. 564, 569 (W.D. Pa. 1983)** (dis-missing under Fed. R. Civ. P. 41(b) where party's fraudulent scheme, including use of a bo-gus subpoena, was "totally at odds with the ... notions of fairness central to our system of litigation").

***Wyle v. R.J. Reynolds Indus., Inc.*, 709 F.2d 585, 589 (9th Cir. 1983)** ("[C]ourts have inherent power to dismiss an action when a party has willfully de-ceived the court and engaged in conduct utterly inconsistent with the orderly administration of justice.")

***Eppes v. Snowden*, 656 F. Supp. 1267, 1279 (E.D. Ky. 1986)** (finding that where fraud is committed upon the court, the court's power to dismiss is inherent "to protect the integrity of its proceedings."

*In re Lucas*, 789 N.W.2d 73, 78 (N.D. 2010)** (suspending an attorney for misconduct). Sanctions can also include paying opposing party's attorney's fees

The Supreme Court, in an opinion authored by Justice Black regarding *Hazel*, held that the judgment must be vacated:(*Hazel* at 244–45)."[T]he general rule [is] that [federal courts will] not alter or set aside their judgments after the expiration of the term at which the judgments were finally entered. ... [but]....[e]very element of the fraud here disclosed demands the exercise of the his-toric power of equity to set aside fraudulently begotten judgments. This is not simply a case of a judgment obtained with the aid of a witness who, on the basis of after-discovered evidence, is believed possibly to have been guilty of perjury. Here, even if we consider nothing but Hartford's sworn admissions, we find a deliberately planned and carefully executed scheme to defraud not only the Patent Office but the Circuit Court of Appeals." (*Hazel.at 244–45*)

And this is important. The officers of the court that have lied in court to deceive the court and the record are doing so not merely to deceive the trial court and the District Court of the West Texas, but the Fifth Circuit Court of Appeals as well. It matters not whether the bankruptcy court judge Ronald B King or any other judge take offense to the fraud upon the court. The act of fraud upon the court is just as vile whether or not these judges condone such fraud or not. It only raises more red flags when judges deliberately blind themselves to the fraud, and exponentially unveils a more serious problem when they threaten and sanction the victims and whistleblowers, and threaten any other attorneys who suggested that the victims contact the Federal Bureau of Investigation, and who have filed reports themselves, as it is consistent with extortion and racketeering offenses to silence witnesses and threaten victims into silence.

Additionally, although *Hazel* may not have exercised proper diligence in uncovering the fraud, the Court thought it immaterial.(*Hazel at 246*).On the other hand, Johnson and Rozelle have worked single-handedly to uncover and expose the fraud in their case, including fighting against their own attorneys who have repeatedly worked to suppress evidence of the fraud for fear of going against the will of the bankruptcy court machinery, and therefore going against their own self interests as attorneys practicing before the court. Indeed, it noted the case did not concern just the private parties, but rather the public at large because there are "issues of great moment to the public in a patent suit." (*Hazel at 246*)

The court also stated:

"Furthermore, tampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated

consistently with the good order of society. Surely it cannot be that preservation of the integrity of the judicial process must always wait upon the diligence of litigants. The public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud" **(Hazel at 246)**

While parties have the right to file a motion requesting the court to set aside a judgment procured by fraud, the court may also proceed on its own motion.**(Universal Oil Prods. Co. v. Root Refining Co.) 328 U.S. 575 (1946) (other citations omitted)**

In fact, the court stated that the facts that had come to its attention "not only justify the inquiry *but impose upon us the duty to make it*, even if no party to the original cause should be willing to cooperate, to the end that the records of the court might be purged of fraud, if any should be found to exist."**(Root Refining Co. v. Universal Oil Prods. Co.,169 F.2d 514, 521–23 (3d Cir. 1948) (emphasis added)**

Unlike just about every other remedy or claim existing under the rules of civil procedure or common law, *there is no time limit* on setting aside a judgment obtained by fraud, nor can laches bar consideration of the matter.The logic is clear: "[T]he law favors discovery and correction of corruption of the judicial process even more than it requires an end to lawsuits." **(*Lockwood v. Bowles*, 46 F.R.D. 625, 634 (D.D.C. 1969))**

While Rule 60(c)(1) limits to one year the time with-in which a motion under Rule 60(b)(3) must be made, a claim based upon fraud on the court under Rule 60(d)(3) is intended "to protect the integrity of the judicial process" and, therefore, *is not time barred*.**(Bowie v. Maddox, 677 F. Supp. 2d 276, 278 (D.D.C. 2010)**

"An attorney is an officer of the court and owes the court fiduciary duties and loyalty"…. "[w]hen an attorney misrepresents or omits material facts to the court, or acts on a client's perjury or distortion of evidence, his conduct may constitute a fraud on the court." **(Trehan v. Von Tarkanyi, 63 B.R. 1001, 1007 (Bankr. S.D.N.Y. 1986)).** Furthermore, when an officer of the court fails to correct a misrepresentationor retract false evidence submitted to the court, it may also constitute fraud on the court. **(In re McCarthy, 623 N.E.2d 473, 477 (Mass. 1993))**

In addition to the rules of professional conduct and an attorney's duty of candor as an officer of the court, "Rule 11 [of the F.R.C.P.] imposes a duty on

attorneys to certify that they have conducted a reasonable inquiry and have determined that any papers filed with the court are well grounded in fact, legally tenable, and not interposed for any improper purpose." **(Cooter &Gell v. Hartmarx Corp., 496 U.S. 384, 393 (1990) (internal quotation marks omitted)).**

An examination of the offender and his duties is important because violations of Rule 26, Rule 11, or even the rules of professional conduct may give rise to a fraud-on-the-court claim, *even if those violations were not specifically directed to the court itself*.

A fraud-on-the-court claim can be brought as an independent action preserved by Rule 60(d)(3) or as a claim under Rule 60(b)(3) *if it involves fraud by an opposing party*." **(In Re Jorge Eliecer Bueno-Sierra, 1/29/2018)**

Rule 60(b)(1) through (5) permits a district court to set aside an otherwise final judgment on a number of specific grounds, such as mistake, newly discovered evidence, an opposing party's fraud, or a void or satisfied judgment. See Fed. R. Civ. P. 60(b)(1)-( 5). Rule 60(b the hut put that behind)(6), the catch-all provision, authorizes a judgment to be set aside for "*any other reason that justifies relief*." Fed. R. Civ. P. 60(b)(6)

**In Kupferman v. Consolidated Research & Manufacturing Corp, 459 F.2d 1072 (2d Cir. 1972)** the court stated that "[w]hile an attorney should represent his client with singular loyalty that loyalty obviously does not demand that he act dishonestly or fraudulently; on the contrary his loyalty to the court, as an officer thereof, demands integrity and honest dealing with the court." And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the court.(**Kupferman at 107** (internal citation omitted)).

Where courts have undertaken a specific analysis of good faith in the context of approving § 363 sales, they focus more on the detection of collusion and unfair dealing rather than the more general determination of whether a debtor's purpose for filing bankruptcy comports with the goals of the Bankruptcy Code. **(See Cumberland Farms Dairy, Inc. v. Nat'l Farmers' Org., Inc. (In re Abbotts Dairies of Pa., Inc.), 788 F.2d 143, 147 (3d Cir. 1986)** ("'The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the course of the sale proceedings.'" (alteration in original) **(quoting In re Rock Indus. Mach. Corp. 572 F.2d 1195, 1198 (7th Cir. 1978))).**

With the objective of encouraging bidders to participate in these auctions, courts seem to be reluctant to set aside sale orders where no inequitable conduct has occurred. **(Cf. Taylor v. Lake (*In re Cada Invs., Inc.*), 664 F.2d 1158, 1162 (9th Cir. 1981)** (recognizing that despite a strong interest in finality of sale orders, "[c]ourts have generally appeared willing to set aside confirmed sales that were 'tinged with fraud, error or similar defects which would in equity affect the validity of any private transaction'" **(quoting *In re Gen. Insecticide Co.*, 403 F.2d 629, 631 (2d Cir. 1968)))**

An analysis of a party's status as a good faith purchaser turns on whether the purchaser has engaged in any fraudulent or collusive conduct including "'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'"**(*In re Abbotts Dairies*, 788 F.2d at 147 (internal quotation marks omitted) (quoting *In re:Rock Indus. Mach. Corp.*, 572 F.2d at 1198)**

The scope of this investigation into the purchaser's conduct encompasses the purchaser's actions throughout the bankruptcy process up through the performance of the sale.(See Charles R. Sterbach & Keriann M. Atencio, Why Johnny Can't Get Paid on His General Unsecured Claims: A Potpourri of Lingering Abuses in Chapter 11 Cases, 14 J.BANKR.L.&PRAC.111, 127 (2005) (noting that a good faith analysis examines the purchaser's conduct during "the course of the bankruptcy proceedings, including its conduct leading up to and during the sale itself ")

The key component in actual fraud is the perpetrator's intent in making the transfer. As a defendant or debtor seldom admits that the transfer was made with the actual intent to "hinder, delay, or defraud" a creditor, the Court can look to the "badges of fraud" in the facts and circumstances of the transfer. (*See Tracy Lynne Zubrod, Tr. v. Denise L. Kelsey, Scott Barry Kelsey (In re Denise L. Kelsey, Scott Barry Kelsey), 270 B.R. 776, 782 (B.A.P. 10th Cir. 2001)*("a court may consider circumstantial evidence establishing badges of fraud.")(citing, *Julia W. Taylor v. Stephen W. Rupp, Tr.(In re Stephen W. Rupp, Tr.*), 133 F.3d 1336, 1339 (10th Cir. 1998)*("under 11 U.S.C. § 548(a)(1) bankruptcy courts consider similar badges of fraud as evidence of actual fraudulent intent.")).

The badges of fraud in the Johnson and Rozelle bankruptcy case are overwhelming, and have been extensively documented by the victims/whistleblowers. The sale was actually procured by fraud upon the court to

hide the fact that the insider to noteholder Stratford land fund and or its employee Steve Sanders was really the insider purchaser.

Nothing in the Bankruptcy Code prohibits a sale to insiders per se. *However*, insider sales are subject to "heightened scrutiny to the fairness of the value provided by the sale and the good faith of the parties in executing the transaction." (*In re Family Christian, LLC*, 533 B.R. 600, 622 (Bankr. W.D. Mich. 2015)). As the fifth circuit court found in an earlier case, insiders "usually have greater opportunities for ... inequitable conduct." *Fabricators, Inc. v. Technical Fabricators, Inc.* (Matter of Fabricators, Inc.), 926 F.2d 1458, 1465 (5th Cir. 1991).See also *In re Tidal Const. Co., Inc.*, 446 B.R. 620, 624 (Bankr. S.D. Ga. 2009) ("[E]ven when parties are completely forthright with the facts surrounding the transfer, § 363 sales to insiders are subject to a higher scrutiny because of the opportunity for abuse."); (*Rickel& Associates v. Smith* (*In re Rickel & Associates, Inc.*), 272 B.R. 74, 100 (Bankr. S.D.N.Y. 2002)(same); *In re W.A. Mallory Co., Inc.*, 214 B.R. 834, 837 (Bankr. E.D. Va. 1997) (same).


As the bankruptcy court found in the Roussos case:

"A sale to insiders is fundamentally different from a sale at arms-length. In an arms-length transaction, the asset's exposure to the marketplace insures that the price is reasonable. Insider sales, by their very nature, lack this characteristic. Insiders do not have an incentive to aggressively market the assets to obtain the highest price. **Their incentive is just the opposite—the less marketing, and the lower the price, the better.**" This hits the nail on the head with regards to the price-fixing and bid-rigging scheme of the insiders to judge king in conspiracy with the insiders to the noteholder/purchasers.

Under §363(n). *Neither section 363(n) nor any other provision in the statute specifies a limitation period for challenges to a sale on the basis of collusion.* Likewise, fraud on the court has no statutes of limitations with respect to Rule 60(b), and as referenced herein, §363 sales have been overturned after 21 years when evidence comes fourth of fraud, fraud on the court, misrepresentation, collusion and other misconduct, which would include bankruptcy court corruption by the officers of the court.

### § Intent to defraud §

According to the Department of Justice, "The requisite intent under the federal mail and wire fraud statutes may be inferred from the **totality of the circumstances** and need not be proven by direct evidence." *United States v. Alston*, **609 F.2d 531, 538 (D.C. Cir. 1979),** *cert. denied*, **445 U.S. 918 (1980).** Thus, intent can be inferred from statements and conduct. *United States v. Cusino*, **694 F.2d 185, 187 (9th Cir. 1982) (***citing United States v. Beecroft***, 608 F.2d 753, 757 (9th Cir. 1979)),** *cert. denied*, **461 U.S. 932 (1983).**

Impression testimony, that is, testimony of victims as to how they had been misled by defendants, is admissible to show an intent to defraud. *See Phillips v. United States*, **356 F.2d 297, 307 (9th Cir. 1965),** *cert. denied*, **384 U.S. 952 (1966).** The inference might be drawn that, since the defendant knew victims were being misled by solicitation literature and other representations, the continued operation of the business despite this knowledge showed the existence of a scheme to defraud.

Fraudulent intent is shown if a representation is made with reckless indifference to its truth or falsity. *Cusino*, **694 F.2d at 187.**

In addition, "[f]raudulent intent may be inferred from the modus operandi of the scheme." *United States v. Reid*, **533 F.2d 1255, 1264 n. 34 (D.C. Cir. 1976)** ("[T]he purpose of the scheme 'must be to injure, which doubtless may be inferred when the scheme has such effect as a necessary result of carrying it out.") (quoting *United States v. Regent Office Supply Co.*, **421 F.2d 1174, 1180-81 (2d Cir. 1970) (quoting *Horman v. United States*, 116 F. 350, 352 (6th Cir.),** *cert. denied*, **187 U.S. 641 (1902))).** "Of course proof that someone was actually victimized by the fraud is good evidence of the schemer's ntent." (quoting *Regent Office Supply Co.*, **421 F.2d at 1180-81).**

In *United States v. D'Amato*, the court explained the government's burden of proving fraudulent intent as follows:

"The scheme to defraud need not have been successful or complete. Therefore, the victims of the scheme need not have been injured. However, the government must show "that some actual harm or injury was contemplated by the schemer." Because the defendant must intend to harm the fraud's victims, "[m]isrepresentations amounting only to a deceit are insufficient to maintain a mail or wire fraud prosecution." "Instead, the deceit must be coupled with a contemplated harm to the victim." In many cases, this requirement poses no additional obstacle for the government. When the "necessary result" of the actor's scheme is to injure others, fraudulent intent may be inferred from the scheme itself. Where the scheme does not cause injury to the alleged victim as its necessary result, the government must produce evidence independent of the alleged scheme to show the defendant's fraudulent intent."

Based on the totality of the circumstances, it is clear beyond a reasonable doubt that the mountains of repeated perjured testimony, fraud and fraud upon the court were in furtherance of the scheme to defraud the bankruptcy estates of its equity for the private gain of those complicit in carrying out the scheme's orchestration, facilitation and approval, including the continued blatantly reckless, sloppy and self-evident cover up.

According to the Fifth Circuit, the cumulative effect of all the falsehoods together evidence is a pattern of reckless and cavalier disregard for the truth (citing *Guardian Indust.Prods. Inc* v *Diodati* (*in re:Diodate*), 9 B.R. 808, 808 – 09 (Bankr.D. Mass.1981), and as the debtors had noted in previous pleadings before the bankruptcy court:

> "[D]irect evidence of a person's intent to deceive is rarely, if ever, available. Thus, circumstantial evidence is sufficient.(*In re Powers*, 979 F.2d 1533, (5th Cir. 1992) (stating Compton, however, did not have to

prove intent with direct evidence. Indeed, direct evidence of a person's intent to deceive is rarely, if ever, available. Thus, circumstantial evidence is sufficient; the court can infer actual intent to defraud from the debtor's actions. (*citing to Matter of Chastant,* **873 F.2d 89, 91 (5th Cir. 1989)**

See also *Ho v. MacArthur Ranch, LLC,* **395 S.W.3d 325, 328-29 (Tex.App.— Dallas 2013, no pet.).** "[a]ctual intent to defraud creditors ordinarily is a fact question. Circumstantial proof may be used to prove fraudulent intent because direct proof is often unavailable. Facts and circumstances that may be considered in determining fraudulent intent include a non-exclusive list of 'badges of fraud' prescribed by the legislature in §24.005(b))."

See also *Sholdra v Chilimark Fin, LLP (in re Sholdra)* **249 F3d. 380, 382 (5th Cir. 2001)** ("[S]tatements [made] with fraudulent intent – or reckless indifference to the truth... can be proven by circumstantial evidence."); *Beaubouef,* **966 F.2d at 178** ("[T]he existence of more than one falsehood, together with [the debtors] ... Failure to take advantage of the opportunity to clear up all inconsistencies and omissions when he filed his amended schedules, constituted reckless indifference to the truth and, therefore, the requisite intent to deceive."); *FDIC v Sullivan (in re Sullivan),* **204 B.R. 919, 942 – 43 (Bankr. N.D. Tex. 1977) ("a series of even innocent mistakes or omissions can constitute evidence of a pattern of reckless disregard for the truth....Thus, courts look at the circumstances surrounding the omissions to determine whether they were intentional.")**

The above were actually used in the trial against Walt Busby by the United States Trustee, as Busby not only defrauded the Johnson and Rozelle bankruptcy estates in conspiracy with trustee John Patrick Lowe and Branscomb, but also attempted to defraud creditors in his own 2019 bankruptcy by repeatedly amending his schedules that concealed his $10,000 - $12,000 per month income from Sanders and Schumacher on their development of the Johnson Rozelle bankruptcy estate property- the ill -gotten gains. As the UST inferred by Busby's testimony, and even the deposition testimony from Busby's partner Steve Sanders, Busby was misleading with investors to the point of allegedly being "kicked out of deals"**(ecf 985-6@31-34)**. Sanders even tried to claim it was Busby's poor reputation that was so bad it was even 'starting' to hurt Sanders'

reputation within the real estate community **(ecf 985-6@47)** when in fact, both of them have apparently been in a downward credibility spiral for years of apparently attempting to lure investors into deals that never come through – except for the bid-rigging scheme with John Patrick Lowe, Branscomb, Schumacher and their lawyers that got the scheme pushed through Judge King's bankruptcy court. This was guaranteed to work from the get-go and gave them a ship to jump off to, as Busby and Sanders began reaping income from the ill-gotten gains of the bid-rigging scheme.

Busby's reputation wasn't any surprise to anyone in the real estate business or to the bankruptcy court or trustee Lowe, as the debtors had included in their objection to Busby as the trustee's broker a lawsuit filed against Busby by even his other former partner real estate developer Brad Galo.  Under direct questioning by trustee john Patrick Lowe's counsel Pat Autry of Branscomb PC, they created a false narrative that Busby had himself simply decided to split with Brad Galo in 2008 **"because of the recession"**, testifying **"so I made the decision to leave Galo and just kind of went out on my own**" **(ecf 681@ 13).**  The scuttle amongst the real estate community is far different.

In the same hearing Busby was then cross examined by Rozelle, where Busby again testified he split with Galo because **"there was no work to do in single family development"**, only to then admit he was sued by Brad Galo at the same time, **"or in 2009 I think" (ecf 681@ 38)**.  Apparently Busby's propensity for being kicked out of partnerships has followed him throughout his career, and in fact, in deposition by the United States Trustee in UST vs. Busby **(19-05051cag)**, Busby admitted his reason for filing his own bankruptcy was a charging order by Brad Galo, testifying **"The major factor was a charging order which was obtained by the attorney for Galo Properties, which closed down my bank accounts and made it almost impossible for me to do business". (ecf 985-5 @12).**

It cannot be overlooked that 'birds of a feather flock together', and to pull off the bid-rigging scheme, trustee John Patrick Lowe specifically sought out Steve Sanders and specifically chose Busby in conspiracy with Sanders and Stratford, not *in spite* of Busby and Sanders' reputations, but apparently *because of* their reputations to do the dirty work of supplying falsified testimony and a 'red flag' valuation of the property for the trustee and judge King to hide behind in

furtherance of the scheme, which they did – most specifically Busby under the direction of trustee John Patrick Lowe and the trustee's other counsel Branscomb.

In fact, it was imperative that they all stick together *to this day* by defending each others reputations and fee applications despite the facts and evidence of their reputations for defrauding bankruptcy estates through fraud on the court with a malleable facilitating court.  For example, trustee Lowe was asked under cross examination by Rozelle if a reputable broker had been hired to actually market the property rather than taking their "targeted approach" that Busby's partners Sanders and Schumacher may not have ended up with the property.  Although Lowe's counsel Pat Autry of Branscomb PC immediately objected trying to claim attorney/ client privilege, Lowe responded **"Well, first, Mr. Busby and his company are reputable"**, and then further falsely testified that Rozelle was a liar for even suggesting there was anything on the record to indicate that Busby's partner Sanders had contacted each of the debtors brokers to interfere with their sales, when of course the debtors own bankruptcy lawyers have felt it important to file on record the emails and marketing reports from their brokers that documented their conversations with Steve Sanders, and his attempts to infiltrate Busby into the debtors camp and interfere with sales (see herein).

The trustee's lawyer Pat Autry of Branscomb PC had previously defended Busby's reputation by defending the trustee's broker in light of new evidence that he had lied to the bankruptcy court regarding cutting ties with Stratford and Steve Sanders.  The affidavit of attorney Carol Mattick **(ecf 240-2@1-3)** confirms that Busby's signs on Stratford Properties were not removed for a reason -the reason being that Busby never stopped representing Stratford and Steve Sanders as he had testified for the trustee.  The debtors' bankruptcy lawyer that time, Ron Smeberg, filed the affidavit on the record and emailed it to Pat Autry requesting the trustee join in the debtors motion for rehearing to hear new evidence of fraud on the part of the trustee's broker:

> **"Dear Mr. Autry,**
> **The debtors have pointed out new information obtained that is relevant to the prior hearings on employment of Walt Busby's company Central Texas Realty and Development, LLC. First, it appears that Walt Busby had not cut**

ties with Stratford Land Fund in regard to the Eisenhauer Point project as testified by Walt Busby at the hearing. Please see the affidavit of Carol Mattick attached to Debtors Facts and Exhibits. Second, Steve Sanders testified at the April 21, 2015, hearing that he wanted to buy the Sommer's property. This evidence becomes very relevant in light of the fact that Busby and Sanders are partners and SLF recommended Central Texas to Pat Lowe. (Likely the recommendation came from Steve Sanders, which only Pat Lowe would know at this time). I am asking Pat Lowe to join in our to be filed 9024 motion (indicative under 8008) for the court to hear this evidence in regard to the Central Texas appointment.

Please let me know if Pat Lowe will join in the motion or if he will at least be unopposed to the motion. Additionally, please let me know the persons at Stratford Land Fund who recommended Central Texas Realty and Development, LLC and/or Walt Busby to Pat Lowe.

Thank you,

Ron Smeberg                                              (ecf 952-2, Exhibit B)

This e-mail was sent on May 12, 2015, just weeks after the trustee john Patrick Lowe had requested a rehearing for the fact that 'front man' purchaser Robert Schumacher and his lawyers at Langley and Banack had been caught lying to the court at the sale hearing of March 26, 2015 about Schumacher partnering with Steve Sanders of noteholder Stratford Land fund in the purchase of the property they had sought since 2012.  The trustee claimed to request the rehearing to hear new evidence that clearly demonstrated fraud on the court was used to falsely portray Sanders and Schumacher as good faith purchasers in the price fixing and bid rigging scheme-as if he was upset about discovering this.

The real reason for the rehearing was because neither the trustee ignore his purchasers couldget a clean title policy from any title company for the fraud on the court and collusion in the sale, as collusive bidding in bankruptcy § 363 sales is prohibited, and in any legitimate bankruptcy court, the sale would be overturned and a new sale held with a legitimate trustee, a legitimate broker and legitimate purchasers.  It wasn't the trustee being upset upon learning that Sanders was involved in the purchase, but the trustee being upset that the title company discovered that Sanders was involved in the purchase and therefore knew that the testimony of purchaser Robert Schumacher and his lawyers at

Langley and Banack had lied to the court repeatedly about the collusion that invalidates the sale.

The bankruptcy trustee Patrick Lowe knew all along that Sanders was involved, as it was the trustee who immediately upon being appointed made a special trip to Austin, Texas on September 16, 2014 with his soon to be hired counsel Pat Autry to meet with Sanders and set up the scheme. This was one of the dirty little secrets that was never disclosed to the bankruptcy court until long after the closing of the sale, and only when the debtors themselves discovered the trip imbedded in the itemized billing of Branscomb PC as attorneys for the trustee.

Smeberg's e-mail to the trustee is misleading in one respect, as he states only the trustee would know whether or not Sanders had recommended Busby as the trustee's broker. To the contrary, Smeberg had been informed by the debtors that the trustee had already admitted to hiring Sanders' longtime partner Walt Busby as the broker at the recommendation of Steve Sanders himself -and had been informed that the trustee had already admitted this to the debtors and their then counsel Lorenzo Tijerina of this in a meeting on September 25, 2014.

**June 2, 2014** – Johnson and Rozelle were forced back into bankruptcy by Sanders and Stratford

**June 11, 2014** - Sanders creates the general partnership that will be the winning bidder and what was already set up to be the price fixing and bid rigging scheme

**August 27,28, 2014** – Sanders gives perjured testimony at the lift stay hearing, his appraiser provides foreclosure sale value of $15 million, appraisers testify just the front 25 acres alone is worth $18,000,000, the brokers testify they can quickly sell the front 25 acres and a fire sale price to pay off all debts and allow Johnson and Rozelle to exit bankruptcy. King makes flagrantly falsified findings of fact including demeaning and defamatory remarks about Johnson and Rozelle in particular. King *sua sponte* orders the appointment of a chapter 11 trustee.

**September 16, 2014** – trustee meeting in Austin where Sanders, the trustee and Branscomb PC – and likely others -setup and /or finalize the price-fixing and bid-rigging scheme**(ECF 377@14)**

**September 22, 2014** - Pat Autry and John Patrick Lowe have a conference call with Walt Busby **(ECF 377@14)**

**September 23, 2014 –** straw offer/straw bidder of $20,000,000 set when Pat Autry meets with longtime bankruptcy lawyer and colleague Dean Greer and his partner/broker in bankruptcy cases Carlos Klutts **(ECF 377@14)**

**September 24, 2014 –** front man purchaser Robert Schumacher contacts trustee john Patrick Lowe instructing him to communicate directly with Schumacher's lawyer Bill Kingman.

**September 25, 2014 –** meeting in the offices of the UST at the request of trustee john Patrick Lowe and his counsel Pat Autry, and using the offices of the UST as a backdrop of legitimacy and intimidation, the debtors are expected to simply 'go along' with accepting the $20,000,000 sale price for the property or face retribution from the Department of Justice and judge King lifting the stay, whereby the debtors and unsecured creditors would likely receive nothing.

As the debtors had specifically memorialized meetings with the trustee in there in e-mail to the trustee of December 18, 2014, the trustee had already disclosed at this September 25, 2014 meeting that Busby had been recommended by eventual purchaser in the scheme Steve Sanders **(ecf 136@6-12)**.  It is unclear why Smeberg at this point attempted to feign ignorance of this in the e-mail to Pat Autry, but the trustee had already admitted to hiring Walt Busby at the referral of Busby's longtime partner at Stratford, Steve Sanders.  The real estate market knew well that Busby, Sanders and Stratford were all 'linked at the hip', and Judge King approving and embedding Busby in place as the broker in the sale of the Johnson Rozelle bankruptcy estate property was a clear signal that Sanders and/or Stratford were controlling the court and the property, and signaled an inside deal and a foreclosure price dictated at Sanders and Stratford's own 'purchasers' valuation' of the property.

The trustee refused to even consider having a rehearing to hear about his brokers fraudulent misrepresentations to the court.  It's important to keep in mind that these are the same types of nondisclosure of conflicts of interest that led to the demise of the now disgraced former chief bankruptcy judge David Jones of the Southern district of Texas in 2023, and for which the United States trustee is moving to clawback some $20,000,000 in fees from the bankruptcy law firms and lawyers that profited from the same type of non-disclosures in that scandal as

did the officers of the court from the non-disclosures in the defrauding of the Johnson Rozelle bankruptcy estates.

Under cross examination, the trustees counsel Pat Autry testified that neither he nor the trustee made any significant inquiry regarding the Carol Mattick affidavit and new information that Busby's disclosures to the court of his conflicts of interest were a fraud on the court.  According to Autry,

The April 21, 2015 re-hearing was for Sanders, Schumacher and their lawyers to now 'come clean' about the fraud and collusion in the sale processand give judge king a reason -however fraudulent-to give his blessing of the sale with a finding that the fraud on the court at the prior sale hearing of March 26, 2015 by judge King's closest colleagues at Langley and Banack was all forgiven, and represented not "any hint of impropriety".

As we now know it didn't work, and the title company didn't buy any of that crap nor did any respect to King's order RE approving the sale to bad faith purchasers.  The point here, however, is the fact that trustee john Patrick Lowe, his lawyers and professionals and judge King were clearly willing to stretch the boundaries of impropriety, fraud and judicial misconduct in order to protect a sale that defrauded bankruptcy estates of $30,000,000 by defending their co-conspirators Sanders and Schumacher, and their lawyers at Langley and Banack (King's prior law firm and close confidants) for their roles in the conspiracy to rig the sale with a rehearing.

But would they be willing to have a rehearing to hear more evidence of fraud on the part of the trustee's broker Walt Busby?  The answer was a resounding no.  Of its evidence that the court would never consider a rehearing unless it was for a specific purpose of obtaining a clean title policy and in furtherance of protecting and perpetuating the price-fixing and bid-rigging scheme -Not provide more evidence of fraud to overturn the sale.  Re- hearings were only meant for coverups of fraud schemes that are apparently making those involved $30,000,000 richer, Not for overturning the sale and administering justice and equity in a court of equity and justice.

Rozelle cross examined the trustees lawyer Pat Autry about the affidavit of attorney Carol Mattick

§

According to Adam D Herring, general counsel for consumer law, Executive Office for U S Trustee's:

**"All stakeholders in the bankruptcy system should be vigilant that the system is functioning as intended for the benefit of debtors and creditors. But too often, the USTP has seen "access to justice" used as a catch phrase to conceal and legitimize schemes designed to benefit professionals. As it has for years, the USTP will continue to investigate and take enforcement action two in harmful substandard practice and misconduct by consumer attorneys" (ABI journal, volume xxxvii, No.10, October, 2018)**

As well, the debtors' fired Wauson and Probus for extreme breaches of fiduciary duty, and hired bankruptcy lawyers John Tutt and David Brown. The new lawyers agreed that the prior bankruptcy lawyers were setting up their clients with a fire sale scenario to maximize a purchasers profit of the property while minimizing that of their clients bankruptcy estates (see herein). However, before long the new lawyers began to turn 180 degrees from first acknowledging the value of the property as per the appraisals and comparable sales. The new lawyers suspiciously suggested bringing no professionals to the debtors' 2012 confirmation hearing, and bringing no appraisals as exhibits. Instead, John Tutt and David Brown wanted as the only exhibits their current fully executed sales contract for 12 acres and their disclosure statement – *but no appraisals or appraisers*. When the debtors insisted on having appraisals and appraiser testimony, the lawyers then attempted to talk them into a consensual agreed-upon value with Broadway bank of $12,000,000, and became angry when debtors refused.

According to lawyers, this was all that was necessary, as it was more than the debt amount and furthermore, judge king would view any argument with Broadway bank over value to be tantamount to making his court into a circus. As such, they advised that bringing appraisals and an appraiser would upset judge king to the point of his immediately hiring a trustee to liquidate the property. According to the lawyers, the $12,000,000 valuation[40] was "only for confirmation

---

[40] Debtors had previously mis-stated this as $14 million in pleadings. In thinking back, and eviewing past emails, it was actually $12 million that the debtors' bankruptcy lawyers wanted to have as an established value. See exhibit A.

purposes", but the debtors didn't fall for it. It clearly appeared to be a setup for the debtors to appear in agreement that the property was worth only $12,000,000, and thereby waiving any claims or objections to a sale for that amount by judge King.

     For a property valued at $44,000,000 "as is" at the time by numerous appraisals, and an appraisal of just the front 20 acres at $14,800,000 **(ECF 959-1)**, and even Valero, who wanted the property for a foreclosure price, had offered $25,000,000 in 2008 **(ecf 989-3)**. It defied logic and raised serious red flags that a bankruptcy judge would be upset with the true appraised values being on the record in sworn testimony by appraisers. Debtors began to suspect Judge King may have a financial stake in the purchase of the property, as Clarita Johnson had been led by another bankruptcy lawyer to Bill Kingman on the day Broadway was posting for foreclosure. Kingman is judge king's former junior bankruptcy partner at Langley and Banack and still close personal friend. Bill Kingman had tried to pressure Clarita Johnson into selling him the property for $14,000,000 as her proposed bankruptcy lawyer, claiming she could lose everything in bankruptcy if she didn't agree to sell the property to him that very day prior to the posting. Debtors were becoming aware of the reputation of bankruptcy courts and bankruptcy lawyers, and debtors soon began to suspect Judge King himself had a vested interest in the property selling for far less than fair market and appraised values, as it was now appearing that king and Kingman had the same modus operandi. Apparently Johnson was led specifically to Kingman because such a 'bait and switch' purchase under duress prior to filing bankruptcy could be clawed back, especially under the circumstances unless it went to the proper channels. As the debtors lawyers had informed that King and Kingman were still close friends, and even warned Johnson about Kingman's attempted extortion in King's court, it clearly appeared that the judge wanted the property to be sold for the lowest value that the debtors could be coerced or threatened into accepting. Accepting a $12,000,000 valuation or risk a take nothing scenario through a trustee liquidation clearly appeared to be manifesting from the top, as King was the only one in position to make such threats as the bankruptcy judge.

     In fact, at the 2014 lift stay hearing, Broadway Bank's bankruptcy lawyer Jim Hoffman was now representing the new/successor noteholder Stratford, who had claimed to have purchased the note from Broadway bank. At the lift stay hearing of August 27, 2014, Hoffman began to badger Clarita Johnson on the witness stand. Hoffman had already in the motion to lift stay claimed that the

debtors were "euphoric" for believing the property was worth $52,000,000, as though the debtors did not have an informed opinion based on numerous appraisals, including one valuing the property and $52,000,000 if sold in parcels. Hoffman blamed the debtors for not accepting the $25,000,000 offer from Valero, and claimed if they had, attempted to bully Clarita Johnson into agreeing that he would then have $75,000,000 **(ecf 111@71).** In continuing to badger the elderly widow, Hoffman demanded to know the lowest sales price she would except for the property. Johnson, knowing you never want the market to know the least any owner would accept for a property lest it would simply chill the bidding and be damaging to our interests responded that she would not want to answer that. Hoffman then relayed that judge king would make her answer that question **(ecf 111@70).** The debtors counsel at the time Steve Cennamo refused Rozelle's request to make an objection. Johnson answered that the debtors would take what was fair and reasonable, but clearly both Broadway bank and apparently the court wanted a fire sale to Valero as though Valero were somehow behind it all as the proposed and users for at least a part of the property for their plans with UTSA.

Looking back at the history of the property, when matriarch of the family Clara Sommers had refused to donate the property to UTSA or sell to Valero as her estate planning lawyer had suggested, the lawyer then began calling Clarita Johnson, requesting that Johnson induce her mother to sell the property to Valero or donate it to UTSA. She testified before judge King to this fact **(ecf 989-6@48-51**). Valero clearly appeared to have colluded with Frost Bank in 2005 to pressure Johnson and Rozelle, and a third heir, into selling the property to Valero – and only Valero - for $13,000,000 **(24-05022rbk  Document 14@306)** The first thing Frost bank did was hire Clara Sommers' former lawyer to act on behalf of frost as administrator. The first thing the lawyer did, according to the lawyers billing, was reached out to Valero two days after Clara Sommers death **(ecf 24-05022 Document 14@305)**

Frost finally admitted it had a conflict of interest due to having Valero as a client **(ecf 789@12)** and agreed to resign as administrator of the Clara Sommers estate for attempting to pressure the debtors into selling to Valero, and damaging the value of the Clara Sommers estate **(ecf 789@13).** Johnson and Rozelle then had to take a loan from Broadway bank due in large part to Frost Bank's actions. From that point, debtors believe Broadway had the same conflict of interest, and

even relayed at one point out of frustration that they had provided the three year balloon note with the expectation that Johnson and Rozelle would sell to Valero.

Broadway bank then, through their bankruptcy lawyer Jim Hoffman, began blaming the debtors for not tying up the entire property with a sales contract to Valero for $25,000,000 **(ecf 989-3)** for a $50,000,000 property, where the debtors could then be strung out into foreclosure by a Fortune 500 corporate entity clearly upset that they could not manipulate the debtors into selling the property for $13,000,000

§

It could clearly appear that the Valero-UTSA interest in the property has been a driving force behind the debtors inability to sell to anyone else but them, and Valero's city councilman and their PR campaign against apartments being built on the property as a 'gatekeeper', has also influenced the bankruptcy court as well.  UTSA is still landlocked and ever expanding now in downtown San Antonio for lack of land at their main campus across from the former bankruptcy estate property.

A large part of the property being developed by the perpetrators of the bid rigging scheme - Steve Sanders, Robert Schumacher and the trustee's 'disinterested' broker Walt Busby  - now have approximately 1000 apartment units in the very same area that the debtors and their prospective purchasers had planned.  Apparently the Valero owned city councilman's public relations campaign against the debtors' proposed purchasers/apartment developers – who claimed it was the neighbors that didn't want apartments - and who were denied their zoning from city councilman, didn't mind the apartment's after all: apparently Valero just wanted Sanders, Stratford and Busby to develop apartments in that portion of the property, and perhaps to develop another part for Valero and UTSA, whom Sanders has advertised as been a client of his for years.

At any rate, it also appeared to influence judge King's falsified findings of fact of August 28, 2014.  According to King, everything was the debtors fault and "so mishandled for so many years that the property's been stigmatized. Nobody wants to go in and make offers on this property, Valero, as well as other perspective buyers, because the property's been stigmatized."

§

Section 363(n) of the Bankruptcy Code forbids collusive bidding, stating that a debtor may avoid a sale to a bidder if it is discovered that "the sale price was controlled by an agreement among potential bidders." (*In re: Waypoint Leasing Holdings Ltd.*, no. 18-13648, 2019 WL 4273889 at 6 (Bankr. S.D.N.Y. Sept. 10, 2019).

"Though the bankruptcy code and rules do not provide a definition of good faith, courts generally have followed traditional principles in holding that a good-faith purchaser is one who buys 'in good faith' and 'for value'. Typically, lack of good faith is shown by 'fraud, collusion between the purchaser and the other bidders for the trustee, or an attempt to take grossly unfair advantage of other bidders."*' (In re: M Capital Corp.*, 290 B. R. 743, 746 (B.A.P. 9th Cir. 2003))

The Fifth Circuit has stated that "misconduct including fraud, collusion between the purchaser and other bidders, or an attempt to take grossly unfair advantage of other bidders could destroy the purchasers good faith status" (***in re: Bleaufontaine***, 634 F. 2d 1383, 1388 n.7 (5th Cir. 1981)

Evidence in the case clearly prove intentional and willful misconduct on the part of the trustee in collusion and conspiracy with his professionals, his purchasers and other officers of the court documented by the debtors clearly demonstrates the trustee specifically chose the purchasers' longtime partner to steer the property only to his partners at an artificially depressed price - $30,000,000 below fair market and appraised values.  And then, of course, there was the willful and intentional false testimony to the court by the trustee and his professionals in artificially downplaying the value of the property, the willful and intentional lying to the court about the identity of the purchasers and there are relationship to the trustee and the trustee's broker, the willful and intentional l areying to the court

The trustee's broker specifically informed the court at the hearing for the brokers approval that the trustee may take a **'targeted approach' of "simply dealing with those the trustee believes they should be dealing with" (ecf 129@24)** to selling the property rather than marketing far and wide for a competitive price, and judge King signaled his approval by reminding the broker in the same overly cordial conversation with a broker that **"bankruptcy is a good place for people find good deals on land" (ecf 129@22).**  Sure enough, now having be court's approval to essentially 'target' the broker's partners, at the sale hearing the trustee's counsel informed of judge King that the trustee had in fact taken a "targeted approach" **(ecf 220 @47).**  The winning 'bidders', of course, were Busby's partners prior to the sale and following the sale – and as it turns

out, during the sale. But of course like in any bid rigging scheme, the trustee, his professionals and the purchasers lied to the court about this, and even after the fraud on the court and collusion was discovered, Judge King simply called it all a conspiracy theory on the part of the debtors.

While King may have wanted to signal that good deals were welcome in his bankruptcy court, the truth is in legitimate bankruptcy courts and legitimate sales, good deals that appear to be a windfall for purchasers are frowned upon and raise red flags as a badge of fraud. For obvious reasons, the bankruptcy code allows a court to set aside a sale if the sale price was controlled by an agreement among potential bidders or collusion between the purchasers and the debtors in possession or a bankruptcy trustee.

Successful bidders at auction who get a significant burden run the risk that the bankruptcy court will set aside the auction results. Typically, a court will reopen bidding, and thereby upset the results of even a properly conducted judicial auction if there was fraud, unfairness, or mistake in the conduct of the sale or if the price brought that the sale was so grossly inadequate as to shock the conscience. Bankruptcy courts have concluded that any of the following can justify denial of an auction sale: unfairness stored bidders, stifling of competition, inaccurate or otherwise insufficient advertisement or marketing, shamrock bidding or puffing, lack of due notice, and interference with the orderly conduct of the sale.

In a subsequent hearing of January 20, 2015 the trustee through his legal counsel deliberately and willfully led the broker in blatantly false testimony regarding the entitlements and condition of the bankruptcy estates $50,000,000 property (see appraisals herein) in order to intentionally downplay its value to support the predetermined $20,000,000 sale price, with the bankruptcy court refusing to allow the debtors rebuttal evidence, and actually struck from the record Rozelle's testimony that the entitlements on the property did not in any way inhibit development of the property as the trustee and his broker had falsely testified.

An integral the component of the price-fixing and bid-rigging scheme to sell the $50,000,000 piece of property for a prefixed price of $20,000,000 to prefixed purchasers connected to the trustee was providing false testimony regarding the value of the property to give the appearance that $20,000,000 was a fair price.

Another component was to defame the debtors Johnson and Rozelle with false claims that they simply refused to sell their property, which is typical

foreclosure language of banks that prevent borrowers from selling and then blame the borrowers for not selling.  This was the talking points/false narrative of noteholder Broadway bank when the debtors refused to enter into an agreement with Valero Energy, who's corporate campus sits adjacent to the debtors 114 acre property.

§

## JUDGE KING'S DISQUALIFICATION UNDER 28 USC § 455 FOR BIAS AND PREJUDICE AGAINST THE DEBTORS

**28 USC § 455  Disqualification of Justice, Judge, or Magistrate Judge:**
  **(a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.**
  **(b) He shall disqualify himself in the following circumstances:**
    **1.  Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the preceding.**


Judge King acted in the absence of jurisdiction by presiding over the case when circumstances required his dismissal. King clearly sits as a disqualified jurist in the case for showing bias and prejudice against the debtors and favoritism towards the trustee, the trustees professionals, the trustee's purchasers and the purchasers law firms, who are the former law firm, former law partners and mentors of Judge King, and who maintain close personal and professional relationships.  The officers of the court, including the trustee and his professionals, were clearly given a 'green light' by King to provide fraud on the court in furtherance of a blatant price fixing and bid rigging scheme.  Judge King willfully and intentionally ignored clear evidence of fraud on the court as it played out in front of him, and retaliated against the debtors with $239,000 in sanctions for filing in their pleadings explanations of how the fraud on the court was clearly made in furtherance of the price fixing and bid rigging scheme.

Even after reluctantly taking judicial notice of transcripts whereby the trustee's broker admitted in sworn testimony before the United States trustee to the role he and the purchasers played in the scheme, including kickbacks, judge King,  the trustee and the trustee's counsel chose to take willful and intentional

steps to ignore the evidence, and furthermore, continue to defame the debtors/whistleblowers by claiming the new evidence was nothing more than conspiracy theories on the part of the debtors.

Furthermore, King himself gave clearly pre scripted falsified findings of fact that clearly appeared to have come directly from the false narrative playbook of the noteholders.

King clearly adopted their false narrative talking points as his falsified findings of fact. Debtors suffer from terminal euphoria—they believe the property is worth $52 million according to their Schedules.

### Judge King's Bias, Prejudice
### and
### Falsified Findings of Fact
### In Furtherance of The Bid-Rigging Scheme

Throughout the bankruptcy cases, Judge King has demonstrated a distinct and easily identifiable bias and prejudice against the debtors and favoritism to other parties and their law firms, going so far as to willfully and intentionally slandering the debtors and even their property with a distinct pattern of blatantly false findings of facts made knowingly, willfully and intentionally in reckless disregard for the truth on the facts and evidence put before him.  His actions have clearly has been made with malice.  The debtors' own bankruptcy lawyers of record had explained that King has a particular dislike for the debtors, with their last bankruptcy lawyer of record, Ron Smeberg, relaying to the debtors and even third parties that "King hates Rozelle and will rule against him on anything and everything".  The rulings and falsified findings made not in just clear error in reckless disregard for the truth, but more disturbingly, also appear to be made in furtherance of the egregious price-fixing, bribery, kickback, bid-rigging and money-laundering scheme that defrauded $30,000,000 from the Johnson Rozelle bankruptcy estates.

Another of the debtors' bankruptcy counsel, Lorenzo Tijerina, had advised filing an affidavit in support of his motion for rehearing to correct judge King's falsified findings of fact of August 28, 2014 that the debtors prior counsel had flatly refused to do.  According to the prior bankruptcy lawyer, Steve Cennamo of the now defunct malaise law firm, who themselves filed for bankruptcy since, wrote but filing such a motion for rehearing in king's court would be **"an utter waste of**

**time because judges hate to admit they are wrong, and King is not going to change his mind".**

As for Tijerina, who was hired after the debtors discharged Cennamo for refusing to defend the truth, advised on November 12, 2014:

> *"The abuse of discretion is an appellate standard and used to attack a judge's decision on appeal. So no need to overly concern yourself at this stage of the case. It will be raised on appeal. You can and should cite the derogatory remarks made by judge King to shore up your argument of prejudice against the debtors. Put in all you want concerning Kings prejudice; but, use words to the effect that the court "appears"," seems", "such action could be interpreted as being prejudice" etc. against the debtors. Sorry I did not return your calls today"* **(ecf 721 Exhibit 1-A,@25)**

According to Tijerina, reviewing King's falsified findings of fact, it clearly appeared that appeals would be necessary, and in fact, Tijerina would soon advised contacting the chief justice of the western district of Texas and the FBI to report the corruption in the case.

Any reasonable person would conclude, given the facts and the evidence, that King, in collusion with the trustee, the trustees professionals, the purchasers and their lawyers:

1. Willfully, intentionally and knowingly ignored massive amounts of lawyer misconduct by his closest longtime colleagues and former law firm, including a forged document scheme by two of his former judicial clerks in furtherance of justifying the appointment of a trustee to perpetrate their unconscionable and egregious price fixing, bribery, kickback, bid-rigging and money-laundering scheme

2. Willfully, intentionally and knowingly protected, and acted in collusion and conspiracy with the bankruptcy trustee's price-fixing and bid-rigging scheme that defrauded the Johnson Rozelle bankruptcy estates of some $30,000,000

3. Willfully, intentionally and knowingly allowed the noteholder and predetermined purchaser of the bid rigging scheme to disrupt court proceedings in an apparent attempt to intimidate a witness

4. Willfully, intentionally and knowingly allowed of the $billion dollar noteholder/purchasers to convey they were in a special position to influence the court in violation of the Canons of Judicial Ethics – ala Judge David Jones, the supreme court Justice Clarence Thomas and many other judges who profit routinely by not disclosing conflicts of interest

5.    Willfully, intentionally and knowingly engaged in clear and repeated violations of the Judicial Canons of Ethics regarding appearances of impropriety

6.    Willfully, intentionally and knowingly engaged in clear and repeated violations of the Judicial Canons of Ethics regarding his obligation to recuse himself from a case under 28 USC § 455

7.    Willfully, intentionally and knowingly ignored false claims brought against the debtors Johnson and Rozelle

8.    Willfully, intentionally and knowingly made clearly falsified findings of fact that clearly appeared to be scripted by the attorneys for the beneficiaries of the scheme

9.    Willfully, intentionally and knowingly made clearly falsified findings of fact in reckless disregard of the truth, facts and evidence put before the court

10.    Willfully, intentionally and knowingly made falsified findings of fact that acted in furtherance of fixing the sale price of the bankruptcy estate property at some $30,000,000 below fair market and appraised values for the benefit of those involved in the scheme

11.    Willfully, intentionally and knowingly made falsified findings of fact using disparaging, derogatory, demeaning and defamatory language against the debtors as apparent 'blame the victim' style justification for the scheme

12.    Willfully, intentionally and knowingly made falsified findings of fact slandering the bankruptcy estate property to support the purchasers' valuation of the property which was an apparent agreed upon purchase price of $30,000,000 below fair market value

13.    Willfully, intentionally and knowingly ignored appraisals and appraiser testimony valuing the property at fair market value of between $35,000,000 - $45,000,000 in 2007, $44,000,000 - $49,000,000 in 2009, $47,000,000 - $52,000,000 in 2014, and $18,000,000 for just the front 25 acres in 2014.

14.    Willfully, intentionally and knowingly accepted and promoted a foreclosure valuation from the purchasers as fair market value to establish the price-fixing aspect of the scheme

15.    Willfully, intentionally and knowingly made a decision to disregard a trustee compensation agreement between the UST and trustee john Patrick Lowe to take the lesser of hourly fees or statutory fees, claiming he didn't want to limit the upside potential for the trustee to capitalize on a sale of a

bankruptcy estate property as large as the Johnson Rozelle bankruptcy estate property valued as high as $52,000,000

16. Willfully, intentionally and knowingly approved the trustee's choice of broker who was disqualified under the rules of disinterestedness, and on the trustee's telling the court that the blatant conflicts of interest "were an advantage"

17. Willfully, intentionally and knowingly accepted that the "advantage" was clearly to those benefiting from the price-fixing and bid-rigging scheme

18. Willfully, intentionally and knowingly sent specific 'wink and a nod' signals to the trustee's broker to 'target' whoever he feels need to be the purchasers, as opposed to actually marketing the property for a fair market and competitive price

19. Willfully, intentionally and knowingly sent specific 'wink and a nod' signals to the trustee's broker to give his desired purchasers "a good deal", when the judge – like everyone else - either knew or should have known that the broker's desired and targeted purchasers were his longtime partners with whom the broker would share in the spoils

20. Willfully, intentionally and knowingly accepted with a 'wink and a nod' testimony from the noteholders lawyer that the noteholder Stratford had nothing to do with the trustee's choice of broker

21. Willfully, intentionally and knowingly ignored what any reasonable person would conclude was disqualifying testimony from the trustees broker prior to approving the trustees broker

22. Willfully, intentionally and knowingly ignored extensive fraud on the court on the part of the trustee and his professionals regarding brokers who had approached the trustee with offers to market the property in a responsible manner – even after the trustee was impeached on the witness stand with testimony and evidence admitted that the trustee had lied on numerous occasions to the debtors regarding brokers approaching him to market the property

23. Willfully, intentionally and knowingly ignored extensive fraud on the court on the part of the trustee and the trustees broker regarding entitlements on the property- a fraudulent testimony clearly designed to falsely support a predetermined and fixed $20,000,000 sales price

24. Willfully, intentionally and knowingly sustained objections by the trustee and his counsel concerning the debtors attempts to testify to the fair market value of their own property and provide impeachment evidence

against the trustee and his broker regarding value of the property and entitlements -even striking from the record any mention that the trustee and broker had lied about entitlements in an effort to support a pre-fixed $20,000,000 sale price

25.  Willfully, intentionally and knowingly ignored all of the red flags and badges of fraud in the proceedings leading up to the sale of the property

26.  Willfully, intentionally and knowingly ignored the debtors pleadings and arguments in court outlining extensive fraud on the court on the part of the trustee, the trustees professionals and purchasers in collusion with the trustee

27.  Willfully, intentionally and knowingly ignored the warnings by the debtors prior to the sale that the trustee was engaging in a fraudulent testimony to artificially downplay the value of the property in an insider sale scheme to benefit an insider to noteholder Stratford

28.  Willfully, intentionally and knowingly ignored the debtors' request to postpone the sale hearing in order that their attorney of record attend the sale hearing – actually telling the debtors that there was no advantage to having an attorney at the sale hearing, as there was nothing an attorney would be able to do for them.

29.  Willfully, intentionally and knowingly accepted that the sale price of $20.3 million was in any way reasonable when in fact, based on the conflicts of interest and fraud on the court leading up to the sale, the sale price itself was indicative of fraud[41]

30.  Willfully, intentionally and knowingly ignored the fact that just as the debtors had warned and alleged, Steve Sanders of noteholder Stratford - the longtime partner of the trustee's broker Walt Busby -was discovered to be a purchaser just as the debtors had alleged would be the case.

31.  Willfully, intentionally and knowingly ignored evidence that former bankruptcy judge Glen Ayres and David Gragg judge King's former law firm had committed egregious fraud on the court at the sale hearing in order to falsely portray front man purchaser Robert Schumacher as a good faith purchaser for value in an arms length transaction

---

[41] *Golson v. Capehart*, 473 S.W.2d 627, 628 (Tex. Civ. App., Eastland 1971), " Where an inadequacy of price is extreme in view of the circumstances surrounding the transaction and is so gross as to constitute, in itself, decisive evidence of fraud, the sale and deed may be set aside."

32. Willfully, intentionally and knowingly ignored the fact that trustee john Patrick Lowe and his counsel Pat Autry of Branscomb PC had conspired with the purchasers lawyers in drafting the fraudulent testimony of former bankruptcy judge Glen Ayres and David Gragg of King's former law firm and mentors

33. Willfully, intentionally and knowingly ignored the fact that the title companies refused to give a clean title policy upon learning that the debtors allegations of a price-fixing and bid-rigging scheme had not only become true, but in hindsight, the title companies could see that the egregious fraud upon the court in the proceedings and pleadings leading up to the sales hearing were ignored by judge King

34. Willfully, intentionally and knowingly ignored his duty to invalidate his own sale order for fraud on the court and hold a second sale with a reputable trustee, a reputable broker and good faith purchasers for value in an arms length transaction after actually marketing the property that trustee john Patrick Lowe refused to do

35. Willfully, intentionally and knowingly ignored the fact that even the newspaper articles covering the story vindicated and validated the debtors' claims of a price-fixing and bid-rigging scheme to the general public, and the bankruptcy case and judge were now scandal ridden in a clear appearances of impropriety

36. Willfully, intentionally and knowingly conspired with the trustee and likely others involved in the scheme *ex parte* to obstruct justice by creating a cover-up story with even more fraud on the court for the sole purpose of deceiving the title company into providing a clean title policy for a clearly corrupted sale

37. Willfully, intentionally and knowingly held a second sale hearing for the sole purpose of making yet another pre-scripted finding of fact that the sale process contained "not even a hint of impropriety"

38. Willfully, intentionally and knowingly ignored the debtors' plea to acknowledge the fraud on the court at the sale hearing and other hearings and hold a legitimate sale with a legitimate trustee after a legitimate marketing of the property

39. Willfully, intentionally and knowingly ignored the debtors' plea to at least postpone a second hearing on the sale until the debtors could find legal counsel to represent them after their lawyers had evidently been scared off or bought off of the case

40. Willfully, intentionally and knowingly allowed his mentor, former bankruptcy judge Glen Ayres of Kings former law firm Langley and Banack to take control and preside himself over the second hearing on the sale, giving the distinct impression that King's mentor and former law firm representing the purchasers and benefactors of the price-fixing and bid-rigging scheme were in a unique position to influence the court in direct violation of the Judicial Canons of Ethics.

41. Willfully, intentionally and knowingly ignored the fact that the testimony of the purchasers in the second sale hearing, completely contradicted the prior testimony of bankruptcy judge Glen Ayres and David Gragg, their client, purchaser Robert Schumacher, which was aided and abetted and pre-scripted by trustee john Patrick Lowe and his counsel Pat Autry

42. Willfully, intentionally and knowingly ignored the fact that it was no apparent that the noteholder through Steve Sanders had secretly colluded in the sale with the trustee's help to control the sale price and obtain the property at a $30,000,000 discount using their partner Walt Busby – the trustee's 'disinterested' broker – and by extension the trustee himself and counsel Pat Autry of Branscomb

43. Willfully, intentionally and knowingly ignored the fact that the public was made aware through newspaper articles were now confirming that the sale was an insider trading scheme that stigmatized the court

44. Willfully, intentionally and knowingly ignored the appearances of impropriety by making yet another falsified finding of fact that the fraud on the court that led to virtually every title company refusing to give a clean title policy contained "not even a hint of impropriety" as a means of attempting to justify and protect the sale to bad faith purchasers in a price-fixing and bid-rigging scheme

45. Willfully, intentionally and knowingly ignored the bankruptcy code, a law and the fact that fraud on the court invalidated his own orders and rendered the sale to bad faith purchasers and their lawyers a fraud itself that has no statute of limitations and voids all of judge King's orders leading up to and including the sale

46. Willfully, intentionally and knowingly engaged in and promoted a 'damage control' / smear campaign against the debtors by falsely claiming the debtors' appeals to the sale were the reason virtually no title company anywhere would lend any respect to his orders re- approving and affirming the sale procured by fraud on the court, knowing full well it was the fraud

on the court- not the appeals filed by the debtors new counsel – that prevented a clean title policy for the trustee's corrupted sale

47. Willfully, intentionally and knowingly engaged in an extortion scheme as an alternative to holding a legitimate sale, the scheme being to leverage and capitalize on the fact that the perpetrator of the scheme, Stratford Land, was collecting $4400 per day in default interest.  Using this against the debtors in a 'squeeze' play, King threatened to allow Stratford to foreclose before an appellate court decision was rendered if the debtors didn't sign an agreement to drop their appeals and validate purchasers Sanders and Schumacher as good faith purchasers – the debtors refused

48. Willfully, intentionally and knowingly lifted the stay allowing Stratford to foreclose prior to a decision from the Appellate Court on the corrupted sale in order to deny the debtors due process of an appeal to the corrupted sale-giving no option but to sign an agreement dropping their appeals

49. Willfully, intentionally and knowingly ignored then and continues to ignore the fact that upon conversion from chapter 11 to chapter 7, trustee john Patrick Lowe was removed from the case, yet executed a sale of the estate property as trustee regardless, and continues to act as chapter 7 trustee without any due process afforded the debtors to object to the

50. Willfully, intentionally and knowingly ignored the new evidence brought before the court by the debtors following the sale, being an even more recent published newspaper article wherein the new purchasers Steve Sanders, Robert Schumacher and Walt Busby (the trustees' 'disinterested' broker) were quoted making public statements that completely contradicted their sworn testimony, including even the later concocted cover-up testimony constituting yet the latest clear confirmation of illegal collusion in the sale between the trustee and the purchasers, and confirming even more fraud on the court in the sale process that renders the sale a fraudulent conveyance

51. Willfully, intentionally and knowingly took a blatant yet transparent blind eye and deliberate ignorance approach to his longtime colleagues fraud on the court in furtherance of the scheme

52. Willfully, intentionally and knowingly sanctioned the debtors $239,000 based on testimony by none other than the very same Glen Ayres, David Gragg and purchaser Steve Sanders who had absolutely no credibility for previously given blatantly and egregious fraudulent testimony before judge King, now falsely claiming that the appeals filed by the debtors counsel Ron

Smeberg prevented title companies from offering a clean title policy, and a false claim that it prevented the purchasers from closing and thereby defaulted on their sale agreement

53. Willfully, intentionally and knowingly prevented the debtors from filing a motion to reconsider his order approving the $239,000 in sanctions by ordering the bankruptcy clerk's office to refuse providing the debtors with a file stamped copy of their September 6, 2016 motion to reconsider, or even allow the debtors copy to be stamped as "received" as proof of its submission.

54. Willfully, intentionally and knowingly misrepresented in a subsequent hearing on October 17, 2016 that the debtors had not submitted their motion to reconsider the order approving $239,000 in sanctions to the bankruptcy clerk's office, and along with Langley and Banack lawyers attending the hearing, falsely claimed the debtors' assertions that they timely submitted the motion to the bankruptcy court clerk's office was false.  In the hearing, King claimed to have never seen the September 6, 2016 motion, and intentionally attempted to confuse it with a follow-up September 9, 2016 supplementary motion.  The bankruptcy clerk's office later confirmed to both Johnson and Rozelle they specifically remembered the incident, and also confirmed that the September 6, 2016 motion was sent up the proper channels to judge King.  King saw it, but in an attempt to obstruct justice, falsely claimed on the record he didn't, as it was a prerequisite to filing an appeal to the $239,000 in sanctions that debtors believe King was sharing with Langley and Banack lawyers along with a cut from the $30,000,000 theft from the corrupted sale

55. Willfully, intentionally and knowingly ignored the provisions of the bankruptcy code and case law regarding the fact that § 363(m) renders appeals moot only to good faith purchasers, and therefore the purchasers who engaged in the fraud on the court and price-fixing and bid-rigging schemes are *not* protected under § 363(m), and thereby sanctioning the debtors $239,000 on clearly blatant and false testimony that the appeals prevented the purchasers from attaining a clean title policy when King knew it was the fraud scheme,  which could clearly be seen as retaliation on the part of the bankruptcy judge for exposing the corruption and new evidence of the corruption in the sale, and clearly appearing to protect the sale and the $30,000,000 skim to be split amongst those who facilitated the scheme

56. Willfully, intentionally and knowingly held Rozelle in contempt of court for refusing to name the names of every lawyer that even suggested reporting the facts and the evidence of the case to the FBI, and refusing to name the names of every lawyer that helped the debtors draft what Langley and Banack lawyers claimed were sophisticated pleadings that gave credibility to allegations of corruption in judge King's court. It was clearly an attempt to extort names of credible lawyers and witnesses for purposes of retaliation, as no other explanation was given for the badgering of Rozelle on the witness stand as a pro se litigant.

57. Willfully, intentionally and knowingly continued to smear the debtors as having an exaggerated opinion of value even after the trustees own broker, co-conspirator Walt Busby, testified he wasn't a surprise that the neighboring properties sold prior to the bid rigging scheme from ounce consistent with the debtors own fair market value appraisals

58. Willfully, intentionally and knowingly continued to support the sale price of $20.3 million even after all the evidence of fraud, collusion and corruption in the sale process by simply claiming that market value was proven by the fact that the sale was between a "willing seller and willing buyer", completely ignoring the requirement of arms length transaction knowing it was not an arms length transaction, and the fact that the trustee was clearly willing to conspire with the purchasers for a split of the $30,000,000 discount from fair market value as other bankruptcy trustees of been imprisoned for

59. Willfully, intentionally and knowingly continue to portray Robert Schumacher as an 'outsider' even after he and his lawyers were caught lying to the court in the sale process and the admissions that he, through Sanders, Sanders partner Walt Busby and trustee john Patrick Lowe had the inside track to the sale, and had even been following the case with purchaser Steve Sanders since 2012 if not before, and admitting he conspired with Sanders to purchase the property prior to the sale, yet only after caught red handed falsely testifying he had never met Steve Sanders until after the sale. King was clearly the still attempting to protect the corrupted sale and purchasers after the sale, and especially protecting the $30,000,000 take as though he had a monetary interest in continuing to lie about the sale

60. Willfully, intentionally and knowingly continued to portray Robert Schumacher and Steve Sanders as simply "shrewd businessmen trying to

make a living for their families" after all the fraud on the court had been revealed and protected by judge King

61. Willfully, intentionally and knowingly approving outrageous fee applications for the trustee and his professionals in light of the fact that the fees were procured for work done in furtherance of defrauding the bankruptcy estates of $30,000,000

### King's Falsified Findings at The August 27-28, 2014 Hearing on Stratford's Motion to Lift Stay

It should be noted that one of the predetermined purchasers and concealed from the public broker for trustee john Patrick Lowe, Steve Sanders of noteholder Stratford committed perjury at this lift stay hearing on August 27, 2014. Sanders was asked specifically if Stratford was a developer, and his answer was "Stratford is specifically not a development company"**(ecf 111@15-16).** However, Sanders self -published LinkedIn resume specifically states that amongst his job description at Stratford as **"specific responsibilities included all property acquisitions in the state of Texas, property sales, entitlement work, site development including major infrastructure and property management..." (ecf 505 exhibit A)**

It appears Sanders' falsified testimony at the lift stay hearing was designed to deflect attention away from the fact of what the debtors believe to be Stratford foreclosing on the property in order to develop for themselves and as well, the Valero/UTSA joint venture debtors discovered upon Clara Sommers death **(ecf 789@11).**

Sanders also publishes on the same LinkedIn page is education was four years at the University of Texas at Austin, with some versions stating he obtained a degree in economics. However, in deposition testimony before the UST in 2020, Sanders admits he graduated from UT Arlington with a degree in history **(ecf 985-6@7-8)**

While many puff up their resumes, Sanders most telling falsified testimony was that neither he nor Stratford ever approached the debtors for a joint venture agreement **(ecf 111@16-20)**. So Sanders is testifying that Stratford is specifically not a developer in any shape form or fashion, yet contradicted by his own publications, and now testifies neither he nor Stratford approach the debtors for a

joint development deal, whereby Stratford would be the developer in partnership with the debtors.

Two different bankruptcy attorneys suggested the debtors file their broker Susan Harris's marketing reports documenting the numerous instances where Sanders and Stratford are approaching the debtors through their broker for a joint venture agreement. Two different lawyers for the debtors – before they were scared off or bought off of the case (Smeberg now represents Busby) felt it was important to demonstrate not just the falsified testimony, but the fact that Sanders and Stratford had to know the debtors retained the marketing reports from broker Susan Harris, yet somehow, for some reason, felt very confident that none of the impeachment evidence would be brought before the court.

The common consensus was that long time bankruptcy lawyer Steve Cennamo was representing the debtors at the time that King and Sanders made what appears to be flagrantly false and coordinated testimony with Stratford lawyer Jim Hoffman. It could appear that Cennamo could be counted on to allow Sanders and King to freely make any misrepresentations or falsified findings of fact with impunity, as it is apparently the unspoken and unwritten rules of the bankruptcy bar that you don't expose falsified findings of fact, and apparently Sanders was protected under this umbrella as well.

The cleanest copies of the marketing reports and emails between the broker and Steve Sanders were electronically filed by Ron Smeberg **(ecf 240-8)**, and in fact, the very first marketing report from Susan Harris relayed that:

> "On 8/26/13: "Discussed my listing of the property and Stratford's position as the lender. Steve suggested that if the ownership is looking for a development partner, they consider Stratford, which already has a firm understanding of the property's characteristics and position in the market. If such a partnership were to be negotiated, it would have to be initiated by the ownership"

> "On 9/17/13: "Conveyed the lack of interest of JV with Stratford – Steve conveyed disappointment and frustration"

> "On 9/20/13: "Steve Sanders calls with his partner Brett Bishob on the line, and he recommends Beck Beckham at 3100 Monticello Ave. in Dallas

"10/25/13: Steve Sanders/Stratford land group –"Stratford would still consider a JV on the property and would take a meeting to discuss terms and expectations"

According to Harris, Sanders was attempting to use other companies closely related to either Sanders or Stratford as a front to tie up the property with either a joint development deal or hard money loan which could be foreclosed upon. From this point on, Harris had turned 180° and concentrated all of her efforts on steering the debtors to either Sanders and Stratford, or one of the related entities. As elsewhere in this report, she had even suggested the debtors hire Walt Busby as a consultant on the very first day she spoke to Steve Sanders, claiming she was unaware of their long-term relationship. It was clear she had been 'turned' or bought from the get-go, and attempted to use Busby as an 'information mole' for Sanders and Stratford operating from inside the debtors' camp.

There are other entries and emails within the same exhibit, but the debtors bring this up now as trustee John Patrick Lowe, who conspired with Sanders in the price-fixing and bid-rigging scheme, would later attempt to defend and cover-up Sanders and Stratford from their tortious interference by falsely testifying that Rozelle was a liar for even suggesting that Sanders had approached the debtors' brokers, or for suggesting there was evidence on the record of such **(ecf 650@94-97) .** This amounts to not only defamation, libel and slander, but perjury and fraud on the court in furtherance of covering up for a key aspect of the scheme – preventing the debtors from selling their property in order to throw them back into King's bankruptcy court, where they could finally perpetrate the price-fixing and bid-rigging scheme they had been waiting for, and under the guise of due process and also collect huge administrative fees on top of the $30 million skim.

According to one bankruptcy lawyer, Lorenzo Tijerina, he knew from prior experience that King could be bias, but had never seen judge king as bias and prejudice against anyone in his court as he was against Johnson and Rozelle. Following the August 27 and August 28, 2014 hearing on noteholder Stratford Land fund's motion to lift stay, the debtors counsel at the time Steve Cennamo absolutely refused to file a motion to reconsider judge king's a *sua sponte* order appointing a  trustee.  Cennamo's clients Johnson and Rozelle wanted to correct the record regarding judge King's falsehoods that appeared to be the very same style of false justification for appointing a trustee that they had seen back in 2012

with the Haynes and Boone forged document scam.  They also wanted to correct the record and expose king's bias and prejudice, which would in turn repair the damage done to their reputations by King's demeaning, disparaging, derogatory and defamatory findings against not only themselves but their property as well. Despite repeated requests, Cennamo finally emailed at 10 PM on the deadline date for filing the motion to reconsider, telling Johnson and Rozelle it would be **"an utter waste of time because judges hate to admit they are wrong, and King is not going to change his mind".**  It's what the debtors had heard from other lawyers as well regarding judge king – once he has prejudged the case, he never changes his mind. Even when there are mistakes made and the predetermined outcome is jeopardized by the truth, facts and evidence, king simply instructs the lawyers to find a way to justify the outcome.  Johnson and Rozelle fired yet another bankruptcy lawyer (#3), and Cennamo's firm (Malaise Law Firm) later filed for Chapter 7 themselves and disbanded.

Debtors immediately realized they had yet another bankruptcy lawyer unwilling to adequately defend their clients in judge King's court. There was clearly a pattern developing, and the common element clearly appeared to be that the debtors first counsel Wauson and Probus, as well as their second counsel Tutt and Brown, clearly appeared to be working only towards what and how the bankruptcy judge and the purchasers had pre decided the case.  In fairness to Cennamo, who is a capable lawyer, other lawyers as well as echoed that King believes he is above the law, pre- decides cases and simply colludes with attorneys on both sides to justify his desired outcome.  Most parties in interest are none the wiser that their own lawyers have colluded with the judge and the other side.

**When an attorney is telling their client that the judge has already made up his mind and there is nothing that can be done about it - other than contact the FBI - then the attorney is really defenseless to defend their client and should not even be charging any money for it. It puts the attorney in a precarious position because they are precluded from advocating for their client, and therefore the only choices are to take money from their clients trying to prosecute a case that the lawyer knows has already been decided against them, and cave in and do what the court tells them to do no matter what, which implicates the attorney in the fraud. The only other alternative is to simply walk away.**

The found another lawyer Lorenzo Tijerina, who was appalled at King's remarks in his falsified findings of fact of August 27 and August 28, 2014, and urged Johnson and Rozelle to draft an affidavit in support of his motion to reconsider. Tijerina emailed:

*"The abuse of discretion is an appellate standard and used to attack a judge's decision on appeal. So no need to overly concern yourself at this stage of the case. It will be raised on appeal. You can and should cite the derogatory remarks made by judge King to shore up your argument of prejudice against the debtors. Put in all you want concerning Kings prejudice; but, use words to the effect that the court "appears"," seems", "such action could be interpreted as being prejudice" etc. against the debtors. Sorry I did not return your calls today"* (ecf 721 Exhibit 1-A,@25)

Immediately following the last witness testimony at the August 28, 2014 hearing on Stratford's Motion to Lift Stay, King wasted no time in reading on the record from an extensively false 8 page **pre-scripted** findings of 'fact' **(ecf 112@123-131).** It clearly appeared to be drafted by either Broadway bank / Stratford lawyer Jim Hoffman, or Langley and Banack pulling strings from behind the scenes (they had yet to make a formal appearance in the case). The findings contained blatant misrepresentations of fact consistent with Hoffman and his future firm Langley and Banack, who along with former Langley and Banack lawyer Bill Kingman, would represent the predetermined purchasers in the 2014 price-fixing and bid-rigging scheme. The findings And clearly appear to have been designed to justify maligning the debtors and their property, but more importantly, lay an intentional foundation for the price-fixing and bid-rigging scheme to defraud the bankruptcy court estates for the private gain of the purchasers and the officers of the court.

This would in turn cover-up the actions of noteholders Broadway bank and Stratford in interfering with the debtors' attempts to sell property and pay off the note.  The debtors' counsel Robert Johnson had met with Hoffman in 2012 in an attempt to agree on a consensual plan of reorganization in the prior bankruptcy. The report back to the debtors from Johnson was that Broadway bank was telling King that the debtors themselves were to blame for not making any sales by refusing every offer, even though they knew they were stymied by a City Councilman and Valero political influence. The false narrative was also that the debtors were too hard in negotiations causing deals to fall apart. On top of that, Broadway was claiming the debtors were unrealistic about the value of their own property.

The debtors counsel relayed that Broadway and their lawyer Hoffman knew it was false, judge King knew it was false, and they knew the debtors of course knew it was false - but Broadway and King didn't care that it was a blatantly false

narrative because they didn't have to care – that was their court and their story and they were sticking to it in order to cover for the interference of Broadway Bank and their clients Valero, and UTSA, who had been after the property since 2004. At this time, Stratford was in negotiations for the note with Broadway Bank and had allegedly purchased the note, and Steve Sanders of Stratford was contacting the debtors' brokers already in attempts to buy them off or mislead them with misinformation. It's likely that the false narrative even prior to the 2014 bankruptcy was protecting Stratford as well, and it was definitely protecting Stratford during the 2014 bankruptcy.

§

## Judge King's Falsified Findings of Fact Of August 28, 2014
## The Setup/Pretext to The Scheme

The following misrepresentations and falsified findings of fact by judge King at the August 28, 2014 hearing on Stratford's motion to lift stay followed Broadway bank and Hoffman's exact talking points. They are first listed by bullet point below with explanations of just how egregiously false they were. It has to be remembered as well that King either knew or had to know that like Sanders' falsified testimony the prior day, King's false allegations and derogatory remarks against the debtors and their property would not be challenged with the truth by the debtors' bankruptcy attorney. It's what's known as a 'drive-by' or 'hit and run' smear campaign whereby King apparently felt in this case, the debtors' hands were tied from defending themselves with the truth, and he was there for free to make whatever misrepresentations were needed in furtherance of the scheme.

**King**: claimed the debtors 114 acre property was at the intersection of IH 10 and De Zavala Road **(BankDoc.112@123).** What he does get correct, and clearly on Hoffman and King's radar, is that "It's a prime development area in northwest San Antonio. It's near the University of Texas at San Antonio. It's near corporate campuses such as Valero."

**Truth:** while not one of the most significant misrepresentations, it inaccurately describes the property location with regards to De Zavala Road, and demonstrates the sloppiness, recklessness and cavalier attitude taken towards the pre-scripted findings of fact. They didn't need to fact check even the most simplest of facts in a pre-decided and prejudged case. The property is at the intersection of IH 10 and

bounded to the north by UTSA Boulevard and to the south by Hausman Road – not De Zavala Rd. De Zavala Road is roughly a mile further to the south of the property where the debtors' family had sold another 150 acres back in the 1970s. Hoffman would have easily gotten confused as he had represented Clara Sommers, the debtors' mother and grandmother in 1990 when Sommers had to foreclose on a group of developers that had for 10 years continually defaulted unable to pay for the same 114 acre property in the 2014 bankruptcy. This was just another in a long line of conflicts of interest that went ignored by the court and the bankruptcy lawyers.

While technically not anything to get excited about, it exemplifies the fact that there was never any real effort in the frame up/set up and implementation of the price-fixing and bid-rigging scheme to even read the pleadings or the transcripts to even get the correct address. It's clear that the important factor in the location was being near Valero and the University of Texas at San Antonio, who King and Hoffman knew to be the driving forces behind driving the debtors into bankruptcy to finally conclude their development plans on the property – perhaps now with Stratford as their developer. It is consistent with judge's acting 'above the law' to the point of not having to concern itself with the trivial little matters such as actual evidence or facts, regardless of how large or small. The important thing is that Valero and UTSA want the property.

§

**King:** "[the debtors] inherited the property in 2005. **(ECF 112@123)**

**Truth:** the debtors inherited part ownership in the property in 1990, and inherited Clara Sommers interest in 2005 upon her death. Debtors had previously sold 47 acres of the 170 acre parent tract prior to inheriting the remainder of the property in 2005, which left 116 acres.

§

**King:** "all they did was sell one little 2 acre tract to Valero" **(ECF 112@124).**

This was the repeated mantra of Broadway bank and Hoffman – and now Stratford, who allegedly purchased the note from Broadway in 2012 and retained Broadway's talking points and bankruptcy lawyer Jim Hoffman as their counsel. They falsely accused the debtors of simply "refusing to sell their property" and accused them in pleadings of holding out for the highest possible price, and now apparently given the false narrative to King to promote as his own finding of actual fact.

While King does acknowledge "the market declined", he nonetheless omits mentioning that the 3 year loan and note was taken out *at the time the great*

*recession hit*. The mantra '*all they did was sell one little 2 acre tract to Valero*' has been repeatedly used by King and his cronies in Broadway bank's pleadings combined with false accusations that the debtors simply "refused to sell".

Broadway bank had eventually admitted to the debtors that they made the three-year loan simply to allow the debtors to sell their property to Broadway client Valero, *but without Frost bank forcing them to sell it to Valero for $13 million*. Broadway had even suggested to Rozelle that that despite a 2009 appraisal of $44 million – $49 million **(ecf 85-6, 85-7)** if the debtors would sell the property to their client Valero for $20 million they would "still be millionaires". The main efforts were to force the debtors into selling to Valero for their joint venture with UTSA, who were undoubtedly the driving forces behind forcing the debtors into bankruptcy to begin with **(see Frost Bank/Valero/UTSA/Reed Williams)**. In fact, one appraiser testified before Judge King that in researching his information and comparable sales from the brokers community that *"all I know is the word on the street is that this piece is going to Valero no matter what"…. "That's the scuttlebutt. I can't get anybody to come testify next to me on that. But conversations with other realtors and other brokers lead me to believe that this has a – – I don't know how to put it – – a pox on it. It is for Valero. They made the first offer of $25 million and somehow every deal gets stepped on."* **(ECF 989-6@111).**

Walt Busby, the real estate broker for noteholder Stratford who would then sell the property to Stratford's Steve Sanders for $20.3 million as the trustee's 'disinterested' broker ' admitted in 2016 under cross-examination by Rozelle that he had partnered with longtime developer Brad Galo in purchasing the 98 acre tract of raw undeveloped land across IH 10 from the Johnson and Rozelle property in 2006, paying $45 million, *and only being able to sell a 2 acre tract themselves to the Cheddars restaurant chain before having to give up that property during the great recession* (ecf 681@38).

So these are two alleged big-time developers who couldn't do any better than the debtors – or anyone else for that matter - during the recession, but king wants to smear the debtors for real estate hardships during the recession. The hypocrisy is evident, of course, but even more so, the trustee's own broker Walt Busby was cornered into admitting to purchasing a neighboring 98 acre tract of raw land in 2006 of $45 million, *yet he and the trustee sold the premium 114 acre Johnson and Rozelle bankruptcy estate property to Busby's partners Sanders and Schumacher for $20.3 million in 2015 when real estate prices were back to an all*

*time high, and in a clearly corrupted and tainted bankruptcy price-fixing and bid-rigging scheme littered with fraud on the court.*

§

**King:** "So Broadway bank extended the loan several times. Still nothing happened." **(ecf 112@124)**

**Truth:** This is also a repeated mantra designed to make loan to own Broadway look like a saint. **However,** Broadway *only* extended the loan while debtors were in contentious negotiations with Valero for the 2 acre tract King referenced, and also while other purchasers under contract for another tract were fighting a Valero backed city councilman acting as a gatekeeper to prevent the debtors from selling to anyone but Valero. Valero was being extremely irrational and unreasonable in demanding blanket drainage and access easements over the remainder 114 acres, which Broadway bank was made very much aware of by the debtors.

At the same time, the debtors were under contract for a separate 12.8 acres of the property to Campus Crest, who had to fight against Valero owned City Councilman Reed Williams – the single vote preventing this and other sales from closing due to being contingent on rezoning. King knew very well from prior testimony that city staff, planning department and the zoning commission had unanimously approved multi-family and high density development on the property and there were no objections from neighboring homeowners but for nefarious reasons (Valero), the City Councilman who had been politically backed by Valero and Broadway bank, and a preferred private banking client of Broadway bank, suspiciously attempted to keep zoning on just the Johnson and Rozelle property *as low as possible*, and thereby taxing revenue for the school districts and hospitals as low as possible.

As even King had relayed in his findings, the property is literally surrounded by high end commercial, office, retail and multifamily developments including the divisional headquarters of the five-story Federal Bureau of Investigation that literally overlooks the 114 acre property. It should also be noted here that Reed Williams had initially given his full support to Campus Crest's request for multifamily zoning on the debtor's property – until the debtors refused Valero's insistence on blanket drainage and access easements over the remainder of the debtor's property for the sake of their purchase of a 2 acre tract (see herein) as a means of controlling the entire property. The following day Reed Williams *pulled his support* for Campus Crest without explanation – but none was needed, as Campus Crest lawyers and zoning attorneys, as well as the debtors, their lawyers,

engineers and land planners all understood completely the game that was being played.

The idea was apparently for Valero to lock in total control of the entire property with restrictive easements, where they, rather than Williams, could restrict future development and control the property.  Williams was apparently the backup plan.  The blanket drainage and access agreement that Broadway and Valero were pressuring the debtors into accepting for an extension of the Broadway bank loan amounted to coercion and extortion.  Have the debtors been stupid enough to sign it, Valero would have control over development over the debtors remaining 114 acres.  It was clear to the debtors and their professionals, being their engineers, land planners and real estate lawyers that this was simply 'pay back' for the family's refusal to sell to Valero for $13,000,000.  It had begun back with 96 year old Clara Sommers, who could see through different scare tactics of brokers approaching her on behalf of Valero, and her own estate planning lawyer attempting to pressure her to either sell or donate the property to Valero and or UTSA.  When Clara Sommers refused to sell to Valero or donate the property to UTSA, Sommers' own lawyer began calling her daughter, Clarita Johnson, attempting to get her to at least agree to sell or donate the property or prompt her mother to do so.

In fact, King heard this testimony from Johnson to the

The lawyer had even admitted later during the Sommers probate estate that Valero and UTSA were the making a joint bid proposal **(ecf 789@11)**.

In 2005, immediately upon Clara Sommers death, Frost bank had attempted to pressure Johnson and Rozelle into selling the property for $13,000,000 to Valero for their joint venture with UTSA.  It was later discovered that Valero's engineers had even trespassed on the property doing extensive engineering, feasibility and environmental studies dating back to 2004 without the property owners knowledge or consent.  The debtors then insisted that Frost bank disclose any and all conflicts of interest with Valero **(ecf 789@12)**, leading to the resignation as administrators of the estate **(ecf 789@13)**.

Regarding the blanket drainage and access easements Valero would later attempt to pressure the debtors into signing, debtors Counsel Richard Moore of Jackson Walker wrote to the debtors:

> *"On the subject of drainage, you should certainly not agree to give a blanket easement for drainage across your entire remaining tract as appears to result under subsection 2.2 of the ECR and section 3.4.2 C of the PSA. Surely, there is no reasonable expectation by Valero that you would grant such a blanket easement and thereby adversely impact and limit*

*developability of the vast majority of your land to such an extent."*
**(ecf  959-8 Exhibit H@1-6)**

The same lawyer would also write:

*"It does seem to me that when you and Pete get into serious negotiations*
*with Valero, that Valero shifts its positions and that as time passes it gets*
*progressively more difficult to achieve a fair solution in the negotiations.*
*My initial impression was that Mr. Otto and Valero were serious and*
*straightforward, but the further these negotiations continue, the more I*
*understand your and Pete's wariness."* **(ecf 959-8 Exhibit H@1-6)**

In fact, Valero's apparent motivation to somehow tie up the property lead them to another tactic of attempting to file a master development plan for the debtors, which was seen as a way to get their claws into the property by hook or by crook.  In fact, when Rozelle first began his due diligence in the property in 2005, the city planning department identified the property is already belonging to Valero, even after Rozelle had made clear he was not speaking of their corporate campus next door.   Apparently Valero had already made plans with the planning department to get the property, perhaps believing they could have pressured 96 year old Clara Sommers into selling or donating the property,  but the plans were never shown to the debtors.

In fact, the debtors were advised that tying up the entire property with a sales contract with Valero, or anyone else for that matter, could lead to getting strung out into a foreclosure or bankruptcy situation, as multibillion dollar developers could keep the property tied up in litigation the regardless how frivolous.

When the debtors would not sign the ridiculous access easement agreement from Valero, Valero apparently called upon Reed Williams to restrict development on the property through his lone vote on any rezoning requests from any purchasers, and Williams was a Valero company man as well as a preferred private banking client of noteholder Broadway bank.  As it was, Williams clearly looked as though he had been bought and paid for like Valero purchases other city Council members in other places.

# ÎNDEPENDENT
WHERE BENICIA CLICKS

The Benicia Independent ~ Eyes...

**BENICIA ELECTIONS, PROGRESS FOR BENICIA PAC, VALERO PAC**

## VALERO PAC FLOODS BENICIA WITH MISLEADING MAILERS UNDER NEW NAME

OCTOBER 28, 2022 | ROGER STRAW



888888888888888888888888888888888888888888888888888888888888888888888888

# ÎNDEPENDENT
WHERE BENICIA CLICKS

The Benicia Independent ~ Eyes...



**BENICIA ELECTIONS, VALERO PAC**

## VALERO'S 2018-2022 BIG-MONEY EFFORT TO CONTROL BENICIA CITY COUNCIL

SEPTEMBER 28, 2022 | ROGER STRAW

As well-known zoning attorney Ken Brown and others informed the debtors, Reed Williams was instructing city staff to vote against *any* higher density zoning

on the Johnson Rozelle property even on a newly formed community- based overlay plan, the North Sector Plan. City staff had already agreed that the property deserved to be in a higher tier mixed-use development zone combining commercial, retail and multi-family through conversations and a meeting between city staff, the debtors and their land planner Duane Hutson. This was foiled when the planning department presented the proposed change to Reed Williams, who rejected it and was actually lobbying other city staff against Johnson and Rozelle's prospective purchasers having any higher zoning on their property. According to Ken Brown's email on 7/14/2010:

> **"Pete**
> **The planning commission voted today to postpone their decision on the sector plan for two weeks, so there is some additional time to work with staff on the designation of  your property. However, we learned today that Councilman Williams has directed city staff to not make any changes to the designation of this particular property and keep the land-use intensity as low as possible."**                    (ECF 721 Exhibit B@9-10)

As documented elsewhere in this report and had been made clear to judge King in the debtors' 2011 disclosure statement and in testimony since, Williams was clearly doing Valero's dirty work to prevent the debtors from paying off the note and leading them to foreclosure. The developers and lawyers for Campus Crest felt sure that Valero and Broadway Bank were behind the now translucent efforts, as Broadway bank would only extend the note so long as the debtors:
1) closed on a 2 acre sale to Valero and;
2) revealed any and all inside information they had concerning the lobbying efforts and legal strategies of Campus Crest and their lawyers to circumvent Reed Williams vote against any rezoning of the debtor's property.

According to Broadway bank, they needed Campus Crest's inside information from the debtors "to assure the Broadway bank board members that there was a workable strategy to circumvent Williams in order to extend the note", but according to Campus Crest lawyers, they believed that the information was going straight to Reed Williams and Valero in order to pay off any opposition to Williams. In other words, Broadway bank wanted to give the appearance of working with the debtors by extending the note while in reality, working against them and their purchasers/developers in order to help Williams and Valero restrict rezoning in order to allow Broadway to foreclose on the coveted property. Broadway would

later become entangled in a messy money-laundering investigation regarding one of its other clients, former Mexican politician Humberto Moreira, in which Broadway was helping move millions of dollars in cash to foreign bank accounts for their client.

It should also be mentioned here, that the debtors have been blamed for failing to get their zoning and bring sales, when the bankruptcy court knew very well that the debtors *never* attempted to get any rezoning on their property by themselves and in fact, never at all. *The truth is, the debtors were soundly advised to leave this up to the purchasers/developers, who had teams of highly qualified zoning lawyers both nationally and local that had never met the illogical and unreasonable resistance to their multifamily developments anywhere in the country like they did with Reed Williams.* According to Campus Crest, there were clearly other 'dark forces' working behind the scenes with an incredible amount of political clout and power, and it was no secret that Valero and UTSA wanted the entire property intact – as that is evidently the way they had it planned for years to obtain the property – even trespassing on the property doing extensive engineering and feasibility studies without the property owner's knowledge or consent. As Frost Bank had admitted, naïvely believing they could pressure Johnson and Rozelle into selling the property to Valero $13 million through the Sommers state in 2005, it was the bank's understanding that it was to be a joint offer from both Valero and the University of Texas at San Antonio.

Just like brokers had explained to Rozelle, Stratford was only interested in purchasing the note from Broadway so long as the entire 114 acre tract was kept intact, thereby revealing the motive in interfering with student housing sales for the 12.8 acres and other tracts from interested purchasers – Strafford, Sanders and Schumacher already had plans for that tract to develop for themselves, while apparently planning UTSA administrative building on other portions. In fact, they have now developed what is now 1000 units of student housing where Reed Williams and Valero's political machine / public relations campaign put out false stories that neighbors were opposed to student housing on the property **(see herein)** In fact, once Steve Sanders of noteholder Stratford and his partners Busby and Schumacher obtained the property through the bankruptcy court's price-fixing and bid-rigging scheme, their very first development was four-story student housing ***on the exact location the debtors had contracted with Campus Crest for their student housing development*** that Reed Williams had opposed. They later developed even more student housing – the same student housing that Reed Williams had falsely claimed neighbors opposed.

In fact, Sanders, Schumacher and Busby – the bankruptcy trustee John Patrick Lowe's 'disinterested' broker in the scheme – essentially took all of the engineering studies and land planning from the debtors and developed as their own, all the while the trustee and his counsel Pat Autry of the Branscomb law firm falsely claimed the debtors had done nothing with respect to land planning or engineering studies needed to sell or develop the property.

Judge King stating that the debtors were in over their heads trying to develop the property blatantly and falsely omits the fact that it was very expensive developers and zoning lawyers that failed in getting the zoning. Likewise, King's falsified findings paints a picture of debtors trying to sell property by themselves without any brokers, when King knew otherwise, and signed the order approving The Cantrell Company as commercial real estate brokers for the debtors on January 14, 2012. **(11-53132rbk, ECF 50)** In fact, as Rozelle testified just the day before on August 27, 2014, the debtors had three brokers working for them during the first bankruptcy **(ECF 111@115)** Blaming the debtors for failing to get any rezoning on their property was all a part of the false narrative implying that the debtors were incompetent and in over their heads in trying to sell their property.

 **King Deception:** Regarding the first bankruptcy, "after about 10 months of negotiations and hearings, and so forth, and no action to sell any of the property, other than the debtors internally, there were no sales ever presented to the court" **(BankDoc.112@124)**

**Truth:** To state there were no action by the debtors or their brokers to sell the property is blatantly false, as is the falsehood that no sales were presented to the court. King knew or had to know this is false and easily proven false – but also knowing the debtors' counsel knew better than to raise any objection or motion to reconsider based on King's misconduct. If his memory was faulty, all he had to do was actually review the record that he claims he did. King is clearly in violation of the Rule 9011 requirement to make reasonable inquiry regarding his false allegations and contentions. These are his findings of fact, and even if he's being misled by whoever drafted them, then that's on King for not doing his own work and checking his own findings or thinking for himself – all he had to do was look at the record. The debtors' brokers were working to sell the property, as were the debtors themselves by making contact with developers to help their brokers.

Furthermore, a fully negotiated contract with Tonti Development for 12.8 acres was presented and admitted as evidence to the court **(ECF 989-6 exhibit F @194-195)**. It was fully executed and in the title company. Jim Hoffman even

committed fraud on the court over the Tonti contract, falsely claiming it was none other than Campus Crest in disguise to imply that since Reed Williams prevented Campus Crest from obtaining multifamily zoning, so too would Tonti. Hoffman's lie also implied that the debtors were being less than forthcoming, and apparently meant to provide false justification for the appointment of John Patrick Lowe as trustee back in 2012 — oddly enough, when Walt Busby obtained his broker's license and when by Busby's own affidavit, Busby and Sanders' partner Robert Schumacher was also following the bankruptcy case **(ECF 390-1@8)**. King had to remember the Hoffman fraud on the court attempting to squirrel the Tonti deal because the issue came up again just the day before on August 27, 2014 with extensive testimony and objections by Hoffman over having it heard on the record again and the debtors' admitting as evidence the emails to and from Tonti Development principals clearly upset over Hoffman's fraud on the court **(ECF 111@114-129)** The email to Rozelle and the debtors' broker Todd Franks reads:

> Pete/Todd,
>
> Tonti Properties is not affiliated with, working with, or working on behalf of Campus Crest in any way. Any statement indicating that Tonti Properties is working with Campus Crest in any capacity is 100% false.
> David Sukenik                                    **(ECF 721 Exhibit B@5-7)**

Again, **the email evidence was admitted just the day before King made the falsified findings (ECF 111@129).** Tonti ended up pulling out of their contract amid the false allegations of Broadway Bank/Stratford, and believed to be due to their belief that if officers of the court could freely make such fraudulent allegations designed to impede or interfere with their attempts to successfully zone their property, and make such false allegations without any sanctions or repercussions from the bankruptcy court of Judge King, then King himself would likely not approve any sale to Tonti. In effect, the gatekeepers in the case have been City Councilman Reed Williams, Broadway Bank, Stratford land, Judge King and Walt Busby as the broker for trustee John Patrick Lowe — and long time past, present and future partner to the eventual purchasers, all with King's approval.

It is simply implausible to believe the judge King had such memory problems as to forget the ***extensive arguments just the day before*** over Hoffman's fraudulent misrepresentations regarding Tonti as to falsely claim that the debtors took ***"no action to sell any of the property, other than the debtors internally, there were no sales ever presented to the court"*** it clearly gives the appearance of a

judge intentionally and willfully making flagrant misrepresentations about the debtors to imply they have not done anything to sell the property, and clearly appears to be covering up for the tortious interference by Broadway Bank and Stratford. Again, King appears to promote the tactic of the noteholders' preventing the debtors from selling and then blaming them for not selling.

More importantly, it clearly gives the appearance that the bankruptcy judge was simply reading off the talking points that the that had been fabricated by Broadway bank and Stratford lawyer Jim Hoffman.

Perhaps King and Hoffman suffer from the same memory problems, often called 'selective memory', as in the 2014 meeting of creditors, Hoffman claimed to have never heard of Tonti Development **(ecf 721 Exhibit B@2-4)** , even though he had made especially sure to spell it out on the record **"T-O-N-T-I"** while making his fraudulent statements to the court at the 2012 confirmation hearing, and which appeared to be in coordinated effort with the debtors' own bankruptcy counsel complicit in setting up their own clients for a trustee to be appointed in order to gain favor with the court and the bankruptcy racketeering ring:

> **Hoffman: okay. Now the buyer of this property that's under contract, have you had any discussions with the buyer? I think it's the name Tonti, 'T-O-N-T-I' [Hoffman spells it out]. Is that right David? (David Brown, Johnson and Rozelle's bankruptcy counsel)**
> **Brown: that was the general name. The contract I think is under a "CCC".**
> **Hoffman: <u>C</u>ampus <u>C</u>rest was the first purchaser for this property years ago and that deal didn't close, but you are aware of that?**
> **Galindo:  yes.**
> **Hoffman: okay. Tonti, as I understand it, is either part or is Campus Crest under this new offer. Are you aware of that?**
> **Galindo: yes.**
> **Hoffman: so you basically have the same people going in.**
> **(ecf 989-6 Exhibit F@15 )**

§

It should be pointed out that the witness, Mayo Galindo, was the debtors' zoning attorney. Although the debtors did not ever intend to do their own zoning, Galindo was on board simply as an advisor to help the debtors understand the process in negotiating contracts contingent upon zoning.

Galindo knew very well that Campus Crest was not Tonti in any shape, form, or fashion, and had advised Johnson and Rozelle that because they had a completely different product, it would eliminate any irrational arguments from Reed Williams that he didn't want three-story apartments going in on the debtor's property. It was irrational because they were three-story apartments surrounding the property, and Galindo had even suggested suing the city over the fact that Reed Williams was obviously in Valero's pocket to allow Broadway Bank to engineer a foreclosure. Reed Williams was the only standout making such outrageous and illogical arguments when city staff and zoning commission approved multi-family on the debtors' property unanimously **(ECF 989-4 Exhibit D) (ECF 989-5 Exhibit E)**

The debtors had asked Mr. Galindo immediately following his testimony why in the world he would agree with Hoffman's misrepresentations. His answer was that David Brown told him. Brown refused to respond to questions regarding, and soon after abandoned Johnson and Rozelle altogether following the hearing. Of all the bankruptcy attorneys turning on the debtors, apparently under pressure from Judge King, Johnson and Rozelle do not want to believe the Galindo was one of them. Galindo was elderly and suffering from some illnesses, and the debtors choose to believe he was simply misled by Brown, Hoffman or both. The debtors in front of their other professionals confronted Brown during the break, but Brown refused to respond. When Rozelle requested that Brown asked later under direct examination to clarify Hoffman's misrepresentation, Brown steadfastly refused, claiming it would amount to mudslinging that would irritate and anger judge King to the point of ordering the appointment of a trustee to liquidate the property. Rozelle informed Brown that he would bring it up himself to the court. Only then did Brown agree to ask Rozelle to clarify. **(ECF 989-6 Exhibit F@194-195).**

The fact that Rozelle had to argue against his own bankruptcy counsel Tutt and Brown on clarifying the record regarding Hoffman's misrepresentations only further indicated that it was a set up. Tutt and Brown had previously attempted to persuade Johnson and Rozelle to enter the confirmation hearing with no